Slip Op. 21-64

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **GUIZHOU TYRE CO., LTD., and GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,**<br><br>　　　　Plaintiffs,<br><br>**CHINA MANUFACTURERS ALLIANCE LLC, SHANGHAI HUAYI GROUP CORPORATION LIMITED, and QINGDAO JINHAOYANG INTERNATIONAL CO., LTD.,**<br><br>　　　　Consolidated-Plaintiffs,<br><br>v.<br><br>**UNITED STATES**,<br><br>　　　　Defendant. | **Before: Timothy M. Reif, Judge**<br><br>**Consol. Court No. 19-00032** |

## <u>OPINION</u>

[ Final Determination sustained in part and remanded in part. ]

Dated:  May 19, 2021

<u>Andrew T. Schutz</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY argued for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the brief were <u>Ned H. Marshak</u> and <u>Jordan C. Kahn</u>.

<u>Matthew P. McCullough</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC argued for consolidated plaintiffs China Manufacturers Alliance LLC, Shanghai Huayi Group Corporation Limited and Qingdao Jinhaoyang International Co., Ltd.  With him on the brief were <u>Tung Nguyen</u> and <u>Kimberly Reynolds</u>.

<u>Kara M. Westercamp</u>, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC argued for defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne</u>

E. Davidson, Director and L. Misha Preheim, Assistant Director.  Of counsel on the brief was Daniel Calhoun, Legal Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Phil (portrayed by Bill Murray):  "Rita, I'm reliving the same day over and over."[1]

* * *

Reif, Judge: This action arises from a challenge by plaintiffs, Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (together, "Guizhou" or "plaintiff"), consolidated plaintiffs China Manufacturers Alliance LLC ("CMA") and Shanghai Huayi Group Corporation Limited (formerly Double Coin Holdings Ltd.) ("Double Coin") (together, "consolidated plaintiffs"), and consolidated plaintiff Qingdao Jinhaoyang International Co., Ltd. ("Jinhaoyang") (all collectively "plaintiffs"), to certain aspects of the final results published by the Department of Commerce ("Commerce") of the underlying administrative review of the countervailing duty ("CVD") order on *Truck and Bus Tires From the People's Republic of China*, 82 Fed. Reg. 8,606 (Dep't Commerce Jan. 27, 2017) (final determination) ("Final Determination*)*, as amended by *Truck and Bus Tires From the People's Republic of China*, 84 Fed. Reg. 4,434 (Dep't Commerce Feb. 15, 2019) (am. final determination) ("CVD Order").  Commerce's findings accompanying its Final Determination were contained in an Issues and Decision Memorandum.  Department of Commerce's Issues and Decision Memorandum, PD 480 (Jan. 24, 2019) ("IDM").

---

[1] GROUNDHOG DAY (Harold Ramis/Columbia Pictures 1993).

Consol. Court No. 19-00032                                                    Page 3

Plaintiff and consolidated plaintiffs filed motions for judgment on the agency record challenging the CVD Order with respect to: (1) Commerce's issuance of the CVD Order; (2) Commerce's determination to apply adverse facts available to certain previously unreported grants and loans by Guizhou just prior to and at verification; (3) Commerce's decision to apply adverse facts available to the Export Buyer's Credit Program; (4) Commerce's calculation of benchmarks regarding ocean freight and import duties in relation to certain less than adequate remuneration ("LTAR") findings; and, (5) Commerce's use of Double Coin's import purchase prices as a benchmark for synthetic rubber and butadiene.  Mem. of Law in Supp. of Pls.', Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd., Mot. for J. on the Agency R., ECF No. 39 ("Pl. Br."); Consolidated Pls.' Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 41 ("Consol. Pls. Br.").  Jinhaoyang filed a separate motion for judgment on the agency record challenging Commerce's decision not to assign Double Coin's cash deposit rate to Jinhaoyang.  Jinhaoyang's Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 36 ("Jinhaoyang Br.").  Defendant United States ("Government") contends that the Final Determination is supported by substantial evidence and otherwise in accordance with law.  Def.'s Resp. to Mot. for J. Upon the Administrative R., ECF No. 49 ("Def. Br.").

For the reasons discussed below, the court is sustaining in part the Final Determination with respect to: (1) the issuance of the CVD Order and (2) Commerce's application of adverse facts available to the loans presented at verification.  The court is remanding in part the Final Determination with respect to: (1) Commerce's decision to

not assign Jinhaoyang a combination cash deposit rate; (2) Commerce's application of

adverse facts available to the grants presented at verification; (3) Commerce's

application of adverse facts available with respect to the Export Buyer's Credit Program;

(4) Commerce's adjustment of ocean freight and import duties; and, (5) Commerce's

selection of actual import prices as a benchmark for synthetic rubber and butadiene.

## BACKGROUND

On February 25, 2016, Commerce published its initiation of a countervailing duty

investigation on truck and bus tires from the People's Republic of China ("PRC").  The

period of investigation ("POI") was January 1, 2015, through December 31, 2015.  *Truck

and Bus Tires From the People's Republic of China*, 81 Fed. Reg. 9,428 (Dep't

Commerce Feb. 25, 2016) (initiation of CVD investigation).  Commerce selected

Guizhou and Double Coin as mandatory respondents and required Jinhaoyang, an

unaffiliated exporter of the subject merchandise produced by Double Coin, to participate

in Commerce's investigation.  IDM at 3,17; *see* Letter Pertaining to Comment on Final

Determination Regarding Cash Deposit Rate for Jinhaoyang at 2, PD 482 (Jan. 25,

2017).

Between April 15, 2016, and June 23, 2016, Commerce received responses from

the GOC and the mandatory respondents to Commerce's initial and supplemental

questionnaires, including information related to potentially countervailable subsidy

programs.  Department of Commerce's Preliminary Decision Memorandum at 3, PD 342

(June 28, 2016) ("PDM"); *see* Department of Commerce's Preliminary Affirmative

Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances

Determination, in part, and Alignment of Final Determination with Final Antidumping

Determination Unpublished Federal Register, PD 341 (June 28, 2016) ("Preliminary

Determination").  These programs included the Export Buyer's Credit Program ("EBCP")

and the Government Policy Lending Program.

Commerce also investigated the provision of four inputs for LTAR: carbon black,

nylon cord, natural rubber, and synthetic rubber and butadiene.  Commerce requested

information from the GOC regarding the specific companies that produced the input

products that Double Coin and Guizhou purchased during the POI.  Specifically,

Commerce asked the GOC for information that would allow Commerce to determine

whether the producers were "authorities" within the meaning of section 771(5)(B) of the

Tariff Act of 1930, 19 U.S.C. § 1677(5)(B).[2]  PDM at 9-10, 29.  Guizhou and Double

Coin reported that they purchased all four inputs during the POI.  *Id*. at 29.

I.     **Preliminary Determination**

On June 28, 2016, Commerce issued its Preliminary Determination.  Commerce

found, based on an analysis of monthly shipment data submitted by Double Coin and

Guizhou, that "critical circumstances exist with respect to imports of truck and bus tires

from the PRC for mandatory respondent [Guizhou]," Preliminary Determination at 3-4,

but that critical circumstances did not exist with respect to exports from Double Coin

and all other producers or exporters.  PDM at 7-8.  Commerce assigned a preliminary

rate of 17.06% for Double Coin, a rate of 23.38% for Guizhou, and an all-others rate of

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, 2012 edition.

20.22%.  Preliminary Determination at 5.  Jinhaoyang was not included in the rate

assigned to Double Coin.  *Id*.

     A.    <u>LTAR Benchmarks</u>

Commerce found that the GOC did not act to the best of its ability in responding

to Commerce's requests for information about the ownership of the suppliers of carbon

black, nylon cord, natural rubber, and synthetic rubber and butadiene.  Commerce

found that the GOC did not provide any information on the record for Commerce to

"analyze for purposes of determining whether [the input suppliers] are under the

management or control of the GOC."  PDM at 10.  Consequently, Commerce applied

adverse facts available ("AFA") to find that these suppliers were "authorities" within the

meaning of 19 U.S.C. § 1677(5)(B), and as such, the provision of carbon black, nylon

cord, natural rubber, and synthetic rubber and butadiene constituted a financial

contribution under 19 U.S.C. § 1677(5)(D)(iii).  *Id.* at 29.

Because Commerce determined that the input suppliers were "authorities,"

Commerce also found that prices from the suppliers did not constitute market-

determined prices.  *Id.* at 23.  Thus, Commerce turned to comparative benchmarks for

determining whether a government good or service was provided for LTAR.  In

determining benchmarks for carbon black, Commerce preliminarily found that the

domestic market for carbon black was distorted and relied on world market prices as the

Tier 2 benchmark.  *Id.* at 23.  For nylon cord, Commerce preliminarily relied on Chinese

import prices as the Tier 1 benchmark.  For natural rubber and synthetic rubber and

butadiene, Commerce looked to actual monthly weighted-average import prices of

natural and synthetic rubber reported by respondents during the POI as a basis for calculating Tier 1 benchmark prices.  *Id.* at 24.

For all of these inputs, Commerce preliminarily included, when it considered that it was necessary, ocean freight and inland freight charges that would have been incurred to deliver the input to the respondents' production facilities.  *Id.* at 30.  The benchmark prices were then compared to respondents' reported purchase prices for individual domestic transactions, including VAT and any delivery charges.  *Id.*  Based on this comparison, Commerce preliminarily found that all four inputs were provided for LTAR.  *Id.*

### B.    Government Policy Lending

Commerce preliminarily found that there was a program of preferential policy lending specific to producers of truck and bus tires.  Commerce found that the loans from the state-owned commercial banks ("SOCBs") under this program constituted a financial contribution pursuant to 19 U.S.C. § 1677(5)(B)(i) and 19 U.S.C. § 1677(5)(D)(i), because the SOCBs are authorities.  *Id.* at 27.

### C.    Export Buyer's Credit Program

Commerce preliminarily determined that the EBCP provided no benefit to Double Coin and Guizhou based on their self-reporting that their customers did not use the financing available under the program.  *Id.* at 40.

II.    **Final Determination**

In its IDM, Commerce addressed arguments from the GOC, Guizhou and Double Coin regarding the Preliminary Determination on LTAR benchmarks, Government Policy Lending Program and the EBCP.

      1.    <u>Less Than Adequate Remuneration Benchmarks</u>

Commerce continued to use world market prices as the Tier 2 benchmark for carbon black, Chinese import prices as the Tier 1 benchmark for nylon cord, and respondents' import prices as the Tier 1 benchmark for natural rubber and synthetic rubber and butadiene.  IDM at 18-19.  Pursuant to Commerce regulations, past practice and prior court rulings, Commerce in the Final Determination continued to include freight and actual prices in the benchmarks, relying on data from Maersk for ocean freight rates.  *Id*. at 37, 39.

      2.    <u>Government Policy Lending</u>

Commerce conducted verification of Guizhou from November 14, 2016, through November 18, 2016.  Department of Commerce's Memorandum Pertaining to Guizhou Tyre's Verification Report at 1, CD 406; PD 449 (Dec. 12, 2016).  In early November, just prior to verification, counsel for Guizhou informed Commerce of loans that the company had not identified in its questionnaire responses.[3]  IDM at 13.  At that time,

---

[3] Commerce records indicate that this communication occurred on November 8, 2016, Department of Commerce's Memorandum Pertaining to Conversation with Counsel for Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016), while Guizhou maintains that counsel

Consol. Court No. 19-00032                                            Page 9

Commerce informed Guizhou that Commerce would not accept the information at

verification.  Department of Commerce's Memorandum Pertaining to Conversation with

Counsel for Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016).  At verification, Guizhou

presented information on a number of grants that the company had not identified in its

questionnaire response.  IDM at 15.  Commerce determined that Guizhou had failed to

cooperate to the best of its ability and applied AFA to find that the unreported loans and

grants constituted countervailable subsidies.  *Id.* at 14-16.

> 3.    Export Buyer's Credit Program

Commerce found that the GOC did not respond to Commerce's questionnaire

with respect to the EBCP.  In particular, the GOC refused to provide information to

Commerce, including answers to questions regarding the involvement of third-party

banks in the program, that Commerce considered essential to verifying the respondents'

claims of non-use.  *Id.* at 12.  As a result, Commerce was unable to verify the

respondents' claims and changed its Preliminary Determination, which had been based

on those claims.  *Id.* at 12-13.  Accordingly, Commerce used AFA to find that there was

a benefit for both Double Coin and Guizhou and assigned a subsidy rate based on AFA.

*Id.* at 11-13, 20.

Commerce assigned final rates as follows: a rate of 38.61% for Double Coin,

65.46% for Guizhou, and 52.04% for all others.  *See* Final Determination.  No rate was

---

called Commerce on Tuesday, November 1, 2016, to notify Commerce of the bill
discounting.  Letter Pertaining to Guizhou Tyre Request for Reconsideration, CD 350;
PD 433 (Nov. 11, 2016).

assigned to Jinhaoyang, consistent with the Preliminary Determination.  On February

15, 2019, Commerce published the amended CVD Order in the Federal Register and

issued an amended subsidy margin of 20.98% for Double Coin, 63.34% for Guizhou,

and 42.16% for all others.  *Truck and Bus Tires From the People's Republic of China*,

84 Fed. Reg. 4,434, 4,435 (Dep't Commerce Feb. 15, 2019) (am. final determination).

The amended CVD Order did not assign an individual rate to Jinhaoyang.  *Id.*

## STANDARD OF REVIEW

The court exercises jurisdiction to hear this appeal under 28 U.S.C. § 1581(c).

The court will sustain a determination by Commerce unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

Under the Tariff Act of 1930, as amended, Commerce will impose a

countervailable duty if: (1) Commerce determines that a foreign government or public

entity "is providing, directly or indirectly, a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported, or sold

(or likely to be sold) for importation, into the United States;" and, (2) the U.S.

International Trade Commission ("the Commission") determines that an industry in the

United States is materially injured or threatened with material injury, or the

establishment of an industry in the United States is materially retarded as a result of the

subsidized imports.  19 U.S.C. § 1671(a).  A subsidy is countervailable when a

government or any public entity within a territory or country provides a contribution to a specific industry and a benefit is thereby conferred.  *See* 19 U.S.C. § 1677(5)(B).

## DISCUSSION

Plaintiffs challenge Commerce's actions to: (1) issue the CVD Order immediately upon completion by the Commission of its determination on remand; (2) apply AFA to the loans and grants presented just prior to and at verification; (3) apply AFA to the EBCP; (4) calculate benchmarks measuring adequate remuneration for carbon black, nylon cord, natural rubber, and synthetic rubber and butadiene; (5) select actual import prices as a benchmark for synthetic rubber and butadiene; and, (6) decline to assign Double Coin's cash deposit rate to Jinhaoyang.

## I.      Commerce's Issuance of the CVD Order

After Commerce issued its Final Determination, the Commission issued a negative final injury determination, which was appealed to this Court.  *See* International Trade Commission's Notice of Remand Determinations, PD 511 (Feb. 12, 2019) ("Notice of Remand Determinations").  The Court remanded the Commission's original negative determination.  *See United Steel Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union v. United* States, 42 CIT __, __, 348 F. Supp. 3d 1328, 1339-40 (2018).  On remand, the Commission reversed itself and issued affirmative injury determinations.  *See* Notice of Remand Determinations.  The Commission notified Commerce of its remand determination and noted that the determination was subject to ongoing appeal before the Court.  *Id.*  After the notification by the Commission of its remand determination, Commerce issued the CVD Order.

*Truck and Bus Tires from the People's Republic of China*, 84 Fed. Reg. 4,434 (Dep't Commerce Feb. 15, 2019) (am. final determination).

Plaintiff seeks review of Commerce's CVD Order on the grounds that the issuance of the CVD Order was premature and contrary to law.  Pl. Br. at 44-45.  The Government argues that Commerce properly issued the CVD Order in accordance with the statute and Commerce regulations and that the issuance of the CVD Order was consistent with the Federal Circuit's decision in *Diamond Sawblades Mfrs. Coal. v. United States*, 626 F.3d 1374 (Fed. Cir. 2010).  Def. Br. at 13-15.  The court agrees with the Government and sustains Commerce's issuance of the CVD Order.

### A.    Legal Framework

19 U.S.C. § 1671e(a) governs the procedures of a CVD investigation.  The statute provides that "[w]ithin 7 days after being notified by the Commission of an affirmative determination under section 1671d(b) of this title, the administering authority shall publish a countervailing duty order . . . ."  19 U.S.C. § 1671e(a).  Commerce's regulations further establish that: "Not later than seven days after receipt of notice of an affirmative final injury determination by the Commission under section 705(b) or section 735(b) of the Act . . . the Secretary will publish in the Federal Register an 'Antidumping Order' or 'Countervailing Duty Order' that . . . [i]nstructs the Customs Service to assess antidumping duties or countervailing duties (whichever is applicable) on the subject merchandise, in accordance with the Secretary's instructions at the completion of each review . . . ."  19 C.F.R. § 351.211(b)(1).

Both plaintiff and the Government reference the Federal Circuit's decision in *Diamond Sawblades* as support for their respective arguments.  Pl. Br. at 44-45; Def. Br. at 13-15.  In that case, the Federal Circuit addressed the statutory interpretation of 19 U.S.C. § 1673e(a), which provides the procedures that Commerce is required to follow in antidumping ("AD") investigations.  *Diamond Sawblades,* 626 F.3d at 1378-1383.  The Federal Circuit held that "the statutory scheme imposes a mandatory duty on Commerce to issue antidumping duty orders covering the subject entries upon being notified of the Commission's final determination . . . ."  *Id.* at 1383; *see also* 19 U.S.C. § 1673e(a).  Accordingly, the Federal Circuit determined that the U.S. Court of International Trade ("USCIT") did not abuse its discretion in ordering Commerce to publish AD orders upon receipt of notice from the Commission of a final affirmative injury determination on remand despite the pending litigation challenging the Commission's remand determination.  *Diamond Sawblades,* 626 F.3d at 1383.

B.     **Positions of the Parties**

Guizhou claims that Commerce's issuance of the CVD Order was not in accordance with *Diamond Sawblades* and seeks to distinguish the present case in two respects.  First, Guizhou notes that the Federal Circuit affirmed the issuance of an AD order only after the USCIT affirmed the affirmative redetermination, not while the Commission's remand determination was still pending before the Court.  Pl. Br. at 44. Second, Guizhou concedes that "the [Federal Circuit] in *dicta* indicated that the correct statutory procedure would have been to issue the AD order beforehand," *id.*; however, Guizhou argues that this language "was not a holding of the case and accordingly such

dictum is not binding" on this Court.  *Id.* (quoting *Zoltek Corp. v. United States*, 672 F.3d 1309, 1320 (Fed. Cir. 2012)).

Guizhou argues that the court should reconsider the "ill-advised *dicta*."  *Id.* Guizhou maintains that because "all other trade redeterminations made on remand lack legal effect until affirmed by this Court," it is unreasonable for the CVD Order to have been issued before such affirmance.  *Id.*  Guizhou further claims that its argument is supported by the statutory language and judicial precedent.  *Id.* at 44-45. (citing 19 U.S.C. § 1516a, 1673d, 1673e; *Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990); *Hosiden v. United States*, 85 F.3d 589 (Fed. Cir. 1996)).  In sum, Guizhou argues that, notwithstanding the *Diamond Sawblades* dicta, the court should find that Commerce prematurely issued the CVD Order "to avoid an inefficient result whereby remand determinations are given effect prior to judicial affirmance."  *Id.* at 45.

The Government asserts that plaintiff's argument lacks merit.  The Government maintains that "the operative language pertaining to the issuance of [CVD orders] in 19 U.S.C. § 1671e(a) mirrors that of 19 U.S.C. § 1673e(a)," which the Federal Circuit applied in *Diamond Sawblades*.  Def. Br. at 15.  Accordingly, the Government argues that the holding in *Diamond Sawblades* applies to CVD orders.  *Id.*  In addition, the Government argues that 19 C.F.R. § 351.211(b)(1) applies to both AD and CVD orders and requires Commerce to publish the order upon "receipt of notice of an affirmative final injury determination by the Commission."  *Id.* (quoting 19 C.F.R. § 351.211(b)).

### C.     Analysis

Guizhou does not dispute the Government's claim that the relevant language for

CVD orders in 19 U.S.C. § 1671e(a) mirrors the language for AD orders in 19 U.S.C. §

1673e(a), which was at issue in *Diamond Sawblades*.  Pl. Br. at 44-45; Pls.' Reply Br.,

ECF No. 50 ("Pl. Reply Br.") at 19; *see Diamond Sawblades*, 626 F.3d at 1376-1381.  In

addition, Guizhou does not dispute that 19 C.F.R. § 351.211(b)(1) does not distinguish

between AD and CVD orders with regard to Commerce's obligations to publish an order

upon receipt of notice of an affirmative final injury determination from the Commission.

*Id.*  Rather, Guizhou seeks to distinguish the Federal Circuit's decision in *Diamond

Sawblades* from this case on the grounds that the Federal Circuit affirmed the issuance

of an AD order *after* the USCIT affirmed an affirmative remand determination, not during

ongoing litigation, as occurred here.  Pl. Br. at 44.  Plaintiffs assert that it was only in

dicta that the Federal Circuit stated that the correct statutory procedure is for Commerce

to issue an AD order *before* the USCIT rules on a remand determination.  *Id.*

To address this issue, the court turns first to the meaning and scope of dicta.

"Dicta*"* is an abbreviation for "obiter dicta," the singular being "obiter dictum."  *Dictum*,

Black's Law Dictionary (11th ed. 2019).  Obiter dictum is defined as "[a] judicial

comment made while delivering a judicial opinion, but one that is unnecessary to the

decision in the case and therefore not precedential (although it may be considered

persuasive)."  *Id.*  Obiter dictum includes "a remark made or opinion expressed by a

judge, in his decision upon a cause, 'by the way' — that is, incidentally or collaterally,

and not directly upon the question before the court . . . ."  *Id.* (quoting WILLIAM M. LILE ET AL., BRIEF MAKING AND THE USE OF LAW BOOKS 304) (internal citation omitted).  By contrast, *Black's* defines a "holding" as a "court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision" or a "ruling on evidence or other questions presented at trial."  *Holding*, BLACK'S LAW DICTIONARY (11th ed. 2019).

The Government argues that the Federal Circuit's holding in *Diamond Sawblades* is not dicta because the Federal Circuit addressed directly the issue of Commerce's statutory duty to issue AD orders upon being notified of the Commission's final determination.  Def. Br. at 15.  The court agrees with the Government.

In *Diamond Sawblades*, the Federal Circuit stated that the question before it was: "whether, in a case in which the Court of International Trade has remanded a negative injury determination to the Commission, and the Commission on remand has made an affirmative injury determination and notified Commerce of that determination, Commerce must issue antidumping duty orders and begin collecting cash deposits of the antidumping duties *while a challenge to the material injury determination is still pending before the courts.*"  *Diamond Sawblades*, 626 F.3d at 1378 (emphasis supplied).  The Federal Circuit held that the statute requires Commerce to issue an AD order "when the Commission issues a material injury determination, regardless of whether that determination is made in the first instance or on remand, and regardless of whether there is any subsequent judicial review of that determination."  *Id.* at 1381.

The Federal Circuit's statement was not an "incidental" comment or a judicial comment that was unnecessary to decide the case.  *See dictum*, BLACK'S LAW

DICTIONARY (11th ed. 2019).  Rather, the Federal Circuit's holding was a necessary

statement of the law to address the specific question presented in the case and as such

is not dicta.  The Federal Circuit stated clearly that the statutory scheme imposes a

mandatory duty on Commerce to issue an AD order upon notification of the

Commission's final determination, regardless of whether the determination is on remand

or subject to judicial review.  *See Diamond Sawblades*, 626 F.3d at 1381.  If the Federal

Circuit had limited its holding to affirming the sequence of events in the case (*i.e.*, the

issuance of the AD order after the USCIT affirmed an affirmative redetermination), the

holding would have been, at the minimum, an incomplete statement of the law.

Applying this same principle to the circumstances in this case, the court holds that

Commerce's decision to issue the CVD Order is in accordance with law.

## II.     Commerce's Application of Adverse Facts Available to Additional Loans and Grants Presented at Verification

On April 1, 2016, Commerce issued its initial questionnaire to the GOC,

requesting information from Guizhou and Double Coin related to the Government Policy

Lending Program.  Countervailing Duty Investigation of Certain Truck and Bus Tires

from the People's Republic of China: Countervailing Duty Questionnaire ("Initial

Questionnaire"), PD 122 (Apr. 1, 2016).  The petitioner alleged that, under this program,

the GOC "subsidiz[ed] producers of truck and bus tires through preferential loans at

interest rates that [were] considerably lower than market rates."  PDM at 26.

Commerce's initial questionnaire required company respondents to identify affiliated

companies by April 15, 2016, and to respond to program-specific questions by May 8,

2016.  Initial Questionnaire at 1.

On April 15, 2016, Guizhou submitted its response to Commerce's initial

questionnaire identifying affiliated companies.  Guizhou Tyre Affiliation Response,

barcode 3459832-01 (April 15, 2016).  On May 2, 2016, Guizhou sent a letter to

Commerce requesting an extension to submit its program-specific responses to the

questionnaire.  Guizhou Tyre Initial Questionnaire Extension Request, bar code

3465661-01 (May 2, 2016).  Commerce granted the extension in part and set a new

deadline of May 19, 2016.  Request for Extension for Initial Questionnaire Response,

bar code 3466094-01 (May 3, 2016).  Guizhou submitted its responses for the program

specific section of the initial questionnaire on May 20, 2016, after the deadline.  Guizhou

Tyre Program Specific Response, CD 210, 213; PD 238, 240 (May 20, 2016).

In its response, Guizhou reported having loans outstanding from SOCBs in China

during the POI.  *Id.* at 10-12; *see* PDM at 26.  Commerce's initial questionnaire also

requested that respondents report "other subsidies," including "any other forms of

assistance" from the GOC related to subsidy programs not alleged or identified in the

petition.  Initial Questionnaire at 19; *see* IDM at 15.  Guizhou answered that it had

identified 114 government grants from 2003 to 2015.  Guizhou Tyre Program Specific

Response at 45-46, Exhibit P.F.1., CD 210, 213; PD 238, 240 (May 20, 2016); *see* Pl.

Br. at 5.  On June 10, 2016, Commerce issued a second supplemental questionnaire.[4]

Department of Commerce's Second Supplemental Questionnaire for Guizhou Tyre, bar

code 3477665-01 (June 10, 2016).  In response to Commerce's second supplemental

questionnaire, Guizhou submitted a revised grant list.  Letter Pertaining to Guizhou

Tyre's Second Supplemental Response, CD 280, 300-301 (June 24, 2016).  In total,

Guizhou reported "around 180 grants" in response to Commerce's inquiries.  Pl. Br. at

5, 17.

On October 28, 2016, following Commerce's issuance of the Preliminary

Determination, Commerce sent its Verification Outline[5] to Guizhou, asking the company

to identify any errors in its questionnaire responses.  Department of Commerce's

Verification Pertaining to Guizhou Tyre, PD 420 (Oct. 28, 2016).  The Verification

Outline provided that the "verifiers will examine the errors to determine if they are minor.

Further, depending upon the nature of the errors that you identify (*e.g.*, the discovery of

unreported loans), you should contact the officials in charge prior to the start of

verification."  *Id.* at 7.

---

[4] Commerce issued its first supplemental questionnaire to Guizhou on May 6, 2016, to clarify Guizhou's responses to Commerce's initial questionnaire with regard to affiliated companies.  Department of Commerce's First Supplemental Questionnaire for Guizhou Tyre, bar code 3466800-01 (May 6, 2016).

[5]  The Verification Outline is an agenda sent by Commerce to respondents in advance of the verification.  The Verification Outline informs respondents about the nature of the verification process, including the relevant documentation Commerce will review and the personnel Commerce will ask to speak to concerning the respondents' questionnaire responses and other information on the record.

