Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

C-570-041<br>
Remand<br>
Slip Op. 21-64<br>
POI: 1/1/2015 – 12/31/2015<br>
E&C/OI:  Team<br>
~~Business Proprietary Document~~ Public Version

***Guizhou Tyre Co. Ltd. v. United States***
**Court No. 19-00032, Slip Op. 21-64 (CIT May 19, 2021)**

**Final Results of Redetermination**
**Pursuant to Court Remand**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final remand results of redetermination (remand results) pursuant to the remand order of the U.S. Court of International Trade (the Court) in *Guizhou Tyre Co. Ltd., v. United States* Court No. 19-00032, Slip Op. 21-64 (CIT May 19, 2021) (*Remand Order*).  These remand results arise out of the final determination in *Truck and Bus Tires from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination, in Part*, 82 FR 8606 (January 27, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

In its *Remand Order*, the Court remanded:  (1) Commerce's application of adverse facts available (AFA) to the grants presented by Guizhou Tyre Co. Ltd., and Guizhou Tyre Import and Export Co. Ltd (Guizhou Tyre) at the company's verification; (2) Commerce's application of AFA with respect to the Export Buyer's Credit (EBC) program; (3) Commerce's calculation of benchmarks regarding ocean freight and import duties in relation to certain less than adequate remuneration (LTAR) programs; (4) whether Commerce considered quantity as an element when

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

evaluating benchmark prices for synthetic rubber; and (5) Commerce's decision not to assign

Qingdao Jinhaoyang International Co., Ltd. (Jinhaoyang) a combination cash deposit rate.

In this final remand determination, we addressed the Court's concerns and are

maintaining our positions from the *Final Determination* for each of these issues.  However, as

discussed below, based on additional information placed on the record, we revised the AFA rate

applied to Guizhou Tyre's unreported grants.

## II.    BACKGROUND

On February 25, 2016, Commerce published its initiation of the countervailing duty

(CVD) investigation on truck and bus tires from the People's Republic of China (China).

Shanghai Huayi Group Corporation Limited's (formerly Double Coin Holdings Ltd.) (Double

Coin) and Guizhou Tyre were selected as mandatory respondents.  Commerce published the

*Preliminary Determination*[1] for this investigation on July 5, 2016.

In the *Preliminary Determination*, Commerce investigated the provision of four inputs

for LTAR:  carbon black, nylon cord, synthetic rubber and butadiene, and natural rubber.[2]

Commerce relied on AFA to preliminarily find that the respondent's suppliers were

"authorities," because the GOC failed to provide information as to whether these input suppliers

were under the management or control of the government.[3]  As a result, we found that the

provision of carbon black, nylon cord, natural rubber, synthetic rubber, and butadiene from all of

the respondents' suppliers constituted a financial contribution.[4]

---

[1] *See Truck and Bus Tires from the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Determination*, 81 FR 43577 (July 5, 2016) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[2] *Id.*
[3] *Id.* at 9-12.
[4] *Id.*

2

To determine a benefit under these programs, Commerce identified comparative benchmarks for determining whether a government good or service is provided for LTAR as set forth in 19 CFR 351.511(a)(2).[5]  These potential benchmarks are listed in hierarchical order by preference:  (1) market prices from actual transactions within the country under investigation (*e.g.*, actual sales, actual imports or competitively run government auctions) (Tier 1); (2) world market prices that would be available to purchasers in the country under investigation (Tier 2); or (3) an assessment of whether the government price is consistent with market principles (Tier 3).

In the *Preliminary Determination*, Commerce found that the domestic market for carbon black was distorted.[6]  As such, we found that neither the domestic Chinese prices nor import prices were an appropriate basis for a Tier 1 benchmark; thus, Commerce relied on world market prices as the Tier 2 benchmark.[7]

Commerce found that the domestic markets for nylon cord, synthetic rubber,  butadiene, and natural rubber were not distorted, and thus we relied upon Tier 1 benchmarks for these inputs.[8]  However, as a result of finding that all of the respondents' suppliers were "authorities," Commerce did not rely on respondents' actual transaction prices from domestic suppliers as Tier 1 benchmarks for any of these inputs.[9]  As a result, for natural and synthetic rubber, Commerce relied upon actual monthly import prices of natural and synthetic rubber reported by the respondents during the period of investigation (POI) as a basis for calculating Tier 1 benchmark prices.  However, neither respondent reported actual imports of nylon cord during the POI, thus Commerce relied instead on Chinese import prices as Tier 1 benchmarks.  Where appropriate, we

---

[5] *Id.* at 22-24.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

included ocean freight and inland freight charges that would be incurred to deliver these inputs to the respondents' production facilities.[10]  These benchmark prices were compared to the respondents' reported purchase prices for individual domestic transactions, including value-added tax and any delivery charges.[11]

Commerce conducted verification of the GOC's, Double Coin's, and Guizhou Tyre's questionnaire responses from November 2 to 18, 2016.[12]  As discussed in the *Final Determination*, Guizhou Tyre presented, as "minor corrections," a significant number of grants received during the AUL by the company, that should have been reported in its initial questionnaire response.[13]  Commerce estimated that there were "more than 40 grants" presented that were previously unreported.[14]  Commerce declined to accept the worksheet with these new grants at verification.[15]

Commerce published the *Final Determination* on January 27, 2017, and we continued to find that the market for carbon black was distorted, while finding that the markets for nylon cord, synthetic rubber, butadiene and natural rubber were not distorted.[16]  As such, the benchmarks for carbon black continued to be (Tier 2) world market prices, while the benchmarks for nylon cord continued to be (Tier 1) Chinese import prices, and the benchmarks for synthetic rubber and natural rubber continued to be (Tier 1) the respondents' actual import prices.  Further, we

---

[10] *Id.* at 30.
[11] *Id.*
[12] *See* Memoranda, "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China: Verification of the Questionnaire Responses Submitted by Double Coin Holdings, Ltd.," dated December 9, 2016; "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China:  Verification of the Questionnaire Responses Submitted by the Government of China," dated December 9, 2016; and "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China:  Verification of the Questionnaire Responses Submitted by Guizhou Tyre Co., Ltd.," dated December 9, 2016.
[13] *See Final Determination* IDM at 15-16.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 18-19.

4

continued to include freight charges that would be incurred to deliver these inputs to the respondents' production facilities.[17]

Further, as a result of the unreported grants that Guizhou Tyre attempted to submit at verification, we applied AFA to the company for these previously unidentified grants in the *Final Determination*.[18]  Specifically, using our hierarchy for selecting AFA rates, we selected the highest rate from a similar program in a China CVD proceeding, which was 0.58 percent.  We multiplied this 0.58 percent by 41 (on the basis that there were more than 40 unreported grants), resulting in a 23.78 subsidy rate.[19]

Additionally, in the *Final Determination*, Commerce applied AFA to the EBC program, as the GOC failed to provide the requested information needed to allow Commerce to analyze this program fully.[20]  Accordingly, we found that the GOC did not cooperate to the best of its ability in response to Commerce's specific information requests.  In turn, as AFA, we found that the EBC program constituted a financial contribution and met the specificity requirements of the Act.[21]  Further, we assigned an AFA rate of 10.54 percent *ad valorem*, the highest rate determined for a similar program in the *Coated Paper from the PRC* proceeding, as the rate for this program, applicable to both respondent companies.[22]

In the investigation, the GOC stated that the Export-Import Bank of China (EX-IM Bank) limits the provision of export buyer's credits to business contracts exceeding 2 million U.S. dollars (USD).[23]  However, information on the record indicated that the GOC revised this

---

[17] *Id.*
[18] *Id.* at 15-16.
[19] *Id.*
[20] *Id.* at 11-13.
[21] *Id.*
[22] *Id.*
[23] *Id.*

5

program in 2013 to eliminate this minimum requirement.[24]  Commerce requested that the GOC

provide the revised *2013 Administrative Measures* for this program.[25]  However, the GOC

refused to provide this document, stating that the "2013 internal guidelines/revised

Administrative Measures are internal to the bank, non-public, and not available for release."[26]

Further, information on the record also indicated that the EX-IM Bank could disburse

credit directly or through a third-party partner and/or correspondent banks.[27]  However, the GOC

refused to confirm whether third party banks play a role in the disbursement/settlement of export

buyer's credits.[28]  Further, the GOC refused to provide a list of all third-party banks involved in

the disbursement/settlement of export buyer's credits.[29]

Given the complicated structure of loan disbursements for this program, we found that a

complete understanding of how this program is administrated was necessary to conduct our

standard subsidy analysis.  However, the GOC refused to provide the relevant information as to

how this program operated.  As a result, the GOC had not provided the necessary information

that would permit us to determine whether this program constituted a financial contribution or

whether this program was specific.  Accordingly, we found that the GOC did not cooperate to the

best of its ability in response to our specific information requests and determined, as AFA, that

this program constituted a financial contribution and met the specificity requirements of the

Act.[30]

The GOC claimed that neither company used this program.  However, we found that

absent the information requested, Commerce was not able to verify non-use of the program.

---

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*

Further, we determined that the GOC was the only party that could answer questions about the internal administration of this program.  Additionally, we found that without a full understanding about the role of third-party banks, the affidavits provided by the company respondents certifying non-use of the program and the respondent companies' claims of non-use were also not verifiable.  Therefore, we found that the GOC had not cooperated to the best of its ability and, as AFA, found that Double Coin and Guizhou Tyre used and benefited from this program. As such, we assigned an AFA rate of 10.54 percent *ad valorem* to both companies.[31]

Finally, in the *Final Determination*, Commerce attributed subsidies received by Jinhaoyang to Double Coin, consistent with 19 CFR 351.525(c).[32]  Jinhaoyang was an unaffiliated trading company that exported subject merchandise produced by Double Coin during the POI.[33]  As a trading company to one of the mandatory respondents, Jinhaoyang participated in this investigation, as it submitted questionnaire responses and participated in verification.[34] However, since it was not a respondent in this investigation, no specific rate was assigned to Jinhaoyang in the *Final Determination*.[35]

Guizhou Tyre, Double Coin and Jinhaoyang (collectively, plaintiffs) challenged Commerce's findings on several issues from the *Final Determination*.  On May 19, 2021, the Court remanded the *Final Determination* to Commerce.  While the Court sustained Commerce's finding on certain issues, it remanded the *Final Determination* back to Commerce for further explanation regarding the:

- application of AFA to the grants presented by Guizhou Tyre at verification;

---

[31] *Id.*
[32] *Id.* at 17.
[33] *See, e.g.*, Jinhaoyang's Letter, "Comment on Final Determination Regarding Cash Deposit Rate for Jinhaoyang: Truck and Bus Tires from the People's Republic of China (C-570-041)," dated January 25, 2017.
[34] *Id.*
[35] *See* CBP Message Number 9051301, dated February 20, 2019.

- application of AFA with respect to the EBC program;

- decision not to apply a supply ratio to import duty and ocean freight adjustments;

- consideration of the quantity of imports in selecting its Tier 1 benchmark for synthetic rubber; and

- decision not to assign Double Coin's cash deposit rate to Jinhaoyang.

Based on the Court's remand, Commerce issued a questionnaire to Guizhou Tyre on June 10, 2021 regarding the unreported grants the company attempted to submit at verification.[36] Guizhou Tyre submitted its questionnaire response on June 17, 2021.[37]

On July 23, 2021, Commerce released its Draft Results[38] in accordance with the Court's *Remand Order*.  On August 6, 2021, Double Coin and Guizhou Tyre submitted comments on Commerce's Draft Results.[39]

## III.   ANALYSIS

*Guizhou Tyre's Unreported Grants*

In Commerce's initial questionnaire, respondents were instructed to report "other subsidies," including "any other forms of assistance" related to subsidy programs not alleged or identified in the petition.[40]  In its questionnaire responses, Guizhou Tyre reported additional subsidies, all self-reported grant programs, that it had received during the AUL that had not been

---

[36] *See* Commerce's Letter, "Truck and Bus Tires from the People's Republic of China:  Supplemental Questionnaire," dated June 10, 2021 (Remand Supplemental Questionnaire).
[37] *See* Guizhou Tyre's Letter, "GTC Response to Supplemental Questionnaire:  Remand of the Countervailing Duty Investigation on Certain Truck and Bus Tires from the People's Republic of China (C-570-041)," dated June 17, 2021 (Remand Supplemental Questionnaire Response).
[38] *See* Draft Results of Redetermination Pursuant to Court Remand Truck and Bus Tires from the People's Republic of China, *Guizhou Tyre Co. Ltd. v. United States*, Court No. 19-00032, dated July 23, 2021 (Draft Results).
[39] *See* Guizhou Tyre's Letter, "GTC Draft Remand Comments: Remand of the Countervailing Duty Investigation on Certain Truck and Bus Tires from the People's Republic of China (C-570-041)," dated August 6, 2021 (Guizhou Tyre Draft Remand Comments); *see also* Double Coin's Letter, "Comments of China Manufacturers Alliance and Shanghai Huayi Group Corporation Limited on the Department's Draft Results of Remand Redetermination Truck and Bus Tires from the People's Republic of China," dated August 6, 2021 (Double Coin Draft Remand Comments).
[40] *See* Commerce's Letter, "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China:  Countervailing Duty Questionnaire," dated April 1, 2016 (Initial Questionnaire) at Section III, page 19.

8

initiated on.[41]  We incorporated these additional subsidies in the calculations for Guizhou Tyre.[42]  However, as discussed above, Guizhou Tyre reported, at verification and for the first time, a significant number of new grants received during the AUL by the company that were unrelated to any subsidies Guizhou Tyre previously reported to Commerce in its questionnaire responses.  We estimated that there were "more than 40 grants" that Guizhou Tyre listed in its worksheet at verification.  Further, we declined to accept these unreported new grants as minor corrections.  As a result, we applied an AFA rate of 23.78 percent *ad valorem* to the company for these unidentified grants in the *Final Determination*.[43]

Following the *Final Determination*, Guizhou Tyre challenged our finding, arguing that Commerce should have accepted the grant information presented at verification, and that its refusal to accept the information and application of AFA to the subsidy programs was not in accordance with law, or supported by substantial evidence.  In its *Remand Order*, the Court stated that Commerce's assertion that "more than 40 grants" were included in these minor corrections was unsupported by the record and instructed Commerce to explain further its determination regarding the grants presented at verification.  As noted above, in light of the Court's *Remand Order*, we issued a supplemental questionnaire to Guizhou Tyre on June 10, 2021, in which we requested Guizhou Tyre provide:  (1) the total number of unreported grants; (2) the name of each unreported grant; and (3) the aggregate value of all the unreported grants.[44]  We received Guizhou Tyre's response on June 17, 2021.[45]

---

[41] *See, e.g.*, Guizhou Tyre's Letter, "Guizhou Tyre Program-Specific Response," May 20, 2016, at 45 and Exhibit P.F.1.
[42] *See, e.g.*, Memorandum, "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China:  Amended Final Determination Calculations for Guizhou Tyre Import and Export Co., Ltd. and Guizhou Tyre Co., Ltd.," dated February 14, 2017.
[43] *Id.* at 15-16.
[44] *See* Remand Supplemental Questionnaire.
[45] *See* Remand Supplemental Questionnaire Response.

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

In its questionnaire response, Guizhou Tyre submitted a worksheet listing all the grants the company had attempted to submit as minor corrections at verification.[46]  As requested, this worksheet listed the total number of grants, the name of the grant (in its Chinese name and translated into English) and the aggregate value of these grants.  Guizhou Tyre reported that it received disbursements under 45 grant programs during the AUL.[47]

We find this submission supports Commerce's finding in the *Final Determination* that there were "more than 40 grants" that Guizhou Tyre attempted to submit in its minor corrections. In fact, this response indicates that Commerce under-counted the total amount of unreported grants presented at verification.  As such, we find this submission also supports our finding that these unreported grants did not meet the standards of "minor corrections."

