## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

————————————————————————x
                                                   :
GUIZHOU TYRE CO., LTD., *et al.*,                  :
                                                   :
                               Plaintiffs,         :          Consol. Court No. 19-00032
                                                   :
               v.                                  :
                                                   :
UNITED STATES,                                     :
                                                   :
                               Defendant.          :
————————————————————————x

## <u>PLAINTIFFS' COMMENTS ON FINAL REMAND REDETERMINATION</u>

Andrew T. Schutz
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005

*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: October 29, 2021

## **TABLE OF CONTENTS**

PLAINTIFFS' COMMENTS ON FINAL REMAND REDETERMINATION ........................... 1

SUMMARY OF ARGUMENT & BACKGROUND ..................................................... 1

ARGUMENT ................................................................................................ 3

    I.      COMMERCE'S AFA DETERMINATION REGARDING UNREPORTED
             GRANTS CONTINUES TO BE UNLAWFUL ..................................... 3

          A.    Remand Proceeding .......................................................... 3

          B.    Argument ........................................................................ 4

                1.    The Grants Are Miniscule and this is Relevant ............... 4

                2.    Assessing Countervailability Is Not Necessary ............. 12

                3.    Calculation Issues ...................................................... 14

    II.     EBCP USAGE CAN BE VERIFIED RENDERING AFA INAPPROPRIATE .. 17

          A.    Commerce Has Recently Verified EBCP Non-Usage ............. 17

          B.    Commerce's Recent Precedent Invalidates The Remand Results ........... 20

CONCLUSION .............................................................................................. 26

# TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1677d ........................................................................................... 9

19 U.S.C. § 1677f-1(e)(1)(A)(i) ................................................................... 24

**Regulations**

19 C.F.R. § 351.504 ........................................................................................ 3

19 C.F.R. § 351.524 ........................................................................................ 5

**Administrative Decisions**

*Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18,521 (Apr. 4, 2011) ...................................................... 10

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Mar. 26, 2012) ........................... 10

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 32,720 (July 9, 2019)... 25

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021) ................................................................................................. passim

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 41, 013 (July 30, 2021) ....................................................................................... 18, 19

*Certain Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 64,045 (Dec. 7, 2009) ............................. 10

*Certain Pasta from Italy: Final Results of the Fourth Countervailing Duty Administrative Review*, 66 Fed. Reg. 64,214 (Dec. 12, 2001) .......................................................... 25

*Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28,959 (May 20, 2015) ....................................................................... 25

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 14,071 (Mar. 12, 2021) ............................................................................ 23, 26

*Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 Fed. Reg. 55,241 (Sept. 10, 2013) ............................................................................................... 8

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the People's Republic of China: Preliminary Affirmative Determination*, 80 Fed. Reg. 68,843 (Nov. 6, 2015) ................................................................................................................ 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) .............................................................................................................................. 24

*Final Affirmative Countervailing Duty Determination: Certain Stainless Steel Wire Rod from Italy*, 63 Fed. Reg. 40,474 (July 29, 1998) .............................................................. 11

*Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (June 23, 2003) ................ 10

*Final Affirmative Countervailing Duty Determination: Stainless Steel Plate in Coils from Italy*, 64 Fed. Reg. 15,508 (Mar. 31, 1999) .......................................................................... 11

*Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Oct. 3, 2002) ................................................. 7

*Large Residential Washers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 75,975 (Dec. 26, 2012) ................................................. 9

*Notice of Final Affirmative Countervailing Duty Determination: Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India*, 67 Fed. Reg. 34,905 (May 16, 2002) .............. 11

*Utility Scale Wind Towers From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Negative Determination of Critical Circumstances*, 85 Fed. Reg. 40,229 (July 6, 2020) .......................................................................... 14, 15

**Other Authorities**
GROUNDHOG DAY (Harold Ramis/Columbia Pictures 1993) .................................................. 17

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

```
————————————————————————————————x
                                 :
GUIZHOU TYRE CO., LTD., et al.,   :
                                 :
                  Plaintiffs,     :        Consol. Court No. 19-00032
                                 :
          v.                     :
                                 :
UNITED STATES,                   :
                                 :
                  Defendant.      :
————————————————————————————————x
```

**PLAINTIFFS' COMMENTS ON
FINAL REMAND REDETERMINATION**

Pursuant to this Court's Scheduling Order of September 27, 2021, Plaintiffs Guizhou

Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively "GTC" or "Guizhou

Tyre"), submit these comments in opposition to the U.S. Department of Commerce's

("Commerce") Final Results of Redetermination Pursuant To Court Remand ("Remand Results")

filed on August 30, 2021, Docket Entry #74-75, in the countervailing duty ("CVD")

investigation of truck and bus tires from the People's Republic of China ("China"), with calendar

year 2016 being the period of investigation ("POI").

**SUMMARY OF ARGUMENT & BACKGROUND**

On May 19, 2021, the Court issued its opinion in this case in Slip Op. 21-64.  In that

opinion, the Court remanded a number of issues, two of which were applicable to GTC.  First,

the Court remanded the application of adverse facts available ("AFA') to GTC's grants presented

as minor corrections at verification.  The Court directed "Commerce {to} explain further its

decision to reject the grants as 'minor corrections'." Slip Op. at 141.  Second, the Court

invalidated Commerce's determination to apply AFA to the usage of Export Buyer's Credit

Program ("EBCP").  *Id*. at 141-143.  In doing so, the Court outlined a series of nine questions / issues that it required Commerce to address.

In its Remand Results, Commerce continued to apply AFA to GTC's grants presented at verification finding that they did not constitute minor corrections.  Commerce also continued to find that AFA was appropriate to the usage of the EBCP because Commerce is unable to verify usage of this program at the respondents' U.S. customers (i.e., the users of the program), given the missing information from the record.