Prior to verification, Guizhou determined that it had not reported commercial bill exchange discounting, which is a type of loan and a part of a program known as Government Policy Lending.  Department of Commerce's Memorandum Pertaining to Conversation with Counsel for Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016).  In early November,[6] two weeks prior to verification, counsel for Guizhou informed Commerce about the new loan program.[7]  *Id.*; *see also* Pl. Br. at 6-7.  Commerce informed Guizhou that in light of the company's failure to report the loan information that Commerce had requested, it would not verify Guizhou's reported use of Government Policy Lending.  Department of Commerce's Memorandum Pertaining to Conversation with Counsel for Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016).  Guizhou objected to Commerce's decision.  *Id.*; *see also* Letter Pertaining to Guizhou Tyre Request for Reconsideration, CD 350; PD 433 (Nov. 11, 2016).

At verification, Guizhou presented information about the loans; however, Commerce declined to accept this information, maintaining Commerce's decision not to verify Guizhou's use of the program on account of Guizhou's failure to report this information in response to Commerce's initial or supplemental questionnaires.  IDM at

---

[6] *See supra* note 3.

[7] Guizhou explained that the discovered financing consisted of "bill discounting," which the company uses for "certain domestic sales wherein [Guizhou] received payment for goods sold by a commercial bill of exchange, which is a promise to pay in a specified amount of time.  Guizhou sold these commercial bills of exchange to the bank at a discount to receive early payment and the bank retained a small fee taken off the total amount of the bill of exchange."  Letter Pertaining to Guizhou Tyre's Request for Reconsideration, CD 350; PD 433 (Nov. 11, 2016).

13-14; Department of Commerce's Memorandum Pertaining to Guizhou Tyre's Verification Report at 2, CD 406; PD 449 (Dec. 12, 2016).

At verification, Guizhou also presented information about grants that were not reported in its responses to Commerce's questionnaires.  Department of Commerce's Memorandum Pertaining to Guizhou Tyre's Verification Report at 2, CD 406; PD 449 (Dec. 12, 2016).  Commerce also declined to accept this information.  *Id.*  Commerce did not accept information concerning the amount of each grant, the date that it was received or the program under which it was provided.  Letter Pertaining to Guizhou Tyre's Pre-Verification Corrections (Rejected), CD 387; PD 442 (Nov. 23, 2016); Department of Commerce's Memorandum Pertaining to Rejection of New Factual Information Filing by Guizhou Tyre, PD 445 (Nov. 29, 2016).  Instead, Commerce noted simply the receipt of "more than 40 grants."  IDM at 15; *see also* Department of Commerce's Memorandum Pertaining to Guizhou Tyre's Verification Report at 2, CD 406; PD 449 (Dec. 12, 2016).

Commerce subsequently applied AFA to these unreported loans and grants.  IDM at 13-16; Pl. Br. at 6-12.  Commerce applied an AFA rate of 10.54% to Guizhou's loans and used an AFA rate of 0.58% for each grant.  IDM at 15.  Because Commerce concluded that the record demonstrated that there were "more than 40" unreported grants, Commerce multiplied the 0.58% rate by 41, resulting in a 23.48% *ad valorem* rate.  *Id.* at 16.

A.     **Legal Framework**

During a countervailing duty proceeding, Commerce requires information from

the foreign government alleged to have provided a subsidy and the respondent

company alleged to have received the subsidy.  *See Fine Furniture (Shanghai) Ltd. v.*

*United States*, 748 F.3d 1365, 1369-70 (Fed. Cir. 2014); *see also Essar Steel*, 34 CIT

1057, 1070, 721 F. Supp. 2d 1285, 1296 (2010), rev'd on other grounds by 678 F.3d

1268 (Fed. Cir. 2012).  Information submitted to Commerce during an investigation is

subject to verification.  19 U.S.C. § 1677m(i)(1).

When a respondent (1) withholds information requested by Commerce, (2) fails

to provide such information by the deadlines established by Commerce for submitting

the information or in the form and manner requested, (3) significantly impedes

proceedings, or (4) provides information that cannot be verified, Commerce shall "use

the facts otherwise available in reaching the applicable determination under this

subtitle."  19 U.S.C. § 1677e(a)(2).  Commerce "may use an inference that is adverse to

the interests of that party in selecting from among the facts otherwise available" in

reaching a determination if Commerce "finds that an interested party has failed to

cooperate by not acting to the best of its ability to comply with a request for information."

19 U.S.C. § 1677e(b)(1)(A).  A respondent's failure to cooperate to "the best of its

ability" is determined by "assessing whether [the] respondent has put forth its maximum

effort to provide Commerce with full and complete answers to all inquiries in an

investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir.

2003).

When applying AFA, Commerce may use any information on the record,

including information in the petition, a final determination or a previous administrative

review.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)-(2).  Commerce is "not

required to determine, or make any adjustments to, a countervailable subsidy rate . . .

based on any assumptions about information the interested party would have provided if

the interested party had complied with the request for information."  19 U.S.C. §

1677e(b)(1)(B).

### B.      Positions of the Parties

Guizhou argues that Commerce should have accepted the information on grants

and financing presented at verification, and, as such, Commerce's refusal to accept the

information and Commerce's subsequent application of AFA to the subsidy programs

was not in accordance with law or supported by substantial evidence.  Pl. Br. at 14-41.

To support its claim, Guizhou puts forward four main arguments: (1) the grants were

"discovered" subsidies and Commerce's decision to reject the grant information

presented at verification, and subsequently to apply AFA, was contrary to Commerce's

regulations and past practice; (2) even if the grants are not considered discovered

subsidies, the grants together with the loans should have been accepted as "minor

corrections;" (3) Commerce's application of AFA to the grants and loans was

unsupported by substantial evidence; and, (4) even if AFA was appropriate, Commerce

failed to consider the statutory mandate of taking into account the totality of

circumstances in calculating the AFA rate.  *Id.*

### 1.      Discovered Subsidies

Guizhou presents two main lines of argument with respect to discovered

subsidies.  First, Guizhou asserts that the statute and Commerce's regulations provide

that if subsidy programs not alleged by the petitioner are discovered during the course

of a proceeding, Commerce has only two options for dealing with such programs —

either include and investigate the subsidies in the proceeding or defer the investigation

of the subsidies until a subsequent administrative review.  Pl. Br. at 16-18 (citing 19

C.F.R. § 351.311).  Guizhou maintains that Commerce has followed this approach for

discovered subsidies in prior reviews.  Pl. Br. at 19-21. Guizhou argues that the list of

grants presented at verification was "related to subsidy programs that had not been

alleged in this investigation," and, therefore, "represented 'discovered' subsidies."  *Id.* at

18.  Accordingly, Guizhou asserts that, in accordance with Commerce's regulation and

past practice, Commerce should have followed procedures set forth in 19 C.F.R. §

351.311 and either investigated the information on the grants provided at verification or

deferred investigation of the programs until a subsequent review.  *Id.* at 18-23.

On this basis, Guizhou disputes Commerce's finding in the underlying

proceeding that — by failing to report all of the grants in response to Commerce's

questionnaire requesting information on "other subsidies," including information on "any

other forms of assistance to your company" — Guizhou failed to provide timely

information, and, as a result, the statute permitted Commerce to include the grants in

the investigation and apply AFA.  Pl. Br. at 21 (citing IDM at 61); *see Id.* at 22-23.  *Id.*

Guizhou further argues that Commerce, by its own admission, had a practice

with respect to subsidies discovered at verification and that Commerce has changed its

practice since 2012.  Pl. Br. at 24-25 (citing IDM at 67); Oral Argument Tr. at. 9-10.

Guizhou argues that while Commerce is permitted to change the way in which it applies

its regulations, this authority is not without limits.  *Id.* at 24 (citing *Habas Sinai Ve Tibbi*

*Gazlar Istihsal Endustrisi A.S. v. United States*, 33 CIT __, __, 625 F. Supp. 2d 1339,

1351-1356 (2009); *Shikoku Chems. Corp. v. United States,* 16 CIT __, __, 795 F. Supp.

417, n.8 (1992)).  In particular, Guizhou submits that Commerce did not provide a valid

reason for its change in practice.  Pl. Br. at 24.  Accordingly, Guizhou asks the court to

conclude that, since that change is unexplained and is, therefore, arbitrary on its face,

Commerce's change in practice renders Commerce's Final Determination contrary to

law.  *Id.* at 23-25.

Guizhou's second argument is that Commerce can use facts otherwise available

pursuant to 19 U.S.C. 1677e(a) only if there is necessary information missing from the

record, thereby "creating a 'gap' on the record to be filled with facts available."  Pl. Br. at

32-33 (citing *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348

(Fed. Cir. 2011) (stating that "Commerce can only use facts otherwise available to fill a

gap in the record")).  Guizhou asserts that because the grants were not alleged in the

petition, the information regarding these grants was not "necessary information," there

was no gap in the record, and, therefore, Commerce's application of AFA to the grants

was contrary to law.  *Id.* at 35.

Guizhou argues that Commerce's position of requiring that respondents report all

unalleged subsidies through Commerce's "other assistance" question, and then

applying AFA if respondents do not comply and unalleged programs are later

discovered in the investigation, is contrary to law.  Pl. Br. at 33-34; Pl. Reply Br. at 6-7.

Guizhou asserts that 19 U.S.C. § 1671a limits Commerce's inquiry to the "four corners of its initial investigation," and does not include unalleged subsidies.  Pl. Br. at 33.[8]

In response to Guizhou's claims that Commerce in this case departed from a prior practice without adequate explanation, the Government asserts that the treatment of subsidies discovered at verification is a "fact-specific determination."  Def. Br. at 21. The Government denies that Commerce had a prior practice and states that: "Commerce has frequently relied on adverse inferences in making a finding on unreported potential subsidies discovered or 'presented' at verification."  Def. Br. at 21 (citing IDM at 16, 67; *Supercalendered Paper From Canada,* 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 12-13, 153-155*; Certain Frozen Warmwater Shrimp From the People's Republic of China,* 78 Fed. Reg. 50,391 (Dep't Commerce Aug. 19, 2013) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 15-16, 75-78); *see also* Oral Argument Tr. at 5-7. The Government argues that had Commerce accepted or deferred the subsidies presented at verification, as suggested by Guizhou, Commerce would have created a "disincentive for parties to report all of the government assistance received" in response

---

[8] Guizhou argues that initiation procedures under 19 U.S.C. § 1671a require that each subsidy program alleged in a petition be supported by sufficient evidence.  Pl. Br. at 34. Guizhou maintains that if respondents are required to report all unalleged subsidy programs, then "a petition would only need to include one sufficiently supported subsidy program in order to have Commerce initiate an investigation and then the burden would be on the respondent to report all unalleged subsidies received."  *Id.*  Guizhou asserts that such a result was not intended by Congress or the World Trade Organization.  *Id.*

to Commerce's questionnaires.  Def. Br. at 21.  The Government asserts that taking this

approach would have hindered Commerce's ability to consolidate all relevant subsidy

programs into a single investigation.  *Id*. at 20-21 (citing *Ansaldo Componeti, S.p.A. v.*

*United States*, 10 CIT 28, 36, 628 F. Supp. 198, 205 (1986)).[9]

        In response to Guizhou's second line of argument, the Government notes that

Commerce specifically requested that Guizhou report "all forms of financing outstanding

during the POI, not only traditional loans."  *Id.* at 18; *see also* Initial Questionnaire,

Section III at 9.  Commerce also asked respondents to report "other subsidies,"

including other forms of assistance.  Initial Questionnaire, Section III at 19.  The

Government maintains that this combination of both specific and broad requests is

necessary and appropriate to satisfy the mandate of the CVD law to investigate all

potential countervailing subsidies and "to consolidate all relevant subsidies into a single

investigation."  Def. Br. at 19 (citing *Allegheny Ludlum Corp. v. United States*, F. Supp.

2d at 1150 n. 12).  The Government argues that Guizhou's failure to provide full and

complete answers to Commerce's requests for information justified Commerce's

application of AFA in accordance with 19 U.S.C. § 1677e(b).  *Id.* at 22.

---

[9] Defendant cites to the section of the IDM that discusses discovered subsidies.
Commerce explained that it has an "affirmative obligation" to "consolidate in one
investigation all subsidies known by petitioning parties to the investigation or by the
administering authority relating to that merchandise" to ensure "proper aggregation of
subsidization practices."  IDM at 27 (citing *Allegheny Ludlum Corp v. United States*, 24
CIT __, __,112 F. Supp. 2d 1141, 1150 n. 12 (2000)).

### 2.    Minor Corrections

Guizhou next argues that even if the unalleged grants are not properly categorized as discovered subsidies, information about the grants, along with information about the bill discounting presented prior to verification, should have been accepted as "minor corrections" to information already on the record.  Pl. Br. at 25. Guizhou submits that, upon receipt of the information about the loans and grants just prior to and at verification, Commerce was required to examine the "errors" to determine if they were minor and include the proffered information in Commerce's Verification Report along with Commerce's assessment as to whether the information constituted a minor correction.  *Id.* at 26-27.  Guizhou notes that these procedures were followed by Commerce in five prior instances.[10]  Pl. Br. at 27-28.

Guizhou maintains that by rejecting — and "removing" from the record — all information offered as minor corrections, Commerce prevented Guizhou from presenting an effective argument to the court that the information was not new factual

---

[10] *Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) (final determination countervailing duty ("CVD") investigation) and accompanying Issues and Decision Memorandum at Comment 19; *53-Foot Domestic Dry Containers From the People's Republic of China*, 80 Fed. Reg. 21,209 (Dep't Commerce Apr. 17, 2015) (final determination CVD investigation); *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final determination CVD investigation); *Certain Polyethylene Terephthalate Resin From the People's Republic of China*, 81 Fed. Reg. 13,337 (Mar. 14, 2016) (final determination CVD investigation); *Certain Iron Mechanical Transfer Drive Components From the People's Republic of China*, 81 Fed. Reg. 75,037 (Oct. 28, 2016) (final determination CVD investigation).

information and was not required to be reported, or, in the alternative, that the grant and

loan information provided by Guizhou constituted corrections that were, in fact, minor.

Pl. Reply Br. at 11.  Guizhou argues that Commerce's rejection of the loans and grants

at verification is subject to judicial review and urges the court to consider the rejected

information, which Guizhou submitted in this proceeding in the form of the attachments

to its Memorandum of Law in Support of Judgment on the Agency Record, to determine

whether Commerce's decision was supported by substantial evidence.  Pl. Br.,

Attachments 1-4;[11] *see also* Pl. Reply Br. at 12-13 (citing *Eregli Demir v. Celik*

*Fabrikalari T.A.S.,* 42 CIT __, __, 308 F. Supp. 3d 1297, 1328 (2018)).

Guizhou concedes that Commerce has discretion to decide whether to accept

"corrective information" from respondents; however, Guizhou argues that if "Commerce

acted differently in this case than it has consistently acted in similar circumstances

without reasonable explanation, then Commerce's actions will have been arbitrary."  Pl.

Br. at 31 (quoting *Consolidated Bearings Co. v. United States*, 348 F.3d 997,

1007 (Fed. Cir. 2003)).  Guizhou notes that Commerce in the past has "contemplated"

and accepted similar grants and bill discounting as minor corrections.  Pl. Br. at 29-30.

Moreover, Guizhou asserts that "Commerce abuse[s] its discretion [when

it] refus[es] to accept updated data when there [i]s plenty of time for Commerce to verify

---

[11] In its Confidential Motion for Judgment on the Agency Record, Guizhou Tyre
submitted six attachments.  Two attachments are labeled "Attachment 1" and two
attachments are labeled "Attachment 2".

or consider it."  Pl. Br. at 31 (quoting *Papierfabrik August Koehler SE v. United States*,

843 F.3d 1373, 1384 (Fed. Cir. 2016) (citations omitted)).

The Government asserts that the new factual information proffered by Guizhou at

verification cannot be accepted as "minor corrections," as defined by Commerce's

Verification Outline, because the loans and grants do not "corroborate, support, and

clarify factual information already on the record."  Def. Br. at 19 (quoting the Department

of Commerce's Verification Pertaining to Guizhou Tyre at 2, PD 420 (Oct. 28, 2016)).

Accordingly, Commerce did not collect information on the loans and grants, noting that

the bill discounting and "more than 40 grants" were presented and rejected by

Commerce at verification.  *Id*. at 19 (citing IDM at 15).

The Government maintains that Commerce's decision to reject Guizhou's

untimely information was in accordance with law.  The Government argues that

Commerce is not permitted under its regulations to consider or keep on the official

record of the proceeding any factual information that the Secretary rejects as untimely.

Def. Br. at 18 (citing 19 C.F.R. § 351.302(d) and 19 C.F.R. § 104(a)(2)(iii)).  The

Government states that Guizhou informed Commerce about the loans "just prior to

verification" and "long after the deadline for submitting such factual information."  *Id*.

Similarly, the Government notes that Guizhou did not report certain grants in response

to the initial questionnaire and instead presented this information at verification.  *Id.* at

18-19.  As a consequence, the Government maintains that Commerce properly rejected

Guizhou's presentation of the grants and loans at verification because this information

was untimely and should have been included in Guizhou's response to Commerce's initial questionnaire.  *Id*. at 19.

The Government further contends that Commerce properly rejected the untimely factual information about the loans and grants in accordance with 19 C.F.R. § 351.104(a)(2)(iii) and 19 C.F.R. § 351.302(d), because, as a respondent, Guizhou had the "burden of creating an adequate record to assist Commerce's determinations," but failed to do so.  *Id*. at 23-24 (quoting *Nachi-Fujikoshi Corp. v. United States*, 19 CIT 914, 920, 890 F. Supp. 1106, 1110 (1995)).  The Government maintains that Commerce was not obligated to collect or analyze the information that Guizhou submitted at verification, and that Commerce's rejection of the loans and grants is consistent with the purpose of verification — "to verify the accuracy and completeness of submitted factual information."  *Id*. at 22 (citing *Tianjin Mac. Imp. & Exp. Corp. v. United States*, 28 CIT 1635, 1644, 353 F. Supp. 2d 1294, 1304 (2004), aff'd 146 F.App'x 493 (Fed. Cir. 2005) (citing 19 C.F.R. § 351.307(d)).

The Government further argues that the Court's authority for judicial review is generally restricted to examining an administrative proceeding based on the record of that proceeding and, therefore, the court in this case should not consider the previously rejected information that was presented by Guizhou at verification.  Def. Br. at 23-24.

### 3.    Insufficient basis to apply AFA to missing information

The third argument that Guizhou presents is that Commerce had no basis to apply AFA.  Pl. Br. at 36.  Guizhou argues that for Commerce to rely on AFA, Commerce cannot simply determine that certain information was not on the record.

Consol. Court No. 19-00032                                                    Page 32

Rather, Guizhou maintains that Commerce must also determine that a respondent has

failed to cooperate by not acting to the best of its ability.  *Id.*  Guizhou asserts that the

"best of ability" standard does not require perfection and "recognizes that mistakes

sometimes occur."  *Id*. at 37 (quoting *Husteel Co. v. United States,* 39 CIT __, __, 98 F.

Supp. 3d 1315, 1352 (2015))[12].  Guizhou presents various arguments to demonstrate

that it cooperated to the best of its ability, including that Guizhou reported other

subsidies in response to Commerce's questionnaire.[13]

The Government argues that Commerce's use of adverse facts available is

supported by substantial evidence because Guizhou failed to provide by the established

deadlines the requested information regarding the loans and grants.  Def. Br. at 24-28.

The Government contends that the purpose of 19 U.S.C. § 1677e is to "ensure that the

party does not obtain a more favorable result by failing to cooperate than if it had

cooperated fully."  *Id.* at 25 (citing Statement of Administrative Action for Uruguay

Round Agreements Act, H.R. Reply No. 103-316, vol. I, at 870 (1994)).  Accordingly, the

---

[12] The correct citation for the quoted text is *Husteel Co. v. United States*, 39 CIT __, __, 98 F. Supp. 1315, 1356 (2015) (citations omitted).

[13] Guizhou presents a number of additional arguments to demonstrate that it cooperated to the best of its ability: (1) AFA is not an appropriate remedy where "there was never any reason for Commerce to think . . . [the respondent's] . . . data [were] false,"  Pl. Br. at 37; (2) Guizhou was cooperative throughout the review and submitted thousands of documents to Commerce covering subsidies over a 14-year period, *Id*. at 29; (3) Commerce should not have applied AFA to the unreported loans because Guizhou never attempted to hide this information from Commerce, and, upon discovering the unreported loans in a separate account, promptly notified Commerce of the omission, *Id*. at 38 ; and (4) Guizhou did not report the loans because it did not consider the bill discounting to be loans since the bill discounting consists of money that the company was owed and was not treated as loans on the company's books.  *Id*. at 38.

Government argues that "[b]y failing to cooperate and exhibiting inattentiveness and careless [sic] in not providing full and complete answers to Commerce's inquiries," Guizhou failed to cooperate to the best of its ability and, therefore, Commerce's application of adverse facts available is in accordance with 19 U.S.C. § 1677e(b).  *Id*. at 25.

### 4.    Totality of the Circumstances

Last, Guizhou argues that Commerce did not consider the totality of circumstances in selecting the 23.78% AFA rate for unalleged grants and the 10.54% AFA rate for bill discounting.  Pl. Br. at 39-41.  Guizhou maintains that, with the exception of the loans and grants presented at verification, Guizhou was a "full cooperating respondent."  *Id*. at 29.  Accordingly, Guizhou maintains, citing *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019), that Commerce did not consider the underlying facts of the case, including (a) that Guizhou was a "full cooperating respondent" and (b) "the seriousness of the conduct of the cooperating party."  Pl. Br. at 29, 39-41.  Guizhou, therefore, asserts that the selected AFA rates were "punitive and aberrational."  *Id*. at 40.

The Government argues that Commerce's selection of the highest AFA rate available was a reasonable exercise of Commerce's "wide, though not unbounded, discretion to select adverse facts that will create the proper deterrent to non-cooperation with its investigations."  Def. Br. at 26 (citing *Papierfabrik,* 843 F.3d at 1380; *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002)).  The Government argues that Commerce selected the AFA rate in accordance with

Commerce's three-step methodology for selecting AFA rates in CVD proceedings.  *Id.* at 27.  The Government notes that the Federal Circuit sustained this methodology as permissible under the previous iteration of the statute.  *Id*.

The Government further asserts that *BMW* is not applicable to this case because that case involved an antidumping proceeding, not the application of the hierarchy for selecting an AFA rate in a countervailing duty proceeding at issue here.  *Id*. at 28.  The Government also notes that *BMW* involved a "much higher" AFA rate.  *Id*.  The Government maintains that the AFA rates in this proceeding are not "punitive, aberrational, or uncorroborated" and, as such, the court should sustain Commerce's selected rates.  *Id*. (quoting language from *BMW*, 926 F.3d at 1302).

**C.    Analysis**

**1.    Whether Commerce's Treatment of "Discovered" Subsidies Was Contrary to Law**

The court first addresses Commerce's treatment of the grants presented at verification.  Guizhou argues that Commerce's rejection of the grants presented at verification and subsequent application of AFA to the programs was contrary to law because the grants were "discovered subsidies."  Guizhou maintains that the grants presented at verification as minor corrections were not alleged in the investigation, and, therefore, the grants represented discovered subsidies.  Guizhou argues that if information regarding unalleged subsidy programs is discovered or presented during an investigation then 19 C.F.R. § 351.311 provides Commerce with only two options — examine the subsidy in the ongoing review or defer the examination until the next

review.  Pl. Br. at 18. Guizhou asserts that Commerce has followed this practice in

numerous prior cases and maintains that the regulation provides no third option for

Commerce to apply AFA.  *Id*. at 18-21.

Guizhou also challenges Commerce's practice of requiring respondents to

disclose all "other subsidies," including subsidies that are not included in an allegation

by the petitioner and subsequently applying AFA if the requested subsidies are

discovered or presented later in the investigation.  Specifically, Guizhou argues that

Commerce's "other subsidies" question cannot be used to "circumvent" 19 C.F.R. §

351.311 and Commerce's statutory obligation to investigate discovered subsidies.  *Id*. at

23.  Guizhou asserts that unalleged subsidies are not "necessary information" for the

investigation of the subsidies identified in the petition and, therefore, the lack of such

information on the record is not "missing" and, as a result, AFA cannot be applied.  *Id*. at

33-34.

The Government counters that Commerce has no standard practice for subsidies

presented at verification.  Oral Argument Tr. at 5.  Citing *Supercalendered Paper from*

*Canada* and *Certain Frozen Warmwater Shrimp from the PRC*, the Government asserts

that the treatment of subsidies discovered at verification is a "fact-specific

determination" and notes that Commerce has previously relied on AFA in making a

finding on unreported subsidies discovered at verification.  Def. Br. at 21 (citing IDM at

16, 67; *Supercalendered Paper from Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce

Oct. 20, 2015) (final determination CVD investigation) and accompanying Issues and

Decision Memorandum at 12-13, 153-155; *Certain Frozen Warmwater Shrimp from the*

*People's Republic of China*, 78 Fed. Reg. 50,391 (Dep't Commerce Aug. 19, 2013) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 15-16, 75-78).

### a.   Whether Commerce Has Discretion to Apply Adverse Facts Available to Discovered Subsidies

The statute directs that when Commerce discovers a practice that appears to be a countervailable subsidy, but was not alleged in the petition, then Commerce "shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to merchandise which is the subject of the proceeding."  19 U.S.C. § 1677d(1).  The Court has recognized that the statute "vests [Commerce] with broad investigative discretion" and, further, that "Commerce's inquiry concerning the full scope of governmental assistance provided by [a government] and received by Respondents in the production of subject merchandise was within the agency's independent investigative authority pursuant to 19 U.S.C. §§ 1671a(a) and 1677d . . . ."  *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 40 CIT __, __, 195 F. Supp. 3d 1334, 1346 (2016) ("*Changzhou I*").[14]  The Court has also determined that in adding 19 U.S.C. § 1677(d) to

---

[14] In *Changzhou*, the court dismissed a similar argument made by plaintiff that Commerce's inquiry regarding forms of governmental assistance beyond those that were alleged in the petition was contrary to law.  In addressing plaintiff's argument that such an inquiry "unlawfully circumvented the initiation requirements" set forth in 19 U.S.C. § 1671a, the court explained that "nowhere does the statute contemplate that the Petitioner's failure to include all known potential subsidies in its petition thereby waives Commerce's own, independent authority to investigate such programs . . . ."

the Tariff of Act of 1930, Congress intended "to avoid 'unnecessary separate'

investigations" and that Congress "clearly intended that all potentially countervailable

programs be investigated and catalogued . . . ."  *Allegheny*, 112 F. Supp. 2d at 1150

n.12 (citing Sen. Rep. No. 96-249, at 98 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381,

484).  Accordingly, the Court reasoned that Commerce had an "affirmative obligation"

under the statute to consolidate all potential subsidies within the scope of an

investigation.[15]  *Allegheny*, 112 F. Supp. 2d at 1150 n. 12.

The Court has also established that it is Commerce, not the respondent, that

determines which information to include in the investigation.  *Ansaldo Componenti*, 628

F. Supp. at 205.  Accordingly, Guizhou's contention that information regarding the

unalleged grants was not "necessary" for Commerce's investigation — and, therefore,

Commerce's application of AFA was invalid — is not supported by the statute.

Pursuant to the statute, when a respondent fails to provide information requested

by Commerce by the deadline or significantly impedes a proceeding, Commerce "shall .

. . use the facts otherwise available in reaching the applicable determination . . . ."  19

---

*Changzhou Trina Solar Energy Co. v. United States,* 40 CIT __, __, 195 F. Supp. 3d
1334, 1342 (2016).