On October 28, 2016, Commerce issued its verification agenda to Double Coin and Guizhou Tyre.[48]  In this agenda, we outlined the topics to be discussed, as well as detailed the types of source documents we would review during the course of verification.[49]  In the cover letter to this agenda, we stated the following:

> Please note that verification is not intended to be an opportunity for the submission of new factual information.  Information will be accepted at verification only when the information makes minor corrections to information already on the record or when information is requested by the verifiers, in accordance with the agenda below, to corroborate, support, and clarify factual information already on the record.[50]

Therefore, prior to verification, Commerce established that the minor corrections portion of verification was not an opportunity for Guizhou Tyre to report significant new information,

---

[46] *Id*.
[47] *Id*.
[48] *See, e.g.*, Commerce's Letter, "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China; Verification of Double Coin Holdings Ltd. Questionnaire Responses," dated October 28, 2016 (Verification Agenda).
[49] *Id*.
[50] *Id*.

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

such as numerous previously unreported grant programs.  Thus, we find that these additional grants Guizhou Tyre attempted to submit do not qualify as "minor corrections."  Specifically, this new information is not a minor correction to information on the record.  Instead, Guizhou Tyre attempted to submit data for programs for which there was no information on the record.  In other words, Guizhou Tyre attempted to submit new factual information with these grants, which Commerce explicitly stated it would not accept.  We note that Commerce accepted other minor corrections submitted by Guizhou Tyre at the beginning of verification that Commerce found were in fact corrections to information already on the record.[51]

Accepting these grants as minor corrections would have significantly impeded the verification, as verifying each of these grants would have required Guizhou Tyre officials to:  (1) provide an overview of the grant program; (2) discuss the application process and eligibility criteria of the program; (3) review the application and approval documents for each program; and (4) tie the receipt of assistance to accounting records and financial statements.

Commerce notes that, based on the names of these grants listed in this submission, it appears that a number of these programs appear to be export contingent (*e.g.*, "Extraction of Export Reward from Municipal Department of Commerce")[52] and, potentially, specific to exports to the United States (*e.g.*, "Subsidies for anti-dumping and countervailing from Municipal Department of Commerce").[53]  As such, if Commerce had accepted these grants at verification, in addition to evaluating the basis on which these grants were provided, Commerce

---

[51] *See, e.g.*, Guizhou Tyre's Letter, "Guizhou Tyre Verification Minor Corrections:  Countervailing Duty Investigation of Certain Truck and Bus Tires from the People's Republic of China (C-570-041)," dated November 21, 2016 (Guizhou Tyre Minor Corrections).
[52] *Id*.
[53] *Id*.

11

would also have had to ensure that it had all necessary sales figures to properly calculate the subsidy rates for each grant program.

Finally, the new information obtained during this remand proceeding provides Commerce with the opportunity to calculate a more accurate AFA rate regarding these unreported subsidies. As stated above, in the *Final Determination*, we calculated a rate of 23.78 percent for these unreported grants by multiplying the AFA rate of 0.58 percent by 41.  However, Guizhou Tyre's June 17, 2021, submission indicates that Guizhou Tyre received 45 grants during the AUL.  As such, for purposes of this remand, we are applying an AFA rate of 0.58 for each of the 45 grant programs that Guizhou Tyre failed to report during this investigation, resulting in a rate of 26.10 percent.  Guizhou Tyre's total *ad valorem* rate for the POI is now 65.66 percent.

*Export Buyer's Credit Program*

As discussed above, in the *Final Determination*, Commerce applied AFA to the EBC program as the GOC failed to provide the requested information needed fully to analyze this program.  On this basis, we applied AFA to the EBC program, as we found that the GOC did not cooperate to the best of its ability in response to Commerce's specific information requests in this investigation.  The Court remanded Commerce's application of AFA with respect to this program.  Specifically, the Court found that while Commerce identified the gap in the record created by the failure of the GOC to provide information in regard to key aspects of the functioning of the EBC program, Commerce had failed to explain the reason that the missing information was critical to verify a company's claims of non-use, and failed to outline for the Court the reasons that the customer certifications were impossible to verify.  On this basis, the Court instructed Commerce to respond to several questions.  Commerce hereby addresses each of these questions separately.

12

*(1a) explain the reason that the information withheld by the GOC about the threshold requirement was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use;*

Commerce's verification outline to the mandatory respondents in this investigation discusses the steps that Commerce would conduct to verify that certain alleged programs were not used.[54]  Specifically, as stipulated in the outline, Commerce will:  examine the sub-ledger detail of various accounts in which unreported assistance would likely be recorded; require access to a computer terminal to query the accounting system; review tax returns and financial statements; and review supporting documentation.[55]  For example, if Commerce were verifying non-use by a mandatory respondent for a loan program, it would first review the company's balance sheets or tax returns to determine the total borrowing during the investigation period.  Next, Commerce would review the subledgers detailing all the company's financing, which would tie to the company's balance sheet/tax returns.  In these subledgers, Commerce would look for loans from banks involved with the specific loan program.  Commerce would then select specific entries from these subledgers and request company officials to pull figures up in their accounting system and would request supporting documentation, including loan applications, loan agreements, bank statements, *etc*.

---

[54] *See, e.g.*, Commerce's Letter, "Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China; Verification of Double Coin Holdings Ltd. Questionnaire Responses," dated October 28, 2016 at 17 (("In verifying "non-use," the Department will examine any evidence of subsidies provided by your government under any subsidy program, including programs not currently subject to investigation.  In particular, the verifiers will:  1. Examine the sub-ledger detail of various accounts in which unreported assistance would likely be recorded (*i.e.*, the Department will review account detail for accounts such as "special payables," "other payables," and "government subsidies" for evidence of any unreported subsidies, including subsidies provided under programs not currently subject to investigation).  2. Access a computer terminal to query your accounting system.  3. Review all attachments and schedules submitted along with your tax return filed with the tax authorities during the POI.  4. Examine all notes attached to your audited financial statements for the POI and prior years of the AUL.  5. Review documentation confirming that your company's facilities are not located in regions to which certain programs are limited (*e.g.*, economic zones, specific cities, specific provinces).  6. Review documentation confirming that your company is not eligible for certain programs (*i.e.*, documentation indicating that your company has no foreign ownership and is thus not qualified for programs targeting foreign invested enterprises")).
[55] *Id*.

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

Were Commerce to attempt to verify non-usage of the EBC program by the respondent's U.S customers, it would perform similar steps.  Specifically, it would have to verify that all the loans the customer received were not under the EBC program.  First, Commerce would review the customer's tax returns and/or financial statements to determine the total of all forms of financing the company had outstanding during the POI.  Commerce would then review the applicable subledgers that were tied to the company's financing during the POI.  In reviewing these subledgers, Commerce would look for indications that the company received loans under this program.  Finally, Commerce would also examine entries in the accounting system, applicable loan documents (loan application, loan approval, *etc*.) and bank statements.

The GOC stated that this program is limited to contracts exceeding USD 2 million.[56] However, as discussed above, record information indicates that the program is no longer limited to USD 2 million contracts, and the GOC has refused to provide supporting documentation to refute this finding.[57]  This information is critical to Commerce's understanding of the program and is relevant for our determination of whether the respondent's merchandise has been subsidized.  If the program continues to be limited to USD 2 million contracts between a mandatory respondent and its customer, as stated by the GOC, then this greatly limits the universe of potential loans under the program and can significantly assist us in targeting our verification of non-use.  Thus, if this program were limited to these larger contracts, when reviewing the company subledgers, Commerce could narrow the universe of loans to verify under this program from all loans received by all customers to focus on larger loans received by the companies claiming non-use during the investigation period.

---

[56] *See Final Determination* IDM at 11-13.
[57] *Id.*

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

Conversely, if the program is no longer limited to USD 2 million contracts, this increases the difficulty of verifying loans without any such parameters.  Further, if the program was no longer limited to USD 2 million contracts, but Commerce were to accept the GOC's assertion that the program was limited, we could mistakenly limit our verification to only larger loans received by the customer, and potentially miss smaller loans that may have been disbursed under the EBC program.

In other words, by not providing full responses to Commerce's questionnaires, the GOC failed to provide information that would allow us to assess the scope of verification and effectively prove (or disprove) whether the mandatory respondents used this program, which are intrinsically necessary steps in verifying non-use of this program.

*(1b) explain the reason that the information withheld by the GOC about the third-party banks was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use;*

As discussed in response to question 1a, if Commerce were to verify the U.S. customers' non-use of the EBC program, it would require an in-depth review of the customers' tax returns/financial statements, relevant sub-ledgers, entries in the accounting system, applicable loan documents and bank statements (loan application, loan approval, bank statements, *etc*.).  To verify non-use of this program in a timely manner, information from the GOC regarding the third-party banks is essential for Commerce to effectively conduct its standard verification procedures.

As discussed in the *Final Determination*, record evidence indicates that the loans associated with this program are not limited to direct disbursements through the EX-IM Bank.[58] Specifically, the record information indicates that customers can open loan accounts for

---

[58] *Id.*

disbursements through this program with other banks, whereby the funds are first sent to the importer's account, which could be at EX-IM Bank or other banks, and that these funds are then sent to the exporter's bank account.[59]  Thus, in order to determine whether any of Double Coin's or Guizhou Tyre's customers received loans under this program, Commerce would need to know the names of the intermediary banks.  Specifically, the names of these third-party banks, not the "Export-Import Bank of China," would appear in the subledgers and bank statements of the U.S. customers if they received credits under this program.  Thus, having the GOC provide us information regarding the correspondent banks is critical for us to perform a verification of the U.S. customers.

Without the names of these third-party banks, Commerce would have to search through the respondent's customers books and records without any guidance as to which banks participate in this program, and thus would have no indication of which banks should be subject to enquiry as part of verification.  Specifically, in a standard verification of non-use, Commerce would review a company's subledgers (which are tied to its audited financial statements) for references to the entity making the financial contribution.  In the case of non-use of a loan program, Commerce would examine a company's subledger to see if there were any loans provided by a bank that participated in a loan program.  In verifying non-use of the EBC program, Commerce would review the U.S. customer's subledgers to see if the company received financing from a bank participating in the program.  If Commerce were provided a list of banks that participated in the EBC program, Commerce could cross-check the names on this list against the customer's subledgers.  If the customer did not receive financing from any of the

---

[59] *Id.*

third-party banks participating in the program, Commerce would be able to verify non-use of the program by that customer.

However, since the GOC did not provide a list of banks that participated in the program, as far as Commerce is concerned, all entries in the loan's subledger could potentially be loans under the EBC program.  As such, in order to verify non-use without an understanding of which intermediary banks participate in the program, Commerce would be required to review the underlying documentation for all entries from the subledger to attempt to confirm the origin of each loan.  Similarly, in instances where a customer reported using the EBC program, we would also be required to review all the underlying documentation to ensure all benefits were reported accurately.  In either scenario, this would be an unreasonably onerous undertaking for Commerce to verify a company that received a significant number of loans.  Furthermore, as discussed in more detail in response to question 3 below, the GOC has failed to provide other relevant information regarding the operations of the program which would allow Commerce to limit the universe of loans to verify.  As a result, the process of reviewing this underlying documentation would be overwhelmingly burdensome, as Commerce has no "roadmap" as to how to evaluate such documentation.  Such a "roadmap" is necessary to verify non-use given Commerce's resource constraints.

*(2) explain whether it would be feasible for Commerce to solicit and obtain the withheld information from customers — which are third parties to the investigation — by describing each step that Commerce would consider to be necessary to obtain such information, including stating clearly the reason(s) that Commerce considered each step necessary;*

Were Commerce to solicit and obtain the relevant information from the respondent's customers, it would follow the steps similar to what Commerce would undertake when seeking information regarding a mandatory respondent's participation in a subsidy program; namely, we

would gather information through the initial questionnaire, and, if necessary, supplemental questionnaires from these customers.  These responses would be subject to verification.

The first step in gathering the necessary information withheld regarding the EBC program would be requesting that the mandatory respondents in the proceeding provide a list of all its U.S. customers during the investigation period.  This step would be necessary to determine the number of customers and to ensure that all potential beneficiaries of this program are accounted for.  Commerce would also be able to verify the total number of customers at the respondent companies' verifications.

Next, we would issue a questionnaire to these U.S. customers, either directly to these customers or through the respondent companies.  In this questionnaire, Commerce would request that the customer report all forms of financing the company had outstanding during the POI, regardless of whether the financing was provided under the EBC program, and tie this information to the company's audited financial statements and/or tax returns.  This financing would include, but would not be limited to, traditional and non-traditional loans, invoice discounting, and factoring of accounts receivable.  This step would be necessary to ensure that Commerce is able to review all forms of financing before determining whether any of them were provided under the EBC program.  Further, should a respondent have received loans under the program, the company would be required to provide information regarding the specific assistance provided to it.  These responses would be subject to verification by Commerce to ensure all information provided in these responses was complete and accurate.  While Commerce may attempt to obtain the withheld information from these third-party customers, such an effort would likely not provide meaningful results.  First, Commerce does not have subpoena power and thus cannot force a party to participate in a proceeding.  In other words, the customers'

participation in this proceeding would be voluntary, although, of course, Commerce can rely on

the use of the facts available, with adverse inferences, when certain statutory requirements are

met.

Further, even if all the customers were to participate, this information would still be

insufficient to provide certainty of a respondent's non-use of the program without the full

cooperation of the GOC.  Specifically, as discussed above in responses to questions 1a and 1b,

the GOC has failed to provide the parameters of who may receive financing under this program

(*i.e.*, the USD 2 million minimum) as well as the names of the banks that participate in this

program.  Further, as discussed in detail in response to question 3 below, the GOC has failed to

provide any guidelines as to how the program operates.  As such, even if these customers were to

fully participate in this program, Commerce obtaining this information from the respondent's

customers would be meaningless without the necessary information from the GOC.

*(3) with respect to "(2)," above, describe with particularity any "significant burden" Commerce might or would likely incur in taking such action;*

Commerce would face several considerable burdens if it attempted to solicit and obtain the

withheld information from the respondent's customers.

First, as discussed above in response to questions 1a and 1b, the GOC's lack of

cooperation in providing information regarding this program represents a significant burden in

assessing:  the conditions under which loans are received, what supporting documentation

Commerce would need to verify, and the scope of the benefits provided under the program.

Thus, even if Commerce were to receive full cooperation from the mandatory respondent and all

its U.S. customers, Commerce would be hampered by its inability to narrow the universe of loans

that were potentially provided under the EBC program.  For example, if a company were to state

that it did not participate in the program and reported all of its financing, Commerce would be

19

unable to confirm this statement without reviewing every loan and the supporting documentation for each loan, a very burdensome task.

In addition to the GOC's missing information regarding the USD 2 million threshold and third party banks, the GOC has failed to provide a complete understanding of how the program functions.[60]  As noted above, the GOC has failed to report the *2013 Revisions*, which would not only clarify the (2 USD million) threshold discussed in response to question 1a, but also provide internal guidelines as to how the EBC program is administered.[61]  Further, the GOC failed to provide responses to the standard questions appendix.[62]  This appendix requests an explanation of the program, which includes identification/description of the applicable laws, records the government maintains, and the application process (including sample application documents). Since the GOC has refused to provide details as to how this program works, Commerce has not been presented with a full overview of the structure, operation, and usage of the program.  This information would help Commerce significantly reduce the burden on its resources by developing an effective method of verification.  Without knowledge of which entities administer the loans, which entities qualify for loans, or what conditions are placed on loans, Commerce has no basis to determine the method by which to verify use or non-use of the program.

As such, Commerce has no "paper trial" that would allow us to follow the paperwork (applications documents, correspondence, approval documents, bank account information, *etc*.) between the EX-IM Bank, the intermediary banks, and the eventual U.S. customer. Fundamentally, we have no basis for what to look for behind each loan in attempting to identify

---

[60] *See, e.g.*, *Final Determination* IDM at 11-13 ("Given the complicated structure of loan disbursements for this program, the Department's complete understanding of how this program is administrated is necessary.  Thus, the GOC's refusal to provide the most current 2013 Revisions, which provide internal guidelines for how this program is administrated by the EX-IM Bank, impeded the Department's ability to conduct its investigation of this program.")

[61] *Id*.

[62] *Id*.

20

a loan provided by the EX-IM Bank via a correspondent bank.  Even if the GOC were to provide

a list of banks that participated in the EBC program, we would still not be able to verify which

loans from a bank were EBC program loans and which loans were provided outside the program,

due to a lack of understanding of the underlying documentation of this program.  Thus, even if a

customer were to state that it received loans under the EBC program, it could be difficult to

verify the total financing (*i.e.*, benefit) under the program if the customer received multiple loans

from a bank that participated in the program.