For the reasons outlined herein, the Court should find Commerce's continued application of AFA to GTC's unalleged grants reported as minor corrections and the usage of the EBCP as unsupported by substantial evidence and otherwise contrary to law.  With regard to GTC's grants, Commerce incorrectly found that grants that represent unalleged subsidy programs constitute new factual information and can never be "minor corrections" presented at verification Commerce's decision has no basis in the law or practice.  Commerce should have instead reviewed the amounts of GTC's grants to determine whether they were in fact minor either on a qualitative or quantitative basis.

For the EBCP usage, Commerce's continued push that verification of this program at the respondents' U.S. customers is not possible has now been invalidated by a recent Commerce decision issued after the filing of these Remand Results.[1]  In that case, Commerce actually conducted a verification of the respondents' U.S. customer and found that it could reliability and reasonably find non-use of this program in such a verification.  Commerce's entire Remand Results on this issue are therefore moot and inaccurate and should be reversed.

---

[1] *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021).

**ARGUMENT**

I. **COMMERCE'S AFA DETERMINATION REGARDING UNREPORTED GRANTS CONTINUES TO BE UNLAWFUL**

In its Remand Results, Commerce continued to apply AFA to GTC's grants from unalleged programs reported at verification as minor corrections. This determination failed to evaluate whether the grants were indeed "minor" and instead ultimately concluded that information regarding unalleged subsidies can never be submitted as minor corrections because it would be "new factual information." This position is without merit.

A. **REMAND PROCEEDING**

Following the Court's remand of this proceeding, on June 10, 2021, Commerce issued a questionnaire to GTC asking the company to submit the chart presented at verification which outlined all of the unreported grants. Remand Questionnaire (June 10, 2021) (R.P.R. 1). GTC submitted its response on June 17, 2021. GTC Remand Questionnaire Response at 1-2 (June 17, 2021) (R.C.R. 1).[2] In this questionnaire, Commerce did not request that GTC submit the chart, as presented to the verifiers in support of GTC's minor correction claim. Instead, Commerce asked that the chart include the total number of unreported grants, the name of the grant (in its Chinese name and translated into English) and the aggregate value of these grants,[3] but **exclude** the individual amounts for each unreported grant. Commerce requested that the chart exclude these amounts despite the fact that this information was provided at verification in the original chart. In responding to the questionnaire, GTC objected to this exclusion. *Id*. at 1-2.

---

[2] Defendant is in the process of seeking leave to file the Administrative Record for the Remand proceeding out of time. They have informed us that the Confidential Record number of this filing is 1.

[3] The aggregate value of grants reported is not used for any purpose in Commerce's CVD calculations. The ad valorem rate for grants is calculated on a per-program and per-year basis. 19 C.F.R. § 351.504.

In its Remand Results, using this submitted information, Commerce ultimately concluded that "these additional grants Guizhou Tyre attempted to submit do not qualify as 'minor corrections'" and that "Guizhou Tyre attempted to submit data for programs for which there was no information on the record." Remand Results at 11. Commerce did not conclude that the number of grants was "extensive," as previously stated. Instead, Commerce concluded that:

> Accepting these grants as minor corrections would have significantly impeded the verification, as verifying each of these grants would have required Guizhou Tyre officials to: (1) provide an overview of the grant program; (2) discuss the application process and eligibility criteria of the program; (3) review the application and approval documents for each program; and (4) tie the receipt of assistance to accounting records and financial statements.

*Id*. at 11. Finally, in supporting its position that this information was not minor, Commerce stated that in "addition to evaluating the basis on which these grants were provided, Commerce would also have had to ensure that it had all necessary sales figures to properly calculate the subsidy rates for each grant program." *Id*. at 11-12. Commerce's conclusions are without merit and unsupported by precedent and by substantial evidence.

**B.   ARGUMENT**

**1.   The Grants Are Miniscule and this is Relevant**

First, Commerce's failure to accept at verification, and request in this remand proceeding, the actual value of each missing grant is arbitrary, capricious and an abuse of discretion. Commerce's verification outline requests the following with regard to purported minor corrections:

A.    **Corrections to Response**

If you identified errors in the responses while preparing for verification, please provide the following at the outset of verification:

1.    a list of the errors;
2.    original documentation to show the corrections; and
3.    a chart that shows the magnitude of changes to quantitative data.

Verification Agenda at 7 (Oct. 8, 2016) (P.R. 420).  The reason why there is a requirement to show the magnitude of changes to quantitative data is because seemingly large data changes on their face can have a small quantitative impact and vice versa.  At verification, GTC provided a chart showing the magnitude of changes to quantitative data, as requested.[4]  Specifically, it provided a chart identifying the amount of each grant, the applicable sales value for the 0.5% test, and the 0.5% test results.  This chart showed that every single grant failed the 0.5% test and, accordingly, should have been be expensed in the year of receipt.[5]  Because all grants were expensed in the year of receipt, only the **two grants in the POI** would be countervailed and result in a combined additional rate of 0.0118%.  *See* GTC Reply Brief at 12 (Mar. 5, 2020), Docket Entry #50.

---

[4] This chart that was originally provided to Commerce's Verifiers on the first day of verification was provided to the Court in Attachment 1 to GTC's Memorandum of Law in Support of Plaintiff's, Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., Rule 56.2 Motion for Judgment on the Agency Record (Confidential Version) (Oct. 11, 2019), Docket Entry #39.

[5] When Commerce evaluates non-recurring subsidies such as grants, the first step in the analysis is to determine whether the grant is large enough to be allocated over the set average useful life (here 15 years).  19 C.F.R. § 351.524.  To do this, Commerce performs what is call the 0.5% test where it divides the amount of the grant by the respondent's sales in the year of receipt.  If the amount is below 0.5%, the grant will be "expensed" in the year of the receipt and **will not be included** in the respondent's CVD rate unless the year of receipt is the POI.  Put another way, small grants received prior to the POI have no impact whatsoever on a respondent's CVD rate.