[15] In support of its decision to ask the "other subsidies" question, Commerce explained
that "[p]ursuant to Section 775 of the Act, the Department has an 'affirmative obligation'
to 'consolidate in one investigation . . . all subsidies known by petitioning parties to the
investigation or by the administering authority relating to the merchandise' to ensure
'proper aggregation of subsidization practices.'"  IDM at 27.  In the corresponding
footnote, Commerce cites *Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 112 F.
Supp. 2d 1141, 1150 n. 12 (2000) and Section 775 of the Tariff Act of 1930.  Neither
*Allegheny* nor the Tariff Act of 1930 uses this language.

U.S.C. § 1677e(a)(2)(B)-(D).  The Statement of Administrative Action for the Uruguay

Round Agreements Act ("SAA") also confirms that Commerce is required to "make

determinations on the basis of the facts available where requested information is

missing from the record or cannot be used because, for example . . . it was provided

late."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.

No. 103-316, vol. 1, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209 ("SAA").

Commerce regulations further provide that Commerce "will not consider or retain in the

official record of the proceeding . . . [u]ntimely filed factual information, written

argument, or other material that [Commerce] rejects . . . ."  19 C.F.R. § 351.302(d)(1)(i).

Further, if Commerce determines that a respondent has failed to act to the best of its

ability to comply with Commerce's requests for information, the statute provides that

Commerce "may use an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b)(1)(A).

Accordingly, it is clear that Commerce has the authority to investigate subsidies not

alleged in the petition, and, therefore, in circumstances in which Commerce requests

information on unalleged subsidies and such information is not provided to Commerce

by the established deadline, Commerce may reject this information and rely on the best

information available.

      In exercising its broad investigative discretion, Commerce in this case requested

that Guizhou provide information about other forms of governmental assistance

received during the POI beyond those alleged in the petition.  In its response, Guizhou

reported receiving more than 180 grants, but did not report all of its additional

governmental assistance.  Instead, Guizhou waited until verification to present to

Commerce more than 40 additional grants.  Under the statute, if Commerce determines

that a party withholds information or fails to provide such information by the established

deadline, Commerce must use "facts otherwise available" to fill in the gaps in the

record.  *See* 19 U.S.C. § 1677e(a).  By failing to provide the information by the

requested deadline, Guizhou triggered the statute, and, therefore, Commerce's decision

to turn to facts available is supported by record evidence.  The question of whether it

was reasonable for Commerce to draw an adverse inference from those facts requires

an assessment of Guizhou's actions during the investigation, taking into account

whether Guizhou complied to the best of its ability with Commerce's requests for

information.  This assessment will be discussed below, *infra* Section II.C.3.

> **b.    Whether Commerce Deviated from Past Practice Without an Adequate Explanation**

The next issues presented are whether (1) Commerce, in exercising the authority

described above, had adopted a *practice* in the exercise of this authority, (2) if so,

whether Commerce departed from that practice in the instant case and, (3) if so,

whether that departure requires an adequate explanation.

Guizhou argues that Commerce did in fact have a practice, departed from that

practice in this case and did not provide "a reasonable explanation as to why it

depart[ed] therefrom."  Pl. Br. at 13 (citing *Save Domestic Oil, Inc. v. United States*, 357

F.3d 1278, 1283-1284 (Fed. Cir. 2004)); *see also* Pl. Br. at 24.  Guizhou argues that this

change is arbitrary on its face and renders the Final Determination contrary to law.  *Id*.

at 24.  In support of its contention, Guizhou cites eight Commerce determinations

between 1998 and 2012, in which Commerce reviewed new information provided at

verification and either countervailed the subsidies based on the information provided or

deferred investigation until a subsequent administrative review.  *Id*. at 19-21.[16]

Commerce in its IDM acknowledged that it had a practice and that the practice

had "evolved over time," notwithstanding the Government's claim that Commerce's

treatment of subsidies discovered at verification is always a "fact-specific"

determination.  IDM at 67; Def. Br. at 21.  Commerce explained that "since 2012, it has

determined that the proper course of action when an unreported potential subsidy is

---

[16] *Large Residential Washers from the Republic of Korea*, 77 Fed. Reg. 75,975 (Dep't
Commerce Dec. 26, 2012) (final determination CVD investigation) and accompanying
Issues and Decision Memorandum at 18; *Bottom Mount Combination Refrigerator-
Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26,
2012) (final determination CVD investigation) and accompanying Issues and Decision
Memorandum at Comment 17; *Aluminum Extrusions from the People's Republic of
China*, 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (final results CVD
investigation) and accompanying Issues and Decision Memorandum at Comment 26;
*Certain Oil Country Tubular Goods from the People's Republic of China*, 74 Fed. Reg.
64,045 (Dep't Commerce Dec. 7, 2009) (final determination CVD investigation) and
accompanying Issues and Decision Memorandum at 24; *Dynamic Random Access
Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't
Commerce June 23, 2003) (final determination CVD investigation) and accompanying
Issues and Decision Memorandum at Comment 21; *Polyethylene Terephthalate Film,
Sheet, and Strip (PET Film) from India*, 67 Fed. Reg. 34,905 (Dep't Commerce May 16,
2002) (final determination CVD investigation) and accompanying Issues and Decision
Memorandum at "B. Programs Determined Not to Confer Subsidies"; *Stainless Steel
Plate in Coils from Italy*, 64 Fed. Reg. 15,508 (Dep't Commerce Mar. 31, 1999) (final
determination CVD investigation) at "IV. Other Programs Examined"; *Certain Stainless
Steel Wire Rod from Italy*, 63 Fed. Reg. 40,474 (Dep't Commerce July 29, 1998) (final
determination CVD investigation) and accompanying Issues and Decision Memorandum
at Comment 18.

discovered or 'presented' at verification is to rely on adverse inferences in making a

finding on that potential subsidy."  IDM at 67.

The court concludes that Commerce did, in fact, have a practice prior to 2013 for

subsidies discovered at verification and that Commerce has modified its practice.  The

court further concludes that Commerce provided an adequate explanation for its change

in practice.  *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011);

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

42, 103 S.Ct. 2856 (1983) ("*State Farm*").

The Federal Circuit has held that "[w]hen an agency changes its practice, it is

obligated to provide an adequate explanation for the change."  *SKF USA*, 630 F.3d at

1373; *see State Farm,* 463 U.S. at 42; *see also Save Domestic Oil, Inc.*, 357 F.3d at

1283.  The Federal Circuit has determined that an agency's "adequate explanation" for

its change in practice must "address important factors raised by comments from

petitioners and respondents."  *SKF USA*, 630 F.3d at 1373-1374.

In *SKF USA*, the Federal Circuit found that Commerce did not adequately explain

its change of methodology after 16 administrative reviews.  *SKF USA*, 630 F.3d at

1373-1374.  Specifically, the Federal Circuit in *SKF USA* determined that, despite

Commerce's explanation of the reasons that the change would serve legitimate

objectives, Commerce did not fulfill its "obligation to address important factors raised" by

the parties.  *SKF USA,* 630 F.3d at 1373-1374.  Therefore, the Federal Circuit held that

Commerce failed to provide an "adequate explanation" for its change in practice

because Commerce did not sufficiently explain the reason that the respondent's

concerns about the change were unjustified or the reasons that the concerns were

"outweighed by competing considerations."  *Id.* at 1374.

In the case before the court, Commerce directly addressed Guizhou's concerns

and provided reasons that Guizhou's arguments were outweighed by competing

considerations.  During the investigation, Guizhou argued that Commerce's refusal to

accept information on the grants first presented at verification did not correspond with

Commerce's practice of examining discovered subsidies if Commerce concludes that

"sufficient time" remains before the final determination.  IDM at 66.  Guizhou further

argued that Commerce's change in practice was arbitrary because Commerce did not

provide an explanation for the change in practice either at the time of verification or in

Guizhou's Verification Report.  *Id*.

In response to Guizhou's expressed concerns, Commerce in the IDM addressed

directly the reasons that Guizhou's concerns were outweighed by competing

considerations, including legitimate policy objectives for Commerce's change in

practice.  *Id.*  Commerce explained that if it were to accept information presented at

verification, Commerce would be deprived of "the opportunity to conduct a full analysis

and issue a Preliminary Determination and implement the relevant cash deposit

requirements, that reflect the subsidies received by the respondents."  *Id.* at 67.  In

addition, Commerce explained that if it deferred the examination of the discovered

subsidies until a subsequent review, the exclusion of the subsidies could result in

Commerce reaching a negative determination, or, at a minimum, allow a respondent to

secure a lower cash deposit rate and avoid the consequences of its non-cooperation.

*Id.* at 67-68.

Therefore, Commerce provided an adequate explanation for its change in

practice for subsidies discovered at verification because the explanation addressed

Guizhou's arguments by explaining the reasons that Guizhou's concerns were

outweighed by competing considerations (*i.e.*, to create an incentive for respondents to

report all government assistance in response to Commerce's requests for specific types

of information).[17]

Finally, the court takes note that the Federal Circuit in *SKF USA*, quoting an

earlier opinion, stated: "the antidumping statute is `highly complex' and `[t]he more

complex the statute, the greater the obligation on the agency to explain its position with

clarity.'"  *SKF USA*, 630 F.3d at 1373 (citing *SKF USA, Inc. v. United States,* 263 F.3d

---

[17] In its IDM, Commerce cited prior proceedings in which it applied AFA to unreported subsidies presented at verification.  IDM at 67.  The court takes no position as to whether, in any of the prior administrative reviews cited by Commerce, it provided a reasonable explanation for its change in practice regarding the treatment of subsidies discovered at verification.  In prior proceedings, Commerce has "acknowledge[d] that the Department's practice regarding assistance discovered during verification has varied in past cases" and found that the particular facts of the prior cases merited the application of AFA.  *See, e.g., Supercalendered Paper from Canada,* 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 155; *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 88; *see also Certain Frozen Warmwater Shrimp From the People's Republic of China,* 78 Fed. Reg. 50,391 (Aug. 19, 2013) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 78.  In the instant case, Commerce provided an adequate explanation for its decision to change its practice to allow Commerce to rely on adverse inferences when subsidies are discovered or presented at verification.

1369, 1382 (Fed. Cir. 2001).  In this case, as noted, Commerce provided an adequate

explanation for its change of practice.  Nonetheless, bearing in mind the language of the

Federal Circuit, the court would like to underscore that it is critical that Commerce

provide a full and clear exposition of its reasoning in each antidumping or countervailing

duty case and as to each issue.  Such an explanation serves to vindicate most

effectively the decisions of the agency, inform parties and the public of the basis of a

decision, and offer the court the most complete record on which to review any contested

determinations.

### 2.      Whether Commerce's rejection of the loans and grants as "minor corrections" was reasonable

Guizhou presents three arguments to challenge Commerce's decision to reject

the additional loan and grant information presented at verification as "minor corrections"

to the information on the record.  First, Guizhou argues that Commerce's rejection of all

information presented at verification foreclosed Guizhou from being able to argue that

the grants and loans were indeed minor corrections.  Pl. Br. at 26-29.  Therefore,

Guizhou argues that the court should consider the rejected information to determine

whether Commerce's actions were supported by substantial evidence.  Pl. Reply Br. at

12-13.  Second, Guizhou argues that by rejecting the grants and loans, Commerce

deviated without a reasonable explanation from its past practice, in which Commerce

accepted similar information as minor corrections.  Accordingly, Guizhou argues,

Commerce's action in this case was arbitrary.  Pl. Br. at 31 (citing *Consolidated*

*Bearings*, 348 F.3d at 1007).  Third, Guizhou argues that Commerce abused its

discretion in refusing to accept the additional information at verification when Commerce had "plenty of time" to verify or consider the information.  Pl. Br. at 31 (quoting *Papierfabrik*, 843 F. 3d at 1384).  The court addresses each of Guizhou's arguments in turn.

> a.    **Commerce's Rejection of the Loans and Grants as "Minor Corrections" is Subject to Judicial Review**

Before determining whether the loans and grants presented at verification constitute new factual information or "minor corrections," the court addresses first Guizhou's argument that the court should include the previously rejected information in its review.  Guizhou argues that Commerce's decision to reject the information is subject to judicial review and requests that the court consider the proffered documents attached to Guizhou's briefs to determine "whether Commerce's rejection of [Guizhou's] minor correction claim was supported by substantial evidence and conformed to law." Pl. Reply Br. at 12-13.

The Government argues correctly that the court's review is confined to the administrative record.  19 U.S.C. 1516a(b)(i); *see, e.g., Hyundai Steel Co. v. United States*, 42 CIT __, __, 319 F. Supp. 3d 1327, 1342 n.13 (2018).  However, Commerce's discretion to reject new factual information is not unbounded and is subject to judicial review.  *See Eregli Demir*, 308 F. Supp. 3d at 1328 (explaining that "the court must have some basis upon which to review Commerce's decision that the corrections 'were not minor'").  Therefore, the court will examine whether the decision by Commerce to

reject the loans and grants as not constituting "minor corrections" is supported by substantial evidence on the record.

> **b.    Whether Commerce Was Required to Include on the Record Information Presented at Verification**

Guizhou challenges Commerce's refusal to include on the record the additional information regarding the loans and grants presented at verification on the grounds that Commerce was required to examine the nature of the "error" in conjunction with the magnitude of the change that the error would have caused to the subsidy margin.  Pl. Br. at 26.  Guizhou maintains that this information should have been included in the Verification Report, together with Commerce's opinion as to whether the information constituted a minor correction.[18]  *Id.*  Guizhou notes that these procedures were followed by Commerce in prior cases,[19] and that Commerce's failure to do so here

---

[18] Guizhou fails to cite a provision in the statute or regulations that requires that Commerce follow these particular verification procedures.

[19] In its brief, Guizhou argues that Commerce followed the aforementioned verification procedures in past administrative reviews; however, Guizhou does not cite the verification reports from the previous reviews.  Pl. Br. at 27-28.  In the cited prior reviews, Commerce examined whether the magnitude of change prevented a classification as a minor correction.  *See, e.g. 53 Foot Domestic Dry Containers From the People's Republic of China*, 80 Fed. Reg. 21,209 (Dep't Commerce Apr. 17, 2015) (final determination CVD investigation).  Nevertheless, neither the cited prior reviews nor Guizhou provides any detail as to whether Commerce actually followed in those earlier cases the verification procedures that Guizhou asserts Commerce should have followed in the present case.  In the IDM for this case, Commerce did in fact assess the nature of the errors and the magnitude of change.  With regard to the loans, Commerce stated that the "magnitude of the unreported financing exceeds what can be considered 'minor.'"  IDM at 60.  With regard to the grants, Commerce explained that it did not accept the information about the grants because "each grant potentially represents an individual program" and the number of grants presented at verification was "extensive."

"foreclosed [Guizhou's] ability to argue that the new information was not new factual

information, was not information that was required to be reported or, in any event, that

the corrections were not minor." *Id*. at 28.  Guizhou maintains that if this information

had been placed on the record, Guizhou could have demonstrated that the corrections

were minor and were not countervailable subsidies.  *Id*. at 29.

      The Federal Circuit has explained that "[a]lthough Commerce has authority to

place documents in the administrative record that it deems relevant, the burden of

creating an adequate record lies with interested parties and not with Commerce." *Nan*

*Ya Plastics Corp. v. United States,* 810 F.3d 1333, 1337 (Fed. Cir. 2016) (quoting *QVD*

*Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  As the Government

points out, Guizhou failed to submit the relevant information to Commerce in response

to the initial questionnaire within the established timeline.[20]  Instead, Guizhou reported

the information about the bill discounting and grants just prior to and at verification.  *See*

---

*Id.*  Commerce further stated that "whether a program was used or not by a company is
not 'minor' in the view of the Department."  *Id*. (citing *Certain Passenger Vehicle and
Light Track Tires From the People's Republic of China Final Affirmative Determination;
and Final Affirmative Critical Circumstances Determinations, in Part*, 80 Fed. Reg.
34,888 (Dep't Commerce June 18, 2015) (final determination CVD investigation) and
accompanying Issues and Decision Memorandum).

[20] Guizhou sought an extension from Commerce to file its questionnaire response,
which Commerce granted.  Request for Extension for Initial Questionnaire Response,
barcode 3466094-01 (May 3, 2016).  Commerce at the time informed Guizhou that,
pursuant to 19 C.F.R. § 351.302, "the Department will not accept any requested
information submitted after the deadline and reject such submission as untimely.  In
such a case, the Department may have to use facts available . . . ."  *Id*.  Despite
Commerce's admonition, Guizhou did not report to Commerce by the extended deadline
all of Guizhou's grant and loan information.

Department of Commerce's Memorandum Pertaining to Conversation with Counsel for

Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016); Department of Commerce's

Memorandum Pertaining to Guizhou Tyre's Verification Report at 2, CD 406; PD 449

(Dec. 12, 2016).  Pursuant to Commerce's regulations, Commerce is not required to

consider or retain in the official record of the proceeding untimely filed factual

information.  19 C.F.R. § 351.302(d); 19 C.F.R. § 351.301(c)(1).

Nonetheless, there must be a basis in the record for Commerce's finding that the

loans and grants are not minor corrections and constitute untimely filed factual

information.  *See Eregli Demir*, 308 F. Supp. 3d at 1328.  Accordingly, the court will

examine whether there is substantial evidence in the record to support Commerce's

finding that the proffered information on the grants and loans did not reflect minor

corrections, and, therefore, was properly rejected as new factual information.

Commerce's regulations address the submission of new factual information.[21]  19

C.F.R. § 351.301 provides that, when factual information is submitted in response to

---

[21] 19 C.F.R. § 351.102(b)(21) defines "factual information" as:
    (i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;
    (ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;
    (iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;
    (iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to

questionnaires, "[t]he Secretary will not consider or retain in the official record of the

proceeding unsolicited questionnaire responses . . . or untimely filed questionnaire

responses."  19 C.F.R. § 351.301(c)(1).  Initial questionnaire responses are due "30

days from the date of receipt of such questionnaire," and "supplemental questionnaire

responses are due on the date specified by the Secretary."  19 C.F.R. §

351.301(c)(1)(i)-(ii).[22]  The Federal Circuit has also held that "Commerce is free to

correct any type of importer error — clerical, methodology, substantive, or one in

judgment . . . provided that the importer seeks correction before Commerce issues its

final results and adequately proves the need for the requested corrections."  *Timken*

*U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006).

     This Court has noted the differences between the submission of "corrective

information" and untimely new factual information.  The court in *Goodluck India Limited*

*v. United States*, noted that "this [C]ourt has held that Commerce abuses its discretion

by rejecting 'corrective information,' which includes submissions 'to correct information

*already provided* [to Commerce]' . . . or to 'clarif[y] information *already in the record*' . . .

---

rebut, clarify or correct such evidence placed on the record by the Department;
and.

(v) Evidence, including statements of fact, documents, and data, other than
factual information described in paragraphs (b)(21)(i)-(iv) of this section, in
addition to evidence submitted by any other interested party to rebut, clarify, or
correct such evidence.

[22] Additionally, 19 C.F.R. § 351.301(c)(v) provides that factual information submitted to
rebut, clarify or correct questions are due "[w]ithin 14 days after an initial questionnaire
response and within 10 days after a supplemental questionnaire response has been
filed with the Department."

but not to 'fill [ ] gap[s] caused by [a respondent's] failure to provide a questionnaire

response . . . .'" *Goodluck India Limited v. United States*, 43 CIT __, __, 393 F. Supp.

3d 1352, 1357-1358 (2019) (emphasis supplied) (citing *Fischer S.A. Comercio v. United*

*States*, 34 CIT 334, 344-349, 700 F. Supp. 2d 1364, 1373-1377 (2010)).

      With respect to loans, the record in this case is clear.  Commerce in its initial

questionnaire, requested that Guizhou "[r]eport all financing to your company that was

outstanding at any point during the POI, regardless of whether you consider the

financing to have been provided under the [Government Policy Lending Program]."

Initial Questionnaire at 8.  Commerce explicitly asked Guizhou to "[e]nsure that

[Guizhou] report *all forms of financing* outstanding during the POI, not only traditional

loans.  This includes, but is not limited to, interest expenses on bank promissory notes*,*

*invoice discounting*, *and factoring of accounts receivable*."[23]  *Id.* (emphasis supplied);

*see also* IDM at 13-14.  Guizhou ignored Commerce's clear request and waited until just

two weeks prior to verification to report all of its financing.  *See* Department of

Commerce's Memorandum Pertaining to Conversation with Counsel for Guizhou Tyre,

---

[23] In Commerce's memorandum discussing its conversation with Guizhou's counsel, Commerce explained that "[a]ccording to [counsel] the [discovered financing] represented the financial expense 'fees' that the company pays when it sells its 'commercial bills of exchange,' *i.e.*, its invoices, to the bank account."  Department of Commerce's Memorandum Pertaining to Conversation with Counsel for Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016).  During the administrative review, Guizhou challenged Commerce's conclusion that the financing related to invoices,  Letter Pertaining to Guizhou's Request for Reconsideration at 2, n.1 CD 350; PD 433 (Nov. 11, 2016); however, in its briefs, Guizhou itself uses the terms "bill discounting" and "invoice discounting" interchangeably to describe the discovered financing.  *See* Pl. Br. at 2; *see also* Pl. Reply Br. at 11-14.

CD 337; PD 430 (Nov. 8, 2016).  Guizhou itself admitted that the company should have

reported the bill discounting in its initial questionnaire response,[24] and as Commerce

explained, Guizhou's failure "to report an entire type of financing and the magnitude of

the unreported financing exceeds what can be considered 'minor' under the instructions

of the verification outline."  IDM at 60.

Guizhou also challenges Commerce's decision in this case as inconsistent with

previous Commerce decisions, arguing that Commerce has accepted similar

submissions as "minor corrections" in the past.  Pl. Br. at 30.  However, the

administrative proceedings on which Guizhou relies are not apposite.[25]  For example,

with respect to the unreported loans, Guizhou points to Commerce's determination in

*Multilayered Wood Flooring From the People's Republic of China*.  *Id.*  In that

determination, Commerce accepted new policy loans at verification as minor corrections

because Commerce agreed that its inquiry about the loans in its questionnaire was

---

[24] During the administrative review, Guizhou acknowledged that the company "should have reported the [discovered financing] in the initial questionnaire, especially in light of the question in the Department's questionnaire, which specifically requests the company to report all financing, including invoice discounting."  IDM at 61-62.

[25] In its brief, Guizhou cites the BOSTD Verification Report (Nov. 1, 2016), Biaxial Integral Geogrids from China (A-570-037) to support its assertion that Commerce has accepted as minor corrections the identification of new loans or bill discounting in prior decisions.  Pl. Br. at 38.  At the oral argument, Guizhou explained that the correct citation for the document is: Document Bar Code – 3518388.  Oral Argument Tr. at 128; *see id*. at 56. The cited document is a redacted public version of the Verification Report which states that Commerce accepted certain loans presented by BOSTD at verification as minor corrections.  Due to the redacted nature of the document, the court cannot determine the magnitude or nature of the loans Commerce accepted at verification and, therefore, cannot conclude that Commerce has previously accepted financing similar to the bill discounting at issue in this case as a "minor correction."

misleading. *Multilayered Wood Flooring From the People's Republic of China,* 84 Fed.

Reg. 38,221 (Dep't Commerce Aug. 6, 2019) (final results CVD admin. review) and

accompanying Issues and Decision Memorandum at Comment 3; *see also* Pl. Br. at 30.

By contrast, as noted, Commerce's request to Guizhou in this case was explicit and

clear — Commerce requested information about bill discounting, stated expressly in the

questionnaire that the form of financing represented by bill discounting represents a

loan and Guizhou, notwithstanding Commerce's clear and explicit direction, claimed that

it "did not consider the bill discounting to be loans."[26]

      Contrary to Guizhou's argument, the additional loan information presented at

verification does not comprise either "corrective information" or "minor corrections."

Commerce's verification instructions specifically stated that: "[v]erification is not

intended to be an opportunity for the submission of new factual information.  Information

will be accepted at verification only when the information is requested by verifiers . . . to

corroborate, support, and clarify factual information already on the record."  Department

of Commerce's Verification Pertaining to Guizhou Tyre at 2, PD 420 (Oct. 28, 2016).

Guizhou's information about the loans submitted at verification did not "corroborate,

support and clarify factual information on the record;" rather, it was an attempt by

Guizhou to fill gaps in the record caused by Guizhou's own failure to respond fully to

Commerce's questionnaires.

---

[26] During the proceeding and in its brief, Guizhou also explained that it failed to report
the bill discounting because the financing was located in a "discrete account," separate
from the expense accounts where Guizhou records the other loans that were reported
to Commerce during the questionnaire stage.  IDM at 59; Pl. Br. at 7-8.

Commerce's finding with regard to the loans is supported by substantial evidence.  The presentation of an entire new category of loans more than six months after the deadline to submit this information on its face is not a minor correction. Accordingly, Commerce acted within its statutory discretion to uphold the enforcement of its deadline for new factual information and correctly rejected the untimely information presented just prior to verification.  *See Tianjin*, 353 F. Supp. 2d at 1303-1304 ("Both the statute and the regulation underscore the breadth of Commerce's discretion in fashioning the temporal parameters of administrative proceedings, and force parties to submit information within a specified time frame in the interests of fairness and efficiency.").

With respect to the grants, Commerce's rejection of the "more than 40 grants" as minor corrections is not supported by substantial evidence.  Commerce explained that its officials at verification did not collect any information about the grants beyond noting the receipt of information about the "more than 40 grants" because Guizhou had failed to provide this information in its responses to Commerce's questionnaires.  IDM at 15. Commerce found that the grants presented were not minor corrections because "presenting information about more than 40 potential individual programs at verification is extensive."  *Id.* at 60.  However, neither the Verification Report nor the IDM provides any information regarding even the exact number of grants.  At oral argument, the Government explained that Commerce acknowledged receipt of "at least 40" grants at

verification but rejected the list[27] of grants presented as untimely information.  Oral

Argument Tr. at 70.

Given that Commerce rejected all of the information pertaining to the grants

presented at verification, there is no information on the record to substantiate the

number or amount of grants presented, notwithstanding that Commerce noted that there

were "more than 40 grants."  IDM at 15, 65.  Accordingly, Commerce's finding that the

number of grants was "extensive," Commerce's estimates of the size of each grant, and

Commerce's conclusion that the number and size of the grants presented could not

constitute a minor correction are not supported by substantial evidence and are,

accordingly, remanded.

> **c.   Whether Commerce Had Sufficient Time to Verify the
>          Information Presented at Verification**

Guizhou's final argument is that Commerce abused its discretion by refusing to

accept the additional loans and grants when it had "plenty of time" to verify or consider

the information.  Pl. Br. at 31.  Guizhou cites *Papierfabrik August Koehler v. United*

*States, Timken U.S. Corp v. United States* and *NTN Bearing Corp. v. United States* to

support its argument.  *Id.*  With respect to loans, the court does not find those cases to

be persuasive in the instant case.  With respect to grants, the court reserves judgment

---

[27] Commerce's and the Government's language is unclear even as to the form in which
Guizhou proffered information as to the additional grants.  In the IDM, Commerce does
not refer to either a list or a chart; rather, Commerce mentions the presentation of the
grants.  At oral argument, the Government referred variously to a "list" and a "chart."
*See, e.g.,* Oral Argument Tr. at 71.

on this issue, consistent with the court's conclusion that Commerce's rejection of the grants as a "minor correction" is not supported by substantial evidence.

Guizhou notes correctly that in *Papierfabrik* the Federal Circuit confirmed its previous conclusions in *Timken U.S. Corp* and *NTN Bearing* that "Commerce abused its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it."  Pl. Br. at 31 (citing *Papierfabrik,* 843 F.3d at 1384). However, Guizhou ignores the fact that the Federal Circuit in *Papierfabrik* indicated that not all information must be accepted.  *Papierfabrik*, 843 F.3d at 1384.  The Federal Circuit noted that, unlike in *Timken U.S. Corp* and *NTN Bearing*, respondents presented information that was "deficient, incomplete, and fraudulent," and, therefore, held that Commerce did not abuse its discretion in rejecting data.  *Id*.