Further, with respect to this specific investigation, Commerce would face a significant

burden in collecting and analyzing this information from all of Double Coin's and Guizhou

Tyre's U.S. customers.  Specifically, Double Coin reported 84 U.S. customer's during the POI.[63]

While we do not have an exact list of Guizhou Tyre's U.S. customers during the POI, the

company submitted 67 non-use certifications from its U.S. customers.[64]  As such, in this

proceeding, if Commerce were to attempt to acquire information regarding participation in the

EBC program from the mandatory respondent's U.S. customers, it would be required to collect

and analyze information from over 140 customers, with no parameters to limit our search (*i.e.*,

USD 2 million threshold, or specific intermediary banks) and with no guidelines that would

allow us to follow a "paper trail."  Even if this was the only program under investigation, this

process would be extremely onerous for Commerce.  However, given the fact that there were 14

other alleged programs in this investigation and 17 additional self-reported programs that

Commerce was required to analyze, verify, and calculate, a collection and verification of loan

---

[63] *See* Double Coin's Letter, "Double Coin's CVD Questionnaire Response (Part 2—Program Specific Questions),"
dated May 19, 2016 at Exhibit B-6.
[64] *See* Guizhou Tyre's Letter, "Guizhou Tyre Program-Specific Response," dated May 20, 2016 (Guizhou Tyre May
20 QR) at Exhibit P.B.4.

documentation for all of Double Coin's and Guizhou Tyre's customers would be virtually

impossible for Commerce to complete by the statutory deadline.

*(4) explain the extent to which Commerce would be able to rely on information from customers by identifying what information Commerce would seek from customers and explaining how, if at all, such information would be useful to Commerce to establish non-use;*

To establish non-use for each customer, Commerce would request every one of the

mandatory respondent's customers to report <u>all</u> forms of financing the company received during

the POI, regardless of whether the financing was provided under the EBC program. This would

include traditional and non-traditional loans, invoice discounting, and factoring of accounts

receivable. Commerce would also request that the company provide its audited financial

statements and/or tax returns that would support the total financing reported by the company.[65]

However, this information on its own will have limited value to establish non-use without

cooperation from the GOC. As discussed above in questions 1a and 1b, the GOC has failed to

provide information regarding the USD 2 million threshold requirement and the names of the

third-party banks that participate in the program. By failing to provide this information,

Commerce is unable to limit the potential loans that might have been disbursed under the EBC

program. As such, without this information, Commerce must presume that any loan received by

the customer was provided under this program.

For example, a customer could respond to Commerce's request for information, and

report not using the program, and provide supporting information including listing all of its loans

outstanding during the investigation period and tying these figures to its audited financial

statements. In other words, the company would have cooperated to the best of its ability.

However, because the GOC has failed to provide information regarding the EBC program, we

---

[65] In the event that the U.S. customer indicates that it participated in the program, Commerce would also request information regarding the loans received under the program, including application, approval, bank statements, *etc.*

22

would still be unable to confirm with certainty that none of its loans were provided under the EBC program.

Were the GOC to provide a list of the correspondent banks (as discussed in question 1b), Commerce may be able to confirm non-use if all the company's loans were from banks that did not participate in the EBC program. However, as discussed in response to question 3, the GOC has failed to provide details of the structure, operation, and usage of the program. As such, should one (or more) of the company's loans, be potentially provided under the program, Commerce would not be able to confirm that the loan was not provided under the EBC program.

Additionally, as discussed in response to question 2, Commerce does not have subpoena power and thus cannot compel a third-party's participation in a proceeding. Commerce would be dependent on voluntary cooperation from these companies. In instances with numerous U.S. customers, it is unlikely we would get full responses from all of the respondents' customers. Thus, Commerce would have responses from some companies indicating non-use, while we would not have such information for other companies. In such a scenario, Commerce would have to infer that the program was used. Otherwise, if we were to find non-use when only receiving responses from some customers as a part of our practice, we would be encouraging a situation in which we would incentivize companies who did receive financing under the program to simply not respond to our request for information. As such, Commerce would have to consider applying AFA in determining usage of the EBC program.

*(5) explain why the claims of non-use are "unverifiable" by describing step-by-step Commerce's methodology for verifying non-use;*

In discussing our verification's procedures, our regulations state that Commerce will "verify the accuracy and completeness of submitted factual information."[66] Further, our

---

[66] *See* 19 C.F.R. 351.507(d).

verification outlines to the company state that the objective of verification is "to tie information already on the record to source documents and your electronic accounting systems."[67]  As such, the purpose of verification is to confirm the data previously provided by the company is accurate. By the time Commerce conducts a company verification in a countervailing duty investigation or administrative review, it will have already received and analyzed information submitted by the company, including the company's financial statements, tax returns, ownership structure, company history, sales data, and details regarding subsidies received.  In most instances, this information will involve hundreds of pages of submissions submitted in numerous questionnaire responses.[68]  Commerce will tailor a company's verification agenda based on the information provided in these responses.[69]

In contrast, the non-use certificates provided in this investigation are simply one page documents from the customers stating that they did not use the program, have never received financing from the EX-IM Bank, and that they do not have a bank account with the EX-IM Bank.[70]  In essence, there is no factual information on the record for Commerce to actually verify for accurateness and completeness.

Were Commerce to attempt to verify these non-use certificates, it would have no knowledge of the company related to its potential use of the program prior to conducting verification.  As such, Commerce would be evaluating all pertinent company information (financial statements, ownership structure, sales data, loan information, *etc*.) for the first time at

---

[67] *See, e.g.*, Verification Agenda.
[68] For example, in this investigation, Commerce verified information from seven responses submitted by Double Coin totaling over 5,000 pages.
[69] For example, in Double Coin's verification agenda issued prior to verification, Commerce specifically stated it would focus on issues regarding the company's ownership structure, further, it also "pre-selected" specific loans and input purchases that it wanted to review at verification.  *Id.*
[70] *See, e.g.*, Guizhou Tyre May 20 QR at Exhibit P.B.4.

24

verification.  This is in stark contrast to the objective of verification, which is to ensure that the information <u>already</u> provided to Commerce is complete and accurate.

Regarding the Court's request to provide the step-by-step methodology for verifying non-use, Commerce provided such a description in response to question 1a.  Specifically, if we were to attempt to verify non-use for a loan program, such as the EBC program, we would first review the company's balance sheets or tax returns, with company officials, to determine the total borrowing during the investigation period.  In a typical verification, Commerce would have already received and reviewed the company's financial statements and tax returns prior to verification.  Thus, Commerce officials would not be reviewing this data for the first time, and would instead have the ability to scrutinize this information in greater detail at verification.  Further, the petitioner would have also had the opportunity to review these documents and submit comments should they find any concerns or discrepancies.  However, as discussed above, if Commerce were to attempt to verify these non-use certifications, it would be reviewing all these financial statements for the first time at verification.

Second, once we have established the company's total financing at verification, Commerce's next step would be to review the subledgers detailing all the company's borrowings.  In reviewing these subledgers, we would look for any indications that any financing was provided by a bank that participated in the specific loan program.  However, as discussed above in response to questions 1a, 1b and 3, such an exercise would be difficult, if not impossible, due to the GOC's lack of participation.  Further, we note that, in our initial questionnaire, we request that respondents provide all financing during the investigation period.[71]  Thus, in a standard verification, Commerce (as well as the petitioner) would have had

---

[71] *See* Initial Questionnaire at Section III, page 8.

the opportunity to review all outstanding financing the company reported and formulate applicable questions.  However, in reviewing these non-use certifications, Commerce would instead be looking at the company's loan information for the first time at verification.

Finally, in verifying non-use of a loan program like the EBC program, Commerce would examine entries in the accounting system, loan applications, loan approvals, and bank statements. In normal circumstances, Commerce would have been provided relevant information regarding the operations of the program by the government.  As such, prior to verification, Commerce would have knowledge of the application and approval process for the loan program, along with the opportunity to review the applicable documents to understand what documents we should be searching for during the verification process.  However, as noted above, Commerce has not received such information from the GOC for the EBC program.  Thus, Commerce would not have a paper trail to follow.  Further, because Commerce would not have had the opportunity to review any of the company's loan information prior to verification, it would not be afforded the opportunity to pre-select any loans that would be of potential concern.  Thus, Commerce would have to select such financing "on the fly" at verification.

Thus, due to the lack of information submitted on the record by both the GOC and the companies who submitted the non-use certifications, Commerce's normal methodology for verifying non-use would not be effective should we attempt to verify these certifications.

*(6) address whether, without information about the operational changes to the EBCP, verification of the customers' self-certifications in accordance with Commerce's methodology is (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both;*

Without information about the operational changes to the program, verification of the customers' self-certifications in accordance with Commerce's methodology would be both insurmountable and would not yield relevant and reliable information.

26

First, for the reasons discussed above in response to questions 1a, 1b, and 2 and 5, verification of these self-certifications would not result in relevant or reliable information.  Most notably, as discussed in response to question 5, because these certifications are simply one-page statements indicating non-use, with no supporting documentation or additional information about the company making the certification, there is no specific factual information for Commerce to verify.  Further, as discussed in response to questions 1a, 1b, and 2, the GOC's unwillingness to provide information requested by Commerce provides Commerce with no parameters or guidelines with which to focus our search during verification.  Thus, were Commerce to attempt to verify these self-certifications, it would have to evaluate all the company's information (financial statements, ownership, *etc*.) for the first time, and then attempt to confirm non-use with no "roadmap" to use.  This would almost certainly result in a verification that is unproductive.  In other words, verification in such a situation would amount to searching for a needle in a haystack.

Moreover, as discussed in response to question 3 above, there were over 140 U.S. customers between the two mandatory respondents in this investigation.  Generally, a company's verification lasts between three and five days.  Even if Commerce were to verify one customer each day, it would take months to complete.  As such, it would not be feasible to verify each customer's self-certifications in accordance with Commerce's methodology and regulatory deadlines.

Thus, verification of all the self-certifications in this investigation would be both "insurmountable" based on Commerce's resources and would also not provide reliable results.

*(7) with respect to "(6)", above, were the question of sampling to arise, explain whether sampling would be (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both;*

For the reasons discussed above in response to questions 1a, 1b, and 2, 5 and 6, Commerce attempting to conduct verification regarding any number of these self-certifications would not yield relevant or reliable information.

Regarding the question of sampling, Commerce finds such an approach would not be viable in this situation.  Specifically, while the Act provides Commerce the option to limit the number of companies examined,[72] it does not provide any guidance as to sampling customers of the exporter/producer.  Even if Commerce were to sample the respondent's customers in this instance, it is unclear how such a process would occur.  Specifically, the Act stipulates that when faced with a large number of exporters/producers, Commerce may limit its examination to a sample of exporters or producers that is "statistically valid" based on available information.[73]

While neither the Act nor regulations provide any basis for how to determine what is "statistically valid," Commerce's *2013 Sampling Notice* provides some guidance.[74]  Specifically, this notice provides four criteria that must be met when sampling:  (i) there is a request by an interested party for the use of sampling to select respondents; (ii) Commerce has the resources to examine individually at least three companies for the segments; (iii) the largest three companies

---

[72] *See* the Act at 1677f-1(e) ("If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may— (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to— (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.")

[73] *Id.*

[74] *See Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 FR 65963, 65965 (November 4, 2013) (*2013 Sampling Notice*).

by import volume of the subject merchandise under review account for normally no more than 50 percent of the total volume; and (iv) information provides a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from such information that would be associated with the remaining exporters.[75]  On this basis, Commerce could, in theory, sample respondents' customers using this criteria for direction.

However, assuming *arguendo*, that the first two criteria have been met (*i.e.*, request by an interested party and Commerce having the resources to examine three companies), there is no record information that would allow Commerce to fulfill the remaining criteria.  Specifically, as noted above, other than one-page statements that these customers did not participate in the EBC program, Commerce has no information regarding these companies.  Thus, we have no information regarding the size/scope of these companies' operations or the volume of subject merchandise these companies purchased during the POI, which could be used to meet the conditions stipulated in criteria (iii), nor do we have any information to differentiate the usage of the EBC program that could be used to meet the conditions stipulated in criteria (iv).

Thus, since we have no information regarding these customers, we have no basis to determine a "statistically valid" sample of the respondent's customers in this investigation.  Due to this, without cooperation by the GOC, sampling would be highly unlikely to provide relevant and reliable information.  However, we do note that in the event that Commerce requested and received information from U.S. customers <u>and</u> the GOC were to fully cooperate by providing the missing information discussed in responses to questions 1a, 1b and 3, sampling in that scenario may be a viable option to limit the number of companies being verified.

---

[75] *Id.*

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

Barcode:4156222-01 C-570-041 REM - Remand  - Slip Op 21-64

*(8a) state whether Commerce has a practice of verifying information from third parties;*

Commerce solicits information from third parties in many proceedings.  Commerce does not have a practice, per se, of verifying this information from third parties in all its proceedings.  However, in some instances, based on the circumstances of the particular proceeding, Commerce will verify information provided by third parties, including unaffiliated suppliers,[76] unaffiliated customers,[77] and surrogate value data.[78]

*(8b) if Commerce has such a practice, explain why it is reasonable for Commerce to refrain from verifying the information submitted by the customers, through the respondents, in this case;*

As discussed in response to question 8a, Commerce will verify information from third parties in certain situations.  However, as discussed in response to question 5, there is no information submitted by these customers for Commerce to verify.  Specifically, in this investigation, the customers have provided non-use certificates that are simply one-page documents stating that they did not use the program, with no supporting documentation to support these assertions.  As such, there is no factual information on the record for Commerce to verify.  In the instances where Commerce has verified third party responses, these parties have provided responses to Commerce's questionnaire responses and, in-turn, have established record information for Commerce to verify.[79]

---

[76] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 FR 51607 (November 7, 2017) (*Carbon from China*), and accompanying IDM at 2.

[77] *See, e.g.*, *Certain Oil Country Tubular Goods from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 79 FR 41983 (July 18, 2014) (*OCTG from Korea*), and accompanying IDM at Comment 2.

[78] *See, e.g.*, *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review, and Final Partial Rescission of Antidumping Duty Administrative Review*, 67 FR 19546 (April 22, 2002) (*Crawfish from China*), and accompanying IDM at "Surrogate Value Information-Introduction" ("We found it in the Australian data which now forms the basis of our live crawfish surrogate value. In the Australian data, we have fully verified, fully reliable, product-specific, average non-export values.")

[79] *See, e.g.*, *Carbon from China*; *OCTG from Korea*; and *Crawfish from China*.

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

*(9) explain whether the proposed solutions — such as Commerce visiting respondents' customers and asking for a list of the banks or lenders that provided loans to the customers during the POI — are feasible alternative methods of verification for Commerce, and if Commerce concludes that these methods are not feasible, explain the reasons for this conclusion.*

In its *Remand Order*, the Court discussed several solutions regarding the collection and verification of U.S. customers' information regarding the EBC program.  These solutions center around three options, specifically:  (1) the GOC providing information requested by Commerce (questions 1a and 1b); (2) Commerce soliciting information from Double Coin and Guizhou Tyre's customers (questions 2, 3 and 4); or (3) Commerce relying on the non-use certifications submitted by the U.S. customers in this investigation (questions 5, 6, 7, 8a and 8b).  While certain of these solutions may be effective in specific scenarios, the only solution that will ensure that Commerce is fully able to confirm usage/non-usage of this program, as well as confirm benefits under the EBC program, is if the GOC fully cooperates with Commerce's request for information regarding this program.

First, regarding the proposed solutions involving the non-use certifications, the Court has asked several questions about relying on and verifying these certifications submitted by the respondent's customers.  However, as discussed previously above, these non-use certifications are only one-page documents that state that the company did not use the program.  Thus, the only "evidence" we have on the record is an unsupported statement that the customer did not participate in the program.  Further, as discussed above, the purpose of verification is to verify information already on the record of the proceeding, not collect new information.  Were Commerce to attempt to verify these non-use certifications, it will not have access to any information regarding these customers prior to verification, and, in-turn, will be viewing the company's financial statements, ownership information, tax records, and loan subledgers for the first time at verification.  This would run contrary to the purpose of verification.  For these

31

reasons, we find that we cannot verify these non-use certificates, and therefore we cannot rely on them for demonstrating non-usage in this investigation.