Rather than permit GTC to fulfill the requirement outlined in the Verification Agenda and show the magnitude of change, Commerce only requested the list of errors (*i.e.*, the number of grants and names).  Using this information, Commerce concluded that the actual amount of the grants was irrelevant.  Instead, Commerce found that the mere nature of these changes as unalleged grant programs prevented Commerce from making this correction.  Commerce does not cite to any support for this position.  As GTC stated in in Remand Response:

> The only way for the Department to adequately address these issues and determine whether the unreported grants represent a minor correction is to review the individual size of each grant.  As we have argued before the court, each of these grants were below the 0.5% test, to be expensed in the year of receipt, and most of which were prior to the POI.  Thus, the Department should permit GTC to submit this worksheet in its entirety so as to be able to address GTC's claim that these grants represent minor corrections.

> If the grants result in no benefit during the POI and are expensed in the year of receipt then they could not be considered "extensive."  Indeed, it is often the Department's practice to not review the countervailability of a program that result in no benefit.  *Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Aug. 9, 2018), IDM at *Comment 5: Whether to Continue to Find Certain Programs Not Used, Not Measurable, or Having No Benefit*.  For example, in the underlying investigation, rather than go through the countervailability of certain programs, the Department explained:

>> Double Coin and Guizhou Tyre reported receiving benefits during the AUL under Import Duty Exemptions for Imported Equipment, the Famous Brands Program, Special Fund for Energy Saving Technology Reform, The Clean Production Technology Fund, and Export Loan Interest Subsidies.  However, these benefits either do not pass the "0.5 percent test" provided in 19 CFR 351.524(b)(2), and they are allocated to the year of receipt, or they are less than 0.005 percent ad valorem during the POI, and they are not measurable.  Thus, they provide no benefits during the POI.

> *Truck and Bus Tires From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final*

> *Determination With Final Antidumping Determination*, 81 Fed. Reg.
> 43,577 (July 5, 2016), PDM at 40 (unchanged in final).

Remand Questionnaire Response at 1-2 (footnote omitted).

Commerce has no basis on which to ignore the amounts for each grant since this information would be used to calculate the benefit, if any. Commerce has previously stated that: "With no benefits received, there is nothing to countervail." *Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Oct. 3, 2002). Indeed, for grant programs, Commerce looks to the benefit calculation **first** and then goes to countervailability factors such as operation of the program, the application process and eligibility. For example, in one case Commerce explained:

> YPC reported that it received numerous grants from provincial and local governments that were not included in any of the programs under investigation. **However, before addressing the issues of financial contribution and specificity, we first determined whether any benefits exist in the POI from any of these reported grants**. We treated these reported grants as non-recurring subsidies, pursuant to 19 CFR 351.524(c), and applied the "0.5 percent test" to each one, individually, to determine whether each grant should be allocated to the POI. None of the grants received prior to the POI passed the "0.5 percent test," and therefore none have been allocated to the POI. In addition, none of the grants received during the POI passed the 0.5 percent test and, therefore, all such grants were allocated to the POI.

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the People's Republic of China: Preliminary Affirmative Determination*, 80 Fed. Reg. 68,843 (Nov. 6, 2015) (emphasis added). Similarly, in another case, Commerce explained:

> Concerning POSCO, it reported receiving grants under the ITIPA prior to and during the POR. Dividing the sum of POSCO's benefits from these grants during the POR by POSCO's total sales results in a net subsidy rate that is less than 0.005 percent ad valorem, which is not numerically significant. Consistent with the Department's practice, we find that the grants received by POSCO under this program do not confer a benefit to POSCO during the POR. Consequently, we preliminarily determine that it is not necessary for the Department to make a finding as to the

> countervailability of the grants to POSCO received under this program.
> We further note that none of the grants received prior to the POR passed
> the 0.5 percent test and, thus, these grants were fully expensed prior to the
> POR

*Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 Fed. Reg. 55,241 (Sept. 10, 2013). Given this practice, Commerce would only need to review the details[6] of the two grants received in 2015 – and not any of the details of the other grants (except possibly to spot check amounts, as noted below).

In response to these GTC arguments, Commerce explained that "the magnitude of change that Commerce typically requests, and Guizhou Tyre refers to, applies only with regards to updating information already on the record that needs to be corrected, not entirely new information which is absent from the record." Remand Results at 47. Commerce then explained that "for these unreported grants, because there was no original amount reported for these grants, there is nothing to compare the 'new' grant amount to, and thus, there is no basis to calculate the magnitude of change as instructed in the verification outline" and that, ultimately, "Guizhou Tyre was aware of what constitutes a recognized minor correction at verification, as well as what Commerce sought when it referred to the magnitude of a change." *Id.*

These Commerce findings take the position that whether it is one grant or 40 grants, no matter the size of the grant, if the grant was not reported, it cannot be a minor correction. Commerce states, simply, that unalleged grants are always "new information" that cannot be reviewed at verification: "In most proceedings, verification (and its subsequent report) is the last

---

[6] That is, to: (1) provide an overview of the grant program; (2) discuss the application process and eligibility criteria of the program; (3) review the application and approval documents for each program; and (4) tie the receipt of assistance to accounting records and financial statements.

chance in a proceeding for respondents to place certain information on the record, and as discussed at length above the information Commerce accepts is limited to information that makes minor corrections to information otherwise already available on the record." *Id*. at 50. This is plainly not true based on both the statute/regulations and Commerce's own practice.

Commerce's regulations specifically identify unalleged subsidy programs as a type of new factual information that Commerce should review any time received in the proceeding.  If, under section 351.311(a), Commerce determines that the subsidy "was not alleged or examined in the proceeding," it has two options on how to proceed.[7]  First, it can "examine the practice, subsidy, or subsidy program if the Secretary concludes that sufficient time remains before the scheduled date for the final determination or final results of review." *Id*.  Second, it can "defer consideration of the newly discovered practice, subsidy, or subsidy program until a subsequent administrative review, if any." *Id*.