In *Timken U.S. Corp.* and *NTN Bearing*, the information that was at issue involved clerical errors and a mis-categorization of home market sales.[28]  These "errors" differ from Guizhou's complete failure to report the requested financing.  In addition, the Federal Circuit in both cases determined that Commerce had "plenty of time" to consider the information because the respondents in both cases submitted the information at the "preliminary results stage".  *Timken U.S. Corp.,* 434 F.3d at 1353-1354; *see NTN Bearing Corp,* 74 F.3d at 1208.  By contrast, in this case, respondents submitted the information about the financing at a much later stage of the investigation

---

[28] In *Timken U.S. Corp.*, respondent submitted new information to support the reclassification of seventeen "miscategorized" home market sales to a different channel of distribution.  *Timken U.S. Corp.*, 434 F.3d 1345, 1347 (Fed. Cir. 2006).

— just prior to verification.  *See* Department of Commerce's Memorandum Pertaining to Conversation with Counsel for Guizhou Tyre, CD 337; PD 430 (Nov. 8, 2016); *see also* IDM at 13-14.

In its IDM, Commerce rejected Guizhou's argument that Commerce had "plenty of time to review the information," explaining that: "By its own actions, in not providing this information until the outset of verification, Guizhou Tyre precluded the Department from fully investigating and verifying this information. . . .  Accepting this information at this point in the investigation would be inconsistent with the statute's mandate that the Department 'shall verify all information relied upon in making . . . a final determination.'" IDM at 61 (quoting 19 U.S.C. § 1677m(i)).

Commerce's explanation is reasonable.  The statute requires that Commerce verify all information in reaching a final determination.  19 U.S.C. § 1677m(i).  As noted, verification is not a forum for respondents to provide or for Commerce to accept or collect new factual information.  *See Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 39 CIT __, __, 61 F. Supp. 3d 1306, 1349 (2015).  The purpose of verification is to "verify the accuracy and completeness of submitted factual information."  19 C.F.R. § 351.307(d).  Further, section 1677m(g) provides that before Commerce makes a final determination, it "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by [Commerce] . . . upon which the parties have not previously had an opportunity to comment."  19 U.S.C. § 1677m(g).

Therefore, accepting new information at verification would not only deprive Commerce of the opportunity to investigate and verify the information, but also deny parties the opportunity to review and comment on that information.  Oral Argument Tr. at 8; *see Chefline Corp. v. U.S*., 26 CIT 878, 882, 219 F. Supp. 2d 1303, 1308 (2002) (explaining that section 1677m(g) requires that the record be closed prior to the time the agency's determination is made and that parties in the proceeding have the final opportunity to comment on all information obtained by the agency) (citations omitted).[29]

### 3.   Whether Commerce's Application of AFA to the Loans and Grants Was Reasonable

Commerce's finding that Guizhou did not act to the best of its ability to comply with Commerce's requests for information and Commerce's application of AFA to the Government Policy Lending Program was reasonable; however, Commerce's application of AFA to the grants is not supported by substantial evidence on the record.

19 U.S.C. § 1677e provides that Commerce can apply "facts otherwise available" when a respondent: (1) withholds information requested by Commerce; (2) fails to provide such information by Commerce's deadlines for submitting the information or in the form and manner requested; (3) significantly impedes proceedings; or, (4) provides

---

[29] The SAA states that the statute "restates the existing right of interested parties to comment on information submitted to the agencies, but requires that the record be closed prior to the time the agency's determination is made, and that the parties to the proceeding be permitted a final opportunity to comment on all information obtained by the agency upon which the parties have not yet had an opportunity to comment.  All final comments properly filed by the date reasonably specified by the agency will be accepted for the record, but the agencies will not obtain or accept for the record new factual information, argument, or comment after this date."  SAA at 871.

information that cannot be verified.  19 U.S.C. § 1677e(a).  Commerce may apply AFA

when Commerce finds that one or more of the above circumstances exists and if

Commerce "finds that an interested party has failed to cooperate by not acting to the

best of its ability to comply with a request for information . . . ."  19 U.S.C. § 1677e(b)(1).

A respondent's failure to cooperate to "the best of its ability" is "determined by

assessing whether [it] has put forth its maximum effort to provide Commerce with full

and complete answers to all inquiries in an investigation."  *Nippon Steel Corp.*, 337 F.3d

at 1382.

        With regard to the loans, Commerce's application of AFA was reasonable.

Commerce specifically asked Guizhou to report all financing outstanding during the POI,

including invoice discounting, regardless of whether Guizhou considered the financing

to have been provided under the Government Policy Lending Program.  Guizhou failed

to provide Commerce with the requested bill discounting information by the established

deadline.  Accordingly, substantial evidence supports Commerce's decision to apply

facts otherwise available.

        Guizhou argues that record evidence demonstrates that it cooperated to the best

of its ability.  Specifically, Guizhou argues that it was a "full cooperating respondent"

throughout the proceeding,[30] Pl. Br. at 29, and notes that the Court has determined that

"a completely errorless investigation is simply not a reasonable expectation.  Even the

---

[30] Guizhou argues that it reported [[8 billion]] RMB in loans and informed Commerce about [[28 million]] RMB in bill discounting just two weeks prior to verification.  Pl. Br. at 26.  Similarly, at verification Guizhou reported "more than 40 grants" in addition to the 180 grants the company reported in its responses to Commerce.  IDM at 15.

most diligent respondents will make mistakes, and Commerce must devise a non-arbitrary way of distinguishing among errors."  Pl. Br. at 37 (quoting *Fujian Machinery and Equipment Importer & Export Corp. v. United States*, 25 CIT 1150, 1157, 178 F. Supp. 2d 1305 (2001)).

Guizhou is correct that the statute does not mandate an errorless review; however, the magnitude of information that Guizhou failed to report to Commerce until verification (*i.e.,* an entire category of financing) cannot be considered "negligible or inconsequential."  *JTEKT Corp. v. United States*, 33 CIT 1797, 1854, 675 F. Supp. 2d 1206, 1255 (2009).[31]

Guizhou attempts to attribute its failure to report the loans to an internal accounting decision to file in separate accounts the financing and loan interest payments that Guizhou reported to Commerce.[32]  This argument is not persuasive.  As

---

[31] In *JTEKT*, the Court accepted plaintiff's argument that the statute does not require an errorless review.  *JTEKT Corp. v. United States*, 33 CIT 1797, 1854, 675 F. Supp. 2d 1206,1255 (2009). (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).  However, the Court determined that record evidence demonstrated that plaintiff "provided Commerce incorrect information on physical bearing characteristics at a frequency (nineteen errors affecting sixteen out of forty models reviewed) that cannot be described as negligible or inconsequential."  *Id.* Therefore, the Court concluded that plaintiff's reporting of the data "fell short" of the "best of its ability" standard established by the statute and interpreted by the Federal Circuit in *Nippon Steel*.  *Id.*

[32] Guizhou explains that it missed the bill discounting in the questionnaire preparation stage because Guizhou did not treat the financing as loans in its books.  Instead, Guizhou located the bill discounting in a "discrete account not identifiable as interest in the company's audited financial statement."  Pl. Br. at 38.  Guizhou further explains that "[t]his sub-account was different and distinct from the interest expense account where

the Federal Circuit has stated, the "best of its ability" standard does not require

perfection; however, it "does not condone inattentiveness, carelessness, or inadequate

record keeping."[33]  *Nippon Steel Corp.*, 337 F.3d at 1382.  Maintaining in a separate

database information repeatedly and expressly requested by Commerce, and then

repeatedly not searching that database constitutes "inattentiveness, carelessness, or

inadequate record keeping."  *Id*.

      Guizhou had the capacity to provide Commerce with the information;

notwithstanding this fact, the company failed to put forward its maximum effort to

respond to Commerce's requests for information, and, as a consequence, failed to

provide information pertaining to an entire type of financing specifically requested by

Commerce.  Therefore, the record demonstrates that Commerce's application of AFA to

the loans was reasonable.

      With regard to the grants, Guizhou argues that as the grants were not alleged,

the information regarding these grants was not "necessary information," preventing the

---

[Guizhou] records the short-term and long term loan interest payments that [Guizhou]
had reported in its questionnaire response."  *Id*. at 7-8.

[33] The Federal Circuit in *Nippon* explained that the best of ability standard "assumes
that importers are familiar with the rules and regulations that apply to the import
activities undertaken and requires that importers, *to avoid a risk of an adverse inference
determination* in responding to Commerce's inquiries: (a) take reasonable steps to keep
and maintain full and complete records documenting the information that a reasonable
importer should anticipate being called upon to produce; (b) have familiarity with all the
records it maintains in its possession, custody, or control; and (c) conduct prompt,
careful, and comprehensive investigations of all relevant records that refer or relate to
the imports in question to the full extent of the importers' ability to do so."  *Nippon Steel
Corp.*, 337 F.3d at 1382 (emphasis supplied).

application of AFA.  Pl. Br. at 32-35.  The court is not convinced by Guizhou's

arguments in this case and has already discussed and affirmed Commerce's discretion

to investigate and apply AFA to unalleged programs.  *See* discussion of application of

AFA to unalleged subsidies, *supra* Section II.C.1.

      Guizhou puts forward two additional arguments to challenge Commerce's

application of AFA to the grants: namely, that (1) the record demonstrates that Guizhou

cooperated to the best of its ability, Pl. Br. at 36-39; (2) Commerce had no factual

information on which to base its AFA for any of the subsidy elements — specificity,

financial contribution, and benefit, *id*. at 36.

      Without information on the record regarding the grants, the court does not

examine whether Guizhou failed to cooperate to the best of its ability.  Therefore, the

court defers the discussion of Commerce's application of AFA to the grants until

Commerce completes its remand determination.

        **4.**    **Commerce's selection of the highest AFA rate was reasonable**

      Guizhou argues that even if the court finds that Commerce's application of AFA

was appropriate, the selected AFA rates for the loans and grants is "punitive and

aberrational."  Pl. Br. at 40.  The Government maintains that Commerce's selection of

AFA rates for loans and grants is in accordance with Commerce's established hierarchy

for selecting AFA rates in CVD proceedings.  Def. Br. at 26-28.  Guizhou does not

challenge Commerce's methodology but rather contends that, in selecting the 23.78%

AFA rate for the grants and the 10.54% AFA rate for bill discounting, Commerce did not

consider the "totality of circumstances" as required by the Federal Circuit in *BMW*, 926 F.3d at 1301.  Pl. Br. at 39-41.

In its final determination, Commerce selected as AFA, consistent with 19 U.S.C. § 1677e(d) and its established practice, the highest calculated rate for the same or a similar program.  IDM at 9.  The Government argues that the statute accords Commerce the discretion to use the highest rate available in applying an adverse inference.  Def. Br. at 26.

In applying this statute, Commerce has established a three-step methodology for selecting an adverse rate to be used in CVD proceedings:  namely, (1) Commerce will use the highest calculated rate for the identical program in the same investigation (excluding zero rates); (2) if no such identical program exists in the investigation, Commerce will use the highest calculated rate for the identical program in another CVD proceeding involving the same country; and, (3) if no identical program exists, Commerce will use the highest calculated rate (excluding *de minimis* rates) for a similar or comparable program (based on the treatment of the benefit) in another CVD proceeding involving the same country.  IDM at 9-10.  The Federal Circuit upheld this hierarchy under the previous version of the statute.[34]  *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014).

---

[34] The previous iteration of the statute did not include subsection (d)(3) which states that when Commerce "uses an adverse inference . . . in selecting from among the facts otherwise available, [Commerce] is not required . . . to estimate what the countervailable subsidy rate or dumping margin would have been if the interested party found to have failed to cooperate . . . had cooperated; or to demonstrate that the

This Court has recognized that § 1677e(d)(1) "codifies Commerce's hierarchy for selecting a rate in an adverse facts available situation." *POSCO v. United* States, 42 CIT __, __, 296 F. Supp. 3d 1320, 1339 (2018).  Commerce in this case followed the hierarchy.  Therefore, the court's analysis will focus on whether Commerce was required to consider the "totality of the circumstances" in selecting an AFA rate, and, if so, whether Commerce did so in this review.

The statute provides that in selecting an AFA rate Commerce "may apply any of the countervailable subsidy rates . . . including the highest such rate or margin, based on the *evaluation* by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available."  19 U.S.C. § 1677e(d)(2) (emphasis supplied).  The language of the statute clearly grants Commerce the authority to select the highest available rate, provided that Commerce considers the particular facts of the case when exercising such discretion.

The Federal Circuit in *BMW* found that it could not determine whether the AFA rate selected by Commerce was "unduly punitive" because Commerce failed to address the importer's argument regarding its "mitigating circumstances."  *BMW*, 926 F.3d at 1302.  The Federal Circuit held: "Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party."  *Id*.  The Federal Circuit further explained that the

---

countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party."  19 U.S.C. § 1677e(d)(3).

appropriate rate should not "impose punitive, aberrational, or uncorroborated margins";
rather, the AFA rate should "be a reasonably accurate estimate of the respondent's
actual rate, albeit with some built-in increase intended as a deterrent to non-
compliance." *Id.* at 1300 (citing *F.Illi De Cecco Di Filippo Fara S. Martino S.p.A. v.
United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).[35]

 The Government argues that *BMW* is not applicable because that case involved
an antidumping proceeding, and the instant case concerns the application of the
hierarchy for selecting AFA rates in a CVD proceeding.[36]   Def. Br. at 28.   The
Government's argument ignores that the statute granting Commerce the discretion to
use the highest rate applies to both countervailing duty and antidumping proceedings.
The statute states that Commerce "may apply any of the *countervailable subsidy rates
or dumping margins* . . . including the highest [AFA] rate. . . ." 19 U.S.C. § 1677e(d)(2)

---

[35] In a dissenting opinion, Chief Judge Prost concluded that "the Majority has erred by
imposing new, extra-statutory limits on the discretion that Congress granted to
Commerce." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1303 (Fed. Cir.
2019) (Prost, C.J., dissenting in part).  The Chief Judge noted that under the statute,
Commerce is already required to consider fully the circumstances that lead to a
respondent's non-cooperation before Commerce can rely on an adverse inference.  *Id.*
The Chief Judge explained: "The statute does not require Commerce, contrary to the
Majority's view, to *reconsider* those facts and circumstances when selecting an
appropriate, non-punitive AFA rate. . . . Nor does our case law contemplate an inquiry
into the 'seriousness of the conduct of the uncooperative party' . . . when selecting a
non-punitive AFA rate . . . ."  *Id.* at 1303-1304 (emphasis in original).

[36] The Government asserts that the AFA rate selected in *BMW* was a significantly
higher rate than was applied in this case, that the rates selected in this case are not
"punitive, aberrational, or uncorroborated" and that "Commerce is at liberty to exercise
its judgment and select a rate it finds appropriate to deter non-compliance."  Def. Br. at
28 (citing *BMW*, 926 F.3d at 1302).

(emphasis supplied).  Therefore, the Federal Circuit's holding in *BMW,* which states that the appropriate AFA rate "will depend upon the facts of a particular case" and "reflects the seriousness of the non-cooperating party's misconduct," is applicable to countervailing duty proceedings.  *See BMW,* 926 F.3d at 1301 (citations omitted).

Moreover, this Court has recognized that in applying the hierarchy to select an AFA rate in CVD proceedings, the statute requires that Commerce make "an evaluation of the specific situation . . . .  And, at a minimum, Commerce must apprise the court of the basis for its findings in this regard."  *POSCO*, 296 F. Supp. 3d at 1349 (citing *NMB Singapore*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)).  The Court has previously sustained Commerce's selection of the highest AFA rate using the established hierarchy because the Court determined that, based on the record as a whole, Commerce's explanation provided a reasonably "discernable path" for how the agency selected the rate.  *Rebar Trade Action Coal. v. United States*, 43 CIT __, __, 389 F. Supp. 3d 1371, 1381-1382 (2019) (citing *NMB Singapore Ltd.,* 557 F.3d at 1321-22).

Turning to the question of whether Commerce provided a reasonable explanation for its selection of the AFA rate with respect to the loans, the court concludes that Commerce did.  In particular, Commerce provided its reasoning for using the selected rates.  For the loans, Commerce initially selected the highest calculated rate for the same or similar program.  IDM at 14.  However, the highest rate for the identical program in the investigation was Double Coin's rate in the Preliminary Determination, which was lower than the rate calculated for Guizhou in the Preliminary Determination.  *Id.*  Commerce found that using the lower rate for Guizhou would "undermine Congress'

intent 'that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"  *Id.* (citing SAA at 870).  Instead, Commerce selected the highest non-*de minimis* rate for the comparable or a similar program in another People's Republic of China proceeding and selected the 10.54% rate from *Coated Paper from the People's Republic of China.  Id.* at 14-15.

Notably, Guizhou does not challenge the AFA rates applied to the loans as "punitive, aberrational, or uncorroborated."[37]  *See BMW,* 926 F.3d at 1301; *see also De Cecco*, 216 F.3d at 1032.  Guizhou does not identify an alternative AFA rate that Commerce could have selected using its established hierarchy, nor does Guizhou propose a way in which Commerce may have selected a lesser non-*de minimis* rate after a consideration of the "totality of the circumstances."  Pl. Br. at 39-41; Pl. Reply Br. at 14-16; *see Rebar Trade,* 389 F. Supp. 3d at 1381.[38]

Commerce explained that it applied AFA to the loans because Guizhou failed to report an entire type of financing in response to Commerce's questionnaires.  IDM at 14.  Commerce further explained that it selected the AFA rate for the loans based on its established hierarchy and found that the 10.54% rate from *Coated Paper from the*

---

[37] Guizhou's argument against Commerce's selection for the highest AFA rates focuses on the AFA rate selected for the grants.  Pl. Br. at 39-41; Pl. Reply Br. at 14-16.  Guizhou's briefs do not directly challenge the AFA rate selected for the loans as punitive and aberrational.  *Id.*

[38]   The Government at oral argument asserted that there is no basis in law for Guizhou's argument that since it provided *some* information that Commerce should have weighed that positive behavior against Guizhou's failure to provide certain other information.  *See* Oral Argument Tr. at 61-62.

*People's Republic of China* was the "highest calculated rate for a similar program in another China CVD proceeding."  *Id*.  Therefore, based on the record as a whole Commerce provided a reasonable explanation for its selection of the 10.58% AFA rate.

     With regard to the grants, as the court is remanding Commerce's application of AFA to these programs, the court defers consideration of the selection of the AFA rate applied to the grants.

**III.    Export Buyer's Credit Program**

     The Export Buyer's Credit Program ("EBCP") of the People's Republic of China Export-Import Bank ("China Export-Import Bank") is a program that extends credit at preferential rates to foreign importers to promote the export of Chinese goods.  *See* Administrative Measures of Export Buyer's Credit of EIBC, Exhibit II.B.11.a (English trans.), bar code 3471115-11 (May 19, 2016) ("The export buyer's credit managed by [the China Export-Import Bank] is an intermediate and long-term credit to foreigners, used for importers making payment at sight for goods to Chinese exporters, which may promote export of goods and technology services."); *see also SolarWorld Americas, Inc. v. United States,* 41 CIT __, __, 229 F. Supp. 1362, 1363 (2017) (noting that the China Export-Import Bank provides "preferential rates" under the EBCP); *Clearon Corp. v. United States,* 43 CIT __, __, 359 F. Supp. 3d 1344, 1347 ("*Clearon I*").

     In the investigation, Commerce examined whether respondents, Double Coin and Guizhou, benefited from the EBCP.  In pursuit of this examination, Commerce presented several rounds of requests for information from the GOC and the mandatory respondents.  IDM at 11-13.

Turning first to the GOC, Commerce in its initial questionnaire, asked the GOC to "provide the information requested in the Standard Questions Appendix with regard to all types of financing provided by the [China Export-Import Bank] under the Buyer Credit Facility and other state-owned banks."  Initial Questionnaire, Section II at 7.  In its response, the GOC provided none of the information requested and simply asserted, without substantiation, that "none of the U.S. customers of the respondents used the Export Buyers [sic] Credits from China Export-Import Bank during the POI."[39]  Letter Pertaining to the GOC's Response to Section II of CVD Questionnaire at 23, CD 106, CD 160; PD 176, PD 204 (May 19, 2016).

Commerce sought and obtained information on the record from sources other than the GOC that the China Export-Import Bank had revised the EBCP in 2013 to eliminate the threshold requirement limiting the provision of Export Buyer's Credits to business contracts exceeding USD 2 million.  IDM at 11.  Commerce also obtained information on the record from sources other than the GOC that indicated that the China Export-Import Bank was permitted to "disburse Export Buyer's Credits directly or through a third party partner and/or correspondent banks."  *Id.* at 12.

Based on this information, Commerce issued a supplemental questionnaire in which it asked the GOC to provide documents pertaining to the 2013 *Administrative*

---

[39] The GOC explained that it "checked with the mandatory responding companies regarding the usage information of the alleged program."  Letter Pertaining to the GOC's Response to Section II of CVD Questionnaire at 23, CD 106, CD 160; PD 176, PD 204 (May 19, 2016).  However, the GOC provided no further information as to how it confirmed non-usage of the Export Buyer's Credit Program ("EBCP") with the respondent companies.  *See id.*

*Measures* revisions and confirm whether the China Export-Import Bank extended credit through third-party banks, and, if so, to identify all participating banks.  *Id.* at 11-12.  In response, the GOC again failed to provide any documents related to the 2013 revisions, explaining that the "Export-Import Bank of China has also confirmed to the GOC that its 2013 internal guidelines/revised Administrative Measures are internal to the bank, non-public, and not available for release."  GOC Second Supplemental Questionnaire Response at 2, PD 392 (Sept. 26, 2016).  The GOC also stated that Commerce's questions related to the disbursement of Export Buyer's Credits through third-party banks were "not applicable" because "none of the U.S. customers of the respondents used the Export Buyer's Credit from [the China Export-Import Bank] during the POI . . . ."  *Id.*  Commerce found that the GOC's responses to the questionnaires demonstrated that the GOC refused to provide the information about the internal administration of the EBCP.  IDM at 13.

Turning next to Double Coin and Guizhou, both asserted in response to Commerce's questionnaires that none of their U.S. customers had used the EBCP and the two respondents provided signed self-certifications from each of their customers attesting to non-use of the program.  *Id.* at 28-29.  However, absent the requested information from the GOC that it had refused to provide, Commerce concluded that it did not have a basis on the record, including the self-certifications provided by the respondent companies, to verify non-use.[40]  *Id.* at 30-33.  Accordingly, Commerce found

---

[40] Commerce explained that without the requested information:

that the GOC did not cooperate to the best of its ability and applied AFA to find that

Guizhou and Double Coin used and benefited from the program.  *Id.* at 13.

### A.    Legal Framework

As discussed in the prior section, during CVD proceedings, Commerce requires

information from the respondent foreign government alleged to have provided the

subsidy and the respondent company alleged to have received from the subsidy.  *See*

discussion of legal framework for AFA *supra* Section II.A.  When necessary information

is not available on the record, or a respondent significantly impedes an investigation,

provides information that cannot be verified, or withholds or fails to provide Commerce

with the requested information by the set deadline, then the statute directs Commerce

to "use facts otherwise available in reaching the applicable determination."  19 U.S.C. §

1677e(a); s*ee* discussion of legal framework for AFA *supra* Section II.A.  Commerce

may use an adverse inference in selecting from the facts available if Commerce finds

that the respondent "has failed to cooperate by not acting to the best of its ability to

comply with a request for information . . . ."  19 U.S.C. § 1677e(b)(1).  The "best of its

---

> [T]he Department determined that the information provided
> by the GOC on the record about this program was
> incomplete and that our understanding of this program was
> unreliable.  As such, we recognized that we could not rely on
> information about this program provided by parties other
> than the GOC, *i.e.*, the respondents.  Therefore, while we did
> consider the customer certifications provided by the
> respondents, without a complete and verifiable
> understanding of the program's operation, especially with
> regard to the involvement of third party banks, the
> information provided by the respondents is also unverifiable.

IDM at 30.

ability" standard is "determined by assessing whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp.,* 337 F.3d at 1382.

A government's failure to provide information can constitute a failure to cooperate to the best of its ability. *See Fine Furniture,* 748 F.3d at 1368. When a foreign government does not cooperate with Commerce's investigation, an inference adverse to the interests of the non-cooperating government respondent may collaterally affect a respondent company, even if the respondent company was otherwise cooperative. *See id.* at 1373 ("Although it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent.").

However, this Court has recognized that in such circumstances the application of AFA "may adversely impact a cooperating party, although Commerce should seek to avoid such impact if relevant information exists elsewhere on the record." *Archer Daniels Midland Co. v. United States,* 37 CIT 760, 769, 917 F. Supp. 2d 1331, 1342 (2013). The Court has also held that: "To apply AFA in circumstances where relevant information exists elsewhere on the record — that is, solely to deter non-cooperation or 'simply to punish' — would make the agency's determination based on an incomplete (and therefore, inaccurate) account of the record; that is a fate this court should sidestep." *Guizhou Tyre Co., Ltd. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018) ("*Guizhou I*").

### B.    Positions of the Parties

Plaintiffs argue that despite the GOC's non-cooperation, Commerce could have verified non-use of the EBCP by relying on information provided by respondents during the proceeding.  Pl. Br. at 41-43; Consol. Pls. Br. at 11-13.  Plaintiffs maintain that Guizhou, Double Coin and their U.S. customers cooperated fully throughout the review. Plaintiffs note that Double Coin and Guizhou responded to Commerce's inquiries and submitted information that none of their customers used the EBCP.  *Id.*  Double Coin and Guizhou maintain that they confirmed non-use of the program by contacting each of their U.S. customers and obtaining signed self-certifications of non-use of the program. *Id.*

Plaintiffs argue further that the Court has held repeatedly that Commerce's failure to verify evidence of non-use of this program renders Commerce's application of AFA unsupported by substantial evidence.[41]  Pl. Br. at 41; *see also* Consolidated Plaintiffs' Reply Brief ("Consol. Pls. Reply Br.") at 4.  Plaintiffs argue that the Court has held that it would be inappropriate for Commerce to apply AFA simply to punish the government's non-cooperation when relevant evidence exists elsewhere on the record.  Pl. Br. at 42-43 (citing to *Changzhou Trina Solar Energy Co.,* 41 CIT __, __, 255 F. Supp. 3d 1312,

---

[41] *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 43 CIT __, 405 F. Supp. 3d 1317 (2019); *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT __, 399 F. Supp. 3d 1346 (2019); *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT __, 389 F. Supp. 3d 1315 (2019); *Clearon Corp. v. United States*, 43 CIT __, 359 F. Supp. 3d 1344 (2019); *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, 352 F. Supp. 3d 1316 (2018); *Guizhou Tyre Co., Ltd. v. United States*, 42 CIT __, 348 F. Supp. 3d 1261 (2018).

1313 (2017); *Guizhou I*, 348 F. Supp. 3d at 1270).  Plaintiffs urge the court to make the same determination in this case.  *Id.* at 43.

The Government argues that Commerce properly applied AFA in this case to determine that Guizhou's and Double Coin's customers used the EBCP because the GOC's failure to cooperate prevented Commerce from obtaining information necessary to verify non-use of the EBCP.  Def. Br. at 38-39.  The Government also argues that Commerce noted that the record indicated that the GOC amended the EBCP in 2013, and, based on this information, Commerce specifically asked the GOC to provide documents pertaining to the 2013 program revision.  *Id.* at 38.  The Government notes that the GOC did not provide the documents, nor did the GOC provide the information that Commerce requested in the Standard Questions Appendix to Commerce's Initial Questionnaire concerning "all types of financing provided by the [China Export-Import Bank] under the Export Buyer's Credit Facility and other state-owned banks.'"  *Id*. (quoting Letter Pertaining to GOC's Supplemental Questionnaire Response Part 2 at 7, CD 323, CD 324; PD 398, PD 399 (Oct. 3, 2016)).