The solutions involving the GOC providing information requested by Commerce and Commerce soliciting information from the respondent's customers provide clarification regarding non-use in some instances. For example, on some occasions, Commerce would be able to confirm non-use. However, in other scenarios these solutions will provide limited results. Most notably, the GOC has not provided full responses for this program, and thus, even if we were to get the two pieces of information discussed in questions 1a and 1b, along with full cooperation from the U.S customers, we will still have instances where we will be unable to confirm non-use. Further, as discussed above, since these U.S. customers are responding on a voluntary basis, Commerce will be missing key information should we not receive complete cooperation from all customers.

Below we provide three hypothetical scenarios to illustrate various outcomes that demonstrate the limitations of these solutions. In each scenario (1) the GOC has provided the two pieces of information discussed in questions 1a and 1b, namely information regarding the USD 2 million threshold[80] and a list of banks participating in the program; (2) the respondent company has fully cooperated to the best of its abilities, and has reported non-use of the EBC program; and (3) the respondent company had two U.S. customers during the POI who did not participate in the EBC program.

In the first scenario, both U.S. customers fully responded to Commerce's request for information. In reviewing the information provided, and subsequently verified, Commerce finds that all financing the two U.S customers received were from banks not participating in the

---

[80] For purposes of these examples, we will presume that the USD 2 million minimum is no longer in effect, and thus, any loans received through a participating bank could have been provided through the EBC program.

32

program. In such an instance, Commerce will be able to confirm and verify non-use of the program. Thus, in this scenario, Commerce would be able to find the program to be not used during the POI.

In the second scenario, both U.S. customers fully responded to Commerce's requests for information. However, in reviewing the information provided, Commerce finds that one customer has financing through banks not participating in the EBC program, while the other customer does have financing through one or more banks participating in the program. In such an instance, because Commerce has not been provided full details of the operations of the program, nor has it been provided a "paper trail" with which to trace the loans provided by the banks participating in the EBC program, Commerce is unable to confirm non-use. Thus, in this scenario, despite the fact that both the respondent and U.S. customers have fully cooperated to the best of their abilities, Commerce would not be able to find the program not-used during the POI, and would likely have to somehow fill in gaps in the record to determine the respondent's overall rate.

In the third scenario, only one of the two U.S. customers fully responded to Commerce's requestion for information. In reviewing the information provided, Commerce finds that the one participating customer has financing through banks not participating in the EBC program. Thus, in this scenario, despite the fact that there is no direct information indicating a loan was provided by a bank participating in this program, Commerce would not be able to find the program not-used during the POI, and would likely have to somehow fill in gaps in the record to determine the respondent's overall rate.

Commerce finds that in order to properly evaluate usage/non-usage and of this program, we need full cooperation from the GOC. This cooperation would require the GOC to provide not

only the parameters of who may receive financing under this program and a list of all third-party banks involved in the disbursement of money under this program (as discussed in response to questions 1a and 1b), but also full a description of how the program operates, including all relevant paperwork (as discussed in response to question 3).  We note that Commerce requests this type of information from the government for alleged subsidy programs in all CVD proceedings, as it is relevant for not only finding financial contribution and specificity, but also to be able to trace benefits in the respondent's books and records.  A complete understanding of the program in combination with complete responses from the respondent's U.S. customers will allow Commerce to evaluate and verify non-usage (and in the event of the program being used, will allow Commerce to confirm and verify benefits received under the program).

In conclusion, the Court discussed various solutions regarding methods to verify non-use of the EBC program, which have been addressed by Commerce in response to these questions.  However, as discussed numerous times throughout our responses, the GOC's full cooperation with regard to the EBC program is essential in order for Commerce to analyze this program consistent with our regulations.  Without this cooperation, Commerce does not have a complete understanding of how the program operates.  In turn, without this understanding, any information provided by the mandatory respondents or their U.S. customers is of minimal or no value.  We have noted that there may be one circumstance in which we could verify non-usage without partial responses from the GOC (specifically, in the event Commerce were provided a list of correspondent banks and we were able to review the financing of all respondents' customers).  Beyond this one scenario, Commerce will be unable to determine and verify usage/non-usage (or benefit) of this program.  As such, without full cooperation from the GOC, Commerce's only recourse is to apply AFA for this program.

*Benchmark Calculations – Application of Supply Ratio to Freight and Import Charges*

As discussed above, to calculate benchmark prices in the *Preliminary Determination*, Commerce included delivery charges, including freight and import duties, as necessary, to reflect delivered prices of carbon black, nylon cord, natural rubber and synthetic rubber, and butadiene.[81]

In their case briefs, the GOC and Double Coin argued that when using benchmarks based on import prices or world export prices, Commerce must limit any adjustment that includes ocean freight and import duties to a representative level consistent with prevailing market conditions in China for the good in question.[82]  Further, they argued that it is Commerce's responsibility to conduct the necessary analysis to determine a country's market conditions and how they affect benchmark adjustments, and that Commerce should consider the prominence of the domestic supply relative to the import supply in the market.  Specifically, Double Coin stated that when import transactions are limited or minimal, Commerce should avoid any ocean freight or import duty adjustments.  Further, in situations where import levels are higher, Double Coin stated that Commerce should adapt its benchmark to reflect the general condition that both domestic supply and import supply exists.  Double Coin suggested that one approach would be to apply a domestic supply to import supply ratio to the duty or freight adjustment.[83]

In the *Final Determination*, we did not make any adjustments to the benchmarks with respect to freight or import duties.[84]  Specifically, we stated that benchmarks should reflect "delivered prices", which include freight charges and import duties, pursuant to 19 CFR 351.511(a)(2)(iv).  Further, Commerce stated that neither the statute nor the regulations require

---

[81] *See Preliminary Determination* PDM at 30.
[82] *See Final Determination* IDM at Comment 7.
[83] *Id*.
[84] *Id*.

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

or instruct us to conduct a market analysis of ocean freight rates as suggested by the GOC and Double Coin.[85]  As such, we did not apply a ratio as suggested by Double Coin in the *Final Determination*.

In its *Remand Order*, the Court states that Commerce did not address Double Coin's argument that Commerce's adjustment to the benchmarks should reflect the prevailing market conditions in China.  Specifically, the Court noted that Commerce did not address the argument that it needed to adjust the benchmark by the ratio of import supply of the product in question.  Accordingly, the Court remanded Commerce's decision to reject Double Coin's supply ratio argument and instructed Commerce to provide an explanation as a reason for its decision.

Commerce believes its decision not to adjust the benchmark using the ratio suggested by Double Coin in the *Final Determination* was appropriate in this case and consistent with our regulations.  As an initial matter, Commerce believes that the adjustments made to the benchmarks in this investigation reflect prevailing market conditions and provide an accurate delivered price as stipulated in to 19 CFR 351.511(a)(2)(iv) of the regulations.  For example, when calculating these benchmark prices, Commerce relied upon actual ocean freight data from the POI sourced from Maersk.[86]  As such, Commerce has relied upon benchmarks reflecting market conditions.

In its case brief, Double Coin suggested that Commerce calculate a domestic/import supply ratio to be applied to import duties or freight adjustments.  As an initial matter, we have no reliable basis to calculate such a ratio in this proceeding.  As noted above, we have found that all the domestic suppliers of the inputs to Double Coin and Guizhou Tyre are "authorities" within the meaning of section 771(5)(B) of the Act.  As such, we find that the domestic figures

---

[85] *Id.*
[86] *See, e.g.*, *Final Determination* IDM at Comment 7.

36

are not viable for calculating such a ratio.  Thus, we find that the use of this supply ratio suggested by Double Coin would not be appropriate.  This is consistent with Commerce's prior findings that have been upheld by the Court.[87]  As such, even if Commerce found the use of a supply ratio appropriate in this instance, the method for calculating the supply ratio suggested by Double Coin (domestic supply / import supply) would result in a distorted benchmark.  Therefore, even if Commerce wanted to apply a ratio in this instance, it has no usable information to do so.

Finally, even if Commerce were to find the figures to calculate the ratio appropriate, it is unclear how this ratio offered by Double Coin would accurately reflect the price that a firm actually paid or would have paid if it imported the input under consideration.  If Commerce were to apply such a ratio, it would be lowering the import duties and freight prices based on the domestic and import supply.  Commerce believes applying such a ratio would arbitrarily lower these duties and prices with no clear purpose.  As noted above, consistent with the benchmark methodology, Commerce used Maersk prices for ocean freight that were actual observed market prices.  By applying a ratio to these Maersk prices, Commerce would be incorporating freight charges that were not actually incurred, and thus the newly modified prices would no longer reflect actual market prices.  In other words, if Commerce were to apply these ratios, it would be not be incorporating duties and transportation costs for these goods that are generally applicable to all purchasers in China.  Instead, it would be lowering these prices for no clear purpose, which in-turn, would result in benchmark prices that do not accurately reflect prices available within the country.

---

[87] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 83 FR 16055 (April 13, 2018) (*OTR Tires from China*), and accompanying IDM at 13; *see also Guizhou Tyre Co. v. United States*, , 389 F. Supp. 3d 1315 (CIT 2019) (*Guizhou Tyre Co. v. United States*).

Therefore, we continue to find that our decision not to use a supply ratio for this proceeding is appropriate.

*Benchmark – Consideration of Quantity of Imports*

As discussed above, in the *Preliminary Determination*, Commerce relied upon the respondent's import purchases as Tier 1 prices to calculate synthetic rubber and butadiene benchmark prices.[88]  In their case briefs submitted on the record of the underlying investigation, Double Coin and Guizhou Tyre argued that their own import purchase prices were not an appropriate benchmark to calculate the benefit for the provision of synthetic rubber because the type of imported synthetic rubber purchased by the respondents is limited in scope compared to the many types of synthetic rubber covered by the allegation.[89]  As such, they argued, these import prices do not provide an appropriate benchmark because the type of synthetic rubber they import is not comparable to the allegedly LTAR purchases at issue in the underlying investigation.[90]  Double Coin and Guizhou Tyre argued Commerce should instead use the aggregate import average unit value (AUV) for synthetic rubber provided on the record by petitioners.[91]

In the *Final Determination*, we disagreed with Double Coin and Guizhou Tyre, and continued to rely upon the actual import purchase prices reported by both respondent companies. Specifically, in the *Final Determination* we stated:

> While both Double Coin and Guizhou Tyre argue that these import prices do not provide an appropriate benchmark because the type of synthetic rubber they import is not comparable to the allegedly LTAR purchases we are examining, there is no evidence on the record to support their claims.  There is no basis in the record to distinguish imports of synthetic rubber from the domestic purchases based on type

---

[88] *See Preliminary Determination* PDM at 18-19.
[89] *See Final Determination* IDM at Comment 12.
[90] *Id.*
[91] *See* Double Coin's Letter, "Double Coin's Case Brief Truck and Bus Tires from the People's Republic of China (C-570-041)," dated December 19, 2016 (Double Coin Case Brief) at 16.

and quality that would render the otherwise usable Tier 1 benchmarks prices not comparable.  Moreover, the respondents' argument regarding the quantity of such purchases is not relevant to our analysis.  We also disagree that the noted differences in prices between the domestic and imported purchases suggest that the purchases are not comparable and find that the actual import purchase price data is reliable.[92]

Following the *Final Determination*, plaintiffs challenged our selection of benchmarks on the basis of comparability issues regarding price, quantity, and product similarity in the selection of Double Coin's import purchase prices as a Tier 1 benchmark.  In its remand, the Court evaluated each of these three elements, and sustained Commerce's position regarding price and product similarity.  However, the Court took issue with Commerce's statement in the *Final Determination* that "the respondents' argument regarding the quantity of such purchases is not relevant to our analysis."  Specifically, the Court stated that this statement is inconsistent with Commerce's regulation, which requires Commerce to consider "quantities sold, imported, or auctioned" in accordance with 19 CFR 351.511(a)(2)(i).  As such, the Court instructed Commerce to further explain the issue of consideration of the quantity of imports with respect to the selection of benchmark prices.

While not specifically discussed during the investigation, Commerce confirms that in its evaluation of the appropriate benchmark for synthetic rubber, Commerce did evaluate all elements, including quantity, in determining which was the best Tier 1 benchmark.  However, in compliance with the Court's instructions, Commerce re-examined whether quantity impacts Commerce's decision regarding the selection of appropriate benchmark prices.  We find that the synthetic rubber import quantities reported by both respondents were of a significant volume.  Specifically, during the POI, Double Coin made [

], while Guizhou Tyre made [

---

[92] *See Final Determination* IDM at Comment 12.

].[93]  Thus, we find that

both companies routinely imported synthetic rubber at significant volumes and values during the

POI (*i.e.*, these were frequent purchases made during the company's normal course of business).

In other words, there is nothing to indicate that these purchases would result in aberrational

benchmark prices.  Thus, we find the prices for these imports to be viable options as

benchmarks.

Further, as explained in the case of *Lumber from Canada*, the preferred benchmark in the

hierarchy is an observed market price from actual transactions within the country under

investigation.[94]  To put it another way, Commerce's general preference would be to use the

actual observed prices (in this case based on the respondent's experience) over an average price

(which has been suggested by plaintiffs here).  Based on our review of the available data, and

Commerce's preference for using actual prices, we determined that respondents' actual import

purchase price data provided the best Tier 1 benchmark.  As such, quantity was one of the many

factors that Commerce considered when determining the best Tier 1 benchmark.

Further, Commerce would like to clarify the statement from the *Final Determination* that

"the respondents' argument regarding the quantity of such purchases is not relevant to our

analysis."  This statement was in response to arguments made by Double Coin in its case brief.

Specifically, in advocating that Commerce should use the aggregate import AUV for synthetic

rubber as a benchmark, the company stated "{I}t is also clear that Double Coin's import

purchases are of a significantly smaller volume than Double Coin's total domestic purchases in

---

[93] *See, e.g.*, Guizhou Tyre Final Revised Calculations; and Memorandum, "Countervailing Duty Investigation of
Truck and Bus Tires from the People's Republic of China:  Amended Final Determination Calculations for Double
Coins Holding Ltd.," dated February 14, 2017 at Attachment II.
[94] *See Final of Countervailing Duty Determination:  Certain Softwood Lumber Products from Canada*, 57 FR 8800
(March 11, 1992) (*Lumber from Canada*), and accompanying IDM at "Analysis of Programs, Provincial Stumpage
Programs Determined to Confer Subsidies, Benefit."

40

2015."[95]  In re-evaluating the proper synthetic rubber benchmark for the purposes of these

remand results, Commerce has compared the company's import purchases and the aggregate

import data for synthetic rubber, of which quantity was an element for consideration.  As stated

above, both respondents had significant volumes of import purchases of synthetic rubber during

the POI, which made these prices viable benchmark options; and based on Commerce's

preference for using observed market price from actual transactions, these transactions

represented the best information available on the record.

However, Double Coin's argument centered around a comparison between the

company's import purchases and its domestic purchases.[96]  Since, as discussed above, we found

all domestic purchases to be made by authorities, and no parties challenged this finding in their

case briefs, Commerce has not considered whether to use any domestic purchases as a

benchmark in the *Final Determination*.  Because we found that total domestic purchases would

not be appropriate for use as a benchmark, a comparison between Double Coin's import

purchases and its domestic purchases is irrelevant in selecting a benchmark here.  As such, we

find Double Coin's statement to be not relevant as we were not considering total domestic

purchases for the purpose of a quantity comparison.

As discussed above, Commerce has re-examined whether quantity impacts Commerce's

decision regarding the selection of appropriate benchmark prices and continues to find the

respondent's import prices to be an appropriate Tier 1 benchmark for synthetic rubber.  Further,

when Commerce has multiple options to select from potential benchmarks, its preference would

be to use actual prices from actual sales.  Thus, we continue to find that the import prices paid by

---

[95] *See* Double Coin Case Brief at 15.
[96] *Id*.

41

Double Coin and Guizhou Tyre represent the best source for benchmark prices of synthetic rubber in this proceeding.