Pursuant to this Regulation, Commerce has treated newly discovered subsidies at verification in two ways: (1) review the information provided; or (2) defer investigation of these items until a later review.  Commerce's practice in this regard is demonstrated by the precedent summarize below.

| Case | Program Discovered | DOC position |
|---|---|---|
| *Large Residential Washers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 75,975 (Dec. 26, 2012), IDM at 18 | Grants | **Reviewed New Information Provided at Verification, including Value, and Countervailed.** |

---

[7] 19 U.S.C. § 1677d, entitled "Countervailable subsidy practice discovered during a proceeding," states that if the practice "appears to be countervailable subsidy and was not in the petition, Commerce: "(1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding."

| | | |
|---|---|---|
| *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Mar. 26, 2012), IDM at Cmt. 17 | Grants | **Reviewed New Information Provided at Verification, including Value, and Countervailed.** "Because we tied this worksheet into the financial statements, we consider it appropriate in this instance to use the sales figure for refrigerators to calculate the benefit instead of applying an adverse inference." |
| *Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18,521 (Apr. 4, 2011), IDM at Cmt. 26 | Purchase of Land-Use Rights and Buildings | **Reviewed New Information Provided at Verification, including Value, and Deferred Investigation.** "{W}e find that there is insufficient time to examine the allegations contained in Petitioners' case brief. . . .  the Department will examine the circumstances surrounding the acquisition of the land and buildings at issue in a subsequent administrative review." |
| *Certain Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 74 Fed. Reg. 64,045 (Dec. 7, 2009), IDM at 24. | Grant | **Reviewed New Information Provided at Verification, including Value, and Did Not Countervail.** "At verification, we learned that Fanli also received a grant under this program during the POI. Based on our analysis, any benefit to WSP under this program would be less than 0.005 percent ad valorem. . . .  Therefore, without prejudice to whether this is a countervailable subsidy, we determine that WSP received no benefit from this program during the POI." |
| *Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (June 23, 2003), IDM at Cmt. 21 | Financing | **Reviewed New Information Provided at Verification, including Value, and Did Not Countervail.** "{B}ecause the Department has found that the GOK did not direct ROK banks to make loans to SEC during the POI, there is no basis for finding a countervailable subsidy. |

| | | |
|---|---|---|
| *Notice of Final Affirmative Countervailing Duty Determination: Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India*, 67 Fed. Reg. 34,905 (May 16, 2002) at "B. Programs Determined Not to Confer Subsidies" | Grant. | **Reviewed New Information Provided at Verification, including Value, and Deferred Investigation.** "At the verification of Polyplex, we found that in FY 1989 . . . Polyplex received a capital subsidy. . . . However, there is insufficient time to determine whether this program is specific under section 771(5A)(D) of the Act." |
| *Final Affirmative Countervailing Duty Determination: Stainless Steel Plate in Coils from Italy*, 64 Fed. Reg. 15,508 (Mar. 31, 1999) at "IV. Other Programs Examined" | Grant | **Reviewed New Information Provided at Verification, including Value, and Deferred Investigation.** "At verification it was discovered that AST received a grant during the POI. . . . {W}e are not making a determination on the countervailability of the Brite-EuRam program in this proceeding. . . . , we will solicit information on the Brite-EuRam program in a future administrative review, if one is requested. *See* 19 CFR 351.311(c)(2)." |
| *Final Affirmative Countervailing Duty Determination: Certain Stainless Steel Wire Rod from Italy*, 63 Fed. Reg. 40,474 (July 29, 1998), IDM at Cmt. 18. | Grant | **Reviewed New Information Provided at Verification, including Value, and Deferred Investigation.** "The Department discovered the existence of this program during verification and determined that there was insufficient time to consider the countervailability of the program for this final determination. Therefore, pursuant to section 351.311(c) of the Department's regulations, we are deferring examination of Law 10/91." |

This practice and Commerce's regulations make clear that grants are in fact "new factual information" in the form of unalleged programs that Commerce can – and must – review at verification. It makes no logical sense that this type of information is something that Commerce

11

can review if discovered during the course of verification on its own, but something it cannot review when the respondent advises Commerce of this discovery at the beginning of verification. If Commerce is making this distinction, there is no better example of a distinction without a difference.

### 2.    Assessing Countervailability Is Not Necessary

GTC conceded the countervailability of the 180 grants that it self-reported.  *See* GTC Second Supplemental Response at 11 (June 23, 2016) ("because GTC reported over 100 grant programs and due to their relatively small sizes, GTC has decided not to challenge the countervailability of grants.") (P.R. 325).  Thus, given GTC's concession as to the countervailability of GTC's self-reported grants, Commerce's analysis of the unreported grants would have been simple.  Commerce would not need: (1) "an overview of the grant program"; (2) a discussion of the "application process and eligibility criteria"; or (3) an analysis of "the application and approval documents for each program"; GTC already concedes that these unreported grants are countervailable (*i.e.*, are specific, are a financial contribution and are from a government authority).  Instead, Commerce would merely need to confirm that the amounts reported in the minor corrections chart match the amounts in the financial system and then spot check to confirm that no other grants were not reported.  Since Commerce would already be performing this spot checking of the accounts in the non-use portion of its verification, regardless of the minor corrections claim, the only additional step would be the matching of the unreported amounts in the company's financial system.  This is an easy process.  And even with this step, Commerce likely would not check every single number, just like it did not check every single self-reported grant.  *See* Memorandum to File, Verification of the Questionnaire

Responses Submitted by Guizhou Tyre Co., Ltd. at 9 (Dec. 9, 2016) (selecting only 9 of the 180

grants GTC reported to review at verification) (P.R. 449).