The Government argues that by failing to respond fully to Commerce's questions, the GOC did not provide the information necessary to permit Commerce to determine whether the EBCP provided a financial contribution or was specific.  *Id*. at 39.  Accordingly, Commerce found that the GOC did not cooperate to the best of its ability and determined, as AFA, that the EBCP "constitutes a financial contribution and meets

the specificity requirements" under the statute.[42]  IDM at 13.  Similarly, due to the

GOC's failure to respond to Commerce's requests for information about the operation of

the program, Commerce found that the plaintiffs used and benefitted from the program

because the companies' claims of non-use of the program were unverifiable.  Def. Br. at

39-40.

The Government asserts that Commerce considered all of the record information,

including respondents' customer certifications of non-use, but Commerce found that this

information could not be verified because the GOC refused to cooperate and, thereby,

failed to provide critical information.  *Id*. at 40.  The Government notes that the Court

has previously held that only the GOC, and, in particular, the China Export-Import Bank,

could provide the information necessary to determine whether respondents or their

customers received a benefit from the EBCP during the period of review ("POR").  *Id*. at

36 (citing *Changzhou I*, 195 F. Supp. 3d at 1355).  The Government argues further that,

without the requested information, the GOC's "unsubstantiated claim that the

companies did not use the [EBCP] was not verifiable," and, therefore, Commerce's

determination to apply AFA to find that Guizhou and Double Coin used and benefited

from the program was supported by substantial evidence.  *Id*. at 38-39.

---

[42] Commerce has explained that "in instances in which the foreign government fails to adequately respond to [Commerce's] questionnaires, it is [Commerce's] practice to apply adverse inferences and assume that the alleged subsidy programs constitute a financial contribution and are specific within the meaning of sections 771(5)(D) and 771(5A) of the Act, respectively." *Countervailing Duty New Shipper Review: Certain In-shell Roasted Pistachios from the Islamic Republic of Iran*, 73 Fed. Reg. 9,993 (Dep't Commerce Feb. 25, 2008) (final results CVD new shipper review) and accompanying Issues and Decision Memorandum at Comment 2.

### C.      Analysis

The Court has issued multiple opinions addressing Commerce's use of adverse facts available to find that a cooperating party benefited from the EBCP because of the GOC's failure to provide information requested by Commerce.  *See, e.g.,* the line of cases captioned *Clearon Corp. v. United States*;[43] the line of cases captioned *Guizhou*

---

[43] *See Clearon Corp. v. United States,* 43 CIT __, __, 359 F. Supp. 3d 1344, 1359-1360 (2019) (remanding to Commerce, noting that Commerce failed to explain why the information it sought related to the "inner workings" of the EBCP was "necessary to make a determination of whether the manufacture, production, or export of [respondent's] merchandise has been subsidized")*; Clearon Corp. v. United States*, 44 CIT __, __, 474 F. Supp. 3d 1339, 1353 (2020) (remanding to Commerce, noting that Commerce explained the reason that it wanted the withheld information, but failed to make clear that "missing information was necessary" to determine whether the EBCP provided a benefit to the respondent); *Clearon Corp. v. United States*, Slip Op. 21-56, 2021 WL 1821448, at *2-3 (CIT May 6, 2021) (sustaining Commerce's decision to accept, under protest, respondents' claims of non-use).

 *Tyre Co. v. United* States;[44] the line of cases captioned *Changzhou Trina Solar Energy*

*Co. v. United States;*[45] the line of cases captioned *RZBC Grp. Shareholding Co. v.*

---

[44] *See Guizhou Tyre Co. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1271 (2018) (remanding, holding that "Commerce had a clear path to find non-use by either accepting the declarations submitted by Plaintiffs and their U.S. customers or by verifying these declarations.  Instead, Commerce has chosen a more convoluted route in substituting facts derived from the record with its own unsupported conclusions."); *Guizhou Tyre Co. v. United States*, 43 CIT __, __, 399 F. Supp. 3d 1346, 1350-1353 (2019) (remanding, noting that Commerce failed to explain the reason that the changes to the EBCP's operation prevented Commerce from verifying claims of non-use); *Guizhou Tyre Co. v. United States,*  43 CIT __, __, 415 F. Supp. 3d 1402, 1405 (2019) (remanding, explaining that Commerce must attempt verification before concluding that there is a "gap" in the record); *see also Guizhou Tyre Co. v. United States*, 43 CIT __, __, 389 F. Supp. 3d 1315, 1322 (2019) (remanding, explaining that Commerce did not explain why the respondents' responses and customer declarations were unverifiable, or explain why the information about the EBCP's operation was necessary to verify claims of non-use); *Guizhou Tyre Co. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1335, 1342 (2019) (remanding, ordering Commerce "to pursue verification of the non-use affidavits on record from Plaintiffs; otherwise, as it stands, the Department's use of adverse facts available to impute use of the EBCP is unlawful on the record of this case"); *Guizhou Tyre Co. v. United States*, 44 CIT __, __, 447 F. Supp. 3d 1373, 1376 (2020) (sustaining Commerce's Second Redetermination, determining that Commerce's conclusion that the factual record indicated non-use of the EBCP by Guizhou was supported by substantial evidence).

[45] *Compare Changzhou Trina Solar Energy Co. v. United States,* 40 CIT __, __, 195 F. Supp. 3d 1334, 1355 (2016) (upholding Commerce's use of AFA because the GOC denied Commerce access to the China Export-Import bank records and Commerce explained that it was left without a means to verify non-use, but where there were no customer certifications of non-use on the record) *with*, *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __,__, 352 F. Supp. 3d 1316, 1327 (2018) (remanding, holding that Commerce must explain "if and how certifications of non-use are unverifiable in the absence of the GOC's cooperation"); *Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 19-137, 2019 WL 5856438, at *4 (CIT Nov. 8, 2019) (remanding, noting that the court "cannot sustain Commerce's determination that verification would be impossible or unduly onerous" because "it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program"); and, *Changzhou Trina Solar Energy Co. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1287, 1291-93 (2020) (sustaining Commerce's decision to

*United States*;[46] the line of cases captioned *Yama Ribbons and Bows Co. v. United*

*States*;[47] and, the line of cases captioned *Jiangsu Zhongji Lamination Materials Co. v.*

---

accept, under protest, respondents' claims of non-use, but noting that the court on remand directed Commerce and interested parties to collaborate to find a way for Commerce to verify the claims); *see also Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 18-167, 2018 WL 6271653, at *3 (CIT Nov. 30, 2018) (remanding, noting that "Commerce does not explain why it was necessary for it to fully understand the EBCP in order to ascertain claims of non-use."); *Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 19-143, 2019 WL 6124908, at *3 (CIT Nov. 18, 2019) (remanding, explaining that "[a]lthough Commerce has shown that the GOC failed to answer certain questions regarding the EBCP's operation, it is still not entirely clear to the court that the missing information is required to effectively verify respondent's non-use of the program. . . . Commerce needs to at least attempt to verify the certifications of non-use in this case."); *Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 20-109, 2020 WL 4464251, at *3 (CIT Aug. 4, 2020) (sustaining Commerce's decision on remand to accept the claims of non-use under protest, but noting that the court did not order this result and "Commerce has not persuaded the court that verification is impossible . . . .")

[46] *See Yama Ribbons and Bows Co. v. United States*, 43 CIT __, __, 419 F. Supp. 3d. 1341, 1356 (2019) (remanding, holding that Commerce "erred, specifically, when it ignored the considerable evidence Yama and the government of China provided indicating that Yama had not in fact benefitted from the program and when it overlooked that there was a complete lack of evidence that Yama had obtained a benefit."); *Yama Ribbons and Bows Co. v. United States*, Slip Op. 20-107, 2020 WL 4386773, at *1 (upholding Commerce's decision to accept, under protest, that respondent and its customers did not use the program); *see also Yama Ribbons and Bows Co. v. United States*, Slip Op. 21-50, 2021 WL 1716644, at *7 (remanding, holding that "[t]here was no evidence on the record of the review to support a finding that any U.S. customer of Yama used the EBCP, and the record contained evidence refuting any such finding.").

[47] *See RZBC Group Shareholding Co., Ltd. v. United States*, Slip Op. 16-64, 2016 WL 3880773, at *6 (remanding, holding that "the record appears to present easily verifiable evidence that RZBC did not use the Buyer's Credit program because it never signed a sales contract above $2 million."); *RZBC Group Shareholding Co., Ltd. v. United States*, 41 CIT __, __, 222 F. Supp. 1196, 1201 (2017) (sustaining Commerce's decision to apply AFA because "[t]he $2 million threshold is ambiguous, and for that reason Commerce cannot ensure non-use of the Buyer's Credit program simply by examining the value of RZBC's contracts.").

*United States*.[48]  In a number of opinions, the Court has found unreasonable

Commerce's determination that, despite customer certifications of non-use, there was

still missing information about the EBCP that prevented Commerce from verifying use of

the program.  *See, e.g., Yama Ribbons and Bows Co. v. United States*, 43 CIT __, __,

419 F. Supp. 3d 1341, 1356 (2019); *Jiangsu Zhongji Lamination Materials Co., Ltd. v.*

*United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1333 (2019) ("*Jiangsu I*").

Specifically, the Court has on occasion held that Commerce failed to explain its finding

that the withheld information about the operation of the EBCP was necessary to verify

non-use.  *See*, *e.g.*, *Jiangsu I*, 405 F. Supp. 3d at 1332; *Clearon Corp. v. United States*,

44 CIT __, __, 474 F. Supp. 3d 1339 (2020) ("*Clearon II*").

    In reaching these conclusions, the Court has determined that to apply an adverse

inference to find that a cooperating party benefitted from the EBCP based on the GOC's

failure to cooperate, "Commerce must: (1) define the gap in the record explaining

exactly what information is missing from the record necessary to verify non-use; (2)

establish how the withheld information creates this gap by explaining why the

information the GOC refused to give was necessary to verify claims of non-use; and (3)

---

[48] *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1333-34 (2019) (remanded, noting that Commerce must "explain why a complete understanding of the operation of the program is necessary to verify non-use of the program" and encouraging the parties to identify an alternative verification procedure); *Jiangsu Zhongji Lamination Materials Co. v. United States*, Slip Op. 20-39, 2020 WL 1456531, at *2 (CIT Mar. 24, 2020) (sustaining Commerce's decision to accept, under protest, respondents' claims of non-use, but noting that the court on remand ordered Commerce to "consider what information could be verified that would show nonuse" and directed all parties to "contemplate a solution to the impasse and to confer").

show that only the withheld information can fill the gap by explaining why other

information, on the record or accessible by respondents, is insufficient or impossible to

verify." *Jiangsu I*, 405 F. Supp. 3d at 1333.  Consistent with this reasoning, the court in

the instant case will examine whether Commerce: (1) identified the missing information

in the record; (2) explained the reason that the withheld information about the operation

of the EBCP was necessary to verify the customers' claims of non-use; and, (3)

provided the reasons that Commerce could not rely on self-certifications from the

respondents' customers.

The court concludes that Commerce: (1) identified the gap in the record created

by the failure of the GOC to provide requested information in regard to key aspects of

the functioning of the EBCP; but (2) neglected to explain reasonably the reason that  the

missing information was a critical, if not essential, tool of verifying claims of non-use;

and, (3) failed to articulate a reasonable explanation as to why Commerce could not

verify information on the record from respondents' customers.  As a consequence, the

court cannot at this time sustain Commerce's application of AFA because Commerce

failed to explain reasonably the reason that  the withheld information about the

operation of the EBCP was necessary to verify company claims of non-use, and failed

to outline for the court the reasons that the customer certifications were "insufficient or

impossible to verify."  *See Jiangsu I*, 405 F. Supp. 3d at 1333.

### 1.      Whether Commerce Identified the Missing Information in the Record

In its Final Determination, Commerce stated expressly that there were two

particulars related to the 2013 revisions to the EBCP that were missing from the record,

whether: (1) the China Export-Import Bank eliminated the USD 2 million threshold for an applicant to receive the credit; and, (2) third-party banks were authorized to disburse program credits to respondents' customers.  IDM at 11-13.  Commerce in turn specifically asked the GOC to provide information on the 2013 revisions to allow Commerce to evaluate which respondents had received a possible subsidy and to verify the information.[49]  *Id.*

With respect to the threshold, the GOC responded to Commerce's questionnaire with an assertion — submitted without any documentation or other substantiation — that the China Export-Import Bank had "confirmed [to the GOC] that [the USD 2 million] requirement for contract amount has been strictly implemented in practice and no business contract or purchase order without clearly noting the exact contract amount can be approved for loan support through export buyer's credits of [China Export-Import Bank]."  Letter Pertaining to the GOC's Response to Section II of the CVD Questionnaire at 24, CD 106, CD 160; PD 176, PD 204 (May 19, 2016).  Commerce explained that information on the record indicated that the GOC revised the EBCP in 2013 to eliminate the minimum requirement.  IDM at 11.  When Commerce asked the GOC to provide documents related to the 2013 program revision, the GOC refused to provide the documentation, stating that the "[China Export-Import Bank] has also

---

[49] *See Ansaldo Componeti, S.p.A. v. United States*, 10 CIT 28, 36, 628 F. Supp. 198, 205 (1986) ("It is Commerce, not the respondent, that determines what information is to be provided for an administrative review.").

confirmed to the GOC that its 2013 internal guidelines/revised Administrative Measures

are internal to the bank, non-public, and not available for release."  Letter Pertaining to

GOC's Second Supplemental Questionnaire Response at 2, PD 392 (Sept. 26, 2016).

With respect to the involvement of third-party banks, Commerce asked the GOC

to "provide a list of all partner/correspondent banks involved in the

disbursement/settlement of export buyer's credits."  *Id*.  Again, the GOC did not provide

the requested information.  *Id.*  Instead, the GOC once more responded with an

undocumented assertion that "this question is not applicable" because "none of the U.S.

customers of the respondents used the Export Buyer's Credit from [China Export-Import

Bank] during the POI."  *Id.*  Commerce explained that the GOC's failure to provide the

requested information related to the alleged elimination of the threshold requirement

and involvement of third-party banks left Commerce without the information necessary

to make a determination as to program use or as to whether the program constitutes a

financial contribution or is specific.  IDM at 12-13.

In sum, Commerce requested information on the threshold requirement and

involvement of third-party banks.  In each instance, the GOC declined to provide the

requested information.  Commerce accordingly defined the gap in the record and

identified "what information is missing from the record necessary to verify non-use."

*See Jiangsu I*, 405 F. Supp. 3d at 1333.

     **2.**     **Whether Commerce Explained the Reason That the Withheld Information Was Necessary to Verify Non-Use**

The court now turns to whether Commerce provided a reasonable explanation of why the missing information concerning the involvement of third-party banks and the existence of the threshold was necessary to verify non-use of the program.

The Government maintains that the GOC's response to Commerce's questionnaires was not sufficient because there continues to be ambiguity with regard to the threshold requirement and the GOC's response does nothing to clarify the ambiguity.  *See* Oral Argument Tr. at 102; *see also* IDM at 12.  At oral argument, plaintiffs did not dispute that (1) there is ambiguity on the record as to the threshold and (2) the GOC failed to respond to Commerce's requests with regard to the involvement of third-party banks.  Oral Argument Tr. at 102-103.  Further, in its brief, Double Coin concedes that the program "could operate in a number of ways that are unclear from the record."  Consol. Pls. Br. at 13.  Notwithstanding plaintiffs' explicit recognition of the ambiguity as to the threshold and the GOC's failure to respond as to the involvement of third-party banks, plaintiffs assert that the self-certifications by respondents' customers were sufficient to establish non-use of the EBCP, and, accordingly, Commerce should have relied on them.

Commerce in its Final Determination explained that without the requested information and documents from the GOC, Commerce did not have the information "critical to understanding how Export Buyer's Credits flow to and from foreign buyers

and the EX-IM Bank."  IDM at 30.  Commerce found that "[a]bsent the requested

information, the GOC's claims that the respondent companies did not use this program

are not verifiable.  Moreover, without a full understanding of the involvement of third

party banks, the respondent companies' (and their customers') claims are also not

verifiable."  *Id.*  Commerce further explained that it did not find it "appropriate" to verify

the GOC's claims of non-use due to its non-cooperation during the investigation and

refusal to provide the requested information about the 2013 amendments to the

operation of the program.  *Id*. at 32.  With regard to the respondents and their

customers' claims of non-use, Commerce explained that:

> We also chose not to verify the information provided by the
> respondent companies because the Department's
> incomplete understanding of the operation of this program
> prevented the Department from fully understanding what
> information an exporter would have regarding whether its
> buyers were using Export Buyer's Credits, *e.g.*, whether an
> exporter would be aware of and would have documentation
> showing, by virtue of the operational requirements of the
> program, that its buyers were applying for or receiving
> credits under the program, and whether they meet the
> threshold requirements for financing, and what banking
> institutions were involved with providing the financing.
> Without the information the Department requested from the
> GOC, we lack an understanding of these aspects of the
> program which are *crucial to the verification of the program*.
> Therefore, the Department was hindered in developing a
> plan for verification of the respondents' (and their
> customers') and the GOC's claims of non-use, *e.g.,*
> identifying appropriate accounting records.

*Id.* (emphasis supplied).

         Commerce's explanation states its conclusion that, without an understanding of

the operation of these specific aspects of the EBCP, Commerce was impeded from

verifying the claims of non-use provided by the respondent companies and their customers; however, Commerce did not state the reasons that the missing information about two core elements in the operation of the program — the existence (or not) of a minimum dollar threshold and the participation of third-party banks — was "crucial to the verification of the program."  *Id.*; *see also Jiangsu I*, 405 F. Supp. 3d at 1333; *Clearon I*, 359 F. Supp. 3d at 1360.

As noted by the Federal Circuit, "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."  *NMB Singapore,* 557 F.3d at 1319; *see also State Farm*, 463 U.S. at 43 ("We will . . . 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'") (citation omitted).  Commerce in this determination did not demonstrate the ways in which the information about the threshold and third-party banks related to its verification of the claims of non-use.[50]

---

[50] In contrast, in its remand redetermination pursuant to *Clearon I*, Commerce explained that the withheld information related to the threshold requirement was necessary because the threshold is:

> an important limitation to the universe of potential loans under the program and can assist us in targeting our verification of non-use.  However, if the program is no longer limited to USD 2 million contracts, this increases the difficulty of verifying loans without any such parameters . . . .  Therefore, by refusing to provide the requested information, and instead providing unverifiable assurances that other rules regarding the program remained in effect, the GOC impeded Commerce's understanding of how this program operates and how it can be verified.

Curiously, Commerce states that the GOC's failure to answer Commerce's questions about the threshold and third-party banks prevented Commerce from understanding "the flow to and from foreign buyers" of the export credits provided under the EBCP.  IDM at 30.  The underlying substance of Commerce's assertion sounds reasonable; however, Commerce then failed to describe and explain the ways in which the missing information crippled Commerce's efforts to detect and track the flow of the credits to and from foreign buyers so as to be able to verify non-use with respondents and its customers.  *See id*.

---

Final Results Pursuant to Court Remand at 14, Clearon Corp. v. United States, 43 CIT __, 359 F. Supp. 3d 1344 (2019) (Court No. 17-00171), ECF No.47-1 ("Clearon Remand Results").  In this way, by identifying the threshold requirement as an essential tool to narrow its review of customer records, Commerce provided a more complete explanation for its determination that the withheld information was necessary to verify claims of non-use.

Similarly, with regard to the information concerning the third-party banks, Commerce in the Clearon Remand Results explained that:

> Given the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administered is necessary to verify claims of non-use.  Thus, the GOC's refusal to provide the 2013 revisions, which provide internal guidelines for how this program is administrated by the [China Export-Import Bank], as well as other requested information, such as key information and documentation pertaining to the application and approval process, interest rates, and partner/correspondent banks, impeded Commerce's ability to conduct its investigation of this program and to verify the claims of non-use by Heze Huayi's customers.

*Id*. at 16-17.

In sum, for the aforementioned reasons, Commerce did not provide an explanation as to the reasons that the information withheld by the GOC was necessary for Commerce to verify claims of non-use.

### 3.    Whether Commerce Explained the Reason That Information on the Record Was Insufficient or Impossible to Verify

Finally, the court will examine whether Commerce's finding that customer certifications are unverifiable is supported by substantial evidence.

### a.    Standard for Cooperating Non-Government Respondents

As noted, Commerce may use facts otherwise available if necessary information is missing from the record, or if "an interested party or any other person . . . withholds information that has been requested . . . or provides such information but the information *cannot be verified* . . . ."  19 U.S.C. § 1677e(a) (emphasis supplied); *see also* SAA at 869.  This Court has concluded that, while it is permissible under the statute for Commerce to make an inference that is adverse to the cooperating non-government party, "it is disfavored and should not be employed when facts not collaterally adverse to a cooperative party are available."  *Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT 1206, 1212 n.10, 865 F. Supp. 2d 1254, 1262 n.10 (2012), *aff'd*, 748 F.3d 1365 (Fed. Cir. 2014).  In addition, the Court has noted and the Federal Circuit has affirmed that "[w]hen Commerce has access to information on the record to fill in the gaps created by the lack of cooperation by the government, as opposed to the exporter/producer . . . it is expected to consider such evidence."  *GPX Int'l Tire Corp. v.*

*United States*, 37 CIT 19, 58-59, 893 F. Supp. 2d 1296, 1332 (2013), *aff'd*, 780 F.3d 1136 (Fed. Cir. 2015).

Commerce itself has explained that in instances in which a foreign government has failed to respond adequately to Commerce's questionnaires, Commerce will opt to calculate the benefit by relying, to the extent possible, on information provided by a respondent company.  *See United States Steel Corp. v. United States*, 33 CIT 1935 (2009); *see also Certain In-shell Roasted Pistachios from the Islamic Republic of Iran*, 73 Fed. Reg. 9,993 (Dep't Commerce Feb. 25, 2008) (final results CVD new shipper review) and accompanying Issues and Decision Memorandum ("Roasted Pistachios 2008 IDM").  Specifically, Commerce has found that "if a respondent has claimed that it can establish non-use of a program as a factual matter, without an accompanying or complete government response, [Commerce] has determined that it will analyze the responses provided by the company to determine if the information on the record is sufficient to establish non-use."  Roasted Pistachios 2008 IDM at Comment 2; *see Certain In-shell Roasted Pistachios from the Islamic Republic of Iran*, 71 Fed. Reg. 27,682 (Dep't Commerce May 12, 2006) (final results CVD admin. review) and accompanying Issues and Decision Memorandum at Comment 2 ("Roasted Pistachios 2006 IDM"); *see also High Pressure Steel Cylinders from the People's Republic of China*, 77 Fed. Reg. 26,738 (May 7, 2012) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 21 (Commerce explained that it would rely on a respondent company's information to the extent that such information is "useable and verifiable.").

By submitting customer self-certifications, respondents in this case provided

information on the record to support their claims of non-use.  Accordingly, the court will

examine whether Commerce provided a reasonable explanation for its finding that the

respondents' information was insufficient to verify non-use.

### b.  Commerce Past Practice with Regard to Information from Cooperating Non-Government Respondents

Plaintiffs argue that the customer self-certifications of themselves should have

been sufficient for Commerce to establish that none of the respondents' customers used

the program.  Consol. Pls. Br. at 13.  Plaintiffs note that Commerce found in its 2016

determination in *Solar Cells from China AR 2*[51] that similar self-certifications were

sufficient to establish non-use of the EBCP.  Pl. Br. at 43.

In this case, Commerce explained that, despite plaintiffs' assertions, the

information on the record is not identical to the information submitted in *Solar Cells from

China AR 2*.  IDM at 30.  Since *Solar Cells from China AR 2*, in which Commerce relied

on customer self-certifications to establish non-use, Commerce has found that

information placed on the record in subsequent administrative reviews of the EBCP

indicates that the GOC revised the program in 2013 to eliminate the threshold

---

[51] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't Commerce July 19, 2016) (final results CVD admin. review) and accompanying Issues and Decision Memorandum at Comment 1.

requirement and permit the disbursement of buyer's credits through a third-party partner

bank and/or correspondent banks.[52]  *Id.*

　　As noted, when using an adverse inference, Commerce may rely on any

information placed on the record, including information from the petition, final

determination or a *previous administrative review*.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. §

351.308(c)(1)-(2).  Here, Commerce explained that, unlike in *Solar Cells from China AR*

*2*, Commerce had information on the record from *Citric and Certain Citrate Salts* and

*Certain Amorphous Silica Fabrics from the PRC* "regarding the 2013 revisions to the

program and the involvement of third-party banks."  IDM at 30; *see also* IDM at 11-12

(citing Department of Commerce's Memorandum Pertaining to Placing Information on

---

[52] In this proceeding, Commerce put information on the record, including: (1) the Memorandum from the Department of Commerce, "Administrative Review of Countervailing Duty on *Citric and Certain Citrate Salts*; Verification of the Questionnaire Response Submitted by the Government of the People's Republic of China," October 7, 2014; and, (2) a Letter from the Government of China, "Certain Amorphous Silica Fabrics from the People's Republic of China: CVD Investigation; GOC 7th Supplemental Response," September 6, 2016.  Department of Commerce's Memorandum Pertaining to Placing Information on the Record, PD 385 (Sept. 19, 2016).  In *Citric and Certain Citrate Salts*, Commerce met with China Export-Import Bank officials, Ms. Tao Hong, Division Chief, and Mr. Liao Junyu, International Export Credit Affairs Division of the Risk Management Department of the China Export-Import Bank.  *Id.* at Attachment 1.  Commerce explained that "[China Export-Import Bank] officials indicated the *Administrative Measures* was [sic] revised in 2013 and eliminated the contract minimum."  *Id*.  In *Certain Amorphous Silica Fabrics*, the GOC explained that the China Export-Import Bank requires the buyer or seller to open accounts with either the Bank or one of its partner banks: "While these accounts are typically opened at the [China Export-Import Bank], sometimes a customer prefers another bank (*e.g.*, the Bank of China) which is more accessible than an account with the [China Export-Import Bank] . . . . The funds are first sent from the [China Export-Import Bank] to the borrower's (importer) account at the [China Export-Import Bank]Ex-Im Bank (or other approved partner bank)."  *Id.* at Attachment 2.

the Record, PD 385 (Sept. 19, 2016)).[53]  Accordingly, Commerce stated that it could not

in this proceeding rely on customer self-certifications to verify non-use as Commerce

had done in *Solar Cells from China AR 2*.  *Id.* at 30.

Rather, Commerce in this proceeding found that the China Export-Import Bank is

the only entity that can provide information about the operation of the EBCP; however,

due to the GOC's failure to cooperate and failure to respond fully to Commerce's

requests for information, Commerce "determined that the information provided by the

GOC on the record about this program was incomplete and that our understanding of

this program was unreliable."  *Id*.  Therefore, Commerce concluded that without

complete and verifiable documentation of the program's operation, especially with

regard to the involvement of third-party banks, the customer self-certifications of non-

use were unverifiable.  *Id.*

Double Coin argues that by not relying on respondents' information, Commerce

abandoned its longstanding practice of relying on information from respondent

---

[53] Since *Solar Cells from China AR 2*, Commerce has placed on the record in subsequent administrative reviews that involve the EBCP — including administrative reviews from multiple different investigations — information from *Citric and Certain Citrate Salts* and *Certain Amorphous Silica Fabrics from the PRC* concerning possible 2013 program revisions to the EBCP.  *See, e.g., Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 81 Fed. Reg. 71,056 (Dep't Commerce Oct. 14, 2016) (preliminary results CVD admin. review) and accompanying Preliminary Decision Memorandum at 13; *Certain Amorphous Silica Fabric from the People's Republic of China*, 82 Fed. Reg. 8,405 (Dep't Commerce Jan. 25, 2017) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at 11-12, 61; *Chlorinated Isocyanurates From the People's Republic of China*, 82 Fed. Reg. 27,466 (Dep't Commerce June 15, 2017) (final results CVD admin. review) and accompanying Issues and Decision Memorandum at Comment 2.

companies when a foreign government fails to cooperate. Consol. Pls. Br. at 11-13.