*Combination Rate*

As stated above, in the *Final Determination*, Commerce attributed subsidies received by Jinhaoyang to Double Coin under 19 CFR 351.525(c).  Following the *Final Determination*, Jinhaoyang challenged Commerce's decision not to assign a cash deposit rate to the company.  Specifically, Jinhaoyang argues that Commerce should have assigned the company Double Coin's rate and that without being assigned Double Coin's rate, the company will be subject to the all-others rate, despite the fact that Commerce attributed its subsidies to Double Coin.  In the *Remand Order*, the Court states that Commerce did not provide an adequate explanation for not assigning Double Coin's rate to Jinhaoyang and instructed Commerce to provide an explanation for its decision not to assign Double Coin's cash deposit rate to Jinhaoyang.

Commerce finds that Jinhaoyang, as an unaffiliated exporter, is not entitled to receive Double Coin's cash deposit rate in this order.  Specifically, Jinhaoyang was not a mandatory respondent in this case, and thus is not entitled to its own rate.  Further, it would be inappropriate to assign Jinhaoyang Double Coin's rate as nothing on the record indicates that Jinhaoyang exports only Double Coin's products.  If Jinhaoyang was given Double Coin's rate, products that were not produced by Double Coin may enter under Double Coin's rate instead of the all others rate.  While the company was required to provide responses in this investigation, that information was incorporated with information submitted by Double Coin and its cross-owned affiliates to calculate Double Coin's specific subsidy rate.  This rate is reflective of the subsidies pertaining to Double Coin under Commerce's attribution's regulations.  Had Jinhaoyang been a mandatory respondent in this investigation, Commerce would have

requested information from not only Double Coin, but also the other producers whose subject merchandise Jinhaoyang exported during the POI, and as such, Commerce would have calculated a unique specific rate for Jinhaoyang.  Thus, while Jinhaoyang's information was incorporated into Double Coin's calculations because it exported merchandise produced by Double Coin, it is not entitled to its own rate.

Further, as previously stated by Commerce, Commerce's customs instructions specifically stipulate that any merchandise produced or exported by Double Coin is subject to Double Coin's rate.[97]  Thus, any subject merchandise exported by Jinhaoyang that was produced by Double Coin would be subject to Double Coin's rate, while any merchandise exported by Jinhaoyang that was not produced by Double Coin would instead be subject to the all-others rate.

Finally, the plaintiffs have cited to *DSSS from China* and *TFE from China*,[98] claiming that assigning an unaffiliated exporter, that participated in the proceeding, the mandatory respondent's rate is Commerce practice.  However, in both instances, Commerce applied the rate to these companies in the same manner as here, namely, merchandise that is produced by the mandatory respondent and exported by the unaffiliated trading company is assigned the mandatory respondent's rate, while all other merchandise exported by the trading company is entered under the all-others rate.[99]  Thus, while Commerce may have referred to these as

---

[97] *See* CBP Message:  9051301 (Countervailing Duty Order and Amended Final Determination on Truck and Bus Tires from the People s Republic of China (C-570-041)), dated February 20, 2019.

[98] *See Drawn Stainless Steel Sinks From the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination*, 77 FR 46717 (August 6, 2012) (*DSSS from China*); *see also Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane From the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 79 FR 62594, October 20, 2014 (*TFE from China*).

[99] For example, in the customs instructions issued with DSSS, Commerce specifically stated that the exporting company would get the mandatory respondent's rate when the merchandise was produced by the mandatory respondent, and the country wide rate when produced by another company.  *See* CBP Message:  2221302 (Notice of preliminary determination in the countervailing duty investigation of drawn stainless steel sinks from the People's

43

combination rates in those proceedings, the rates are applied using the same methodology.

Further, we note that Commerce's current practice is to not assign a combination rate to the

unaffiliated exporter in these instances, even when the exporter provides questionnaire

responses.[100]  For these reasons, we continue to find Jinhaoyang is not entitled to receive

Double Coin's cash deposit rate, nor is Jinhaoyang entitled to an individual rate as it was not a

mandatory respondent in the underlying investigation.

**Final Remand Results of Redetermination**

Thus, in accordance with the *Remand Order*, Commerce reconsidered the record

evidence.  We continue to find that:  (1) our application of AFA to Guizhou Tyre regarding the

grants presented at the verification is warranted; (2) our application of AFA with respect to the

EBC program was warranted; (3) our decision not to apply a ratio to ocean freight and import

duties in the benchmark for calculating benefits for inputs for LTAR was warranted; (4) the

quantity of synthetic rubber purchased by Double Coin and Guizhou Tyre are of significant

volume that they constitute reliable Tier 1 benchmark prices; and (5) our decision not to assign

Double Coin's rate to Jinhaoyang was warranted.  Further, as discussed above, based on the

information submitted by Guizhou Tyre in its June 17, 2021 supplemental questionnaire

---

Republic of China (C-570-984)), dated August 8, 2012 ("CBP shall require for such entries, a cash deposit equal to the rates listed in the appended company-upload table for merchandise produced by Zhongshan Superte Kitchenware Co., Ltd. and exported by Foshan Zhaoshun Trade Co., Ltd. (- 003) in this combination only.  For shipments of subject merchandise from the exporter identified above in any other combination, a cash deposit should be collected at the countrywide rate in effect on the date of entry.")

[100] *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind the Review, in Part; 2017*, 84 FR 34123 (July 17, 2019), and accompanying PDM, unchanged in *Certain Carbon and Alloy Steel Cut-to Length Plate from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2017*, 85 FR 2710 (January 16, 2020); and *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 FR 80024 (Friday, December 11, 2020), and accompanying PDM, unchanged in *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 86 FR 35267 (July 2, 2021).

response, we have recalculated the AFA rate regarding its unreported grants.  As such, the

revised cash deposit rate for Guizhou Tyre is now 65.66 percent.

## COMMENTS ON THE DRAFT RESULTS

**Comment 1:   Whether Commerce's AFA Determination Regarding Guizhou Tyre's
                     Unreported Grants was Lawful**

*Guizhou Tyre's Comments*

- In its Remand Supplemental Questionnaire, Commerce asked Guizhou Tyre to submit
  the chart presented at verification which outlined all of the unreported grants, however,
  instead of asking the company to submit the chart as presented at verification, Commerce
  asked that the chart include the total number of unreported grants, the name of the grant
  and the aggregate value of these grants but exclude the individual amounts for each
  grant.
- Commerce's failure to accept at verification, and request in this remand proceeding, the
  actual value of each missing grant is arbitrary, capricious and an abuse of discretion.
- Commerce has no basis on which to ignore the amounts for each grant since this
  information would be used to calculate the benefit, if any.
- Given Guizhou Tyre's concession as to the countervailability of these self-reported
  grants, Commerce's analysis of the unreported grants would have been simple.

**Commerce's Position:**

       We disagree with Guizhou Tyre's argument that our application of AFA regarding these

unreported grants is inappropriate.  As an initial matter, we find that Guizhou Tyre's arguments

in its Draft Results comments are simply an attempt to distract from the fact that:  (1) the

company failed to report these grants in a timely manner; and (2) that Commerce properly

addressed the Court's concern in this remand, namely whether the minor corrections presented at

verification totaled "more than 40 grants."  First, as discussed above, Guizhou Tyre attempted to

submit information for new subsidy programs at the beginning of its verification for which there

was no previous information on the record, and the company has not provided any arguments or

cited to any information that alters this fact.  Second, in response to the Court's remand, we

asked Guizhou Tyre to list all the grant programs it failed to report in its questionnaire

45

responses.[101]  As discussed above, in its Remand Supplemental Questionnaire Response,

Guizhou Tyre reported 45 previously unreported grants.[102]  Thus, Commerce addressed the

Court's concerns, namely substantiating our finding from the investigation that the total number

of unreported grants was greater than 40.  Further, these grants totaled approximately RMB

11,000,000,[103] and therefore, the record shows that the total value of these unreported grants was

significant.  As such, Commerce believes it sufficiently addressed the outstanding issues raised

by the Court in this remand.  Nevertheless, we address Guizhou Tyre's Draft Results comments

regarding this issue and find them to be without merit.

First, Guizhou Tyre's argument regarding the magnitude of change of its minor

corrections is misplaced.  Guizhou Tyre argued that when presenting these unreported grants at

verification, the company provided a chart showing the magnitude of changes to the data, as

requested by Commerce.  Guizhou Tyre states that it identified the amount of each grant, the

applicable sales value, and the 0.5 percent test results in this chart.  Further, Guizhou Tyre

maintains, the chart indicated that all the grants failed the 0.5 percent test, and thus, should have

been expensed in the year of receipt, which in-turn, would result in a combined additional rate of

0.0118 percent to the company's overall subsidy rate.  As such, the company claims that these

newly reported grants were minor.  However, the magnitude of change that Commerce typically

requests, and Guizhou Tyre refers to, applies only with regards to updating information already

on the record that needs to be corrected, not entirely new information which is absent from the

record.  This was clearly explained to Guizhou Tyre in the verification outline provided to the

company.[104]  Specifically, Commerce stated "{I}nformation will be accepted at verification only

---

[101] See Remand Supplemental Questionnaire.
[102] See Remand Supplemental Questionnaire Response.
[103] Id. (public version).
[104] See Verification Agenda.

when the information makes minor corrections to information already on the record."[105] Further, Commerce provided an example of what it was seeking when it stated, "{f}or example, if you find an error in the reported sales value, please provide the following in your chart for no. 3, above:  1. the original sales value; 2. the corrected sales value; and 3. the percentage change in the sales value that results from the minor correction."[106]  Thus, Guizhou Tyre was aware of what constitutes a recognized minor correction at verification, as well as what Commerce sought when it referred to the magnitude of a change.

In fact, Guizhou Tyre presented, and Commerce accepted, a number of such minor corrections at verification.  For instance, Commerce accepted minor corrections regarding Guizhou Tyre's [



].[107]  As an additional example,, Guizhou Tyre [



].[108]  Thus, Commerce was able to accept minor corrections such as these, as it was able to properly evaluate the magnitude of change using information already available on the record, and find that these corrections were, in fact, small.  However, for these unreported grants, because there was no original amount reported for these grants, there is nothing to compare the "new" grant amount to, and thus, there is no basis to calculate the magnitude of change as instructed in the verification outline.

---

[105] *Id* at 2
[106] *Id* at 7.
[107] *See* Guizhou Tyre Minor Corrections.
[108] *Id.*

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

Further, Guizhou Tyre relied on its own subsidy calculations to conclude that these new grants are minor.  We find that the calculations performed by the company for these programs should not be the basis for determining whether these new grants are minor.  First, it is Commerce's, not the respondent's, responsibility to perform these calculations, and then determine what is relevant.  Additionally, since these programs were not timely reported in the company's questionnaire responses, we have no knowledge as to the nature of these programs; this includes not only the basis on which these programs were provided (*e.g.*, whether they were export contingent), but also whether various disbursements should in fact be considered the same program.  As such, we are unable to determine whether these calculations were done in accordance with our regulations.

For example, Guizhou Tyre stated that all of these newly reported grants failed the 0.5 percent test.  However, in its Remand Supplemental Questionnaire Response, Guizhou Tyre reported the following subsidy programs:  "temporary receipt of the reward for Energy Saving from Municipal" (grant #3); "temporary receipt of the reward from municipal" (grant #4); and "temporary receipt of reward for Energy Saving from municipal economic and Trade Commission" (grant #27).[109]  While all of these programs have similar names, Guizhou Tyre listed them as separate programs.  As such, when performing the 0.5 percent test, Guizhou Tyre calculated these as separate programs, and in-turn, expensed them to the year of receipt. However, because these programs were provided at verification, there was no opportunity for Commerce to evaluate whether any of these disbursements were part of the same program (or whether they were export contingent), which, if Commerce did determine they were part of the same program, could result in the combined program passing the 0.5 percent test.  In other

---

[109] *See* Remand Supplemental Questionnaire Response at Attachment 1.

words, without the proper context for these programs, Commerce cannot confirm whether Guizhou Tyre's calculations for these grant programs were performed as stipulated under our regulations.

Next, noting Commerce's decision not to request the individual grant amounts in the Remand Supplemental Questionnaire, Guizhou Tyre argued that there is no basis for Commerce to ignore the amounts for each grant as such information would be used to calculate the benefit. The company cites to various cases in which Commerce first calculated the benefit, and found no measurable benefit, and thus did not need to evaluate the countervailability (i.e., the presence of a financial contribution and specificity) of the program.[110]  We agree that Commerce will not further evaluate a program if it is found to be not measurable during the POI or expensed prior to the POI; however, we will only do so for information provided in a timely manner, where we have had the opportunity to evaluate the program and determine if it is measurable during the POI.  Guizhou Tyre fails to mention that in these other proceedings, these grants were reported in the companies' questionnaire responses, and calculated by Commerce as part of the preliminary determinations.[111]  To put it another way, in the other proceedings mentioned by Guizhou Tyre, Commerce had the opportunity to evaluate these self-reported grants and seek additional information if needed.  For example, in *Steel Flat Products from Korea*, Commerce issued two supplemental questionnaires to the company under consideration prior to issuing its preliminary results.[112]

---

[110] *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Preliminary Affirmative Determination*, 80 FR 68843 (November 6, 2015) (*Steel Products from China*) and accompanying PDM at page 37; *see also Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013) (*Steel Flat Products from Korea*), and accompanying PDM at 19.
[111] *See Steel Products from China* PDM at 4 and 37; *see also Steel Flat Products from Korea* PDM at 2 and 19.
[112] *Id.*

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

In contrast, Guizhou Tyre asked Commerce to accept this new information for the first time at verification.  In most proceedings, verification (and its subsequent report) is the last chance in a proceeding for respondents to place certain information on the record, and as discussed at length above the information Commerce accepts is limited to information that makes minor corrections to information otherwise already available on the record.  Thus, were Commerce to accept these unreported grants, it would have had to evaluate these grants "on the fly" at verification and would not have had any opportunities to follow up should any questions arise following verification.  As such, we find that *Steel Products from China* and *Steel Flat Products from Korea* are not applicable to this proceeding.  Finally, our decision to not request the individual value of these new grants in our Remand Supplemental Questionnaire is consistent with our practice regarding new/discovered programs at verification.[113]

Next, Guizhou Tyre argued that it has conceded the countervailability of the 180 grants that it self-reported in its questionnaire responses, and given its concession of those self-reported programs, a full analysis of these newly reported programs was unnecessary.  First, while the company may have conceded the countervailability of the 180 programs reported in its questionnaire, there is nothing on the record to indicate that the company was also conceding the countervailability of these new grant programs when they were first presented at verification.  Further, even if the company did concede that these newly reported grants were countervailable when presented at verification, this does not alter the fact that this information was presented <u>at verification</u>, well after the deadline to present this information had passed.  Additionally, even if the company did concede to the countervailability of these 180 grant programs, it did not

---

[113] *See, e.g.*, *Supercalendered Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015), and accompanying IDM at Comment 17 (in which we discovered a grant program not provided in the respondent company's (Resolute) questionnaire responses and declined to take information regarding the value of the grant).

50

preclude Commerce from potentially asking questions regarding these programs during the course of this investigation.  In fact, Commerce did request additional information regarding self-reported programs during the course of this investigation.[114]  However, as discussed above, were Commerce to accept these minor corrections, it would have no opportunity to seek additional information regarding these programs should it require further information in analyzing them.

Further, Guizhou Tyre argues that Commerce would "merely" need to confirm that the amounts reported in the minor corrections chart match the amounts in the financial system and then spot check to confirm that no other grants remain unreported.  The company adds that since Commerce would already be performing this spot check of the accounts in the non-use portion of its verification, the only additional step would be the matching the unreported amounts to amounts recorded in the company's financial system.  Finally, noting that Commerce selected only nine of the 180 (timely reported) grants to check at verification, we would "likely would not check every single number."  First, this reasoning ignores the concerns discussed above, mainly that this is new record information and that we have no prior information available on the record regarding the nature of these programs.  Further, while Guizhou Tyre notes that Commerce selected only nine of the 180 grant programs reported, Commerce was able to evaluate all of these grants prior to verification and select specific grants to check at verification based on this evaluation.  As stated numerous times in this remand, were Commerce to accept these newly reported grants at verification, it would be

---

[114] *See, e.g.*, Commerce's Letter, "Countervailing Duty Investigation on Truck and Bus Tires from the People's Republic of China:  Supplemental Questionnaire," dated September 8, 2016 at 4 and 5; and Commerce's Letter, "Countervailing Duty Investigation on Truck and Bus Tires from the People's Republic of China:  Supplemental Questionnaire," dated June 10, 2016 at 3.

evaluating this information for the first time at verification with no previously submitted information available to serve as a basis for the evaluation.