In response these GTC arguments, Commerce entirely over-complicates verification –

just as it does with the EBCP.  Commerce explains that if it were "to accept these newly reported

grants at verification, it would be evaluating this information for the first time at verification with

no previously submitted information available to serve as a basis for the evaluation."  Remand

Results at 52.  First, it is not clear what exactly Commerce is alluding to as being required for

evaluation.  When GTC reported its 180 grants, it simply provided an excel spreadsheet listing

the name of grant program, year of receipt and amount.  Second Supplemental Response at

Exhibit S2.14.A (June 24, 2016) (C.R. 280-301).  Other than seeking information related to the

countervailability of some of these programs, which GTC conceded and provided minimal

information on, there was no other information on the record about these grants prior to

verification.  *Id*.  In other words, this chart is exactly the same as the chart provided for the

unalleged grants at the start of verification.  If the original chart was a sufficient bases on which

to verify those 180 grants, this chart of unalleged grants should be sufficient at verification.

Second, the reason why these charts are sufficient information on which to base a

verification of grants is that grants are quite literally the easiest subsidy program of all subsidy

types to verify.  To verify a grant, Commerce need only to look in the accounting ledger in which

it is booked and match the amount and date to those recorded.  Even if Commerce chose to

verify each and every one of the unalleged grants, it would have taken no more than one hour to

confirm the amounts reported.  This, in the context of a five day verification, is a drop in the

bucket.

### 3. Calculation Issues

Finally, Commerce indicates that it possibly did not have the right sales value on the record and, thus, if it had accepted these unreported grants that it "would also have had to ensure that it had all necessary sales figures to properly calculate the subsidy rates for each grant program." Remand Results at 12. What Commerce is referring to is sales data that may be missing to perform the 0.5% test only. There is no missing data for calculating the *ad valorem* rate for each unreported grant using POI sales data. Sales data for the year of receipt is only used in the 0.5% test to determine whether to allocate or expense the grant; year of receipt sales data is not used in the benefit calculation for allocated grants. While we believe that all of the applicable sales data for the 0.5% test is on the record of this case, if Commerce discovered missing data it could either: (1) ask for it as "homework" during verification; or (2) treat the grant as passing the 0.5% test and simply allocate the benefit over the AUL.

In response to this, Commerce first explains that it "will frequently request homework from the company being verified during the course of a verification, this homework will be for the purpose of providing supporting documentation for information already on the record, not to provide additional new information." Remand Results at 52. This is entirely inaccurate. Counsel has been involved in many cases where the "homework" asked for during verification is not limited to "supporting documentation" for information already on the record. For example, in *Utility Scale Wind Towers from Vietnam*, Commerce discovered an unreported company during the course of verification. At verification, Commerce requested a significant amount of new factual information that was not previously on the record to determine whether this company was an unreported affiliate or otherwise relevant to the case. *Utility Scale Wind Towers From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*

*and Negative Determination of Critical Circumstances*, 85 Fed. Reg. 40,229 (July 6, 2020), and accompanying I&D Memo at Cmt. 1.  This included homework during verification requesting new information about this company.  Ultimately, Commerce concluded that this company was not an unreported affiliated.  *Id*.  This precedent demonstrates that Commerce often asks for new information not on the record during verification and that Commerce has the discretion to do so.

Next, Commerce explains that "we have no knowledge regarding the nature of these programs, in particular, regarding whether a program is export contingent."  Remand Result at 52.  This statement is again misleading.  Commerce did not have any information regarding the nature of the other 180 grants that GTC reported and yet it was able to make this determination based on the name of the grant alone.  Moreover, Commerce can simply ask for both total sales and export sales as homework if it was unsure.  The amount of information requested is not an impediment to it being requested as homework.[8]

Finally, Commerce states that: "Verifiers cannot be expected to accept new information such as this under the pretext that Commerce can "'simply allocate'" these benefits when calculating benefits."  Remand Results at 53.  It is important for the Court to understand that it was not the verifiers that did or did not make the decision to accept the unalleged grants as minor corrections.  The decision to accept information as minor corrections are made at Commerce headquarters, by the very decision-makers Commerce mentions.  Minor corrections are presented by the respondent on the first day of verification.  The verifiers then report back to their superiors on the corrections made and Commerce decision makers make the decision, not the verifiers.  In this instance, it took Commerce four days to make a decision on the corrections; surely enough

---

[8] To be clear, GTC's counsel has been on many verifications where the homework asked for by Commerce between verification days was extensive and required the company personnel and counsel to be up all night preparing it.

time to consider all implications of acceptance and rejection.  Thus, while we agree that

calculation decisions are made by the "appropriate Commerce decision-maker" at the

preliminary or final determination, we expect those decision-makers to evaluate what

information is or is not needed or could or could not be gathered when evaluating whether a

presented minor correction should be accepted.  In other words, Commerce should evaluate the

quantitative and qualitative impact of the presented minor correction.

      Finally, Commerce concludes its Remand Results by stating that:

> By allowing Guizhou Tyre to place these grants on the record well past the
> deadline, Commerce would be providing a path for companies to not
> report "other" subsidies in its questionnaire responses and wait until
> verification to report such assistance under the pretext that the company
> has determined such subsidies to be small or insignificant.  Creating such
> an incentive would limit Commerce's ability to thoroughly investigate
> potentially countervailable subsidies and enable companies to potentially
> avoid the incorporation of these subsidies in their individual rates.