(citing *Certain In-Shell Pistachios from the Islamic Republic of Iran*, 73 Fed. Reg. 9,993

(Dep't Commerce Feb. 25, 2008) (final results CVD new shipper review) and

accompanying Issues and Decision Memorandum at Comment 2; *Certain Hot-Rolled*

*Carbon Steel Flat Products from India*, 73 Fed. Reg. 40,295 (Dep't Commerce July 14,

2008) (final results CVD admin. review) and accompanying Issues and Decision

Memorandum at Comment 6). Double Coin's characterization of Commerce's approach

— asserting that Commerce has accepted automatically respondent companies' claims

to establish non-use — is not accurate. Rather, as stated above, Commerce's

approach has been to analyze the responses provided by a company respondent to

determine if the respondent's information is sufficient to establish as a factual matter

non-use of a program without government cooperation. *See* Roasted Pistachios 2008

IDM at Comment 2; Roasted Pistachios 2006 IDM at Comment 2.

Further, Commerce has clarified that it will "rely on the responsive producer [sic]

or exporter's records to determine the existence and amount of the benefit to the extent

that those records are useable *and verifiable*." *High Pressure Steel Cylinders from the*

*People's Republic of China*, 77 Fed. Reg. 26,738 (May 7, 2012) (final determination

CVD investigation) and accompanying Issues and Decision Memorandum at 21

(emphasis supplied). Accordingly, Commerce's action was consistent with past practice

because Commerce in its Final Determination explained that it had in fact "considered

all information on the record of this proceeding, including the certifications provided by

the respondent companies." IDM at 34. However, Commerce concluded that it was

unable to rely on the self-certifications from respondents' customers due to "the lack of

a verifiable understanding of the program."  *Id.*

> ### c.    Commerce's Decision Not to Verify Customers' Certifications of Non-Use

At oral argument, plaintiffs maintained that Commerce could "easily" have

verified the non-use self-certifications by examining customer's loan application records,

accounting and other records.  Oral Argument Tr. at 92.  Commerce in its IDM found

that such an examination would not have been sufficient to verify the claims of non-use

because "without a complete understanding of the involvement of third-party banks and

minimum lending thresholds, about which the GOC declined to provide information, the

claims are not meaningful and are *unverifiable* because . . . the Department *cannot*

*identify the appropriate records for review*."  IDM at 32 (emphasis supplied).

The statute and legislative history confirm that Commerce may use facts

otherwise available if, among other requirements, necessary information is missing from

the record, or if "an interested party or any other person . . . withholds information that

has been requested . . . or provides such information but the information cannot be

verified . . . ."  19 U.S.C. § 1677e(a).  The SAA further states that: "New section 776(a)

requires Commerce . . . to make determinations on the basis of facts available where

requested information is missing from the record or *cannot be used* because, for

example, it has not been provided, it was provided late, *or Commerce could not verify the information*."[54]  SAA at 869 (emphasis supplied).

Commerce clearly has the authority to use facts otherwise available if information on the record cannot be verified.  Nevertheless, as noted by the Court, to apply AFA Commerce cannot "simply declare" that evidence on the record is "unverifiable." *Guizhou Tyre Co. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1335, 1343 (2019) ("*Guizhou V*").[55]  Rather, Commerce must explain that, due to a respondent's failure to

---

[54] The SAA further states that: "In such cases, Commerce and the Commission must make their determinations based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration. The agencies will be required, consistent with new section 782(e), to consider information requested from interested parties that: (1) is on the record; (2) was filed within the applicable deadlines; and (3) *can be verified*."  SAA at 869 (emphasis supplied).

[55] *Guizhou IV* and *V* resulted from a countervailing duty investigation of off-the-road tires from the People's Republic of China ("PRC") during the period of review between January 1, 2015 and December 31, 2015.  *See, e.g., Guizhou Tyre Co., Ltd. v. United States,* 43 CIT __, __, 389 F. Supp. 3d 1315, 1317 (2019) ("*Guizhou IV*"); *Guizhou Tyre Co. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1335, 1337 (2019) ("*Guizhou V*"); *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 83 Fed. Reg. 16,055 (Dep't Commerce Apr. 13, 2018) (final results CVD admin. review), *amended by Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 83 Fed. Reg. 16,055 (Dep't Commerce July 11, 2018) (am. final results) and accompanying Issues and Decision Memorandum.  In contrast, *Guizhou I, II* and *III* resulted from a separate underlying administrative review of a countervailing duty investigation of off-the-road tires from the PRC during the period of review between January 1, 2014 and December 31, 2014.  *See, e.g., Guizhou Tyre Co., Ltd. v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018) ("*Guizhou I*"); *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT __, __, 399 F. Supp. 3d 1346, 1351 (2019) ("*Guizhou II*"); *Guizhou Tyre Co. v. United States,* 43 CIT __, __, 415 F. Supp. 3d 1402, 1404 (2019) ("*Guizhou III*"); *see also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017) (final results CVD admin. review), *amended by Certain New Pneumatic Off-the-Road Tires*

cooperate by not acting to the best of its ability, information on the record is

"unverifiable" because the information is "missing or otherwise deficient."  *Zhejiang,* 652

F.3d at 1348 (citations omitted); *see also Guizhou V*, 415 F. Supp. 3d at 1343.

Therefore, in light of the claims on the record of non-use, Commerce must show that the

self-certifications are "deficient" and are not a reliable means to confirm non-use.

      The Court in previous cases has addressed two dimensions of assessing

whether information from third parties[56] is verifiable.  First, the Court has considered the

question in general of verifying information received from third parties.  *See CS Wind*

*Vietnam Co., Ltd. v. United States*, 41 CIT __, 219 F. Supp. 3d 1273 (2017).  Second,

the Court has considered the question in particular of verifying third-party information

related to the EBCP.  *See, e.g. Jiangsu I*, 405 F. Supp. 3d at 1331-1334; *Guizhou Tyre*

*Co., Ltd. v. United States*, 43 CIT __, __, 399 F. Supp. 3d 1346, 1351 (2019) ("*Guizhou*

*II*").  The Court has conducted this assessment, specifically in light of uncertainties

---

*from the People's Republic of China*, 82 Fed. Reg. 40,554 (Dep't Commerce Aug. 25, 2017) (am. final results) and accompanying Issues and Decision Memorandum.

[56] The court uses this term to refer to customers of Guizhou and Double Coin.  By statute and regulation, these entities are parties that are not "interested parties" to this investigation.  *See* 19 U.S.C. § 1677 (9)(A)-(B), which defines "interested party," in relevant part, as:

      (A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise

      (B) the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported . . . .

*See also* 19 C.F.R. § 351.102(b)(29) (2016) and 19 C.F.R. § 351.102(b)(42) (2016) (which defines "[r]espondent interested party" as "an interested party described in subparagraph (A) or (B) of section 771(9) of the Act").

created by the GOC's repeated failure to respond fully and accurately to Commerce's request for information about two key parameters of the program — (a) the participation of third-party banks in disbursing EBCP funds, and (b) the continued existence, or not, of a minimum threshold.

In this case, the court concludes that Commerce's IDM fails to provide a reasonable explanation sufficient to identify a "reasonably discernible path" with respect to Commerce's conclusion as to either issue.  Accordingly, the court remands the decision to Commerce for further explanation in light of the court's analysis below.

### i.       Verification Generally of Third Party Information

Plaintiffs assert that Commerce could establish non-use by contacting respondents' customers directly.  Consol. Pls. Br. at 14.  However, it is notable that plaintiffs do not demonstrate that the respondents themselves (*i.e.*, without seeking extensive documentation from their customers) could establish non-use.  *See* Pl. Br. at 41-43; Consol. Pl. Br. at 7-18 ; Pl. Reply Br. at 16-19; Consol. Pl. Reply Br. at 1-4. Plaintiffs also do not argue that they possess or even could possess the key missing information — which, plaintiffs appear to presume, may be in the possession of third parties — that has been requested by Commerce.  *See id*.

The Court has recognized the considerable burden that Commerce faces when soliciting or verifying information from third parties.  In *CS Wind Vietnam Co., Ltd. v. United States,* Commerce explained that it would not seek information from a third party because doing so would unnecessarily burden Commerce as it could neither "compel responses from third parties" nor guarantee "the timeliness or accuracy of such

responses."  *CS Wind Vietnam,* 219 F. Supp. 3d 1273 at 1279.  The court agreed with

Commerce, noting that while the burden on Commerce to request information from third

parties is "likely fairly low," Commerce cannot 'compel' a timely or accurate response

from . . . third part[ies], by applying adverse inferences to its use of facts otherwise

available or by using subpoena power."  *Id.* at 1284.[57]  The court further held that

"[a]lthough Commerce appears to have the authority to verify a [third party's] response

as accurate . . . the verification process generally entails a significant burden on

Commerce and the responder may choose not to allow verification."  *Id*.  The court

concluded that "[a]bsent the ability to obtain with some assurance a timely and accurate

response, and given the significant burden Commerce would incur in attempting to

obtain accurate information," Commerce did not abuse its discretion in deciding to not

solicit information from the third party "over whom it has no control."  *Id*.

     Given the various obstacles that Commerce faces when dealing directly with third

parties, it would be reasonable for Commerce to decide against obtaining and verifying

information from the respondents' customers.  Even if Commerce were to assume full

cooperation from the customers,[58] as the Government noted at oral argument, given the

---

[57]  The court determined that "Commerce's ability to apply adverse inferences to
information under 19 U.S.C. § 1677e(b)(1) applies only to information submitted by
interested parties, not by third parties, and unlike the International Trade Commission
('ITC'), Commerce does not have subpoena power over nonparties."  *CS Wind Vietnam
Co., Ltd. v. United States*, 41 CIT __, __, 219 F. Supp. 3d 1273, 1284 (2017).

[58] Plaintiffs argue that Commerce could have "easily" verified the claims of non-use by
contacting customers to review their accounts and financial statements, Oral Argument
Tr. at 92; however, the record does not necessarily support plaintiffs' assertion.  During

large number of customer certifications in this case, it may not have been feasible for

Commerce to verify the certifications by contacting each customer and reviewing their

records.[59]  *See* Oral Argument Tr. at 105-106.  Further, without the cooperation from the

GOC, it is not clear how Commerce would have been able to ensure the accuracy of

any information provided by the customers.

      Commerce, however, did not include this reasoning in its Final Determination.

*See* IDM at 11-13, 28-36.  The court will not rely on the Government's post-hoc

---

the investigation, the only information that the customers provided were self-
certifications of non-use, which were submitted to Commerce by the respondent
companies.  *See* Guizhou Tyre Program Specific Response – Exhibit P.B.4, CD 210,
213; PD 238, PD 240 (May 20, 2016); Double Coin's Factual Information Related to
U.S. Customers' Utilization of the Export Buyer's Credit Program – Attachment 1, CD
241; PD 252 (May 31, 2016).  Thus, Commerce had no direct contact with customers
during the review and the customers provided no further information beyond simple
statements of non-use.  The court cannot conclude that this minimal action by
customers is a sufficient basis to support the conclusion that customers would have
cooperated fully with: (1) Commerce's direct requests for what would almost certainly be
substantial amounts of additional information, including information that could be
considered confidential business information or information sensitive to the GOC, which
the GOC itself identified as "internal to the bank, non-public, and not available for
release,"  GOC Second Supplemental Questionnaire Response at 2, PD 392 (Sept. 26,
2016); and, (2) a verification process of the third parties that likely would have ensued
from that, involving the same difficulties.

[59] At oral argument, the Government stated: "[T]here's 61 or so of these certifications . .
. . that would essentially require Commerce to scan all those records of all those clients
that submitted a non-use certification, and . . . potentially to guess which loans could be
covered, since again we don't know about . . . how that $2 million threshold works at
this point."  Oral Argument Tr. at 105.  The Government further argued that "there's also
no information Commerce has available to it that gives it any parameters by which to
determine whether a loan should fall into the [EBCP], or not. . . .  But the problem is that
even with these certifications, the tools that other judges on this Court have suggested
are available to Commerce still don't get to the heart of the issue, in that Commerce
doesn't know what it should even be looking at . . . in order to verify that those
certifications are correct."  *Id*. at 105-106.

explanation of Commerce's inability to verify the self-certifications.  In contrast to Commerce's determination in *CS Wind Vietnam*, Commerce in the instant case did not articulate the burden and unreliability of working directly with third parties.  In fact, Commerce in the Final Determination did not even mention — let alone present in a step-by-step manner for the benefit of the public, the parties and the court — the specific ways in which any attempt Commerce would have made to seek further information from the customers would have been futile or would otherwise have entailed an unreasonably burdensome effort.  Without a more complete explanation from Commerce, the court is unable to determine the basis for Commerce's refusal to rely on the self-certifications or solicit further information from customers in an attempt to fill the gap in the record.  As such, the court cannot assess whether Commerce's determination was reasonable.

### ii.   Verification of Third Party Information Related to the EBCP

As noted, the Court has considered on a number of occasions the question of whether Commerce has explained reasonably its decision not to verify customer self-certifications related to the EBCP.  *See, e.g., Clearon I,* 359 F. Supp. 3d at 1355-1360; *Jiangsu I*, 405 F. Supp. 3d at 1331-1334.  The issue presented in all of these cases, as in the instant case, is whether the uncertainty related to key parameters of the program — an uncertainty created by the GOC's refusal to provide information about the amendments to the program indicated on the record — prevents Commerce from being

able to verify non-use of the EBCP.  *See id.*  The court addresses this point in detail in the hopes of creating, in this case, greater clarity on these critical issues.

In its prior decisions, the Court has rejected similar findings from Commerce: namely, that such an examination would not have been sufficient to verify the claims of non-use because Commerce lacked "a complete understanding of the involvement of third-party banks and minimum lending thresholds . . . [rendering] the claims . . . unverifiable because . . . the Department cannot identify the appropriate records for review."  IDM at 32.  The Court has determined that Commerce failed to explain adequately the reason that the missing information was required to verify the self-certifications of the program.  In reaching this conclusion, the Court has in some instances held that Commerce must at least attempt verification of non-use certifications or find an alternative method of verification.  *See, e.g., Clearon II,* 474 F. Supp. 3d at 1354; *Jiangsu I,* 405 F. Supp. 3d at 1334; *Guizhou Tyre Co. v. United States,* 43 CIT __, __, 415 F. Supp. 3d 1402, 1405 (2019) ("*Guizhou III*").

In *Guizhou III*, the court rejected in part Commerce's redetermination.[60]  In particular, the court took issue with Commerce's continuing to find that there was a "gap" in the record that "prevent[ed] an accurate and effective verification of Guizhou Tyre's customers' certification of non-use and Xuzhou Xugong's statements that its

---

[60] In the redetermination under review, Commerce "complied, under protest, with the Court's rulings" and relied on non-use certifications submitted by respondents and their customers in reaching its determination that neither of the respondents used the EBCP during the period of review.  *Guizhou Tyre Co. v. United States,* 43 CIT __, __, 415 F. Supp. 3d 1402, 1404 (2019) ("*Guizhou III*") (citation omitted).

customers did not use the program."  *Guizhou III*, 415 F. Supp. 3d at 1405 (citing Final

Results of Redetermination Pursuant to Court Remand, ECF 109-1 (Nov. 19, 2019)).

The court determined that: "The Department has provided a myriad of [sic] reasons why

verification *might* be onerous without additional information pertaining to the EBCP. . . .

But until . . . the Department actually *attempts* verification and adequately confronts

these (purportedly) insurmountable challenges, there is little for the Department to hang

its hat on when it 'continues to find a 'gap' in the record'."  *Id.* (emphasis supplied).

        Similarly, in *Jiangsu I*, the court was not convinced by Commerce's explanation

that only the China Export-Import Bank had the records sufficient to verify non-use.  The

court determined that Commerce failed to "explain why it could not identify the

intermediate banks and the corresponding bank disbursement information by soliciting

information from respondents."  *Jiangsu I,* 405 F. Supp. 3d at 1334.  The court

remanded the issue back to Commerce and directed the parties to develop a mutually

acceptable solution to avoid continued remands.  *Id*.

        In particular, the Court in previous cases has concluded that evidence on the

record submitted by company respondents demonstrated that neither the respondents

nor their customers used the program, and determined that Commerce was not free to

ignore such evidence on the record.  *See, e.g., Clearon II*, 474 F. Supp. 3d at 1353

("Evidence pertinent to this inquiry was on the record . . . .  Rather than attempt to verify

[the certifications of non-use], however, Commerce concluded it would be too onerous

to do so without the information withheld by China . . . .");  *Guizhou V,* 415 F. Supp. 3d at

1343 ("There is evidence in the record that squarely detracts from Commerce's

inference that Plaintiffs used and benefitted from the EBCP.  Commerce may not simply

declare that the evidence cannot be verified and [sic] therefore, a gap exists.  That is

not how it works.  Commerce must attempt verification *in order to conclude* that a gap

exists related to that inquiry.").

This court, however, is not prepared to conclude that — in situations in which a

respondent significantly impedes a CVD proceeding by repeatedly withholding

information requested by Commerce or by providing incomplete responses to

questionnaires — Commerce must attempt verification to conclude that verification is

not possible or overly burdensome.  *See* 19 U.S.C. § 1677e(a)-(b).

Plaintiffs maintain that Commerce has a "number of tools" available to verify the

customer certifications, such as contacting the customers directly to review their records

or going to the China Export-Import Bank to review the bank's computer database.  With

regard to plaintiffs' argument that Commerce could have verified the certifications by

visiting the customers and reviewing their loan accounts, Consol. Pls. Br. at 14,

Commerce explained that, without a full understanding of the third-party banks and the

threshold, it could not "identify the appropriate records to review."  IDM at 32.

Commerce further explained that without the additional information concerning the

operation of the EBCP, Commerce's understanding of the program was "unreliable."  *Id.*

at 30.  In this regard, Commerce determined that:

> [W]e could not rely on information about this program
> provided by parties other than the GOC, *i.e.,* the
> respondents.  Therefore, while we did consider the customer
> certifications provided by the respondents, without a
> complete and verifiable understanding of the program's

> operation, especially with regard to the involvement of third-
> party banks, the information provided by the respondents is
> also unverifiable.

*Id*.

Again, the court considers that Commerce's underlying logic is not unfounded.

Notwithstanding evidence of non-use on the record — notably, self-certifications by

Guizhou's and Double Coin's customers — Commerce explained that information on

the record indicates that the 2013 amendments to the EBCP changed the structure of

the program to eliminate the threshold requirement and allow for the use of intermediary

banks to disburse export buyer's credits.  *Id*. at 11-12.  Based on the record, these

amendments appear to have changed the legal parameters of the program, affecting

which business contracts created eligibility for a business to participate in the program

and modifying substantially the way in which funds are disbursed to the respondents'

customers.[61]  *See id*. at 28-34.  Given that information in the record indicated that the

GOC implemented these critical changes to the operation of the program — and for

which the GOC has repeatedly refused to provide any documentation — Commerce

decided not to rely on unsubstantiated claims of non-use by the GOC and company

respondents, or the self-certifications by the customers of the company respondents.

*See id*.

---

[61] At oral argument, plaintiffs maintained that there are three actors involved in the
EBCP — the Chinese exporter, "the foreign importer" and the China Export-Import
Bank.  Oral Argument Tr. at 79.  Commerce in its determination pointed to information
on the record that indicates that the 2013 revisions to the program added a fourth
potential actor — third party banks.  IDM at 12.

Commerce in this review explained in detail its decision to not solicit further

information from respondents.  *Id.* at 33.[62]  Commerce could not or chose not to obtain

missing information about the operation of the program, *e.g.* a list of third-party banks

involved in the EBCP, by asking the customers directly.  It is possible that this decision

by Commerce was reasonable.  However, the court does not have a basis in the record

to make this determination because Commerce did not describe: (1) each of the specific

ways in which its understanding of the operation of the program was "unreliable"; and,

(2) each of the ways in which the uncertainty created by the gaps in the record

concerning the operation of the program (a) reasonably prevented Commerce from

relying on the self-certifications, and (b) created uncertainty as to whether Commerce

would even be able to establish through verification, and having to rely on non-GOC

sources, non-use of the EBCP.  Commerce's failure to elucidate these points in its

explanation leaves unclear the basis for Commerce's decision, particularly whether

---

[62] As stated above, Commerce explained that it did not verify the information on the record with company respondents because, without an understanding of the EBCP, Commerce was unable to determine "what information an exporter would have regarding whether its buyers were using Export Buyer's Credits, *e.g.*, whether an exporter would be aware and would have documentation showing, by virtue of the operational requirements of the program, that its buyers were applying for or receiving credits under the program, and whether they meet the threshold requirements for financing, and what banking institutions were involved, without providing the financing." IDM at 32.  Commerce concluded that, without the GOC's cooperation, Commerce lacked a "verifiable understanding of the program's operation," and, therefore, was "unable to rely on the information provided by the respondents, and . . . did not issue supplemental questionnaires to the respondent companies regarding the information they submitted."  *Id.* at 33.

Commerce's determination rests on the fact that the customers were non-respondent third parties in the CVD investigation.

Plaintiffs further argue that Commerce can verify the customer certifications by going to the China Export-Import Bank to review the bank's computer database.  Oral Argument Tr. at 107.  The Court is not convinced by plaintiffs' arguments.  Commerce has previously attempted — on multiple occasions — to verify respondents' claims of non-use by traveling to China to review the China Export-Import Bank records; however, the GOC has repeatedly denied Commerce access in not one but three separate respects: (1) by not allowing Commerce to go to the China Export-Import Bank, *see RZBC Grp. Shareholding Co. v. United States*, Slip Op. 16-64, 2016 WL 3880773 (CIT June 30, 2016); (2) by asserting that Commerce did not have the "proper authorization" to review the records, *id*., *see also Changzhou I*, 195 F. Supp. 3d at 1354; and, (3) by asserting that the information explicitly sought by Commerce is "internal to the bank, non-public, and not available for release."  GOC Second Supplemental Questionnaire Response at 2, PD 392 (Sept. 26, 2016).  Accordingly, the court is not persuaded that Commerce should expend additional resources to follow this method of verification, particularly given that the record demonstrates clearly that attempting this type of verification would in all likelihood be futile.  *See Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (the Federal Circuit recognized "the general principle that agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources").

In sum, the court is not persuaded by plaintiffs' argument that Commerce should seek to verify non-use by going yet again to the China Export-Import Bank; however, the court is unable to determine from the record that the customers' self-certifications are, as Commerce asserts, "unverifiable."  *See* IDM at 30, 32.  The court understands Commerce's assertion to mean that, without the withheld information from the GOC about the operational changes to the EBCP that are indicated in the record, Commerce was prevented from verifying the customer self-certifications in accordance with its verification methodology.

The court is aware that in *Clearon II* and *Guizhou II*, the Court did not sustain Commerce redeterminations pursuant to court remands in which Commerce outlined its methodology for verification[63] and explained that, without the withheld information from the GOC, verification "would be unreasonably onerous, if not impossible."[64] Specifically, the court in *Guizhou II* explained that:

---

[63] *See* Final Results Pursuant to Court Remand at 7-8, Clearon Corp. v. United States, 43 CIT __, 359 F. Supp. 3d 1344 (2019) (Court No. 17-00171), ECF No. 47-1; Final Results of Redetermination Pursuant to Remand at 8, Guizhou Tyre Co., Ltd. v. United States, 43 CIT __, 415 F. Supp. 3d 1402 (2019) (Court No. 17-00101), ECF No. 109-1.

[64] In the Clearon Remand Results and Guizhou First Remand Results, Commerce explained that, without the names of the intermediary banks, it would be "unreasonably onerous" for Commerce to conduct verification in accordance with its typical verification methodology.  For example, Commerce explained that without the names of the third-party banks:

> Commerce's second step of its typical non-use verification procedures (*i.e.,* examining the company's subledgers for references to the party making the financial contribution) could not by itself demonstrate that the U.S. customers did not use the program (no correspondent banks in the subledger).  Nor could the second step be used to narrow down the company's lending to a sub-set of loans

> Commerce does not state *why* the purported 2013 rule
> change gave the Department reason to think verification was
> "unreasonably onerous" or no longer possible. . . .
> Commerce offers only one reason for why verifying would be
> challenging – that it would require access to intermediate
> Chinese banks.  But that does not address *why this
> challenge is insurmountable*, or why Commerce did not
> initially solicit information from Guizhou or Guizhou's U.S.
> customers that would enable it to gain access to (or identify)
> the intermediate banks.  Nor does Commerce adequately
> explain the connection between intermediate Chinese banks
> and verification . . . .[65]

*Guizhou II*, 399 F. Supp. 3d at 1351 (emphasis supplied).

Based on the above, the court is not persuaded by plaintiffs' arguments that

Commerce could have "easily" verified the self-certifications, or in the alternative, simply

accepted the certifications to establish non-use as Commerce had previously done in

*Solar Cells from China AR 2.*  Oral Argument Tr. at 92; Pl. Br. at 43.  The court

---

> likely to be the export buyer's credits (i.e., loans from the correspondent banks).
> Thus, verifying non-use of the program without knowledge of the correspondent
> banks would require Commerce to view the underlying documentation for *all*
> entries from the subledger *to attempt* to confirm the origin of each loan – *i.e.*,
> whether the loan was provided from the China [Export-Import] Bank via an
> intermediary bank.  This would be an unreasonably onerous undertaking for any
> company that received more than a small number of loans.

Final Results Pursuant to Court Remand at 19-20, Clearon Corp. v. United States, 43
CIT __, 359 F. Supp. 3d 1344 (2019) (Court No. 17-00171), ECF No. 47-1; *see also*
Final Results of Redetermination Pursuant to Remand at 13, Guizhou Tyre Co., Ltd. v.
United States, 43 CIT __, 415 F. Supp. 3d 1402 (2019) (Court No. 17-00101), ECF No.
109-1.

[65] The Court further determined that Commerce failed to support its conclusion that
verification is "practically impossible" because Commerce had the opportunity to request
additional information from respondents and their customers to allow Commerce to
verify the self-certifications and failed to do so.  *Guizhou Tyre Co., Ltd. v. United States*,
43 CIT __, __, 399 F. Supp. 3d 1346, 1352-1353 (2019) ("*Guizhou II*")

concludes that the record is ambiguous as to the two key parameters of the EBCP —
the involvement of third-party banks and the minimum threshold requirement.  Due to
the GOC's continued refusal to respond fully to Commerce's requests for information
concerning the 2013 amendments, Commerce is unable to gain clarity as to the
operation of the program.  Given the ambiguous nature of the EBCP's operation,
Commerce's concerns about the reliability and verifiability of the customer self-
certifications, or any other information it may need to seek from customers due to the
GOC's non-cooperation, is not unwarranted.  Nevertheless, Commerce has failed to
explain its decision not to verify the self-certifications.  Accordingly, the court remands
this matter back to Commerce for further explanation.

Accordingly, on remand, the court encourages Commerce to outline step-by-step
its verification methodology, and articulate each of the reasons that verification of the
self-certifications, whether Commerce were to use its typical methodology or by
alternative feasible methods of verification, is "insurmountable" or would result in
unreliable information.  Only with this full elucidation will the court be able to determine
whether Commerce has a reasonable basis on its existing record to decline to conduct
the further verification that plaintiffs urge.