Finally, in response to concerns raised by Commerce as to whether the proper sales figures were on the record, Guizhou Tyre states that all the POI sales information is on the record.  Further, the company states if any AUL sales data was missing, Commerce could either (1) ask for the missing data as "homework during verification"[115] or (2) treat the grant as passing the 0.5 percent test and simply allocate the benefit over the AUL.  We find both of these approaches unreasonable.  While Commerce will frequently request homework from the company being verified during the course of a verification, this homework will be for the purpose of providing supporting documentation for information already on the record, not to provide additional new information.  Further, since we have no information on these programs, we have no knowledge regarding the nature of these programs, in particular, regarding whether a program is export contingent.  Thus, Commerce would need to seek information regarding this program to ensure the proper sales data (*i.e.*, total sales, export sales, etc.) is provided to perform the 0.5 percent test.

Second, Guizhou Tyre suggests that Commerce could have simply treated these grants as passing the 0.5 percent test and allocated the benefits over the AUL.  In other words, Guizhou Tyre is stating the Commerce officials should have accepted new information at verification and simultaneously made a determination regarding how this new information would be calculated without sufficient time to verify the information as required by statute.  As stated above, the purpose of verification is to confirm information that is already on the record, not to make determinations.  A decision regarding whether to allocate these grants can only be

---

[115] *See* Guizhou Tyre Draft Remand Comments at 7.

made by the appropriate Commerce decision-maker at the time of the preliminary or final

determination/results, as the case may be, not by Commerce verifiers at verification.  Verifiers

cannot be expected to accept new information such as this under the pretext that Commerce can

"simply allocate" these benefits when calculating benefits.

In conclusion, Guizhou Tyre provided several arguments as to why Commerce should

have accepted these newly reported grants as minor corrections at verification.  However, the

most relevant detail that Guizhou Tyre ignores in making these arguments is that the company

asked (and is continuing to ask) Commerce to accept information regarding 45 new grant

programs for the first time at verification, well beyond the deadline for the submission of

information of this nature.  By allowing Guizhou Tyre to place these grants on the record well

past the deadline, Commerce would be providing a path for companies to not report "other"

subsidies in its questionnaire responses and wait until verification to report such assistance under

the pretext that the company has determined such subsidies to be small or insignificant.

Creating such an incentive would limit Commerce's ability to thoroughly investigate potentially

countervailable subsidies and enable companies to potentially avoid the incorporation of these

subsidies in their individual rates.

Further, Guizhou Tyre portrayed these minor corrections as small, irrelevant grants, that

Commerce should have indiscriminately accepted at verification.  However, as discussed above,

there are additional considerations Commerce must take into account when determining the

countervailability of a potential subsidy than simply looking at the amount of the grant.  Finally,

if Commerce were to accept Guizhou Tyre's logic that it should accept these minor corrections

on the basis that they are small grants, it would be opening the door for arguments that

Commerce is obligated to accept similar minor corrections for other programs.  For example,

53

should a company "discover" that it had in fact purchased a small amount of an input for an initiated LTAR program for which it had previously reported non-use, and attempt to report these purchases at verification, companies may use Commerce's acceptance in this instance to argue that Commerce should also be required accept information related to these subsidies as "minor corrections" due to the fact that they only constitute a small amount.  As stated previously, accepting previously unreported, new information for the first time at verification as a "minor correction" serves no purpose but to incentivize companies to wait to report such subsidies until verification in order to limit Commerce's ability to fully investigate the potentially countervailable programs.  For these reasons and those discussed above, Commerce continues to find that the rejection of new, unreported grants presented for the first time at verification, as well as the subsequent application of AFA, is appropriate.

**Comment 2:   Whether Commerce's AFA Determination Regarding the EBC Program was Lawful**

*Guizhou Tyre's Comments*[116]

- Knowing whether the $2 million threshold exists and/or knowing the third-party banks involved in the program, would make it easier to verify.  However, knowing this information does not establish usage, nor does lack of this information make verification impossible or unduly burdensome.
- Commerce does not need to request all financing obtained during the POI from a customer.  The EBC program is a specific type of program, and there would undoubtedly be a clear paper trail linking the loan to this program.
- Commerce overstates the burden that verification of this program would entail.  When faced with numerous data points (*e.g.*, many loans or many customers), Commerce may use a spot-check methodology.
- The requirement that every customer submit specific information to Commerce is unnecessary.  The most effective and reasonable method would be to require the respondent company to contact each of its customers and confirm non-use, and then for Commerce to select one or two customers to either report information or submit to verification.

---

[116] Double Coin also agreed with Guizhou Tyre's argument regarding Commerce's application of AFA for the EBC program.  *See* Double Coin Draft Remand Comments at 8 ("CMA and Double Coin incorporate by reference the more detailed arguments of Guizhou Tyre regarding this issue submitted in this remand proceeding".)

54

- Commerce has a typical procedure for verifying statements of non-use that can be employed for the EBC program without requesting any affirmative information from the respondent's U.S. customers during the course of the proceeding. As such, the concerns that Commerce would be looking at the company's loan information for the first time at verification is not accurate. In fact, Commerce's verification of non-use of this program would be the same as its usual process.
- The self-certifications submitted on the record are no less reliable or relevant than other statements of non-use that the respondent makes in its questionnaire response. Commerce has not demonstrated or explained why these certifications should be treated differently than other statements of non-use.
- The provision in the Act regarding the sampling of exporters for individual examination has absolutely nothing to do with limiting verification to certain information or certain companies. The term sampling in the verification context can also be described as the spot check method.
- In general, Commerce does not require information to verify non-use claims. The very nature of non-use is that no information is submitted.

**Commerce's Position:**

Before addressing the arguments raised by Guizhou Tyre in its Draft Results comments, Commerce would like to highlight to the Court that most of the disputes arising from the EBC program in this proceeding (and other China CVD proceedings involving this program) are a direct result of the GOC's failure to adequately respond to our specific requests for information about the EBC program. As discussed throughout this remand, the GOC failed to provide information that Commerce has deemed necessary to fully evaluate this program. The uniqueness and complexities of this specific program only increase the need for cooperation from the government in order to effectively evaluate what is necessary to determine usage and/or benefits. Specifically, the fact that usage and benefits under the EBC program will appear in the customers' books and records, not the respondent companies' books and records, is paramount to the investigation process. As a result, we have found that the GOC significantly impeded our ability to conduct an effective investigation of this program, and thus it is appropriate to apply total AFA. Guizhou Tyre made arguments detailing how Commerce may attempt to confirm usage/non-usage despite the GOC's lack of cooperation. While there are instances where

55

Commerce may confirm non-usage with the GOC not providing full responses to the program, there are many more scenarios, including this investigation, where Commerce will not be able to effectively confirm non-use of the program because of the GOC's lack of cooperation.  Further, the fact remains that Commerce does not have a clear understanding of this program, and the GOC has provided little or no indication it has put in a good faith effort to address Commerce's concerns.  As such, our application of total AFA in this proceeding is the only reasonable course of action for Commerce to follow.

Further, we note that the GOC has displayed a frequent and consistent pattern of failing to adequately respond to Commerce's requests for information in these CVD proceedings, resulting in Commerce applying AFA.  For instance, Commerce conducted numerous China CVD proceedings with a 2015 review/investigation period in which a mandatory respondent participated, and in these proceedings, Commerce consistently applied AFA for at least one program based on the GOC's lack of cooperation.[117]  A review of China CVD proceedings with other POIs/PORs show a similar pattern.  This stands in stark contrast to complicated CVD proceedings, such as *Lumber from Canada (2015)*,[118] in which the respondent governments fully cooperated, and Commerce did not need to resort to the application of AFA.  By consistently failing to provide information to evaluate these programs, the GOC has left the onus on

---

[117] *See, e.g.*, *Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products from the People's Republic of China:  Preliminary Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 81 FR 41292 (June 24, 2016), and accompanying PDM; *Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products from the People's Republic of China:  Final Affirmative Determination and Final Determination of Critical Circumstances, in Part*, 82 FR 3282 (January 11, 2017), and accompanying IDM; *Countervailing Duty Investigation of Stainless Steel Sheet and Strip from the People's Republic of China:  Preliminary Affirmative Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 81 FR 46643 (July 18, 2016), and accompanying PDM; and *Countervailing Duty Investigation of Stainless Steel Sheet and Strip from the People's Republic of China:  Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 82 FR 9714 (February 8, 2017), and accompanying IDM.
[118] *See Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Lumber from Canada (2015)*), and accompanying IDM.

Commerce and other parties to attempt to fill in the gaps.  By applying anything other than AFA

for this program, Commerce would effectively be telling the GOC it can choose not to cooperate

with Commerce with no repercussions.

In its remand to Commerce, at questions 1a and 1b, the Court instructed Commerce to

address the following:

*Explain the reason that the information withheld by the GOC about the threshold requirement
was necessary to verify non-use by describing how the missing information prevents Commerce
from taking the steps that it considers necessary to verify non-use.*

and

*Explain the reason that the information withheld by the GOC about the third-party banks was
necessary to verify non-use by describing how the missing information prevents Commerce from
taking the steps that it considers necessary to verify non-use.*

In response, Commerce explained how an understanding of whether the $2 million

threshold was still in effect, and which third-party banks participate in this program were

fundamental factors to conducting a meaningful and accurate non-use verification.  In its Draft

Results comments, Guizhou Tyre states that while having knowledge of the $2 million threshold

and which third party banks participate in this program would make verification easier, not

having this information does not make verification impossible or unduly burdensome.  Further,

the company states that having this information would not establish usage.

First, we agree that having the information that the GOC failed to provide would make

verification significantly simpler.  If Commerce had knowledge and evidence that this program

was limited to larger contracts, we could limit the number of loans to review at verification.

Similarly, if Commerce were provided a list of third-party banks that participated in the program,

we could limit our review to loans from these banks during verification.  Further, were the GOC

to provide this information, it would open new avenues of verification of non-use, which would

be impossible otherwise.  For example, Commerce could confirm non-usage of the EBC program for a customer in the instance where a company only has loans from banks not participating in this program.

Conversely, we disagree with Guizhou Tyre regarding the consequences of not having information regarding the $2 million threshold and the third-party banks.  Guizhou Tyre implies that Commerce could easily perform verification without this information.  However, as discussed above, without this information, all entries in the loan's subledger could potentially be loans under the program, and thus, Commerce would be required to review the underlying documentation for all entries from the subledger of each customer to attempt to confirm the origin of each loan.  Therefore, if a company had a significant amount of loans outstanding during the POI, it would be unduly burdensome to verify non-usage of this program.  This would be especially relevant in an investigation like this one, in which there were 14 other alleged programs and 17 additional self-reported programs that Commerce must also evaluate in addition to the EBC program.

Finally, we agree with Guizhou Tyre that providing this information will not necessarily establish usage, as Commerce will need to evaluate the underlying documentation to determine whether the loan was provided pursuant to the EBC program.  However, reducing the number of loans that need to be reviewed (were the GOC to provide this information) can make verification significantly less burdensome for Commerce.  This is particularly relevant given Commerce's resource constraints.  Further, with regard to the underlying loan documentation, as discussed in response above to question 3, the GOC has failed to provide full responses regarding this program.  Thus, Commerce has no knowledge of which entities administer the loans, which entities qualify for loans, or what conditions are placed on loans, and in-turn, has no basis to

determine the method by which to verify use or non-use of the program.  As such, we disagree

with Guizhou Tyre's statement that the lack of information regarding the minimum threshold and

third-party banks would not make verification burdensome or impossible.  Instead, the GOC's

lack of cooperation in providing information regarding the program will make consistent

confirmation of non-usage of this program very difficult, if not impossible, in most proceedings

involving the EBC program.  This is especially true in this investigation, as both companies have

a significant number of U.S. customers.

       In question 2, the Court instructed Commerce to address the following:

*Explain whether it would be feasible for Commerce to solicit and obtain the withheld information from customers — which are third parties to the investigation — by describing each step that Commerce would consider to be necessary to obtain such information, including stating clearly the reason(s) that Commerce considered each step necessary.*

       In response, we indicated that, among other items, Commerce would request that the

customer report all forms of financing the company had outstanding during the POI, regardless

of whether the financing was provided under the EBC program, and tie this information to the

company's audited financial statements and/or tax returns.  However, we stated such an effort

would likely not provide meaningful results, as we do not have subpoena power and thus cannot

force a party to participate in a proceeding.  Finally, we stated even if all customers participated,

this information would still be insufficient to provide certainty of a respondent's non-use of the

program without the full cooperation of the GOC, because the GOC has failed to:  (1) indicate

whether the USD 2 million minimum is still in effect; (2) provide the names of the banks that

participate in this program; and (3) provide any guidelines as to how the program operates.  In its

Draft Results comments, Guizhou Tyre argues that Commerce has failed to explain why it would

require a complete reporting of all financing by the customers even if the customers did not use

this program.

Barcode:4156222-01 C-570-041 REM - Remand  -  Slip Op 21-64

First, Commerce does require respondent companies to report all types of financing in these proceedings in which a lending program is alleged.  In fact, Guizhou Tyre was instructed to provide all financing during the POI.[119]  Thus, requesting the U.S. customers to report all of their financing would be consistent with our practice.  Further, requesting all financing from a company, and having it tie these figures to its audited financial statements and/or tax returns, would allow Commerce to ensure it captures the full universe of the company's loans.  Finally, by requiring the company to report all financing, Commerce will have the opportunity to review these loans and evaluate whether these loans were provided pursuant to the EBC program, or any other alleged loan program.  Should any concerns arise from any of these reported loans, Commerce will have the opportunity to issue supplemental questions to the customer.

This practice is also consistent with how Commerce approaches investigation of other similar programs.  For instance, for an alleged input for LTAR program, Commerce would request the company report all purchases of the input under consideration.  In fact, this approach was undertaken in this investigation.[120]  Thus, even if the company believed none of its input purchases were provided by the government (either imports or private companies in the country), it would still be required to report all purchases of the input.  This would provide Commerce the opportunity to evaluate which, if any, of these purchases are countervailable purchases under the alleged LTAR program.  Similarly, in the case of the EBC program, Commerce would request all types of financing the customer had, and would evaluate whether any loans were provided through the program.

---

[119] *See* Initial Questionnaire at Section III, page 8 ("Report all financing to your company that was outstanding at any point during the POI, regardless of whether you consider the financing to have been provided under this program.")
[120] *Id.* at Section III, page 14 ("Using the attached Microsoft Excel template 'Input Purchases,' please report all of your purchases during the POI.")

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

Further, Guizhou Tyre argues the EBC program is a "very" specific program, operated by the EX-IM Bank and the loan is for the specific purpose of purchasing Chinese goods from the respondent.  Thus, given the specificity of the program, Guizhou Tyre states there would undoubtedly be a clear paper trail linking the loan to this program, even in the case of a correspondent bank.  We find Guizhou Tyre's assertions to be without merit.  First, we find that Guizhou Tyre has made a number of unsubstantiated statements regarding the administration of the EBC program without providing supporting evidence to back up its claims.  In particular, the company stated that there would "undoubtedly be a clear paper trail" for this program, without pointing to or otherwise providing any record evidence to support this assertion.  Further, if there were, in-fact, a clear paper trail for Commerce to follow, the GOC should have been able to timely provide us this information in its questionnaire responses that would allow us to follow the paperwork (applications documents, correspondence, approval documents, bank account information, *etc*.) for each U.S. customer.  However, as it is, Commerce has no road map to confirm usage/non-usage of the EBC program available on the record in this investigation.

In question 3, the Court instructed Commerce to address the following:

*With respect to "(2)," above, describe with particularity any "significant burden" Commerce might or would likely incur in taking such action.*

In response, we noted several burdens Commerce would face if we attempted to solicit such information from the respondent's customers.  In particular, we noted the GOC's lack of cooperation in providing information regarding the program information regarding the USD 2 million threshold and third-party banks, as well as an overall understanding of the program and the paperwork associated with this program.  Specifically, in considering the lack of cooperation in combination with the significant number of U.S. customers, we found that attempting to collect all this information with no parameters to limit our search and with no guidelines to

review the "paper trail" would result in a significant burden for Commerce.  In its Draft Results comments, Guizhou Tyre argues that Commerce has overstated the burden of verification. Further, the company adds that when faced with numerous data points (*e.g.*, many loans or many customers) or multiple affiliates/tollers, Commerce will normally use a spot-check methodology. As such, Guizhou Tyre argues Commerce may select several loans to review or several customers and use the spot-check methodology to verify the EBC program.