Remand Results at 53.  We entirely disagree.  If Commerce had accepted these as minor

corrections it would not incentivize other companies to do the same with small or insignificant

grants.  There is no benefit to the company to report such grants as minor corrections rather than

in the initial questionnaire and Commerce has not identified one.  While theoretically a company

could get a lower primarily determination rate by not doing so, rejecting the grants as minor

corrections does not change that.  That is, the respondent would have a lower primarily rate

whether they report the grants and they are accepted or whether they report the grants and they

are not accepted.  If a respondent is clearly trying to manipulate rates, then Commerce can reject

the minor corrections but that was obviously not happening here.  This was an honest mistake

with a negligible impact on GTC's rate if the grants were countervailed.  Commerce should be

incentivizing respondents to make minor corrections and not hide information so that Commerce

16

has the most complete data possible.  Commerce's draconian take on "new factual information" does not do that and indeed does quite the opposite.

## II.     EBCP USAGE CAN BE VERIFIED RENDERING AFA INAPPROPRIATE

Commerce in it Remand Results continues to defend its decision to apply AFA to the EBCP and this decision continues to rest squarely on Commerce's belief that it cannot verify usage at the respondents' U.S. Customers.  The Court has seen this before; many times.  *See* Slip Op. 21-64 at 75-79 & nn.43-48.  But like Phil Connors breaking the time loop by changing his ways toward Larry the cameraman, his producer Rita, and others, Commerce too has broken the Groundhog Day spell with regard to this matter.[9]  Specifically, in an investigation decision published after the filing of Commerce's Remand Results here, Commerce in fact solicited information a respondent's U.S. customers, **and verified that information successfully finding non-use of the EBCP**.  *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Oct. 19, 2021) ("*MAE from China*"), and accompanying Issues and Decision Memorandum ("MAE IDM").  This decision renders all of Commerce's protestations and lengthy explanations in its Remand Results on why EBCP cannot be verified at the U.S. customer moot, inaccurate, unreasonable and, ultimately, unlawful.

### A.     COMMERCE HAS RECENTLY VERIFIED EBCP NON-USAGE

In its Remand Results, Commerce concluded that:

> {T}he Court discussed various solutions regarding methods to verify non-use of the EBC program, which have been addressed by Commerce in response to these questions.  However, as discussed numerous times throughout our responses, the {Government of China's ("GOC")} full cooperation with regard to the EBC program is essential in order for

---

[9] GROUNDHOG DAY (Harold Ramis/Columbia Pictures 1993); *see* Slip Op. 21-64 at 2, 140-41.

> Commerce to analyze this program consistent with our regulations.
> Without this cooperation, Commerce does not have a complete
> understanding of how the program operates.  In turn, without this
> understanding, any information provided by the mandatory respondents or
> their U.S. customers is of minimal or no value.  We have noted that there
> may be one circumstance in which we could verify non-usage without
> partial responses from the GOC (specifically, in the event Commerce were
> provided a list of correspondent banks and we were able to review the
> financing of all respondents' customers).  Beyond this one scenario,
> Commerce will be unable to determine and verify usage/non-usage (or
> benefit) of this program.  As such, without full cooperation from the GOC,
> Commerce's only recourse is to apply AFA for this program.

Remand Results at 34.  Commerce's decision in *MAE from China* renders each of these

statements inaccurate.

In *MAE from China*, Commerce investigated the EBCP as it does in every current CVD

case.  In that investigation, Commerce issued the very same questions regarding the EBCP in the

initial CVD questionnaire as it did in this case.  And as in this case, in *MAE from China* both

respondents responded to these questions stating that none of their U.S. customers used the

program providing "customer declarations or 'non-use certificates' demonstrating its U.S.

customers did not use this program."  *Certain Mobile Access Equipment and Subassemblies*

*Thereof From the People's Republic of China: Preliminary Affirmative Countervailing*

*Duty Determination*, 86 Fed. Reg. 41,013 (July 30, 2021), and accompanying Decision Memo at

21.  However, unlike this case, after the submission of the initial questionnaire responses with

this information, Commerce issued a supplemental questionnaire "requesting further information

regarding their U.S. customers, including information on all of their traditional and non-

traditional financing, as well as a loan template for the information." *Id*.  In the MAE

Preliminary Determination, Commerce found that one respondent, Lingong Group Jinan Heavy

Machinery Co., Ltd. ("LGMG"), responded fully and demonstrated non-use.  *Id*.  For the other,

mandatory respondent Zhejiang Dingli Machinery Co., Ltd. ("Dingli"), Commerce found that

that there were deficiencies in Dingli's supplemental response and applied AFA.  *Id*. at 22-24.

After the MAE Preliminary Determination, Commerce issued Dingli a supplemental

questionnaire asking it to correct certain deficiencies in its responses regarding the EBCP, which

the company submitted.  MAE IDM at 4.  Commerce then issued an "In Lieu of Verification

questionnaire"[10] to each U.S. Customer of the respondents to which they fully responded.

In its MAE Final Determination, Commerce first explained that the GOC withheld

necessary information regarding this program.  MAE IDM at Cmt. 5.  This information – the list

of third party banks and 2013 Administrative Measures – is the same information missing in this

investigation.  Commerce then found the program was countervailable based on AFA because

this information was missing from the record.  However, unlike previous cases, Commerce did

not apply the AFA to the benefit and usage of the program:

> However, regarding benefit, **we recognize that the CIT directed Commerce** in numerous decisions to consider whether any available information provided by respondents may be sufficient to fill the gap of missing record information in considering claims of non-use for the EBC program.  As a result, we issued supplemental questionnaires and questionnaires in lieu of onsite verification to each mandatory respondent and their U.S. customers, requesting additional information regarding its financing activities.  We received complete responses from the respondents, and, consequently, as facts available, we find that neither Dingli nor LGMG – or their U.S. customers used the program.  However, we note that our ability to fully analyze the respondents' financial records and verify certain information could potentially have been bolstered by an onsite verification and the findings thereof.  We acknowledge that there are certain concerns and issues raised that could potentially have benefited by examination during an deadline for the final was not extended by alignment with the antidumping duty investigation, Commerce cannot request further information from the respondents to clarify all possible concerns.