Given the extensive litigation and numerous remands on this issue, the court
would like to make clear its direction to Commerce on remand.  The court is not
concluding that Commerce's finding as to the use of the EBCP is incorrect nor that
verification of private parties may be futile.  Rather, the court determines that
Commerce has not articulated a reasonable explanation that buttresses its conclusions.

In the Final Determination, Commerce concluded that without the information from the GOC regarding the threshold and third-party banks, Commerce could not verify claims of non-use; however, Commerce failed to explain why this information was critical to Commerce's verification process.  Similarly, Commerce determined that it could not rely on information from the respondents and their customers to establish non-use, including the self-certifications, because the information was "unverifiable"; however, Commerce neglected to explain the reasoning behind this finding.  The court will uphold a determination of "less than ideal clarity" if Commerce provides a reasonably discernible path of its decision, *Bowman Trans., Inc., v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438 (1974); however, Commerce's explanation must establish a reasonable connection between its determination and the record.  *See CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1376-1377 (Fed. Cir. 2016).

On remand, Commerce, after taking into consideration the foregoing analysis, is to: (1a) explain the reason that the information withheld by the GOC about the threshold requirement was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use; (1b) explain the reason that the information withheld by the GOC about the third-party banks was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use; (2) explain whether it would be feasible for Commerce to solicit and obtain the withheld information from customers — which are third parties to the investigation — by describing each step that Commerce would consider to be necessary to obtain such

information, including stating clearly the reason(s) that Commerce considered each step

necessary; (3) with respect to "(2)", above, describe with particularity any "significant

burden" Commerce might or would likely incur in taking such action; (4) explain the

extent to which Commerce would be able to rely on information from customers by

identifying what information Commerce would seek from customers and explaining how,

if at all, such information would be useful to Commerce to establish non-use; (5) explain

why the claims of non-use are "unverifiable" by describing step-by-step Commerce's

methodology for verifying non-use; (6) address whether, without information about the

operational changes to the EBCP, verification of the customers' self-certifications in

accordance with Commerce's methodology is (a) "insurmountable" based on

Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both;

(7) with respect to "(6)", above, were the question of sampling to arise, explain whether

sampling would be (a) "insurmountable" based on Commerce's resources, (b) unlikely

to yield relevant and reliable information or (c) both; (8a) state whether Commerce has

a practice of verifying information from third parties; (8b) if Commerce has such a

practice, explain why it is reasonable for Commerce to refrain from verifying the

information submitted by the customers, through the respondents, in this case; and, (9)

explain whether the proposed solutions — such as Commerce visiting respondents'

customers and asking for a list of the banks or lenders that provided loans to the

customers during the POI — are feasible alternative methods of verification for

Commerce, and if Commerce concludes that these methods are not feasible, explain

the reasons for this conclusion.  The court emphasizes that each of the aforementioned

instructions for Commerce on remand is a distinct inquiry that requires a distinct

individual response as well as clarification from Commerce in its redetermination.

Finally, as noted, this Court is familiar with other actions concerning this

program,[66] including the various explanations Commerce has provided in its remand

redeterminations.[67]  To date, Commerce has failed to provide a reasonable explanation

for its refusal to rely on the customer certifications of non-use.  Commerce is

encouraged to use this remand as an opportunity to provide a complete and detailed

explanation for its determination by carefully connecting the dots between each

conclusion made and Commerce's underlying reasoning for its findings.  By doing so,

Commerce will provide a basis for the court to determine whether Commerce's findings

are supported by substantial record evidence.

## IV.    Commerce's Benchmarks in Relation to Certain Less Than Adequate Remuneration Calculations

In this case, the GOC failed to respond adequately to Commerce's inquiries

regarding the specific companies that produced the inputs at issue.  PDM at 9-11, 29.

As a result, Commerce found that the GOC failed to cooperate to the best of its ability

and relied on AFA to find preliminarily that the suppliers of Double Coin and Guizhou

---

[66] *See supra* notes 43-48.

[67] *See e.g.*, Final Results Pursuant to Court Remand at 7-8, Clearon Corp. v. United States, 43 CIT __, 359 F. Supp. 3d 1344 (2019) (Court No. 17-00171), ECF No. 47-1; Final Results of Redetermination Pursuant to Remand at 8, Guizhou Tyre Co., Ltd. v. United States, 43 CIT __, 415 F. Supp. 3d 1402 (2019) (Court No. 17-00101), ECF No. 109-1.

were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *Id.* at 10-11, 29.

Plaintiffs do not contest this determination.[68]

Based on this finding, Commerce turned to comparative benchmarks to

determine whether a government good — in this case, four inputs: (1) carbon black, (2)

natural rubber, (3) synthetic rubber and butadiene, and (4) nylon cord — was provided

for less than adequate remuneration ("LTAR").  For carbon black, Commerce relied on

world market prices as a Tier 2 benchmark and found that there was a benefit to Double

Coin and Guizhou.  IDM at 18.  For natural rubber, and synthetic rubber and butadiene,

Commerce found that the record evidence showed a high volume of imports as a

percentage of both production and consumption and, consequently, that the market for

those two inputs was not distorted.  *Id*. at 19.  As a result, Commerce relied on actual

monthly weighted average import prices for the POI as reported by Double Coin as a

Tier 1 benchmark.  *Id*.  Applying those prices, Commerce determined that a benefit had

---

[68] Plaintiffs do not dispute the use of AFA in finding that plaintiffs' suppliers were authorities.  *See* Consol. Pls. Br. 18-28; Consol. Pls. Rep. Br. 4-11.  In reaching the conclusion that Double Coin's and Guizhou's suppliers were "authorities," Commerce first requested information from the GOC regarding the specific companies that produced the four inputs at issue here that were purchased by plaintiffs.  PDM at 9-10.  Specifically, Commerce asked the GOC to coordinate with plaintiffs to provide a list of each company's input suppliers to determine whether these suppliers were authorities.  *Id.*  Plaintiffs and the GOC submitted inconsistent lists, obstructing Commerce from making a determination based on this information.  *Id.*  The GOC claimed that it did not have the requested information; however, Commerce determined that the GOC did have the requested information.  *Id.*  This finding by Commerce led to the application of AFA to determine preliminarily that plaintiffs' suppliers of the four inputs in question were authorities.  *Id.*  Commerce did not change this AFA finding in the Final Determination.  IDM at 8-9.

been conferred on both Double Coin and Guizhou.  For nylon cord, Commerce relied on

Chinese import prices[69] as the Tier 1 benchmark and found that there was no benefit for

Double Coin and that there was a benefit for Guizhou.  *Id.* at 21.

> Commerce then adjusted each of these benchmarks to reflect "delivered prices"
by including ocean freight and inland freight charges that would be incurred to deliver
carbon black, nylon cord, natural rubber, and synthetic rubber and butadiene to the
respondents' production facilities.  *Id.* at 36-39.  The countervailable subsidy rates that
Commerce calculated for the provision of these four inputs at LTAR were as follows: for
carbon black, 3.40% *ad valorem* for Double Coin and 3.77% *ad valorem* for Guizhou; for
nylon cord, 0.00% *ad valorem* for Double Coin and 4.09% *ad valorem* for Guizhou; for
natural rubber, 9.32% *ad valorem* for Double Coin and 0.01% *ad valorem* for Guizhou;
and, for synthetic rubber and butadiene, 10.68% *ad valorem* for Double Coin and 6.78%
*ad valorem* for Guizhou.  *Id.* at 20-21.

> **A.    Legal Framework**

> U.S. law requires that Commerce determine that a countervailable subsidy exists
in cases in which an authority provides a financial contribution, a benefit is thereby
conferred, and the subsidy is specific.  19 U.S.C. § 1677(5).  When the financial
contribution is a good or service, the statute defines a benefit as occurring in those

---

[69] These prices are general Chinese import prices.  Commerce chose to rely on these prices because neither respondent reported actual imports of nylon cord during the period of investigation, so Commerce opted to use these data as a Tier 1 benchmark. IDM 18-19.

cases in which those goods or services "are provided for less than adequate remuneration."  *Id.* at § 1677(5)(E)(iv).

The adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country that is subject to the investigation or review.  *Id.* at § 1677(5)(E).  Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*  If Commerce determines that the goods or services are provided for LTAR, then "a benefit shall normally be treated as conferred."  *Id*. at § 1677(5)(E)(iv).

Commerce's regulations provide a methodology for measuring the adequacy of remuneration based on a three-tiered hierarchy.  As a Tier 1 benchmark, Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question."  19 C.F.R. § 351.511(a)(2)(i).  The preamble to Commerce's countervailing duty regulations specifies that "[s]uch market-determined prices include actual sales involving private sellers and actual imports."  *Countervailing Duties,* 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) (preamble).  As a part of selecting transactions or sales as a Tier 1 benchmark, "the Secretary will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(i).

Commerce has a preference for Tier 1 benchmarks because they are most likely to reflect closely the prevailing market conditions experienced by the purchaser under investigation.  IDM at 37.  This Court has "acknowledge[d] the agency's normal

preference for tier one market prices." *Borusan*, 661 F. Supp. at 1327, *aff'd sub nom.*

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017).

If a Tier 1 benchmark is unavailable, Commerce will look to a Tier 2 benchmark.

In this case, "the Secretary will seek to measure the adequacy of remuneration by

comparing the government price to a world market price where it is reasonable to

conclude that such price would be available to purchasers in the country in question."

19 C.F.R. § 351.511(a)(2)(ii).  If Tier 1 and Tier 2 benchmarks are unavailable,

Commerce will turn to a Tier 3 benchmark, in which case "the Secretary will normally

measure the adequacy of remuneration by assessing whether the government price is

consistent with market principles."  *Id.* at § 351.511(a)(2)(iii).

### B.    Positions of the Parties

Plaintiffs first challenge Commerce's adjustments to the Tier 1 and Tier 2

benchmarks on the grounds that plaintiffs do not consider prevailing market conditions

and consequently do not yield an accurate "delivered price."  Consol. Pls. Br. at 20.

Plaintiffs argue that Commerce's regulations call for the use of "delivered prices" that

reflect the price that a firm actually paid or would have paid if it had imported the

product.  *Id.* at 19-20.  Plaintiffs maintain that Commerce's delivery adjustments are not

limitless because the statute provides that "the adequacy of remuneration shall be

determined in relation to prevailing market conditions for the good or service being

provided or the goods being purchased in the country which is subject to the

investigation or review . . . ."  *Id.* at 20 (quoting 19 U.S.C. § 1677(5)(E)(iv)).  Plaintiffs

argue that the use of the word "shall" in the statute requires that Commerce

demonstrate how the benchmark Commerce chooses, and any adjustments made to that benchmark, relate to the conditions in the comparison market.  *Id.* (citing *Amerikohl Mn., Inc. v. United States*, 899 F. 2d 1210, 1213 (Fed. Cir. 1990)).

Plaintiffs further argue that in determining the benchmarks for measuring the adequacy of remuneration for carbon black, nylon cord, natural rubber, and synthetic rubber and butadiene, Commerce should have considered, consistent with the statute, the prevailing delivery costs within China for these goods.  *Id*. at 21.  Plaintiffs assert that this assessment requires that Commerce understand the market conditions in China and, in particular, the extent to which domestic supply and import supply service the market.  *Id.*  After examining these conditions, plaintiffs maintain, Commerce should have determined the extent to which specific delivery costs, such as ocean freight or import duties, prevail in China and, to that extent only, should have included those costs in any LTAR benchmark.  *Id.*

Plaintiffs maintain that Commerce, instead of following those steps, utilized benchmarks that reflected full delivery costs for ocean freight and import duties and "presumed that prevailing market conditions in China included 100 percent import supply and no domestic supply of the inputs in question."  *Id*.  Plaintiffs argue that Commerce's presumption was not supported by the record, and that Commerce itself found that the inputs at issue in most cases were but a small fraction of deliveries in the Chinese market.  *Id.* at 21-22.

The Government counters that Commerce's selection of benchmarks for the inputs in question and subsequent adjustments using ocean freight data and actual

import transactions was reasonable.  Def. Br. at 31.  The Government explains that, as

provided in the regulations, and as explained in *Softwood Lumber from Canada*, the

preferred benchmark in the hierarchy is an observed market price from actual

transactions within the country under investigation.  Def. Br. at 31 (citing *Final of*

*Countervailing Duty Determination: Certain Softwood Lumber Products from Canada*,

57 Fed. Reg. 8,800 (Dep't Commerce Mar. 11, 1992) ("*Softwood Lumber from*

*Canada"*).[70]  This preference is a result of observed market prices being the most likely

to reflect closely the prevailing market conditions of the purchaser under investigation.

*Id*.; *see* IDM at 37.  As such, the import transactions that Double Coin reported and

information obtained on actual shipping data from Maersk were preferred sources for

adjusting the benchmarks for the four inputs at issue to match as closely as possible the

"delivered price" of these inputs.  Def. Br. at 31-32.

        The Government argues that Commerce properly relied on Maersk data to adjust

its selected benchmarks to calculate "the price that a firm actually paid or would pay if it

---

[70] The Government in its brief and Commerce in its IDM cite to "*Final of Countervailing Duty Determination: Certain Softwood Lumber Products from Canada*, 57 FR 8800 (March 11, 1992) (*Softwood Lumber from Canada*) and accompanying Issues and Decision Memorandum at "Analysis of Programs, Provincial Stumpage Programs Determined to Confer Subsidies, Benefit."  IDM at 37, 43-44; *see* Def. Br. at 3.  The cited Federal Register notice relates to Commerce's preliminary determination in the 1992 *Softwood Lumber from Canada* review.  *See Certain Softwood Lumber Products From Canada*, 57 Fed. Reg. 8,800 (Dep't Commerce Mar. 12, 1992) (preliminary determination CVD investigation).  Commerce explained the reason that its preferred benchmark is an observed market price in *Certain Softwood Lumber Products From Canada*, 67 Fed. Reg. 15,545 (Dep't Commerce Apr. 2, 2002) (final determination CVD investigation) and accompanying Issues and Decision Memorandum at "Analysis of Programs, Provincial Stumpage Programs Determined to Confer Subsidies, Benefit."

imported the product." *Id.* at 32 (citing 19 C.F.R. § 351.511(a)(2)(iv)).  The Government

maintains that Commerce's reliance on Maersk data to calculate ocean freight was

reliable and notes that Commerce's practice of using Maersk data to adjust benchmarks

has been affirmed by this Court.  *Id.* (citing *Jiangsu I*, 405 F. Supp. 3d at 1341;

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 42 CIT ___,___, 352 F. Supp.

3d 1316, 1339 (2018) ("*Changzhou II*")).

 In response to Double Coin's argument that Commerce was required by law to

adjust the benchmarks for prevailing market conditions, the Government first argues

that its adjustments reflect both prevailing market conditions and an accurate "delivered"

price.  *Id.* at 31.  Second, the Government contends that Double Coin provided no basis

to select its proffered alternative adjustment, which in this case was a ratio of imported

products relative to domestically-sourced products.  *Id.* at 32.  Moreover, the

Government adds that Double Coin's suggested ratio would not reflect accurately the

price that a firm actually paid or would have paid if it imported the product at issue —

the standard that the statute requires Commerce to meet.  *Id.* at 34 (citing *Jiangsu I,*

405 F. Supp. 3d at 1341).

 Plaintiffs next challenge Commerce's use of Double Coin's import purchase

prices as a Tier 1 benchmark as not supported by substantial evidence and not in

accordance with law.  Specifically, for synthetic rubber and butadiene, plaintiffs contend

that Commerce failed to consider adequately and account for factors affecting

comparability as a result of differences in price, quantity and product similarity between

Commerce's chosen Tier 1 benchmark and prevailing market conditions in China.

Plaintiffs present three arguments in this respect.  First, plaintiffs argue that Commerce selected a narrow set of specific import prices when the record showed that there are more than 31 types of synthetic rubber products listed in China's HS 4002.  Consol. Pls. Br. at 26.  Second, plaintiffs argue that the record shows that Double Coin's import purchases were significantly higher priced than China's aggregate import average unit value ("AUV").  *Id*. at 27.  Third, plaintiffs argue that Double Coin's imported inputs represent only a small quantity of high-value synthetic rubber and butadiene not available in the domestic market.  Consol. Pls. Reply Br. at 10.

Based on these arguments, plaintiffs assert that Commerce used a benchmark that inflated the amount of the benefit to plaintiffs in that the benchmark failed to capture the breadth of synthetic rubber products purchased in the domestic market and utilized import prices that were significantly higher than prices of domestic product.  Consol. Pls. Br. at 21-29.  Accordingly, plaintiffs conclude that Commerce failed to consider factors affecting comparability.  *Id*.  Plaintiffs further propose that Commerce should have used China's aggregate import AUV on the grounds that it was more comparable than respondents' own actual import prices as a Tier 1 benchmark because it would have captured a broader portion of the domestic synthetic rubber market.  *Id.* at 26.

In response, the Government reiterates Commerce's position that "[t]here is no record evidence that distinguishes imports of synthetic rubber by Double Coin from its domestic purchases based on type and quality sufficient to render the preferred Tier 1 benchmark prices not comparable."  Def. Br. at 33 (citing IDM at 44).  The Government adds that the methodology employed by Commerce in this case was in accordance with

past practice and with the hierarchy established by its regulation.  In addition, the

Government emphasizes that Commerce utilized plaintiffs' own data concerning their

own import transactions.  Def. Br. at 33.

C.      Analysis

1.      Ocean Freight Adjustment

The statute provides that the adequacy of remuneration in countervailing

proceedings "shall be determined in relation to prevailing market conditions for the good

or service being provided in the country that is subject to the investigation or review."

19 U.S.C. § 1677(5)(E).  "Prevailing market conditions include price, quality, availability,

marketability, transportation, and other conditions of purchase or sale."  *Id.*

When using Tier 1 and Tier 2 benchmarks, Commerce regulations direct

Commerce to "adjust the comparison price to reflect the price that a firm actually paid or

would pay if it imported the product.  This adjustment will include delivery charges and

import duties."  19 C.F.R. § 351.511(a)(2)(iv).  Commerce has "broad discretion" to

determine how to adjust the benchmark price to reflect delivery charges, provided that

such adjustments are reasonable.  *Guizhou Tyre Co., Ltd. v. United States,* 43 CIT __,

__, 389 F. Supp. 3d 1315, 1326 (2019) ("*Guizhou IV*") (quoting *TMK IPSCO v. United

States*, 41 CIT __, __, 222 F. Supp. 3d 1306, 1320 (2017)).

Plaintiffs argue that in determining the benchmarks for the inputs at issue, the

statute requires that Commerce consider the prevailing delivery costs for the goods in

China.  Consol. Pls. Br. at 21.  Specifically, plaintiffs assert that Commerce should have

limited any adjustments to its Tier 1 and Tier 2 benchmarks for ocean freight and import

duties to "a representative level consistent with prevailing market conditions in China," including the extent to which the market is served by domestic inputs.  *Id.*  In particular, plaintiffs argue that Commerce should have applied a supply ratio to the import duty and ocean freight adjustments, limiting the adjustments to the benchmark to the share of the market attributed to imports.  *Id*.  The Government argues that the LTAR calculations and selected benchmarks are in accordance with the statute and Commerce's regulations and should be sustained by the court.  Def. Br. at 29.

In its Final Determination, Commerce cited *Essar Steel Ltd. v. United States*, 678 F.3d 1267 (Fed. Cir. 2012) to support its finding that "[n]either the statute nor the regulations require or instruct the Department to conduct a market analysis of ocean freight rates."  IDM at 37.  However, Commerce's reliance on *Essar Steel* does not address plaintiffs' argument that Commerce's adjustment to the benchmarks should reflect the prevailing market conditions in China.

Plaintiffs make clear to the court that they are not challenging Commerce's ability to adjust benchmark prices to account for ocean freight and import duties, nor are they challenging Commerce's use of Maersk data as argued in *Essar Steel* and *Jiangsu I*, respectively.[71]  Consol. Pls. Reply Br. at 6.  Rather, plaintiffs argue that the *extent* to

---

[71] In *Essar Steel*, plaintiff challenged Commerce's addition of freight and import costs to the benchmark.  The Federal Circuit held that plaintiff's argument ignored that the statute and regulation "*require* that these costs be added to the benchmark prices." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1274 (Fed. Cir. 2012) (citing 19 U.S.C. § 1677(5)(E)).  In *Jiangsu I*, plaintiff challenged Commerce's reliance on Maersk data to calculate ocean freight benchmarks.  *Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1317, 1339 (2019) ("*Jiangsu I*").  The

which ocean freight and import duties are applied to the benchmark must reflect the prevailing market conditions for the good being purchased in China: in specific, that Commerce needed to adjust the benchmark "by the ratio of import supply of the product in question."  Consol. Pls. Br. at 7, 23; *see also* Letter Pertaining to Double Coin's Case Brief at 14-15, PD 456 (Dec. 19, 2016).

As noted by plaintiffs, the Court has recently considered a similar argument in *Guizhou IV,* 389 F. Supp. 3d at 1325-1327.  In that case, the court determined that due to Commerce's AFA finding that the supplying producers were "authorities," a supply ratio that would include plaintiff's domestic purchases, which were found to be an inappropriate comparative for benchmarking, would distort the benchmark analysis.  *Id*. at 1326.[72]

The court in *Guizhou* based its holding, in part, on Commerce's explanation for its decision to reject the proposed supply ratio benchmark adjustment.  *Id*. (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 83 Fed. Reg. 16,055 (Dep't Commerce Apr. 13, 2018) (final results CVD admin. review) and accompanying Issues and Decision Memorandum at 13).  In the underlying Issues

---

Court held that Maersk data is reliable and can be used to calculate freight costs.  *Id*. at 1341.

[72] Plaintiffs argue that the Court's reasoning in *Guizhou* misapprehends the proposed adjustment.  Plaintiffs assert that the adjustment for ocean freight and import duties would not introduce respondents' domestic purchases into the benchmark price which would remain exactly as determined by Commerce.  Consol. Pls. Reply Br. at 9. Plaintiffs further argue that the adjustments — ocean freight and import duties — do not include the respondents' domestic purchases.  *Id.*

and Decision Memorandum at issue in *Guizhou IV*, Commerce stated: "We also find that the use of a supply ratio would not be appropriate in light of the AFA finding that the domestic producers of the inputs purchased by Guizhou Tyre are authorities." *Id.* In contrast, Commerce in the present case failed to provide such an explanation, and sidestepped Double Coin's supply ratio argument.  IDM at 36-37.

Commerce is required to explain the basis for its decision and the decision must be "reasonably discernable to a reviewing court." *NMB Singapore,* 557 F.3d at 1319. (citations omitted).  The Federal Circuit has noted that a "final determination by Commerce must include 'an explanation of the basis for its determination that addresses relevant arguments [ ] made by interested parties who are parties in the investigation or review.'" *Id*. at 1320 (citing 19 U.S.C. § 1677f(i)(3)(A)).[73]  Commerce failed to address the arguments related to the supply ratio adjustments raised by Double Coin in the administrative review.  Accordingly, Commerce's decision to reject Double Coin's supply ratio argument and apply the full delivery costs of ocean freight and import duties to its adjustment calculation is not reasonable, and the court remands this issue back to Commerce to provide an explanation as a reason for its decision.

**2.      Selection of Tier 1 Benchmarks for Synthetic Rubber and Butadiene**

When selecting a Tier 1 benchmark, "the Secretary *will* consider product similarity; quantities sold, imported, or auctioned; and other factors affecting

---

[73] The Federal Circuit referred to this requirement in the antidumping context; however, the cited statutory provision, 19 U.S.C. § 1677f(i)(3)(A), applies to both antidumping and countervailing determinations.

comparability."  19 C.F.R. § 351.511(a)(2)(i) (emphasis supplied).  Use of the word "will"

makes clear that consideration of these factors is mandatory.  *See Amerikohl*, 899 F.2d

at 1213.  Plaintiffs have raised comparability issues regarding price, quantity and

product similarity in the selection of Double Coin's import purchase prices as a Tier 1

benchmark.  The court addresses each issue in turn.

      The court first examines the issue of comparability regarding price.  As previously

explained, the statute requires that "the adequacy of remuneration *shall* be determined

in relation to prevailing market conditions for the good or service being provided or the

goods being purchased in the country which is subject to the investigation or review."

19 U.S.C. § 1677(5)(E) (emphasis supplied).  "Prevailing market conditions include

*price*, quality, availability, marketability, transportation, and other conditions of purchase

or sale."  *Id*. (emphasis supplied).

      As a general matter, when measuring the adequacy of remuneration, "[o]ften, the

calculation of the benefit is drawn from the record submissions of the respondent

companies."  *Fine Furniture*, 865 F. Supp. 2d at 1262.  Specifically, Commerce has a

preference for Tier 1 benchmarks because they are most likely to reflect closely the

prevailing market conditions of the purchaser under investigation.  IDM at 43 (citing

*Softwood Lumber from Canada*).

      As stated above, here Commerce prioritized appropriately the selection of a Tier

1 benchmark based on respondent's own data in accordance with the methodology

established in 19 C.F.R. § 351.511(a)(2).  At the same time, plaintiffs during the review

proposed an alternate Tier 1 benchmark that, plaintiffs maintained, was substantiated

with other record evidence.  Letter Pertaining to Double Coin's Case Brief at 15-16, CD

408; PD 456 (Dec. 19, 2016); *see* Petitioner's Benchmark Factual Information at 6, PD

253 (May 31, 2016).  Commerce's past practice suggests that where there are multiple

prices that can be used as a viable benchmark on the record, Commerce will compare

the prices to select the most comparable.  For example, Commerce's Issues and

Decision Memorandum in *Essar Steel* explained Commerce's consideration of the two

proposed benchmark prices at issue there:

> To the extent that there are differences between to [sic] the two prices that are
> substantiated with record evidence, the Department, where possible, will make
> the necessary adjustments to ensure an appropriate comparison.  And, to the
> extent that substantiated record evidence demonstrates that the price of the good
> sold by the government is not comparable to the price of the proposed
> benchmark, the Department will not conduct its LTAR analysis using that
> benchmark.

*Certain Hot-Rolled Carbon Steel Flat Products from India*, 74 Fed. Reg. 20,923 (Dep't

Commerce May 6, 2009) (final results CVD admin. review) and accompanying Issues

and Decision Memorandum at Comment 12 ("*Essar Steel* IDM").

Plaintiffs argue that China's import AUV would serve as a superior Tier 1

benchmark.  Consol. Pls. Br. at 26.  As support, plaintiffs maintain that there is a

substantial price difference among the 31 different varieties of synthetic rubber as listed

in China's HS Code 4002.  *Id*. at 27.  Specifically, plaintiffs state that the record

demonstrates that Double Coin's synthetic rubber imports were priced roughly [[30%]]

higher than the 2015 average China import AUV for HS Code 4002.  *Id*. at 25.  Notably,

plaintiffs failed to provide reasons supported by record evidence as to why this price

difference makes Double Coin's import purchases noncomparable.  Double Coin points

only to price differences and does not provide an explanation about comparability.

Double Coin during the investigation argued that this price difference:

> [I]llustrates that Double Coin's import purchases are not
> indicative of the broader synthetic rubber market reflected in
> the aggregate AUV that encompasses all synthetic rubber
> products.  As such, a benchmark based on those specific
> import purchases is not comparable in terms of all synthetic
> rubber purchases made by Double Coin in the domestic
> market.

Letter Pertaining to Double Coin's Case Brief at 16, CD 408; PD 456 (December 19,

2016).

Commerce responded to both of Double Coin's arguments.  As to the first

argument, Commerce explained that it prefers to use observed market prices.

Commerce in its IDM stated: "As provided in our regulations, and as we explained in

*Softwood Lumber from Canada,* the preferred benchmark in the hierarchy is an

*observed market price* from actual transactions within the country under investigation."