As an initial matter, Commerce believes it has not overstated the burden of verification should we attempt confirmation of non-use without the full cooperation of the GOC.  As discussed in responses to questions 1a, 1b and 3, the GOC has failed to provide significant information regarding this program.  Further, as addressed above, the uniqueness of this program (specifically, that it is reflected in the customer's books and records) makes evaluating and confirming usage/non-usage particularly challenging.  Thus, Commerce has not overstated the difficulties in confirming non-usage of this program.

Further, we disagree with Guizhou Tyre's argument that a spot check (either in the form of selecting several customers to verify, or selecting several loans to review at verification), will alleviate these issues.  First, we do not have the information that would allow us to narrow down the number of customers to be reviewed in any meaningful manner.  Since we do not have any information on the continued enforcement of the $2 million minimum threshold, nor any information on the third-party banks participating in the program, we have nothing that would allow us to effectively select companies that might have received loans under the program.  For example, if Commerce were to blindly select customers to review, without any knowledge of the programs, it could easily select customers that have no loans from any participating banks, and

thus the whole exercise of evaluating these companies would be a waste of time and resources, as Commerce could have easily eliminated these companies if the GOC had cooperated.

Similarly, without this information we do not believe a spot check of several loans at verification is appropriate, as we have no basis to limit the potential loans at verification. Further, as discussed in detail in response to question 3, even if Commerce were to select a loan from a bank that participates in the EBC program, it has no "roadmap" to evaluate whether the loan was in fact part of the program.  Despite the various complications Commerce has outlined related to verification through the customers, Guizhou Tyre holds that Commerce should be able to easily determine whether or not a loan is part of the EBC program.  As an example, Guizhou Tyre states that Commerce would be able to clearly understand that a loan for real estate is not part of the EBC program.  While Commerce would be able to determine a loan for real estate is not part of the program, it would not be able to make such a determination if the loan documentation was less clear.  For instance, if the loan was provided for the purchases of goods and/or materials, Commerce would be unable to easily determine if the loan was provided under the EBC program, as these goods and/or materials could have then been used for a variety of purposes, including for purposes would be eligible for funding through the EBC program.  Thus, we disagree with Guizhou Tyre's assertion that an understanding of the underlying documentation is not necessary for the purposes of this investigation.

Additionally, with regard to spot checks, in general, Commerce can and will use this tactic at verification when the methodology is deemed appropriate.  However, this methodology is most frequently employed when the proceeding is "running smoothly," that is, if the respondent parties are cooperative with respect to Commerce's request for information, and subsequently there are no issues during the course of verification.  In other words, when the

parties have demonstrated a pattern of cooperativeness and there is no indication the information being provided is incomplete or untrustworthy, Commerce may use spot checking to verify benefit amounts and/or non-usage.  However, such a practice is not viable when the parties have shown themselves to be unreliable.  As discussed throughout the *Preliminary Determination*, *Final Determination* and these remand results, this investigation has been plagued with missing information from interested parties.  Specifically, not only has the GOC failed to provide information requested by Commerce throughout the proceeding including the EBC program,[121] but there were also significant issues with Guizhou Tyre attempting to provide untimely information immediately preceding verification and during verification.[122]  As such, we find that attempting to spot check information regarding the EBC program at verification is not a viable option in this proceeding.

Finally, Guizhou Tyre has cited to Commerce's finding in *Vertical Shaft Engines from China* in an attempt to demonstrate that Commerce can verify non-usage of the EBC program without verification and/or the information the GOC has failed to provide.[123]  We find the circumstances in that instance were unique and are not applicable to this investigation.  In that proceeding, the exporter had only one customer, its parent company; and thus, the company was able to provide unique documentation, including documentation related to all loans the company received during the period of review, regarding its U.S. customer's financing.[124]  In contrast, in this investigation, there are a large number of U.S. customers, for whom we have no information

---

[121] See *Preliminary Determination* PDM at 9 to 14; *see also Final Determination* IDM at 11 to 13.
[122] *Id*. at 13 to 16.
[123] *See Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 86 FR 14071 (March 12, 2021) (*Vertical Shaft Engines from China*) and accompanying IDM at Comment 2.
[124] *Id*. ("Chongqing Kohler had only one customer during the POI, its parent company, for which it was able to provide extensive documentation of a kind that can fill some of the gaps of the record necessary to Commerce's inquiry.")

64

other than a one-page certification stating the customer did not use the EBC program.  In fact,

Commerce stated the fact pattern in *Vertical Shaft Engines from China* was very unique and

indicated that the finding in that case likely would not be applicable to other cases involving the

EBC program.[125]  Thus, we find Guizhou Tyre's assertion that the findings in *Vertical Shaft*

*Engines from China* allow Commerce to find non-use for all cases involving the EBC program to

be misleading at best.

      In question 4, the Court instructed Commerce to address the following:

*Explain the extent to which Commerce would be able to rely on information from customers by identifying what information Commerce would seek from customers and explaining how, if at all, such information would be useful to Commerce to establish non-use.*

      In response, we indicated that we would request reporting of <u>all</u> forms of financing every

one of the mandatory respondent's customers received during the POI, and would also request

audited financial statements and/or tax returns that would support the total financing reported by

the company.  Further, we stated this information on its own will have limited value to establish

non-use without cooperation from the GOC for the reasons discussed in responses to questions

1a, 1b and 3.  In its Draft Results comments, while Guizhou Tyre argues that Commerce

consistently requests information from third parties, the company also argues that it is

unnecessary to request that all U.S. customers submit information and documentary evidence of

non-use for the EBC program.  Guizhou Tyre claims that the simplest, yet most effective and

reasonable, method would be to require the respondent to contact each of its customers and

---

[125] *Id.* ("Here, we find that the unique circumstances in this case allow Commerce to rely on the facts available to find that Chongqing Kohler did not use the EBCP") and ("Additionally, we reiterate that the GOC's lack of cooperation with regard to numerous requests for information pertaining to the EBCP continues to leave Commerce with an incomplete understanding of the program, wherein Commerce cannot discern the entire universe of ways a party may receive financing.  Indeed, the GOC is reticent to share any official information about its export credit programs.")

confirm non-use, and then for Commerce to select one or two customers to either report information or submit to verification.

We disagree with Guizhou Tyre.  First, it is absolutely essential that Commerce request information from all the U.S. customers to confirm non-use of the EBC program.  Guizhou Tyre has implied that confirming non-use of this program is identical to confirmation of non-usage of other programs.  However, the EBC program is unique in that usage of the program would be reflected in these companies' books and records, not in the respondent's records.  For most programs, should a company not report usage of a program during the course of proceeding, Commerce will be able to discover this failure during the non-usage phase of verification.  However, in the case of the EBC program, Commerce cannot take the same approach to confirm non-usage by checking the respondent's books and records.  Thus, in order to effectually confirm non-usage of this program, Commerce must request financing information from all of the respondent's U.S. customers.

Further, we find that Guizhou Tyre's suggestion that Commerce could simply select one or two customers to review/verify is not viable.  Specifically, Guizhou Tyre has suggested that the respondent contact each of its customers to confirm non-use, and then have Commerce select one or two customers to report information and/or submit to verification.  However, this would not be an effective way to confirm non-use, because if Commerce selected only one or two out of multiple customers to examine and verify, it would have no confidence that the other customers – entirely different companies – were truthful in their reporting of non-use.

Even in instances where there were no blatant attempts to avoid reporting usage of the program, the suggested practice of Commerce simply selecting one or two respondents to provide verification responses would not be an effective way to confirm non-usage.  This is

especially true in instances such as this investigation, in which the respondents have a significant

number of U.S. customers.  As discussed above Guizhou Tyre submitted 67 non-use

certifications.  Thus, if Commerce were to follow Guizhou Tyre's suggested path, it would only

be reviewing one or two of 67 companies that may have used the program.  A verification of

such a small sample is not an effective confirmation of non-use, and an inefficient use of

Commerce resources.  Further, Commerce has no information on these U.S customers (other

than a statement of non-usage), and as such it would be required to randomly choose one or two

of Guizhou Tyre's U.S. customers without any information to guide in the selection.  Commerce

would then attempt to confirm non-usage of a program, for which it has limited information due

to the GOC's lack of cooperation, for this extremely limited portion of Guizhou Tyre's U.S.

customers and be required to assume such a limited verification somehow provides reliable

evidence of non-usage for all of Guizhou Tyre's U.S. customers.  In other words, Guizhou Tyre

holds that Commerce should randomly select a very limited number of customers that we have

no substantive information on, verify the usage or non-usage of a program that Commerce has

incomplete information on for those companies, and then find that not only the limited number of

companies verified did not use the program without a complete understanding of the program in

question, but further go on to conclude that from this limited verification Commerce can

therefore conclude that none of Guizhou Tyre's companies used the program.  Confirming non-

usage in such a situation would truly be akin to finding a needle in a haystack, and Guizhou

Tyre's suggested solutions fail to solve any of the multitude of problems Commerce has

discussed in detail in these remand results that arise when attempting to verify non-usage of the

EBC program.

 In question 5, the Court instructed Commerce to address the following:

*Explain why the claims of non-use are "unverifiable" by describing step-by-step Commerce's methodology for verifying non-use.*

In response, we stated the purpose of verification is to confirm that the data previously provided by the company is accurate.  However, since the non-use certificates provided are no more than one-page documents that do not provide any details regarding the operation or structure of the company making the certification, there is no factual information on the record for Commerce to verify.  Moreover, we stated that were we to attempt to verify these non-use certificates, we would be evaluating all relevant information about the company for the first time at verification.  Additionally, we stated that due to the GOC's lack of cooperation regarding information about the EBC program, it would be difficult to effectively confirm non-usage of the program due to a lack of information on the operation of the program or samples of the documents involved in applying for and obtaining loans under the program.  Finally, since we would not have had the opportunity to review any of the company's information prior to verification, we would not have the opportunity to pre-select any loans that would be of potential concern, and thus, would be making such selections "on the fly" at verification.  In its Draft Results comments, Guizhou Tyre argues that Commerce's focus on the need for previously submitted information is incorrect and does not apply to situations where it verifies non-use. Further, the company claims, the process used to confirm non-use of the EBC program is the same process that Commerce uses to verify other programs for non-use.  The company argues that Commerce typically reviews accounts and selects items "on the fly" by asking for more details to confirm that they are not part of any subsidy program, thus, there is no concern that Commerce did not have this information ahead of time.  Finally, Guizhou Tyre states that it is unnecessary for a U.S. customer to report all of its loans, as the focus during the non-use portion

of verification is whether the company used the program or not, and the actual number of loans the company received does not matter.

First, we disagree with Guizhou Tyre's argument that "previously submitted" information does not apply to non-use. Specifically, when Commerce evaluates non-usage during verification, the mandatory respondents will have already submitted a significant amount of information in response to Commerce's initial and supplemental questionnaire responses. Thus, Commerce will have reviewed a substantial volume of the company's information prior to verification, namely, financial statements, sales and purchase information, accounting records, etc. This information will allow Commerce to begin to evaluate non-usage prior to verification. For example, were a respondent company to report receiving no loans under an alleged loan program, but the financial statements indicate the company may have benefitted from the program, Commerce will be able to note this discrepancy to discuss at verification. In other words, Commerce has the opportunity to flag any potential issues or inconsistencies prior to verification which afford Commerce and the respondent time to effectively address the issue. To put it another way, prior to verification, there will be a significant amount of information on the record that will indicate non-use of programs, and verification will be the final step to confirm whether this is accurate.

Next, Guizhou Tyre argues that confirmation of non-use of the EBC program will be identical to the process used to verify non-use of other programs, and therefore, any concerns that Commerce would be looking at a company's information for the first time at verification is misplaced. Guizhou Tyre is correct that verifying non-use of the EBC program will be very similar to the process used to verify non-use of other programs. However, as stated in the paragraph above, typically when verifying non-use of a mandatory respondent, Commerce will

69

already have seen and reviewed information from the mandatory respondent that pertains to verifying non-use.  However, in the case of the EBC program, the benefits will be reflected in the U.S. customer's books and records.  Thus, in order to reliably confirm non-use of the EBC program, and to follow the standard process Commerce follows in confirming non-use of other programs by respondent companies, Commerce needs to collect information from the respondent's customers prior to verification.  This is one of the reasons that verification of the EBC program is uniquely difficult, as it is in the customer's books and records, not the respondent's, that potential EBC program loans will be recorded.  In arguing that Commerce may somehow verify non-use of the program without any prior information regarding the customers who potentially received the EBC program loans, Guizhou Tyre is arguing that Commerce can somehow follow its normal non-use verification process while ignoring the context that allows for this process to actually function.  As Commerce stated numerous times throughout these remand results, the purpose of verification is to verify information already contained on the record, not to seek out new information for the first time in order to determine whether a company may have used a program.

Further, Guizhou Tyre argues that Commerce often selects items "on the fly" at verification by asking for more details to confirm that they are not part of any subsidy program, and thus, there should be no concern that Commerce did not have any information from the U.S. customers ahead of time.  As an example, Guizhou Tyre states that in reviewing non-use of grant programs, Commerce examines the relevant account and then selects an entry that did not appear in the respondent's grant reporting.  As an initial matter, Commerce does select items on the fly during verification.  These alleged "on the fly" selections that Guizhou Tyre refers to in its Draft Results comments are done to confirm and support information already present on the record.

As noted above, there is a significant amount of information already present on the record by the time Commerce carries out a verification, and therefore Commerce has already had an opportunity to evaluate information regarding the company being verified prior to verification. To take Guizhou Tyre's example of a grant program, Commerce can and will select items "on the fly" to review should any issues come up during the course of reviewing non-use of grant programs. However, prior to verification, Commerce will have reviewed the company's records, including its financial statements, and these "on the fly" selections of items to review are done when Commerce has discovered a potential discrepancy between the information presented at verification, and the information that has already been submitted on the record prior to verification. Most company's income statements list various forms of non-operating income, including "government assistance" or "other income." Thus, should there be any discrepancies between the grants reported and the company's financial statements, Commerce will be able to address such issues prior to verification.

Finally, Guizhou Tyre argues that the focus during the non-use portion of verification is whether the company used the program or not, and the actual numbers (*i.e.*, benefit amounts) do not matter; adding that if a customer reported non-use and was found during verification to have used the program, AFA would be applied. Thus, Guizhou Tyre has argued that it is unnecessary for a U.S. customer to report all of its loans. While the focus of the non-use portion of verification is to confirm non-usage, that does not mean that requesting the complete financing of these customers is unwarranted. A complete listing of all financing the company had outstanding during the POI would ensure that Commerce will have the "full universe" of potential assistance prior to verification. This approach is virtually identical to verifying non-use of a loan program during the verification of a respondent, as in the case of a respondent we have

71

already requested companies to report all financing in their questionnaire responses prior to verification.  Thus, it is not only necessary for each customer to report its financing, but also consistent with our practice.

To summarize, Guizhou Tyre's statements regarding this issue boil down to two arguments:  (1) the U.S. customers do not need to provide any information to support Guizhou Tyre's claim of non-use of this program; and (2) Commerce can determine whether or not a company used the program at verification, without any prior information regarding what financing the company may have outstanding during the POI, by collecting and analyzing information related to the financing the customer received and divining which loans in the company's books and records were distributed under the EBC program.  First, this directly contradicts the purpose of verification.  Again, as stated throughout this remand, the purpose of verification is to verify information already contained on the record of the proceeding.  Further, as discussed above, in conducting verification of non-use with respect to a respondent company, Commerce typically has a significant amount of information about a respondent company prior to verification, including information supporting its reported non-use of programs.  Thus, not gathering information from these customers prior to verification would be inconsistent with Commerce practice.  Finally, Guizhou Tyre's proposed approach would leave the verifiers responsible for learning and understanding everything about these U.S. customers and the financing they received within the short amount of time during which verification takes place, including reviewing the company's financial statements, tax returns and loan information, as well as an understanding of the company's accounting system, for the first time.  Such an undertaking would require far more time than a standard verification would allow for, and thus

there would not be sufficient time for verifiers to thoroughly and completely analyze the customer's books and records to adequately determine non-use of the program.