---

[10] As a result of the Covid-19 pandemic, and in particular the Delta Variant situation in September, Commerce performed a "paper verification" rather than an in person verification. Commerce has been conducting verifications in this manner since the pandemic began.

Regarding the petitioner's concerns related to certain business proprietary elements of the in lieu onsite verification questionnaire responses, we agree with Dingli and LGMG that their responses: (1) fully answered all questions; (2) that information cited as concerning by the petitioner was not explicitly requested by Commerce, including certain information regarding cash flows; (3) that information regarding certain liability or interest accounts was provided with sufficient accompanying support; (4) that accompanying financial information did not raise concerns as outlined by the petitioner; and (5) that concerns regarding certain non-responding companies is neither warranted nor subject to this investigation. **The record regarding use of the EBC program in the instant investigation is, pursuant to the direction of the CIT, sufficient to demonstrate non-use of the program**.  Respondents provided sufficient information regarding their financing and the financing of their U.S. customers, notwithstanding the gaps that persist in our understanding regarding the operation of the program.

Thus, while we continue to find that the GOC's non-cooperation significantly impedes and prevents a complete verification of the EBC program, **in recognition of court precedent**, we find that neither LGMG nor Dingli used the EBC program.

*Id*. (emphases added).

## B.   COMMERCE'S RECENT PRECEDENT INVALIDATES THE REMAND RESULTS

In its Remand Order, the Court outlined eight questions for Commerce to address on the remand of this issue.  Slip Op. 21-64 at 142-43, Docket Entry #70.  Each of these questions relate to the verification of this issue.  Now that Commerce has actually verified this issue at respondents' U.S. customers, Commerce's theoretical objections are demonstrably false.  We briefly address each of the Court's remand items below.

*(1a) explain the reason that the information withheld by the GOC about the threshold requirement was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use*

Commerce incorrectly concludes that because this $2 million threshold may not be in effect, the GOC "failed to provide information that would allow us to assess the scope of verification and effectively prove (or disprove) whether the mandatory respondents used this

program." *Id.* at 22.  While certainly Commerce would prefer to limit its verification of this

program, the existence or non-existence of a $2 million threshold does not impede or

Commerce's ability to verify non-use.  Indeed, Commerce was able to successfully verify this

issue in *MAE from China* through a review of the U.S. customers' accounts and the underlying

loan documentation.

*(1b) explain the reason that the information withheld by the GOC about the third-party banks was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use*

It is not necessary.  In *MAE from China* the respondents reported loans from banks in the

United States and was able to demonstrate that the loans were not part of the EBCP.[11]

*(2) explain whether it would be feasible for Commerce to solicit and obtain the withheld information from customers — which are third parties to the investigation — by describing each step that Commerce would consider to be necessary to obtain such information, including stating clearly the reason(s) that Commerce considered each step necessary*

In *MAE from China*, Commerce issued questionnaires to the respondents seeking

information directly from the respondents' U.S. customers.  The public versions of those

questionnaires are attached as **Attachment 1** to these comments.  The questionnaires asked the

U.S. customers to report all financing received during the POI and then in supplemental

questionnaires asked additional information regarding those loans, including information about

the lender, the purpose of the loan and the underlying loan documents.  As Commerce gains

more experience verifying this issue, its questions and verification process will become more

efficient.  Indeed, as Commerce begins to verify this issue and, undoubtedly, begins to find that

no U.S. customer in any case used this program, its verification process will become less and less

---

[11] GTC's counsel represented mandatory respondent Dingli in *MAE from China*.

complex and in some cases Commerce may forgo verification of the U.S. customers all

together.[12]

*(3) with respect to "(2)," above, describe with particularity any "significant burden" Commerce might or would likely incur in taking such action*

There was no burden for Commerce in *MAE from China* and, as explained, any "burden"

will become significantly reduced as Commerce gets more familiar with verifying this issue.

*(4) explain the extent to which Commerce would be able to rely on information from customers by identifying what information Commerce would seek from customers and explaining how, if at all, such information would be useful to Commerce to establish non-use*

In *MAE from China*, Commerce required the respondents to report all financing,

information regarding the lenders, financial statements and underlying loan documentation.  *See*

**Attachment 1**.  In the "verification," Commerce sought reconciliations of interest amounts

reported and "spot checked" various accounts.  We explain each of these items below.

- *Reporting all Financing* – this provides Commerce with a universe of loans from which to review and gives Commerce more specific information on which to ask supplemental questions.  It also eases Commerce's ability to compare the information to the company's financial statements and accounting records.

- *Information Regarding Lenders* – in some instances the identification of the lender alone may be enough to show that the loan is not part of the EBCP.  For example, if the lender is an individual, it would be clear that this is not part of the EBCP.

---

[12] For example, there have been dozens of CVD cases against China since 2007 with many of the same subsidy programs alleged involved over.  In the first cases, Commerce verified each and every program at the GOC.  As years went by, Commerce began to limit its GOC verifications to only unique issues that arose in a specific case (*e.g.*, a newly alleged program).  Before the pandemic began when in-person verification were still occurring, Commerce almost never verified the GOC finding it unnecessary given the knowledge Commerce developed on a particular program from past cases.

- *Loan Documentation* – this can be used to show the purpose of the loan.  The EBCP is specifically issued for the purchase of Chinse goods only.  If the loan was a mortgage or a working capital line of credit, then it would be clear that it is not EBCP.[13]

- *Financial Statements* – the financial statements show whether the company has any outstanding loans (in liability accounts on the balance sheet) and whether the company paid interest during the POI (in the income statement under either interest expense or financial expense accounts).  In some instances, like in *MAE from China*, the respondent's audited financial statement may provide very detailed notes regarding the company's financing that can be used to confirm that the loans were not EBCP loans.

*(5) explain why the claims of non-use are "unverifiable" by describing step-by-step Commerce's methodology for verifying non-use*

In as noted, *MAE from China* established that non-use claims are in fact verifiable.

*(6) address whether, without information about the operational changes to the EBCP, verification of the customers' self-certifications in accordance with Commerce's methodology is (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both*

In *MAE from China*, Commerce explained that: "Respondents provided sufficient information regarding their financing and the financing of their U.S. customers, notwithstanding the gaps that persist in our understanding regarding the operation of the program"; and that this information was reliable and a sufficient basis on which to establish non-use.  MAE IDM at Cmt. 5.

---

[13] In *Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 86 Fed. Reg. 14,071 (Mar. 12, 2021), and accompanying I&D Mem. at Cmt. 2 ("*VSE II*"), the respondent submitted "lending agreements . . . show the purpose of each of {the} debt instruments and the parties involved in the financing' of loans."  Based on this information, Commerce found non-use of the EBCP **without a verification**.

*(7) with respect to "(6)", above, were the question of sampling to arise, explain whether sampling would be (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both*

In *MAE from China*, the issue of sampling did not arise because the respondents only had one or two U.S. customers.

That said, Commerce's explanation of "sampling" is completely off-base and wrong as applied to this situation.  *See* Remand Results at 28-29.  The statutory provision regarding the sampling of exporters for individual examination (*i.e.*, mandatory respondent purposes) has absolutely nothing to do with limiting verification to certain information or certain companies.  19 U.S.C. § 1677f-1(e)(1)(A)(i).  That statutory provision does not apply to this situation and that situation is not analogous to the one here.

The term sampling in the verification context can also be described as the spot check.  The spot check, as described above, can take the form of only reviewing select items as a sample of the completeness of the information, or it can take the form of only verifying certain companies, or both.  Commerce regularly limits verification to a select number of companies involved in the production of subject merchandise; neither the number of customers involved nor the fact that they are not affiliated with a respondent has prevented Commerce from conducting a meaningful verification in the past.

For example, a mandatory respondent in an antidumping duty proceeding may report the use of numerous tollers or other unaffiliated suppliers.  Neither of these circumstances prevents Commerce from conducting a meaningful verification. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 83 Fed. Reg. 67,222 (Dec. 28, 2018), and accompanying I&D

Mem. n.14 (referencing "verification of the factors of production of Chint's unaffiliated solar cell supplier"); *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 32,720 (July 9, 2019), and accompanying I&D Mem. at Cmt. 3 (verifying unaffiliated customers to find absence of affiliation); *Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28,959 (May 20, 2015), accompanying I&D Mem. at Cmt. 11 (verifying several unaffiliated tollers, but not all, to find an absence of affiliation).  In a CVD proceeding, a respondent may purchase subject merchandise from numerous unaffiliated producers or export through numerous unaffiliated trading companies. *See, e.g.*, *Certain Pasta from Italy: Final Results of the Fourth Countervailing Duty Administrative Review*, 66 Fed. Reg. 64,214 (Dec. 12, 2001), and accompanying I&D Mem. at "Attribution" (limiting Commerce's analysis of an exporter's subsidies to only its major unaffiliated producers).  Often, because it is time consuming to visit all trading companies, and not necessary to conduct a meaningful verification, Commerce selects only a limited number of companies to verify – or sometimes none at all.

*(8a) state whether Commerce has a practice of verifying information from third parties*

Yes, as evidenced by *MAE from China*.  In instances where Commerce has solicited information from third parties, it has made a practice of verifying those third parties.  When faced with numerous third party companies, Commerce often selects a sample of them to verify.

*(8b) if Commerce has such a practice, explain why it is reasonable for Commerce to refrain from verifying the information submitted by the customers, through the respondents, in this case*

It is not.  Commerce's response ignores the fact that it does not require information, in general, to verify non-use claims.  The very nature of non-use is that no information is submitted.

*(9) explain whether the proposed solutions — such as Commerce visiting respondents' customers and asking for a list of the banks or lenders that provided loans to the customers during the POI — are feasible alternative methods of verification for Commerce, and if Commerce concludes that these methods are not feasible, explain the reasons for this conclusion*

As the *MAE from China* case makes clear, the Remand Results entirely over-exaggerate both the complication of verification and the burden.  Regardless of whether a documentary road map exists for EBCP, Commerce has failed to demonstrate that it cannot use its verification expertise to verify the nonuse of this program.  In fact, now with *MAE from China*, it has done the reverse.

In sum, given the facts presented, Commerce can conclusively determine if the EBCP is used either by asking for underlying loan documentation from select U.S. customers or actually verifying those customers.  While verification would be simpler if Commerce knew the exact documents required to receive EBCP loans, not knowing this documentation does not mean that the verification is impossible or overly difficult. Indeed, in its recent *VSE II* and *MAE from China* CVD investigations, Commerce has expressly concluded that the loan documents (and other documentation) submitted established non-use.

## CONCLUSION

For the reasons outlined herein, the Court should find Commerce's continued application of AFA to GTC's unalleged grants reported as minor corrections and the usage of the EBCP as unsupported by substantial evidence and otherwise contrary to law.  The Court should remand these issues back to Commerce for a new determination in accordance with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/  Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn

1201 New York Ave., NW
Suite 650
Washington, DC 20005

*Counsel for Plaintiffs Guizhou Tyre Co.,
Ltd. and Guizhou Tyre Import & Export Co.,
Ltd.*

Dated: October 29, 2021

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Remand Comments, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 8,199 words less than the 10,000 word limit.

*/s/ Andrew T. Schutz*
*Counsel for Plaintiffs Guizhou Tyre Co.,*
*Ltd. and Guizhou Tyre Import & Export Co.,*
*Ltd.*

Dated: October 29, 2021

11339574_1