IDM at 43 (emphasis supplied).

Commerce responded to Double Coin's arguments that its actual import prices

were "not comparable in terms of all synthetic rubber purchases made by Double Coin

in the domestic market"  by stating that "there is no evidence on the record to support

their claims."  IDM at 44.  Commerce further explained that "[t]here is no basis in the

record to distinguish imports of synthetic rubber from the domestic purchases based on

type and quality that would render the otherwise usable Tier 1 benchmarks prices not

comparable. . . .  We also disagree that the noted differences in prices between the

domestic and imported purchases suggest that the purchases are not comparable and find that the actual import purchase price data is [sic] reliable." [74]  *Id.*  Accordingly, Commerce provided a reasonable explanation for its choice of a Tier 1 benchmark.

The court next turns to quantity.  When selecting a Tier 1 benchmark, Commerce regulations require that it consider "quantities sold, imported, or auctioned" as a factor affecting comparability.  19 C.F.R. § 351.511(a)(2)(i).  Here, plaintiffs argue that the difference between Double Coin's import purchase prices and China's aggregate import AUV suggests that Double Coin imported only a small quantity of specific high-valued synthetic rubbers not available in the domestic market.  Consol. Pls. Reply Br. at 10. Plaintiffs maintain that this quantity of imports was significantly smaller than Double Coin's total domestic purchases during the POI.  Consol. Pls. Br. at 25.  Using such a relatively small quantity, plaintiffs contend, ultimately resulted in a finding of inflated benefits.  *Id*. at 26.  It is notable, however, that plaintiffs did not provide record evidence to Commerce quantifying the relative amounts in question, thereby failing to buttress plaintiffs' allegation concerning the relatively small quantities.  *Id*. at 25.

---

[74] In the *Essar Steel* IDM, Commerce explained that Essar failed to demonstrate that the iron ore lumps allegedly purchased for LTAR were so "substantially different that they [were] incomparable" with the lumps Commerce used as a Tier 1 benchmark.  *Essar Steel* IDM at Comment 12.  Commerce added: "There is no requirement that the benchmark used in the Department's LTAR analysis be identical to the good sold by the foreign government."  *Id.*  Nonetheless, Commerce described the specific adjustments that it made to its benchmark to ensure comparability.  Commerce added also that "Essar itself placed pricing data regarding lumps it purchased from the Brazilian supplier on the record of the prior review and advocated using the prices for purposes of a lumps benchmark."  *Id*.

Commerce in its analysis explained that the "the volume of imports was significant" such that "imports accounted for approximately 50 percent of the rubber consumed in the country during the POI."  *See* PDM at 24.  In this way, Commerce appears to have addressed, if in a somewhat cursory manner, the quantity of Double Coin's total domestic purchases of synthetic rubber and butadiene.  Nonetheless, almost inexplicably, Commerce then stated: "respondent's argument regarding the quantity of such purchases is not relevant to our analysis."  IDM at 44.

Commerce's second statement is inconsistent with its regulation, which requires specifically that Commerce consider "quantities sold, imported, or auctioned."  19 C.F.R. § 351.511(a)(2)(i).  Moreover, Commerce's comments that Double Coin's import purchases are not sufficiently distinguishable from "domestic purchases" are not directly responsive on this point.  IDM at 44.  Notably, plaintiffs did not during the administrative proceeding point to — and have not in this proceeding pointed to — further record evidence to support their argument on quantity.  However, Commerce's statement that a consideration of quantity was "not relevant to our analysis" directly contravenes its obligation under the regulation.  *See* IDM at 44; 19 C.F.R. § 351.511(a)(2)(i).

The court turns finally to product similarity.  In selecting a Tier 1 benchmark to measure the adequacy of remuneration, the regulation requires that Commerce consider "product similarity" as a factor affecting comparability.  19 C.F.R. § 351.511(a)(2)(i).  In *Essar Steel*, Commerce used as a Tier 1 benchmark a price that Essar paid when purchasing iron ore lumps from a Brazilian supplier.  *Essar Steel*, 712 F. Supp. 2d at 1289.  Essar disputed this selection, raising product similarity issues due

to differences, in Essar's view, in the chemical and physical composition among the

lumps that Commerce selected.  *Id*. at 1065.  Essar offered an alternate Tier 1

benchmark, *id*., which Commerce declined to use, finding that Essar failed to show that

the lumps Commerce selected were "so substantially different that they [were]

incomparable."  *Essar Steel* IDM at Comment 12.

This Court upheld Commerce's benchmark selection, determining that

Commerce "did not act contrary to law" in concluding that the Brazilian iron ore lumps

were comparable despite Essar's arguments to the contrary.  *Essar Steel*, 721 F. Supp.

2d. at 1294.  The Federal Circuit also upheld Commerce's Tier 1 benchmark selection,

finding that "Commerce appropriately identified Essar's purchase of iron ore lumps from

the Brazilian supplier as a tier 1 benchmark for the iron ore lumps Essar purchased from

NMDC."  *Essar Steel*, 678 F.3d at 1273.

Here, plaintiffs contend that, due to disparities in product similarity, factors

affecting comparability were not adequately considered by Commerce in selecting a

Tier 1 benchmark.  Specifically, plaintiffs argue that (1) Commerce selected a narrow

set of imports reflecting a small subset of the 31 synthetic rubber varieties available

domestically in China and (2) there was a [[30%]] price difference between Double

Coin's actual imports and China import AUV.  Consol. Pls. Br. at 26.

However, unlike the plaintiff in *Essar Steel*, Double Coin and Guizhou did not

during the investigation present further record evidence to substantiate their claim that

there were, in fact, physical or chemical differences between the allegedly LTAR

purchases and Commerce's chosen benchmark.  Plaintiffs assert merely that "if

synthetic rubber and butadiene was truly homogeneous (as Commerce's selected benchmark implied) and subsidized, then Double Coin would have no incentive to import."  Consol. Pls. Br. at 27; *see* Consol. Pls. Reply Br. at 10.

The record does not support plaintiffs' contention that there are demonstrable differences between imports and domestic purchases of synthetic rubber and butadiene based on type and quality that would render noncomparable Commerce's chosen benchmark.  As Commerce stated:  "While both Double Coin and Guizhou Tyre argue that these import prices do not provide an appropriate benchmark because the type of synthetic rubber they import is not comparable to the allegedly LTAR purchases we are examining, there is no evidence on the record to support their claims.  There is no basis in the record to distinguish imports of synthetic rubber based on type and quality that would render the otherwise usable Tier 1 benchmarks not comparable."  IDM at 44.

Further, as noted by the Government, this price difference among varieties "could result for a number of reasons."  Def. Br. at 33.  *Essar Steel* further confirms that Commerce's choice of a Tier 1 benchmark can be supported by substantial evidence even if the comparable products do have some physical or chemical differences.  *Essar Steel*, 721 F. Supp. 2d at 1293-1294.

As a result, with respect to price and product similarity, Commerce demonstrated that it adequately considered "factors affecting comparability" sufficient to support its chosen Tier 1 benchmark as reflective of "prevailing market conditions" for synthetic rubber and butadiene as required by regulation and statute.  Commerce's explanation

that there was no record evidence to support Double Coin's claim that its imports were of a "type and quality" that materially affected comparability in this case was reasonable.

For the reasons noted above, Commerce satisfied its obligations under the statute and regulation; however, Commerce missed an opportunity to provide greater clarification of the reasons that respondents' arguments were insufficient.  And, importantly, Commerce opted not to explain the reasons that it prioritized respondent-specific data in view of the fact that there is no specific provision in the statute or regulation that requires Commerce to do so.  Providing such explanations serves the interests of the public, the parties and the court — and, ultimately, Commerce — by enabling the clearest possible understanding of a decision.

Commerce articulated the aforementioned shortcomings in Double Coin's position with respect to quality and price.  In so doing, Commerce demonstrated that it considered adequately those two "factors affecting comparability" to support its choice of a Tier 1 benchmark as reflective of "prevailing market conditions" for synthetic rubber and butadiene as required by regulation and statute.  However, as noted above, Commerce's proclamation that quantity was "not relevant" to its analysis contravenes Commerce's own regulations and was not reasonable under the statute.  Accordingly, the court remands to Commerce the issue of consideration of the quantity of imports for further explanation consistent with this decision.

## V.   Combination Rate

Jinhaoyang is an unaffiliated trading company that exported subject merchandise produced by Double Coin during the POI.  *See* Letter Pertaining to Comment on Final

Determination Regarding Cash Deposit Rate for Jinhaoyang at 2, PD 482 (Jan. 25,

2017).  Commerce individually examined Double Coin as a mandatory respondent and

required Jinhaoyang to participate.  *See* Letter Pertaining to Double Coin's 2nd

Supplemental Questionnaire Response at 7, CD 263; PD 323 (June 23, 2016) (referring

to the separate response of Jinhaoyang to the initial questionnaire at Exhibit 9).

Jinhaoyang cooperated during Commerce's investigation of Double Coin.  *See id.*  In its

Final Determination, Commerce calculated a subsidy margin of 38.61% for Double

Coin, 65.46% for Guizhou and 52.04% for all others.  *See* Final Determination.

Commerce calculated the subsidies received by Jinhaoyang and attributed them to

Double Coin.  IDM at 17; Jinhaoyang Br. at 4.  However, Commerce's Final

Determination does not set forth a cash deposit rate for Jinhaoyang.  *See* Final

Determination; Consol. Pls. Reply Br. at 12.  On February 15, 2019, Commerce

published the amended CVD Order and issued an amended subsidy margin of 20.98%

for Double Coin, 63.34% for Guizhou and 42.16% for all others.  *Truck and Bus Tires*

*from the People's Republic of China*, 84 Fed. Reg. 4,434, 4,435 (Dep't Commerce Feb.

15, 2019) (am. final determination).  The amended CVD Order did not identify a specific

cash deposit rate for Jinhaoyang, and, as a result, Jinhaoyang was subject to the all-

others rate, which is higher than the rate assigned to Double Coin.  *Id.*; Jinhaoyang Br.

at 4; Consol. Pls. Reply Br. at 12.

        The court concludes that Commerce's decision was not reasonable because it

failed to provide a reasonable explanation.

### A.      Legal Framework

Once Commerce makes an affirmative final determination in a CVD proceeding,

the statute requires that the agency "determine an estimated individual countervailable

subsidy rate for each exporter and producer individually investigated, and . . . an

estimated all-others rate for all exporters and producers not individually investigated and

for new exporters and producers within the meaning of section 1675(a)(2)(B) of this title

. . . ." 19 U.S.C. § 1671d(c)(1)(B)(i)(I).  Commerce regulations in turn establish that

"[b]enefits from subsidies provided to a trading company which exports subject

merchandise shall be cumulated with benefits from subsidies provided to the firm which

is producing subject merchandise that is sold through the trading company, regardless

of whether the trading company and the producing firm are affiliated."  19 C.F.R. §

351.525(c).

For nonproducing exporters, Commerce "may establish a 'combination' cash

deposit rate for each combination of the exporter and its supplying producer(s)."  19

C.F.R. § 351.107(b)(1)(i).  Commerce has explained that combination rates may be

appropriate in a countervailing duty proceeding because "rates established for particular

combinations of exporters and producers are the most accurate rates."  *Antidumping*

*Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,303 (Dep't Commerce May 19,

1997) (final rule) ("Final Rule").  Given the position taken by Commerce in its Final Rule

that all subsidies — those provided to the producer, the exporter or both — benefit the

subject merchandise, countervailable subsidy rates that are established for certain exporter/producer combinations are likely to be the most accurate.  *See id.*

### B.    Positions of the Parties

Consolidated plaintiffs claim that Commerce's refusal to assign Double Coin's cash deposit rate to Jinhaoyang is contrary to Commerce's past practice and is not in accordance with law.[75]  Consol. Pls. Reply Br. at 11.  Jinhaoyang argues in particular that in situations in which "(1) a cooperating unaffiliated trading company is examined [for purposes of subsidy attribution] along with the mandatory respondent in a CVD investigation. . . and (2) Commerce calculates a CVD margin for subsidies received by the trading company, Commerce's past practice is to assign the unaffiliated trading company the CVD rate for the mandatory respondent in the form of a combination rate under 19 C.F.R. § 351.107(b)."  Jinhaoyang Br. at 5 (citing *Drawn Stainless Steel Sinks From the People's Republic of China ,* 77 Fed. Reg. 46,717, 46,721-22, 46,730 (Dep't Commerce Aug. 6, 2012) (preliminary determination CVD investigation) ("*DSSS*");[76] *1, 1, 1,2 Tetrafluoroethane From the People's Republic of China,* 79 Fed. Reg. 62,594 (Dep't Commerce Oct. 20, 2014) (final determination CVD investigation)

---

[75] Jinhaoyang is the only party among the "consolidated plaintiffs" that has not been assigned a specific cash deposit rate and is not listed in Commerce's instructions to Customs.  *See Truck and Bus Tires From the People's Republic of China,* 84 Fed. Reg. 4,434, 4,435 (Dep't Commerce Feb. 15, 2019) (am. final determination).  Jinhaoyang, therefore, is subject to the all-others rate, despite the fact that Commerce attributed its subsidies to Double Coin.

[76] *See also Drawn Stainless Steel Sinks From the People's Republic of China*, 78 Fed. Reg. 13,017 (Dep't Commerce Feb. 26, 2013) (final determination CVD investigation).

("*TFE*") and accompanying Issues and Decision Memorandum at Comment 5 ("*TFE*

IDM")).

Jinhaoyang notes that it cooperated with Commerce in the review and, in the

Final Determination, Commerce attributed subsidies received by Jinhaoyang to Double

Coin.  Jinhaoyang Br. at 6-7.  Jinhaoyang argues that Commerce should have

consequently assigned Double Coin's rate to Jinhaoyang and further notes that

Commerce did not provide a reason for its departure from past practice.  *Id.* at 7–8.

Jinhaoyang recalls that "[d]espite Commerce's statutory discretion . . . if Commerce had

a routine practice for addressing like situations, it must either apply that practice or

provide a reasonable explanation as to why it departs therefrom."  *Id.* (quoting *Save*

*Domestic Oil, Inc.*, 357 F.3d at 1283).  Jinhaoyang further recalls that "[w]hen an agency

changes its practice, it is obligated to provide an adequate explanation for the change."

*Id*. at 8 (quoting *SKF USA Inc.*, 630 F.3d at 1373).

Jinhaoyang further challenges the Government's contention that "if Jinhaoyang

appropriately indicates Double Coin as the producer of the goods to the Customs

Service, [Jinhaoyang] will receive Double Coin's rate . . . ."  Consol. Pls. Reply Br. at 12

(citing Def. Br. at 35).  Jinhaoyang explains that there is no guidance in Commerce's

cash deposit instruction to Customs or in Commerce's Cash Deposit Instructions as to

which rate will apply if Jinhaoyang demonstrates that it exports Double Coin's tires, and,

as such, Jinhaoyang cannot rely on the Government's *post hoc* assurance.  *Id*. (citing

Department of Commerce's Cash Deposit Instructions, PR 514 (Feb. 21, 2019)).

The Government maintains that while Commerce may establish a combination cash deposit rate for the exporter and its supplying producer, Commerce is not required to do so.  Def. Br. at 34.  As reference, the Government cites the Preamble to 19 C.F.R. § 351.107: "as in AD proceedings, in CVD proceedings there may be situations in which it is not appropriate or practicable to establish combination rates.  In such situations, [Commerce] will make exceptions to its combination rate approach on a case-by-case basis."  *Id.* at 35 (quoting *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) (final rule)).

The Government argues that "Commerce's decision not to assign Double Coin's rate to Jinhaoyang is both directly supported by the regulations and consistent with past practice."  *Id.* (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea* ("*CTL Plate from Korea*"), 81 Fed. Reg. 63,168 (Dep't Commerce Sept. 14, 2016) (preliminary negative CVD determination and alignment of final determination with final antidumping duty determination) and accompanying Preliminary Determination Memorandum at 13).  In *CTL Plate From Korea*, the Government contends that Commerce attributed subsidies of an unaffiliated trading company to a respondent without assigning the unaffiliated trading company and the respondent the same rate.  *Id.*

Following its other argumentation, the Government further asserts that if Jinhaoyang "appropriately indicates" Double Coin as the producer of the goods to Customs, "Jinhaoyang will receive Double Coin's rate for the purpose of cash deposits."  *Id.*

C.      Analysis

1.      Commerce's Discretion to Apply a Combination Rate

For nonproducing exporters, Commerce "*may* establish a 'combination' cash

deposit rate for each combination of the exporter and its supplying producer(s)."  19

C.F.R. § 351.107(b)(1)(i) (emphasis supplied).  Notably, the word "may" in the

regulation conveys that Commerce has discretion whether to apply a combination rate

in any given instance — the regulation permits but does not require Commerce to apply

combination rates.  As recalled by the Government, the Preamble to 19 C.F.R. §

351.107 also provides that "[a]s in AD proceedings, in CVD proceedings there may be

situations in which it is not appropriate or practicable to establish combination rates.  In

such situations, the Department will make *exceptions* to its combination rate approach

on a case-by-case basis."  *Antidumping Duties; Countervailing Duties,* 62 Fed. Reg.

27,296 (Dep't Commerce May 19, 1997) (final rule) (emphasis supplied); *see* Def. Br. at

35.  The language of the Preamble — in particular, the use of the word "exception" —

suggests that, as a general matter, combination rates are the preferred approach under

Commerce's regulations.  *See id*.

This Court has confirmed the applicability of the Preamble: "The Preamble,

although it was issued after the notice-and-comment rulemaking procedure that went

into 19 C.F.R. § 351.107, is a policy statement, and not an agency interpretation that

holds the 'force of law' . . . . "  *Tung Mung Development Co., Ltd. v. United States,* Slip

Op. 01-83, 2001 WL 844484, at *13 (CIT July 3, 2001).  In *Tung Mung*, the court

confirmed that Commerce has discretion to impose a single rate or a combination rate,

*see id.*; however, in that case, the court remanded the issue because Commerce in that case declined to apply a combination rate notwithstanding that Commerce had applied such a rate in similar cases previously.  The court directed Commerce either to provide a reasonable explanation for its change in practice or apply the "combination rate approach."  *See id.* at *16.  Subsequently, the Federal Circuit affirmed that decision. *See Tung Mung Dev. Co. v. United States*, 354 F.3d 1371 (Fed. Cir. 2004).

### 2. Commerce's Decision Not to Assign Double Coin's Rate to Jinhaoyang

In this case, Commerce did not provide an adequate explanation of the reason that it did not assign Double Coin's rate to Jinhaoyang.  Commerce's failure to do so is peculiar given that the Government suggests that Jinhaoyang can obtain Double Coin's rate if only Jinhaoyang "appropriately indicates" to Customs that Double Coin is the producer of the goods that Jinhaoyang imported.  *See* Def. Br. at 35.

Jinhaoyang cites *DSSS* and *TFE* to support its claim that in the past, Commerce has granted the combination cash deposit rate of the producer to an unaffiliated exporter that cooperates in Commerce's investigation of that producer.  *See* Jinhaoyang Br. at 5.  In *DSSS*, an unaffiliated trading company that had exported the subject merchandise cooperated in the underlying CVD investigation by submitting requested information.  *See DSSS*, 77 Fed. Reg. at 46,721-22.  Commerce preliminarily attributed subsidies received by the trading company to the producer and determined that the trading company should receive a combination cash deposit rate.  *Id.* at 46,730.  In *TFE*, an administrative review that Commerce acknowledged was factually similar to

*DSSS*, Commerce determined that the unaffiliated trading company's cash deposit rate should be the same as the producer's rate.  *See TFE* IDM at Comment 5.  Both *DSSS* and *TFE* support the conclusion that Commerce has assigned combination rates in similar situations in the past.

　　　In response to Jinhaoyang's argument, the Government relies on *CTL Plate from Korea* for the proposition that Commerce previously has decided *not* to apply a combination rate to a cooperating exporter.  Def. Br. at 35 (citing *CTL Plate from Korea*, 81 Fed. Reg. 63,168 (Dep't Commerce Sept. 14, 2016) (preliminary negative CVD determination and alignment of final determination with final antidumping duty determination) and accompanying Preliminary Determination Memorandum at 13).  In that investigation, Commerce preliminarily determined that the subsidy rate for the respondent in question was *de minimis*.  *CTL Plate from Korea*, 81 Fed. Reg. at 63,168. In its final determination, Commerce established an all-others subsidy rate.  *CTL Plate from Korea*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) (final affirmative CVD determination and final negative critical circumstances determination).  Commerce then applied 19 U.S.C. § 1671d(c)(5)(A)(ii), which provides that when subsidy rates for all exporters and producers individually investigated are zero or *de minimis*, Commerce "may use any reasonable method to establish an all-others rate."  *Id.*  Applying the statute, Commerce established that the all-others rate would be the same as the rate calculated for the sole mandatory respondent, following an approach that Commerce had taken in similar CVD investigations.  *Id.*  Neither the statutory provision applied by

Commerce in *CTL Plate from Korea*, nor the facts of that investigation are apposite to the instant case.

The Government next relies on the language in *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,304 (Dep't Commerce May 19, 1997) (final rule), which provides that "the proper application of rates to entries for deposit purposes generally requires that the producer of the merchandise be identified."  Def. Br. at 35.  The Government asserts that this provision justifies a decision not to apply the combination rate to Jinhaoyang.  *Id*.  This argument is contradicted by the fact that Commerce treated Jinhaoyang as an unaffiliated trading company during the POI and attributed subsidies received by Jinahoyang to Double Coin.  *See* Letter Pertaining to Comment on Final Determination Regarding Cash Deposit Rate for Jinhaoyang at 2, PD 482 (Jan. 25, 2017).  In short, Commerce provided no explanation that would support Commerce applying here an "exception[] on a case-by-case basis" within the meaning of Commerce's regulation.  *See Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27,296, 27,303 (Dep't Commerce May 19, 1997) (final rule); *see Tung Mung,* 25 CIT at 764, *aff'd Tung Mung*, 354 F.3d 1371; *see also NMB Singapore*, 557 F.3d at 1319-20 (stating that "while [Commerce's] explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court . . . . [A] final determination by Commerce must include 'an explanation of the basis of its determination that addresses relevant arguments [ ] made by interested parties who are parties to the investigation or review.'" (citing 19 U.S.C. § 1677f(i)(3)(A)).

The court concludes that Commerce failed to provide a reasonable explanation of its decision not to apply a combination rate to Jinhaoyang.  Accordingly, the court remands the issue to Commerce and directs Commerce to (1) present an explanation of its decision, or (2) apply a combination rate to Jinhaoyang and list Jinhaoyang as an exporter to receive Double Coin's cash deposit rate in Commerce's instructions to Customs.

## CONCLUSION

In the 1993 film, Groundhog Day, weatherman Phil (portrayed by Bill Murray) takes an overnight business trip to the small town of Punxsutawney, Pennsylvania to report on the town's local Groundhog Day festivities.  On February 2, Phil wakes up in the local bed and breakfast and heads to the town square to cover the town's Groundhog Day events.  Jaded and unimpressed with the small town and its inhabitants, Phil is eager to leave but due to a winter storm, he is forced to spend another night in Punxsutawney.  The next day, Phil wakes up in the same bed and breakfast and begins to experience the previous day's events.  Unbeknownst to Phil, he has entered a time loop and is set to re-live February 2 for the foreseeable future.  Phil, bewildered and concerned by what he believes to be a severe case of déjà vu, attempts to seek some guidance from the owner of the bed and breakfast, Mrs. Lancaster (portrayed by Angela Paton).

Phil: "Do you ever have déjà vu, Mrs. Lancaster?"

Mrs. Lancaster: "I don't think so, but I could check with the kitchen."[77]

* * *

In conclusion, this case has presented a recurring issue before the court. Repeatedly, the issue of Commerce's application of AFA to find use of the EBCP has come before the Court and repeatedly the Court has remanded back to Commerce for further explanation.  The court encourages Commerce to use this remand finally to move beyond this endless loop by providing a further explanation for its decision to not verify the customer self-certifications and turn to AFA.  On remand, Commerce is also directed to: (1) explain further its determination regarding the grants presented at verification; (2) explain its decision to not apply a supply ratio to the import duty and ocean freight adjustments; (3) address the issue of the quantity of imports in selecting its Tier 1 benchmark for synthetic rubber and butadiene; and, (4) explain its decision to not assign a combination rate to Jinhaoyang.  Accordingly, the court grants in part and denies in part plaintiffs' Motions for Judgment on the Agency Record and remands in part the Final Determination to Commerce.

Based on the foregoing reasons, it is hereby

**ORDERED** that on remand Commerce explain further its decision to reject the grants as "minor corrections;" it is further

**ORDERED** that on remand Commerce describe: (1) each of the specific ways in which its understanding of the operation of the EBCP was "unreliable"; and, (2) each of

---

[77] *See supra* note 1.

the ways in which the uncertainty created by the gaps in the record concerning the operation of the program (a) reasonably prevented Commerce from relying on the self-certifications, and (b) created uncertainty as to whether Commerce would even be able to establish through verification, and having to rely on non-GOC sources, non-use of the EBCP; it is further

**ORDERED** that on remand Commerce: (1a) explain the reason that the information withheld by the GOC about the threshold requirement was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use; (1b) explain the reason that the information withheld by the GOC about the third-party banks was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use; (2) explain whether it would be feasible for Commerce to solicit and obtain the withheld information from customers — which are third parties to the investigation — by describing each step that Commerce would consider to be necessary to obtain such information, including stating clearly the reason(s) that Commerce considered each step necessary; (3) with respect to "(2)", above, describe with particularity any "significant burden" Commerce might or would likely incur in taking such action; (4) explain the extent to which Commerce would be able to rely on information from customers by identifying what information Commerce would seek from customers and explaining how, if at all, such information would be useful to Commerce to establish non-use; (5) explain why the claims of non-use are "unverifiable" by describing step-by-step Commerce's methodology for verifying non-

use; (6) address whether, without information about the operational changes to the EBCP, verification of the customers' self-certifications in accordance with Commerce's methodology is (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both; (7) with respect to "(6)", above, were the question of sampling to arise, explain whether sampling would be (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both; (8a) state whether Commerce has a practice of verifying information from third parties; (8b) if Commerce has such a practice, explain why it is reasonable for Commerce to refrain from verifying the information submitted by the customers, through the respondents, in this case; and, (9) explain whether the proposed solutions — such as Commerce visiting respondents' customers and asking for a list of the banks or lenders that provided loans to the customers during the POI — are feasible alternative methods of verification for Commerce, and if Commerce concludes that these methods are not feasible, explain the reasons for this conclusion.  The court emphasizes that each of the aforementioned instructions for Commerce on remand is a distinct inquiry that requires a distinct individual response as well as clarification from Commerce in its redetermination; it is further

ORDERED that on remand Commerce (1) explain the basis for its decision not to apply a supply ratio to the import duty and ocean freight adjustments by addressing directly Double Coin's arguments on the issue, and (2) address the issue of consideration of the quantity of imports in selecting its Tier 1 benchmark for synthetic rubber and butadiene; it is further

Consol. Court No. 19-00032                                      Page 144

     **ORDERED** that on remand Commerce must either (1) present an explanation for its decision not to assign Double Coin's cash deposit rate to Jinhaoyang, or (2) apply a combination rate to Jinhaoyang and list Jinhaoyang as an exporter to receive Double Coin's cash deposit rate in Commerce's instructions to Customs; it is further

     **ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; it is further

     **ORDERED** that any comments on the remand results shall be submitted within 30 days of the filing of the results; and it is further

     **ORDERED** that any replies to the comments are due 15 days thereafter.


                              /s/     Timothy M. Reif
                              Timothy M. Reif, Judge

Dated:   May 19, 2021
         New York, New York