In question 6, the Court instructed Commerce to address the following:

*Address whether, without information about the operational changes to the EBCP, verification of the customers' self-certifications in accordance with Commerce's methodology is (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both;*

In response, we indicated that such an attempt would be both insurmountable and would not yield relevant and reliable information. Specifically, we stated that without all the needed information about the program, coupled with the fact that these certifications are simply one-page statements indicating non-use, with no supporting documentation, verification of these self-certifications would not result in relevant or reliable information. In its Draft Results comments, Guizhou Tyre's argues that these certifications are no less reliable than other statements of non-use that a respondent makes in its questionnaire response, and that Commerce has not explained why these certifications should be treated differently than other statements of non-use. Further, the company argues that even if Commerce had the missing information regarding the EBC program (*i.e.*, information on the $2 million threshold, the names of the partner banks, and the nature of the underlying documents) it would perform the same verification as it would if it did not have this information.

We disagree with Guizhou Tyre. First, we find these certifications are, in-fact, less reliable than the non-use statements made by the respondents. The customers are not respondents and therefore have less incentive to cooperate than respondents. Further, given that there is no additional information regarding the customer or its operations, there is nothing on the record to support a customer's non-use certification. For example, we do not have the U.S. customer's complete list of chart of accounts, ledgers, trial balances, financial statements, etc.

This is in contrast to the significant amount of financial information provided by the respondents in their questionnaire responses, which we have been able to thoroughly review and gather supplemental information in order to address potential deficiencies in the responses, as necessary.  Thus, when Commerce verifies non-use during a respondent's verification, there is already significant record information supporting the claim of non-use on the record, and verification is Commerce's opportunity to confirm this assertion.  However, as stated above, were Commerce to attempt to verify these certifications, we would be reviewing the customer's information for the first (and only) time.

Second, Guizhou Tyre is wrong when it states that we would perform the same exact verification, regardless of whether Commerce had the information the GOC has failed to provide.  If Commerce had this information, verification would be significantly more productive and efficient.  Specifically, if the GOC provided the parameters of who may receive financing under this program (*i.e.*, the USD 2 million minimum), as well as the names of the banks that participate in this program, then Commerce would narrow its focus at verification to the loans that fit within these guidelines.  By considering the parameters of the program Commerce could reduce the number of loans that <u>could</u> have been provided under the program before looking at any underlying documentation.  Further, if we were provided a complete understanding of the program from the GOC, this would allow Commerce to review the underlying documents in a timely and effective manner, and in-turn, review more potential loans to ensure non-use.

In question 7, the Court instructed Commerce to address the following:

*With respect to "(6)", above, were the question of sampling to arise, explain whether sampling would be (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both.*

74

In response to the question of sampling, we stated that the approach would not be viable in this situation.  First, we noted that the Act does not provide any guidance as to sampling customers of the exporter/producer.  Further, even if Commerce were to attempt to sample customers using the methodology used to select mandatory respondents, the necessary information to determine a "statistically valid" sample is not on the record.  In its Draft Results comments, Guizhou Tyre argues that Commerce's explanation of sampling is "completely off-base and wrong" as the provision in the Act regarding the sampling of exporters for individual examination has absolutely nothing to do with limiting verification to certain information or certain companies.  Instead, the company argues, the term sampling in the verification context can also be described as a spot check.

As an initial matter, we noted in response to question 7 that sampling as discussed in the Act pertained to the methodology to determine the mandatory respondents, not limiting verification of respondents' customers.  However, given the fact that the Court specifically used the term "sampling" and the only discussion of sampling in the Act is within the context of respondent selection, Commerce responded to the Court's question in the framework of sampling to determine mandatory respondents.  As discussed above, Commerce does not have the necessary information on the record to perform a sampling analysis as described in section 777A(e)(2) of the Tariff Act of 1930, as amended (the Act).

Further, assuming *arguendo* Guizhou Tyre was correct, and the Court used the term sampling to mean a type of spot check to limit the customers to review, we find such a path is not viable in this investigation.  Specifically, as explained above, we do not have any information regarding the companies who filed these non-usage certifications, thus, deciding which customers would participate in verification would amount to a random selection of companies.

75

Further, once these customers were selected, we continue to lack pertinent information from the GOC regarding the program (the $2 million threshold, the names of the partner banks, and the nature of the program (including relevant documentation)).  Thus, in attempting to confirm non-use, Commerce would still be left to randomly select a few respondents for which it has no information, and then attempt to review the companies' information with no meaningful guidance as to how the program in question operates.  Therefore, "sampling," whether considered under the relevant provisions of the Act, or in terms of spot checking, will not provide reliable results in this investigation.

In questions 8a and 8b, the Court instructed Commerce to address the following:

*State whether Commerce has a practice of verifying information from third parties.*

and

*If Commerce has such a practice, explain why it is reasonable for Commerce to refrain from verifying the information submitted by the customers, through the respondents, in this case.*

In response, we indicated that Commerce solicits information from third parties in many proceedings, and in some instances, verifies the information provided by the third parties. However, as we have stated multiple times throughout these remand results, there was no factual information on the record for Commerce to verify in this investigation, as the customers have only provided one-page documents claiming non-use of the program.  In its Draft Results response, Guizhou Tyre argues that Commerce has made a practice of verifying third parties and will often select a sample of these parties when faced with numerous third-party companies. Further, the company argues that Commerce does not require information to verify non-use claims, as the very nature of non-use is that no information is submitted.

We disagree with Guizhou Tyre on both of its arguments.  First, for the reasons stated above, there is no basis for us to select a sample of these customers to review.  The respondents

in this proceeding had a significant number of customers reported during the period of investigation, for which we have no information.  Thus, Commerce has no basis to select a relevant or meaningful sample of these customers.  For example, if Commerce had information on the customers' financing, it could remove companies with no or little outstanding financing from consideration.  Given that we have no information on any of these customers, any such attempt to select a sample of customers to review in this investigation would be fruitless.

Second, we reiterate our disagreement with Guizhou Tyre's assertion that information is not required to be on the record to verify non-use.  When Commerce examines non-usage at verification, there is a significant amount of information (e.g., financial statements, sales and purchases).  Commerce will have evaluated this information prior to verification and will have had the opportunity to gather additional details to supplement the record.  Thus, there will be a significant information on the record about the company prior to verification.

In question 9, the Court instructed Commerce to address the following:

*Explain whether the proposed solutions — such as Commerce visiting respondents' customers and asking for a list of the banks or lenders that provided loans to the customers during the POI — are feasible alternative methods of verification for Commerce, and if Commerce concludes that these methods are not feasible, explain the reasons for this conclusion.*

In response, we stated that some of the proposed solutions may be effective in specific scenarios.  However, we added that the only solution that will ensure that Commerce is fully able to confirm usage/non-usage of this program, as well as confirm benefits under the EBC program, is if the GOC fully cooperates with Commerce's request for information regarding this program.  In its Draft Results response, Guizhou Tyre again holds that Commerce does not need to have complete information from the GOC regarding the operation of this program to verify non-use of this program.  Further, the company states that many factual scenarios exist which would permit Commerce to verify non-use without the information which the GOC has failed to provide.  In

77

conclusion, Guizhou Tyre argues that not having this information does not mean that the verification is impossible or overly difficult.

Throughout this remand, Commerce has fully discussed our central position:  that in order to consistently confirm non-usage of the EBC program, we will need full cooperation from both the GOC and the customers of the mandatory respondents.  Guizhou Tyre stated there are factual scenarios where Commerce may confirm non-use without the full cooperation of the GOC and cited to *Vertical Shaft Engines from China* as support.  As discussed above, the circumstances surrounding *Vertical Shaft Engines from China* were unique to that fact pattern and are not applicable here, nor in most other China CVD proceedings involving the EBC program.  Thus, we find Guizhou Tyre's assertion that Commerce may, generally, verify non-use without this information to be false.

Further, we have noted there are some instances where Commerce may confirm non-use where portions of the missing information in question are provided.  For example, in response to question 1b, we stated that if Commerce were provided a list of banks that participated in the EBC program, it would be able to verify non-use of the program should the customer not receive financing from any of the third-party banks participating in the program.  However, we find that this would not apply in this investigation given the significant number of U.S. customers.  Given the significant number of U.S. customers, reviewing and verify the books and records of each of the U.S. customers would still prove extremely burdensome even with a list of banks that participated in the EBC program.  Thus, the only way to confirm non-usage in this investigation would be full cooperation from the GOC and respondents, namely, information regarding the $2 million threshold, the names of the partner banks, and the nature of the underlying documents from the GOC, as well as a complete record of the U.S. customer's financing during the POI.

In conclusion, it should not be incumbent upon Commerce and other interested parties to fill in this missing information that the GOC has refused to provide in order to confirm non-use. As noted in this remand, Commerce has limited resources and should not be forced to devote an overwhelming amount of time and attention to a program for which the GOC has refused to provide basic information.  Instead, the most reasonable approach, given the challenges discussed above, and the missing critical information from the GOC, is for Commerce to apply total AFA for the EBC program.

**Comment 3:   Whether Commerce's decision to reject Double Coin's supply ratio argument is reasonable**

*Double Coin's Comments*

- Section 771(5)(E)(iv) of the Act provides that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."
- In its explanation against Double Coin's supply ratio argument, Commerce has neither identified prevailing market conditions in China nor constructed an accurate delivered price in relation to such prevailing market conditions, contrary to the statute.  In fact, Commerce does not even address section 771(5)(E)(iv) of the Act anywhere in its Draft Results.
- Commerce identifies misplaced concerns based on its unreasonable application of 19 CFR 351.511(a)(2)(iv) and the use of delivered import prices as benchmarks at the complete expense of a statutory mandate to take prevailing market conditions in China into account to adjust market benchmarks.
- The supply ratio could achieve the same lawful result applied in ways that do not directly affect benchmarks used in actual comparisons.

**Commerce's Position:**

As an initial matter, we addressed the concerns brought up by the Court in its *Remand Order*.  Specifically, the Court directed Commerce to "explain its decision to not apply a supply ratio to the import duty and ocean freight adjustments."  As discussed above, we find that the domestic figures are not viable for calculating such a ratio due to all the domestic suppliers of the

inputs being "authorities" within the meaning of section 771(5)(B) of the Act.  Further, we explained that it is unclear how this ratio would accurately reflect the price that a firm actually paid or would have paid if it imported the input under consideration.  Instead, we found that this would simply lower these expenses for import duty and ocean freight and, in-turn, lower the overall benchmark prices to an extent that they would not accurately reflect available market prices.  Thus, we find that Commerce has addressed the concerns the Court set forth in its *Remand Order*.  Further, we find Double Coin's arguments in its Draft Results comments provide no basis to change our finding.

Throughout its Draft Results comments, Double Coin has repeatedly emphasized the language in section 771(5)(E)(iv) of the Act in an apparent attempt to insinuate that Commerce's position is inconsistent with the statute.  Further, the company argues that Commerce has disproportionately relied upon the language of its regulations which states the use of delivered prices should reflect "the price that a firm actually paid or would pay if it imported the product" under 19 CFR 351.511(a)(2)(iv).  Double Coin holds that Commerce's regulations "must be tempered by the statute since mechanical application of the regulation would violate the statute's command."

We find our decision not to apply a supply ratio in this investigation is consistent with both the Act and our regulations.  The Act states "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.  Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  Beyond this, the Act provides no other guidance or methodology for how Commerce should measure the adequacy of remuneration, which means

we are left to rely on the language stipulated in our regulations at 19 CFR 351.511 to calculate benchmarks.  Thus, our decision to calculate benchmarks is "consistent with our regulations" contrary to Double Coin's claims to the contrary.

Further, our decision not to incorporate a supply ratio directly aligns with objectives of the Act.  In the context of the input for LTAR questions under consideration, the Act instructs Commerce to assess the market conditions for the good being sold in China, and one of the conditions explicitly set forth in the Act is availability.  When calculating benefits under these LTAR programs, Commerce will compare the price paid for inputs charged by the administering authority (in this case, the GOC) to the appropriate benchmark price.  In this proceeding, we find that all domestic transactions are from "authorities" and thus do not serve as an accurate reflection of market based transactions.  Thus, when considering "availability" for purposes of selecting a benchmark, we find there are no domestic prices available.  In other words, the prevailing market conditions indicate that there are no viable domestic prices, and as such, there is no reason to calculate a ratio to adjust import prices to account for non-existent domestic supply prices, as the prices are not available.

Next, Double Coin disagrees with Commerce's position that there is no reliable basis to calculate a supply ratio.  As discussed above, due to our AFA finding that the supplying producers were "authorities," a supply ratio that would include these domestic purchases would distort our benchmark prices.  Double Coin argues that whether the suppliers of these inputs are authorities has no bearing on the volumes of domestic and imported supply in the market.  We find Double Coin's argument misses the point of our finding.  As stated above, Commerce is attempting to derive a benchmark that it can compare to the price paid by Double Coin to the authority.  We cannot compare the prices paid by Double Coin to one "authority" to the prices it

Filed By: Nicholas Czajkowski, Filed Date: 8/30/21 10:09 AM, Submission Status: Approved

paid to another "authority," because such prices are not private domestic prices.  Therefore, in the context of our proceeding there are no available domestic prices.  Thus, if we were to incorporate a supply ratio in this proceeding, we would be lowering these import duty and ocean freight expenses to account for a non-existent domestic supply.

Further, as discussed above, our finding is consistent with *Guizhou Tyre Co. v. United States*, which had a similar fact pattern.[126]  Double Coin argues the Court's ruling in that case reflected an obvious misunderstanding of facts and Commerce's methodology.  Thus, Double Coin objects to Commerce's reliance on *Guizhou Tyre Co. v. United States* in this proceeding on the basis that the company does not agree with the Court's finding in that case.  We find that this is not the appropriate forum to re-evaluate the Court's decision pertaining to a different investigation (*OTR Tires from China*).

Next, regarding Commerce's concerns that applying this ratio would lower these expenses with no clear purpose, Double Coin argues that such concerns are misplaced based on an unreasonable application of Commerce's regulations.  Double Coin argues that, as stipulated in the Act, Commerce must take the prevailing market conditions into account to adjust for market benchmarks, which includes accounting for the degree to which domestic production supplies the market.  In conclusion, the company argues that the "clear purpose required by the statute is to create an obligation for Commerce to calculate a countervailing duty margin {sic} as accurately as possible."[127]  First, as discussed above, we believe our decision not to apply this ratio is consistent with both the Act and regulations.  Further, we find our decision to be in

---

[126] See *Guizhou Tyre Co. v. United States*.  In that case, the Court found that because Commerce had applied AFA in concluding that suppliers in China where authorities, Commerce did not need to make adjustments to ocean freight and import duties to reflect the level of domestic supply in China, and thus, to allow a supply ratio adjustment to these expenses would include domestic purchases that were found to be an inappropriate comparative for benchmarking.

[127] *See* Double Coin Draft Remand Comments at 7.

harmony with the objective to calculate CVD rates as accurately as possible.  Specifically, in calculating the CVD rate we have used <u>actual</u> prices for our benchmark.  We find that incorporating actual prices to calculate these benchmarks are preferable to using any other sources to calculate benchmarks.  In addition, as discussed above, we have applied AFA in concluding that suppliers in China constitute authorities under the Act, and thus find making modifications to actual market prices by incorporating unreliable data to artificially lower these expenses to be inappropriate.  Instead, Commerce has used actual prices to calculate benchmarks, and not artificially lowered these prices by incorporating unreliable data, which reflects a clear effort by Commerce to calculate CVD rates as accurately as possible.  Finally, Double Coin argues that this supply ratio could, in theory, be used in other ways that do not directly affect the benchmarks.  First, it is true Commerce may use ratios (including supply ratios) where it deems it necessary.  However, Double Coin has simply listed a number of ways that a supply ratio may be employed by Commerce.  While Commerce agrees that supply ratios may be employed where appropriate, the practice is not applicable here, and none of the situations referenced by Double Coin are present in this case.  For the reasons discussed above, Commerce continues to find there is no reliable basis to calculate or otherwise make adjustments in accordance with such a ratio in this investigation.

8/27/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance