## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE**: **THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |
|---|---|
| ———————————————————— ) | |
| GUIZHOU TYRE CO., LTD., AND ) | |
| GUIZHOU TYRE IMPORT AND ) | |
| EXPORT CO., LTD., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| CHINA MANUFACTURERS ALLIANCE, ) | |
| LLC, SHANGHAI HUAYI GROUP ) | |
| CORPORATION LIMITED, and QINGDAO ) | |
| JINHAOYANG INTERNATIONAL CO., LTD., ) | |
| ) | Consol. Court No. 19-00032 |
| Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ———————————————————— ) | |

## DEFENDANT'S RESPONSE TO
## COMMENTS ON FINAL REMAND REDETERMINATION

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

W. MITCH PURDY
Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce

KARA M. WESTERCAMP
Trial Attorney
Civil Division/National Courts
U.S. Department of Justice
P.O. Box 480
Washington, DC 20044
Phone: (202) 305-7571
Email: kara.m.westercamp@usdoj.gov

December 22, 2021                              Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIE ............................................................................................. ii

BACKGROUND ..........................................................................................................2

I.      Commerce's Final Results And The Court's Remand Order .............................2

II.     Remand Redetermination..................................................................................3

        A.      GTC's Unreported Grants.................................................................4

        B.      Commerce's Continued Application Of AFA To The EBCP................7

        C.      Commerce Rejected Using A Supply Ratio For Freight And Import Charges......21

SUMMARY OF THE ARGUMENT .............................................................................22

ARGUMENT ..............................................................................................................23

I.      Applicable Legal Framework ..........................................................................23

        A.      Standard of Review.........................................................................23

        B.      Facts Available With An Adverse Inference .........................................24

II.     Substantial Evidence Supports Commerce's Application Of AFA Regarding
        Unreported Grants..........................................................................................24

III.    Commerce's Application Of AFA To The EBCP Is In Accordance With Law
        And Supported By Substantial Evidence .........................................................30

IV.     Commerce's Decision Not To Apply Double Coin's Proposed Supply Ratio
        Adjustment Is In Accordance With Law .........................................................37

V.      Commerce Complied With The Court's Remand Order With Respect To The
        Remaining Two Issues....................................................................................44

CONCLUSION...........................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Acaci Speciali Terni S.p.A. v. United States*,
　120 F. Supp. 2d 1101 (Ct. Int'l Trade 2000) ............................................................... 28

*American Alloys, Inc. v. United States*,
　30 F.3d 1469 (Fed. Cir. 1994) ..................................................................................... 28

*Consol. Edison Co. v. NLRB*,
　305 U.S. 197 (1938) ..................................................................................................... 24

*Consolo v. Fed. Mar. Comm'n*,
　383 U.S. 607 (1966) ..................................................................................................... 24

*Fine Furniture (Shanghai) Ltd. v. United States*,
　748 F.3d 1365 (Fed. Cir. 2014) ................................................................................... 38

*Goodluck India Ltd. v. United States*,
　393 F. Supp. 3d 1352 (Ct. Int'l Trade 2019) .................................................... 26, 28, 29

*Guizhou Tyre Co. v. United States*,
　389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) .................................................... 38, 41, 42

*Guizhou Tyre Co., Ltd. v. United States*,
　523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ...................................................... passim

*MacLean-Fogg Co. v. United States*,
　100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ............................................................... 23

*Maverick Tube Corp. v. United States*,
　273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017) .................................................... 38, 39, 43

*Nippon Steel Corp. v. United States*,
　337 F.3d 1373 (Fed. Cir. 2003) ............................................................................. 24, 29

*Nucor Corp. v. United States*,
　286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) .................................................... 38, 42

*Ticaret A.S. v. United States*,
　61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ............................................................... 25

*TMK IPSCO v. United States*,
   179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ................................................. 37

*TMK IPSCO v. United States*,
   222 F. Supp. 3d 1306 (Ct. Int'l Trade 2017) ............................................ 38, 43

## **Statutes**

19 U.S.C. § 1516a ............................................................................................ 23

19 U.S.C. § 1677(5) .................................................................................... 22, 38

19 U.S.C. § 1677e ...................................................................................... 24, 26

## **Regulations**

19 C.F.R. § 351.511 .................................................................................. passim

## **Other Authorities**

*Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the*
   *People's Republic of China*, 86 Fed. Reg. 14,071 (Dep't of Commerce Mar. 12, 2021) ......... 32

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of*
   *China*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) ............................................ 32

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE**: **THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| _____ )<br>GUIZHOU TYRE CO., LTD., AND )<br>GUIZHOU TYRE IMPORT AND )<br>EXPORT CO., LTD., )<br>                                                     )<br>                 Plaintiffs, )<br>                                                     )<br>                 and )<br>                                                     )<br>CHINA MANUFACTURERS ALLIANCE, )<br>LLC, SHANGHAI HUAYI GROUP )<br>CORPORATION LIMITED, and QINGDAO )<br>JINHAOYANG INTERNATIONAL CO., LTD., )<br>                                                     )<br>                 Consolidated Plaintiffs, )<br>                                                     )<br>                 v. )<br>                                                     )<br>UNITED STATES, )<br>                                                     )<br>                 Defendant. )<br>_____ ) | Consol. Court No. 19-00032 |

**DEFENDANT'S RESPONSE TO COMMENTS
ON FINAL REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to comments filed by

plaintiffs Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd. (collectively,

GTC), GTC Cmts., ECF No. 121, and consolidated plaintiffs China Manufacturers Alliance,

LLC, Shanghai Huayi Group Corporation Limited, and Qingdao Jinhaoyang International Co.,

Ltd. (Jinhaoyang), (collectively, Double Coin), Double Coin Cmts., ECF No. 78, concerning the

Department of Commerce's remand redetermination filed in accordance with this Court's

decision and remand order in _Guizhou Tyre Co., Ltd. v. United States_, 523 F. Supp. 3d 1312 (Ct.

Int'l Trade 2021). _See_ Final Results of Redetermination Pursuant to Court Remand, Aug. 30,

2021 (Remand Redetermination), ECF No. 74.  For the reasons explained below, we respectfully request that the Court sustain Commerce's remand redetermination and enter final judgment for the United States.

## BACKGROUND

I.   **Commerce's Final Results And The Court's Remand Order**

GTC and Double Coin challenged the final results of the 2015 administrative review of the countervailing duty order covering narrow truck and bus tires from the People's Republic of China.  Specifically, GTC challenged Commerce's determination to apply adverse facts available (AFA) to certain previously unreported grants and loans presented by GTC just prior to and at verification.  GTC and Double Coin also challenged Commerce's decision to apply AFA in relation to the Export Buyer's Credit Program (EBCP).  Finally, Double Coin challenged Commerce's calculation of benchmarks regarding ocean freight and import duties in relation to certain less than adequate remuneration (LTAR) findings covering carbon black, nylon cord, natural rubber, and synthetic rubber and butadiene, as well as Commerce's decision not to assign Double Coin's cash deposit rate to Jinhaoyang.

On December 19, 2021, the Court issued its remand order.  The Court sustained, in part, and remanded, in part, certain aspects of the final results.  *See Guizhou*, 523 F. Supp. 3d at 1330, 1354-55, 1392-93.  The Court sustained Commerce's issuance of the countervailing duty order as in accordance with law, as well as Commerce's determination to apply AFA to GTC's previously unreported loans.  *Id.* at 1330, 1354-55.

However, the Court remanded several issues to Commerce for further consideration: (1) the application of AFA to the grants GTC presented at verification; (2) the application of AFA with respect to the EBCP; (3) Commerce's decision not to apply a supply ratio to import

duty and ocean freight adjustments to the benchmark prices; (4) Commerce's consideration of

quantity in selecting its Tier 1 benchmark for synthetic rubber; and (5) Commerce's decision not

to assign Double Coin's cash deposit rate to Jinhaoyang.  *Id.* at 1392-93.

II.     **Remand Redetermination**

On remand, Commerce re-opened the record and, with respect to the previously

unreported grants, issued a supplemental questionnaire to GTC requesting:  (1) the total number

of unreported grants; (2) the name of each unreported grant; and (3) the aggregate value of the

unreported grants, GTC Supplemental Questionnaire, Remand P.R. 1 (June 10, 2021), to which

GTC timely responded.  GTC Supplemental Questionnaire Response, Remand P.R. 2 (June 17,

2021).

After considering GTC's questionnaire response as well as the parties' comments on the

draft remand redetermination, Commerce continued to apply AFA to GTC's grants presented at

verification, finding that they did not constitute "minor corrections."  Remand Redetermination

at 45-54.  Commerce also continued to find that the application of AFA was appropriate to the

usage of the EBCP because Commerce is unable to effectively verify usage of this program

through the respondents' U.S. customers (*i.e.*, the users of the program), given the missing

information from the record and the burden such a verification would pose to Commerce.  *Id.* at

12-34, 55-79.  Additionally, Commerce continued to find Double Coin's proposed supply ratio

inappropriate under the factual circumstances present in this case, and did not apply the proposed

ratio to the benchmarks for import duty and ocean freight adjustments.  *Id.* at 79-83.  Commerce

also further explained the consideration of quantity of imports and its decision not to assign

Jinhaoyang Double Coin's cash deposit rate.[1]  *Id.* at 38-44.

A.  **GTC's Unreported Grants**

In the final results, Commerce declined to accept "more than 40 grants" that GTC had listed in its worksheet at verification, explaining that these unreported new grants were not "minor corrections" and applied an overall AFA rate of 23.78 percent to these unreported grants. *Id.* at 9.  To address the Court's remand order holding that the "more than 40 grants" was not supported by substantial evidence, Commerce issued a supplemental questionnaire to GTC, requesting that it provide:  (1) the total number of unreported grants; (2) the names of each grant; and (3) the aggregate value of the unreported grants.  *Id.*  GTC's response to the supplemental questionnaire listed 45 previously unreported grants.  *Id.* at 10.

Commerce found that these 45 unreported grants were not "minor corrections" because it had explained prior to verification, that "{i}nformation will be accepted at verification only when the information makes minor corrections to information *already on the record* or when information is requested by the verifiers, . . . to corroborate, support, and clarify factual information already on the record."  *Id.* (emphasis added).  Commerce explained that the new information with respect to the 45 grants was not a "minor correction to information on the record," rather, GTC "attempted to submit *new factual information* with these grants, which Commerce explicitly stated it would not accept."  *Id.* at 11 (emphasis added).

Commerce's rationale for rejecting the 45 grants as "minor corrections" was because it would have "significantly impeded the verification, as verifying each of these grants would have required {GTC} officials" to provide an overview of each program, explain/discuss the

---

[1]  Because no party submitted comments on these issues and Commerce complied with the remand order, we address these issues only in the argument section of our brief.

application and eligibility criteria of each program, review relevant documents, and tie the grants to accounting records and financial statements.  *Id.*  Indeed, Commerce explained that "based on the names of these {previously unreported} grants listed in this submission, it appears that a number of these programs appear to be export contingent (*e.g.*, 'Extraction of Export Reward from Municipal Department of Commerce') and, potentially, specific to export to the United States (*e.g.*, 'Subsidies for anti-dumping and countervailing from Municipal Department of Commerce')."  *Id.*; *see also id.* at 48 (explaining that the programs have similar names but {GTC} "listed them as separate programs").  The total value of these grants was also "significant" because it totaled close to RMB 11,000,000.  *Id.* at 46.

Moreover, if Commerce accepted the new grants as minor corrections, it would have had to "ensure that it had all necessary sales figures to properly calculate the subsidy rates for each grant program."  *Id.* at 12.  Relatedly, Commerce rejected GTC's argument that the newly reported grants were minor with respect to the "magnitude of change" and that "all the grants failed the .5 percent test, and thus, should have been expensed in the year of receipt, which in-turn, would result in a combined additional rate of 0.0118 percent to the company's overall subsidy rate."  *Id.* at 46; *id.* at 52 (explaining that Commerce, not the respondent, determines whether the grants could pass the .5 percent test and "{v}erifiers cannot be expected to accept new information such as this under the pretext that Commerce can 'simply allocate' these benefits when calculating benefits.").  This was because "the magnitude of change that Commerce typically requests, and {GTC} refers to, applies only with regards to updating information *already on the record* that needs to be corrected, not entirely new information which is absent from the record."  *Id.* (emphasis in original).  Commerce explained that the verification agenda gave clear examples of what constitutes a minor correction, "as well as what Commerce

sought when it referred to the magnitude of a change." *Id.* at 47.  To wit, Commerce accepted

multiple minor corrections that GTC had submitted at verification "as it was able to properly

evaluate the magnitude of change using information already available on the record, and find that

these corrections were, in fact, small." *Id.*  But Commerce explained that "for these unreported

grants, because there was no original amount reported for these grants, there is nothing to

compare the 'new' grant amount to, and thus, there is no basis to calculate the magnitude of

change as instructed in the verification outline." *Id.*

Commerce likewise rejected GTC's assertion that it was arbitrary and capricious for

Commerce to not request the size of each individual grant in the remand proceeding, explaining

that Commerce typically will not "further evaluate a program if it is found to be not measurable

during the {period of investigation} or expensed prior to the {period of investigation}; however,

{it} will only do so for information provided in a timely manner, where {it has} had the

opportunity to evaluate the program and determine if it is measurable during the {period of

investigation}." *Id.* at 49.  Because Commerce determined that the information was untimely

submitted, it declined to request the individual value of the grants on remand.  *Id.* at 50.

And while GTC argued that Commerce could have easily verified the newly-reported

grant programs and "a full analysis of these newly reported programs was unnecessary" because

GTC had already conceded the countervailability of the 180 grants that it had self-reported in the

questionnaire responses, Commerce explained that "this does not alter the fact that this

information was presented *at verification*, well after the deadline to present this information had

passed." *Id.* (emphasis in original).  Commerce rejected GTC's characterization of any

confirmation as clerical because there was "no prior information available on the record

regarding the nature of these programs," and "spot-checking" new programs at verification was

not analogous to "spot-checking" previously reported grants at verification, for which "Commerce was able to evaluate all of these grants prior to verification and select specific grants to check at verification based on this evaluation."  *Id.* at 51.

Put another way, Commerce explained that "{b}y allowing {GTC} to place these grants on the record well past the deadline, Commerce would be providing a path for companies to not report 'other' subsidies in its questionnaire responses and wait until verification to report such assistance under the pretext that the company has determined such subsidies to be small or insignificant."  *Id.* at 53; *id.* (explaining that acceptance of such "minor corrections on the basis that they are small grants, {} would be opening the door for arguments that Commerce is obligated to accept similar minor corrections for other programs.").  The creation of "such an incentive would limit Commerce's ability to thoroughly investigate potentially countervailable subsidies and enable companies to potentially avoid the incorporation of these subsidies in their individual rates."  *Id.*

Therefore, after thoroughly explaining why the 45 previously unreported grants was not a "minor correction," Commerce calculated an AFA rate by applying the unchallenged AFA rate of .58 percent to the 45 grants, resulting in a rate of 26.10 percent for the unreported grants.  *Id.* at 12.

B.    **Commerce's Continued Application Of AFA To The EBCP**

In the remand redetermination, Commerce explained why the gap in the record created by the government of China's (GOC) failure to provide information regarding key aspects of the functioning of the EBCP was "critical to verify a company's claims of non-use" and why the

"customer verifications were impossible to verify." *Id.* at 12.  Commerce addressed each of the

Court's nine questions in the remand order.  *See Guizhou*, 523 F. Supp. 3d at 1392-93.

*(1a) explain the reason that the information withheld by the GOC about the threshold requirement was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use;*

Commerce first explained that a verification outline typically requests a mandatory

respondent to verify that certain alleged programs were not used, which includes Commerce's

"examin{ation of} the sub-ledger detail of various accounts in which unreported assistance

would likely be recorded;" access to a computer terminal for querying the accounting system;

review of tax returns and financial statements; and review of such supporting documents.

Remand Redetermination at 13.  Next, in reviewing the sub-ledgers, Commerce "would then

select specific entries" and "request company officials to pull figures up in their accounting

system" as well as "supporting documentation, including loan applications, loan agreements,

bank statements, *etc.*" *Id.*

In the context of verifying non-usage of the EBCP by U.S. customers, Commerce

explained that it would use similar steps.  *Id.* at 14.  But since record information indicated that

"the program is no longer limited to USD 2 million contracts, and the GOC has refused to

provide supporting documentation to refute this finding," "this increases the difficulty of

verifying loans without any such parameters." *Id.* at 13-14.  In other words, with a $2 million

threshold, that "greatly limits the universe of potential loans under the program and can

significantly assist {Commerce} in targeting {its} verification of non-use," by only "focus{ing}

on larger loans received by the companies claiming non-use during the investigation period." *Id.*

at 14.  Thus, Commerce explained that, by the GOC's failure to confirm the monetary parameters

of the EBCP, "the GOC failed to provide information that would allow {it} to assess the scope of

verification and effectively prove (or disprove) whether the mandatory respondents used this program, which are intrinsically necessary steps in verifying non-use of this program." *Id.* at 15. Commerce explained that "without this information, all entries in the loan's subledger could potentially be loans under the program, and, thus, Commerce would be required to review the underlying documentation for all entries from the subledger of each customer to attempt to confirm the origin of each loan." *Id.* at 58.

*(1b) explain the reason that the information withheld by the GOC about the third-party banks was necessary to verify non-use by describing how the missing information prevents Commerce from taking the steps that it considers necessary to verify non-use;*

Fundamentally, Commerce has time constraints in its verification of non-use of the EBCP, and it explained that "{t}o verify non-use of this program in a timely manner, information from the GOC regarding the third-party banks is essential for Commerce to effectively conduct its standard verification procedures." *Id.* at 15.  For example, Commerce explained that "record information indicates that customers can open loan accounts for disbursements through this program with other banks, whereby the funds are *first* sent to the importer's account, which could be at EX-IM Bank or other banks, and that these funds are *then* sent to the exporter's bank account." *Id.* at 15-16 (emphasis added).  In other words, because the funds are potentially routed through at least one or more accounts, "the names of these third-party banks, not the 'Export-Import Bank of China,' would appear in the sub-ledgers and bank accounts of the U.S. customers if they received credits under this program." *Id.* at 16.

The importance of obtaining the names of the third-party banks is, thus, readily apparent because, without those banks identified, Commerce explained that it "would have to search through the respondent's customers books and records without *any* guidance as to which banks participate in this program, and thus would have no indication of which banks should be subject

to enquiry as part of verification." *Id.* (emphasis added).  Notably, Commerce explained that in a standard verification of non-use, it already knows what to look for in a company's sub-ledger "to see if there were any loans provided by a bank that participated in a loan program." *Id.*  If the GOC were to provide a list of the participating EBCP banks, then Commerce could verify non-use of the program in its cross-check of the names against the company's sub-ledgers. *Id.* at 16-17.  But without such information, "all entries in the loan's sub-ledger could potentially be loans under the EBC{P}" because Commerce "has no 'roadmap' as to how to evaluate" loan documentation." *Id.* at 17.  To require Commerce to "verify non-use without an understanding of which intermediary banks participate in the program, Commerce would be required to review the underlying documentation for all entries from the sub-ledger to attempt to confirm the origin of each loan," which would "be an unreasonably onerous undertaking for Commerce to verify a company that received a significant number of loans." *Id.* (emphasis added); *see also id.* at 58-59 (explaining that "Commerce has no knowledge of which entities administer the loans, which entities qualify for loans, or what conditions are placed on loans, and in-turn, has no basis to determine the method by which to verify use or non-use of the program.").

*(2) explain whether it would be feasible for Commerce to solicit and obtain the withheld information from customers — which are third parties to the investigation — by describing each step that Commerce would consider to be necessary to obtain such information, including stating clearly the reason(s) that Commerce considered each step necessary;*

As Commerce explained, it would first request the mandatory respondents to "provide a list of all its U.S. customers during the investigation period" which would enable it to both "ensure that all potential beneficiaries of this program are accounted for" and to assist in "verify{ing} the total number of customers at the respondent companies' verifications." *Id.* at 17-18.

Second, Commerce would issue a questionnaire to the identified U.S. customers, which would "request that the customer report all forms of financing the company had received during the {period of investigation}, regardless of whether the financing was providing under the EBC{P}, and tie this information to the company's audited financial statements and/or tax returns." *Id.* at 18.  The purpose of this step is to ensure that Commerce can "review all forms of financing before determining whether any of them were provided under the EBC{P}," with the responses then subject to verification." *Id.*  Commerce explained, however, that while it could "attempt to obtain the withheld information from these third-party customers, such an effort would likely not provide meaningful results" because Commerce has no subpoena power and "even if all the customers were to participate, this information would still be insufficient to provide certainty of a respondent's non-use of the program without the full cooperation of the GOC." *Id.* at 18-19.  That is, a U.S. customer could voluntarily open its sub-ledgers to Commerce, but without guidance from the GOC, such as the "parameters of who may receive financing under this program (*i.e.*, the USD 2 million minimum) as well as the names of the banks that participate in this program," Commerce would still lack a "roadmap" for identifying EBCP loans. *Id.* at 19.

Further, Commerce rejected GTC's argument that there was a "clear paper trail" because the program is "very" specific, noting that "if there were, in-fact, a clear paper trail for Commerce to follow, the GOC should have been able to timely provide {it} with this information in its questionnaire responses that would allow {it} to follow the paperwork (applications documents, correspondence, approval documents, bank account information, *etc.*) for each U.S. customer." *Id.* at 61.

11

*(3) with respect to "(2)," above, describe with particularity any "significant burden" Commerce might or would likely incur in taking such action;*

To begin with, Commerce reiterated that the GOC's refusal to cooperate in providing EBCP information significantly impedes Commerce's understanding regarding the "conditions under which loans are received, what supporting documentation Commerce would need to verify {any loans}, and the scope of the benefits provided under the program." *Id.* Due to the GOC's failure to provide the "missing information regarding the USD 2 million threshold and third party banks, the GOC has failed to provide a complete understanding of how the program functions." *Id.* at 20. In addition, the GOC has "failed to provide responses to the standard questions appendix," which "requests an explanation of the program, which includes identification/description of the applicable laws, records the government maintains, and the application process (including sample application documents)." *Id.* Access to such "information would help Commerce significantly reduce the burden on its resources by developing an effective method of verification," because without more knowledge of the program, "Commerce has no 'paper trail' that would allow {it} to follow the paperwork (applications documents, correspondence, approval documents, bank account information, *etc.*) between the EX-IM Bank, the intermediary banks, and the eventual U.S. customer." *Id.*

Moreover, Commerce acknowledged that even if the GOC provided a list of participating banks in the EBCP, it "would still not be able to verify which loans from a bank were EBC{P} loans and which loans were provided outside the program, due to a lack of understanding of the underlying documentation of this program." *Id.* at 21. That is because, even if a U.S. customer volunteered that it received EBCP funding, "it could be difficult to verify the total financing (*i.e.*, benefit) under the program if the customer received multiple loans from a bank {(or banks)} that participated in the program." *Id.*

Next, Commerce explained the significant burden collecting and analyzing information from U.S. customers would have on this specific investigation because Double Coin reported 84 U.S. customers and GTC had at least 67 U.S. customers on the basis of its EBCP non-use certifications.  *Id.*  To verify non-use of the EBCP by *at least 140* customers with no guidance on the monetary limits of the loan, potential participating third-party banks, or "guidelines that would allow {it} to follow a 'paper trail'" would be "extremely onerous" for Commerce.  *Id.* Especially because Commerce already had to verify "14 other alleged programs in this investigation and 17 additional self-reported programs;" thus, Commerce explained that adding verification of 140 U.S. customers' non-use of the EBCP would make it "virtually impossible for Commerce to complete {the review} by the statutory deadline."  *Id.* at 21-22.

Additionally, Commerce explained that "spot checking" was "not viable when the parties have shown themselves to be unreliable" because the GOC had "failed to provide information requested by Commerce throughout the proceeding including the EBC{P}, but there were also significant issues with {GTC} attempting to provide untimely information immediately preceding verification and during verification."  *Id.* at 64.

*(4) explain the extent to which Commerce would be able to rely on information from customers by identifying what information Commerce would seek from customers and explaining how, if at all, such information would be useful to Commerce to establish non-use;*

Commerce explained that to establish each U.S. customer's non-use, it would request each customer to "report *all* forms of financing the company received during the {period of investigation}, regardless of whether the financing was provided under the EBC{P}."  *Id.* at 22 (emphasis in original).  Such information would also include traditional and non-traditional loans, any invoice discounting, factoring of accounts receivable, and audited financial statements and/or tax returns "that would support the total financing reported by the company."  *Id.*  But

again, without the information regarding the $2 million threshold requirement and the third-party bank names, Commerce would be "unable to limit the potential loans that might have been disbursed under the EBC{P}" and would "presume that any loan received by the customer was provided under this program." *Id.*

For example, Commerce explained that even if a U.S. customer responded to its information requests, reported not using the program, and provided information/documentation regarding all of its outstanding loans, thus, cooperating to the best of its ability, Commerce "would still be unable to confirm with certainty that none of its loans were provided" pursuant to the EBCP. *Id.* at 22-23. If the GOC provided at least third-party bank names, then Commerce "may be able to confirm non-use if *all the company's loans* were from banks that did not participate" in the program. *Id.* at 23 (emphasis added). But if "one (or more) of the company's loans" were potentially provided by a bank listed as participating in the EBCP, then Commerce "would not be able to confirm that the loan was not provided" under the EBCP. *Id.*

Commerce again stressed that because it does not have subpoena power over third parties and is "dependent on voluntary participation from these companies," it would be "unlikely" to get full participation and "responses from all of the respondents' customers." *Id.* As a result, Commerce explained that it could face a scenario where it has "responses from some companies indicating non-use, while {it} would not have such information from other companies," and as a result, "would have to infer that the program was used." *Id.* Such an inference of use would be necessary to discourage "a situation in which {Commerce} would incentivize companies who did receive financing under the program to simply not respond" to Commerce's requests. *Id.*

Indeed, the very uniqueness of the EBCP "is that usage of the program would be reflected in these *companies'* books and records, not in the respondent's records," and, thus, "to

effectually confirm non-usage of this program, Commerce must request financing information from *all* of the respondent's U.S. customers." *Id.* at 66 (emphasis added).

*(5) explain why the claims of non-use are "unverifiable" by describing step-by-step Commerce's methodology for verifying non-use;*

When conducting verifications of non-use, Commerce first verifies the accuracy and completeness of submitted factual information. By the time of verification, Commerce "will have already received and analyzed information submitted by the company, including the company's financial statements, tax returns, ownership structure, company history, sales data, and details regarding subsidies received." *Id.* at 23-24.

In contrast, with the non-use certifications GTC presented in this investigation, "there is no factual information on the record for Commerce to actually verify for accurateness and completeness" because they are one-page "documents from the customers stating that they did not use the program, have never received financing from the EX-IM Bank," and that they do not have an account with the EX-IM Bank. *Id.* at 24. Considering the paucity of information from the U.S. customers as to non-use, Commerce explained that if it attempted to verify in this case it would be conducting nearly an entirely new review of each company, including "evaluating all pertinent company information (financial statements, ownership structure, sales data, loan information, *etc.*) for the first time at verification," which is not the purpose of verification. *Id.* at 24-25.

Turning to a step-by-step methodology for verifying non-use, Commerce reiterated its response to question 1(a), which would be to first review a company's audited financial statements and tax returns prior to verification, establish the total financing at verification, and then to review the sub-ledgers detailing all the company's borrowings. *Id.* at 25. Even then, Commerce explained that it would be "difficult, if not impossible, due to the GOC's lack of

participation" to find any indications that any financing was provided by the EBCP because, again, Commerce's review of non-use certifications would still involve Commerce looking at a "company's loan information for the first time at verification." *Id.* at 25-26.  With no "paper trail" to identify loans of "potential concern," Commerce explained that it would have to "select such financing 'on the fly' at verification," thus, Commerce's "normal methodology for verifying non-use would not be effective should {it} attempt to verify these certifications." *Id.* at 26.

Moreover, without the "significant amount of information about a respondent company prior to verification, including information supporting its reported non-use of programs" which Commerce typically has, Commerce explained that it would be "inconsistent with {its} practice" to not gather information from customers prior to verification. *Id.* at 72.  But to require verifiers to be "responsible for learning and understanding everything about these U.S. customers and the financing they received within the short amount of time during which verification takes place, including reviewing the company's financial statements, tax returns and loan information, as well as an understanding of the company's accounting system," for the first time at verification would not allow sufficient time for them to "thoroughly and completely analyze the company's books and records to adequately determine non-use of the program." *Id.* at 72-73.

*(6) address whether, without information about the operational changes to the EBCP, verification of the customers' self-certifications in accordance with Commerce's methodology is (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both;*

Commerce explained that without information about the operational changes to the EBCP, verification of the U.S. customers' self-certifications would be both "insurmountable" and unlikely to yield relevant and reliable information. *Id.* at 26-27.  First, any verification would not result in relevant or reliable information "because these {non-use} certifications are

simply one-page statements indicating non-use, with no supporting documentation or additional information about the company making the certification," that is, "there is no specific factual information for Commerce to verify." *Id.* at 26-27; *id.* at 73 (explaining that customers have less incentive to cooperate and "there is nothing on the record to support a customer's non-use certification").  "In other words, verification in such a situation" without any of the company's financial information and no "roadmap" for non-use," would amount to searching for a needle in a haystack." *Id.* at 27.

Second, Commerce explained that with over 140 U.S. customers between the two mandatory respondents, and with a typical verification lasting between three and five days, a verification of the U.S. customers' non-use could potentially take months to complete, even if Commerce only took one day per customer to verify. *Id.*  Such an endeavor "would not be feasible." *Id.*

*(7) with respect to "(6)", above, were the question of sampling to arise, explain whether sampling would be (a) "insurmountable" based on Commerce's resources, (b) unlikely to yield relevant and reliable information or (c) both;*

Commerce next explained that even if it were to resort to "sampling" to hasten the U.S. customers' verification of non-use, that would likely "not yield relevant or reliable information" for several reasons. *Id.* at 28.  First, Commerce explained that while it typically limits mandatory respondents, there is no statutory or regulatory "guidance as to sampling customers of the exporter/producer," and even so, Commerce would have no basis on how to determine a "statistically valid" sample. *Id.*

In the context of limiting mandatory respondents, Commerce at least has a request from a party to sample, the resources to do so, information about the three largest companies' volumes by import of the subject merchandise, and a reasonable basis to believe/suspect that the average

export prices of the non-examined companies would be similar.  *Id.* at 28-29.  But in the context of the one-page non-use certifications, Commerce explained that it "has no information regarding these companies" such as "the size/scope of these companies' operations or the volume of subject merchandise" that these companies purchased during the period of investigation.  *Id.* at 29; *id.* at 73 (explaining that Commerce lacks "any information regarding the companies who filed these non-usage certifications, thus, deciding which customers would participate in verification would amount to a random selection of companies").  Thus, Commerce determined that without the GOC's cooperation, "sampling would be highly unlikely to provide relevant and reliable information," but that *if* the GOC provided the requested data, "then sampling in that scenario may be a viable option to limit the number of companies being verified."  *Id.* at 29.

*(8a) state whether Commerce has a practice of verifying information from third parties;*

Commerce explained that while it does not have a *per se* practice of verifying information from third parties, it will still, "in some instances," "verify information provided by third parties, including unaffiliated suppliers, unaffiliated customers, and surrogate value data." *Id.* at 30.

*(8b) if Commerce has such a practice, explain why it is reasonable for Commerce to refrain from verifying the information submitted by the customers, through the respondents, in this case;*

In this case, Commerce explained that it is reasonable to refrain from verifying the information submitted by the U.S. customers because "the customers have provided non-use certificates that are simply one-page documents stating that they did not use the program, with no supporting documentation to support these assertions."  *Id.*  In contrast, where Commerce has verified information from third parties, the parties have "provided responses to Commerce's questionnaire responses and, in-turn, have established record information for Commerce to

verify." *Id.*; *see id.* at 76-77 (explaining that significant information is on the record when Commerce examines non-usage at verification, such as financial statements, sales, and purchases).

*(9) explain whether the proposed solutions — such as Commerce visiting respondents' customers and asking for a list of the banks or lenders that provided loans to the customers during the POI — are feasible alternative methods of verification for Commerce, and if Commerce concludes that these methods are not feasible, explain the reasons for this conclusion.*

In assessing whether the Court's proposed solutions would be feasible alternative methods of verification, Commerce explained that, "{w}hile certain of these solutions may be effective in specific scenarios, the only solution that will ensure that Commerce is fully able to confirm usage/non-usage of this program, as well as confirm benefits under the EBC{P}, is if the GOC fully cooperates with Commerce's request for information regarding this program." *Id.* at 31.

First, Commerce acknowledged the Court's proposed solutions involving non-use certifications, but noted that the only record evidence are "one-page documents that state that the company did not use the program." *Id.* Because the purpose of verification is to verify record information, "not collect new information{, w}ere Commerce to attempt to verify these non-use certifications, it will not have access to any information regarding these customers prior to verification, and, in-turn, will be viewing the company's financial statements, ownership information, tax records, and loan sub-ledgers for the first time at verification." *Id.*

Commerce next explained that a situation where the GOC provides Commerce's requested information and Commerce also solicits information from the U.S. customers, that that could "provide clarification regarding non-use in some instances." *Id.* at 32. For example, in some instances, Commerce could confirm non-use, but even if the GOC provided both the list of intermediary banks and whether the $2 million threshold applies, there would be "various

outcomes that demonstrate the limitations of these solutions." *Id.*  In the first hypothetical involving two U.S. customers, if both fully respond to Commerce's information requests, then Commerce could verify non-use if none of their financing came from the EBCP. *Id.* at 32-33.

In the second scenario, where both U.S. customers fully respond to Commerce's information requests, but one customer has "financing through one or more banks participating in the program," "because Commerce has not been provided full details of the operations of the program, nor has it been provided a 'paper trail' with which to trace the loans provided" by the participating banks, Commerce would be unable to confirm non-use. *Id.* at 33.  As a result, despite full cooperation by the U.S. customers, Commerce would still resort to gap-filling to determine the respondent's overall rate. *Id.*

Finally, in the third scenario, if only one of the two U.S. customers fully responds to Commerce's information requests, then even if there is no information indicating a loan was provided by a participating bank under the EBCP, "Commerce would not be able to find the program not-used during the {period of investigation}, and would likely have to somehow fill in gaps in the record to determine the respondent's overall rate." *Id.*

At bottom, Commerce explained that the information it has requested from the GOC is not only necessary to understand the EBCP, but that Commerce typically "requests this type of information from the government for alleged subsidy programs in all {countervailing duty} proceedings, as it is relevant for not only finding financial contribution and specificity, but also to be able to trace benefit sin the respondent's books and records." *Id.* at 34.  Although Commerce acknowledged that it could potentially determine and verify usage/non-usage in one hypothetical scenario *if* Commerce were at least provided a list of all correspondent banks by the

GOC and could review the customer's financial records, ultimately, "any information provided by the mandatory respondents or their U.S. customers is of minimal or no value." *Id.*

Therefore, Commerce continued to find that "the GOC's full cooperation with regard to the EBC{P} is essential in order for Commerce to analyze this program consistent with {its} regulations" and "without full cooperation from the GOC, Commerce's only recourse is to apply AFA for this program." *Id.* Commerce explained that "it should not be incumbent upon Commerce and other interested parties to fill in this missing information that the GOC has refused to provide in order to confirm non-use" and Commerce, with its limited resources, "should not be forced to devote an overwhelming amount of time and attention to a program for which the GOC has refused to provide basic information." *Id.* at 79.

C. **Commerce Rejected Using A Supply Ratio For Freight And Import Charges**

In the remand redetermination, Commerce continued to find that adjustments to the benchmarks with respect to freight or import duties to reflect the delivered prices of carbon black, nylon cord, natural and synthetic rubber, and butadiene was not necessary. *Id.* at 35-36. Specifically, Commerce considered the Court's holding that Commerce had not addressed Double Coin's argument that Commerce's adjustment to the benchmarks should reflect the prevailing market conditions in China by using a supply ratio, but explained that the adjustments it had already made "to the benchmarks in this investigation reflect prevailing market conditions and provide an accurate delivered price" pursuant to 19 C.F.R. § 351.511(a)(2)(iv). *Id.* at 36. Commerce explained that "when calculating these benchmark prices, Commerce relied upon actual ocean freight data from the {period of investigation} from Maersk," and rejected Double Coin's argument that it should somehow "calculate a domestic/import supply ratio to be applied to import duties or freight adjustments." *Id.*

Commerce explained that there would be "no reliable basis to calculate such a ratio in this proceeding," because it had already determined that the domestic suppliers of the inputs are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B), and any such calculation "would result in a distorted benchmark." *Id.* at 36-37.

Moreover, even if there were record information with which to calculate a supply ratio, Commerce explained that "it is unclear how this ratio offered by Double Coin would accurately reflect the price that a firm actually paid or would have paid if it imported the input under consideration. *Id.* at 37. In other words, using such a ratio would have the effect of "lowering the import duties and freight prices based on the domestic and import supply" and such an "arbitrar{y} lower{ing of} these duties and prices" would serve "no clear purpose." *Id.* In contrast, the Maersk benchmark prices Commerce used "were actual observed market prices" and any such modification via a supply ratio "would no longer reflect actual market prices." *Id.*

## SUMMARY OF THE ARGUMENT

First, Commerce's application of AFA regarding certain unreported grants is supported by substantial evidence and in accordance with law. GTC submitted information regarding 45 new grant programs for the first time at verification, for which no data was previously on the record of the proceeding. These grants consisted of entirely new factual information that GTC should have submitted as a part of its initial questionnaire responses and were not "minor corrections" as GTC alleges; thus, Commerce reasonably rejected them and resorted to AFA.

Second, Commerce's application of AFA to find use of the EBCP for both Double Coin and GTC is in accordance with law. Commerce continues to face difficulties in verifying the use of the EBCP due to the GOC's refusal to cooperate, and this refusal to cooperate has created a significant gap in Commerce's understanding of the program, as Commerce explained in its

thorough responses to the Court's questions.  Although Commerce has recently found non-use of the program based on facts available, that administrative review is distinguishable and does not invalidate or nullify Commerce's remand redetermination in this case.

Third, Commerce's decision not to apply Double Coin's proposed supply ratio to the benchmarks for freight and import charges is supported by substantial evidence and in accordance with law.  When selecting benchmarks for the purpose of measuring adequacy of remuneration, Commerce performs a price-to-price comparison to determine whether a respondent provided adequate remuneration for inputs received from its suppliers.  Commerce determined that the domestic market for certain inputs was distorted, and, thus, because domestic prices could not be used as the benchmarks, Commerce resorted to world market prices sourced from Maersk, with adjustments as appropriate, to reflect the price a company would pay under prevailing market conditions if it had imported certain inputs into China.

Finally, substantial evidence supports Commerce's explanation that it considered quantity as an element when evaluating benchmark prices for synthetic rubber, as well as its determination to continue to not apply Double Coin's rate to Jinhaoyang.

## ARGUMENT

I.   **Applicable Legal Framework**

A.   **Standard of Review**

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may

be "less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)

(citations omitted).

     B.       <u>Facts Available With An Adverse Inference</u>

When a respondent: (1) withholds information that has been requested by Commerce;

(2) fails to provide such information by Commerce's deadlines for submission of the information

or in the form and manner requested; (3) significantly impedes an antidumping proceeding; or

(4) provides information that cannot be verified, then Commerce shall "use the facts otherwise

available in reaching the applicable determination." 19 U.S.C. § 1677e(a)(2).  Commerce "may

use an inference that is adverse to the interests of that party in selecting from among the facts

otherwise available" if it "finds that an interested party has failed to cooperate by not acting to

the best of its ability to comply with a request for information{.}" *Id*. § 1677e(b)(1)(A).

Commerce may apply an adverse inference for a respondent's "failure to cooperate to the

best of respondent's ability, regardless of motivation or intent." *Nippon Steel Corp. v. United

States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003).  A respondent fails to act to the best of its

ability when it does not exert "maximum effort to provide Commerce with full and complete

answers to all inquiries in an investigation." *Id*. at 1382.

II.     **Substantial Evidence Supports Commerce's Application Of AFA Regarding**
        **Unreported Grants**

Commerce complied with the Court's remand order by re-opening the record and

confirming that GTC had failed to report 45 grants until verification, and Commerce's

determination that the unreported grants are not "minor corrections" is in accordance with law.

Remand Redetermination at 45-54.  GTC contends that Commerce's position that an unreported grant cannot be a minor correction at verification is contrary to law, because Commerce must either review the information provided or defer investigation until a later date.  GTC Cmts. at 9-10.  Further, GTC contends that it would have taken Commerce minimal effort to perform "spot checks" of the grants and it was not necessary to assess countervailability because GTC had already conceded the countervailability of the 180 grants that it had self-reported.  *Id.* at 12-13.  Finally, GTC argues that Commerce was obligated to consider the grants because they were "miniscule" and Commerce could have given it "homework" if there was any missing sales figures to determine whether the grants passed the .5 percent test.  *Id.* at 4-8, 14-16.  These arguments are meritless.

As an initial matter, while the Court held that Commerce had "discretion to investigate and apply AFA to unalleged programs," it also held that Commerce had not substantiated its claim that GTC had presented "more than 40 grants" at verification, and ordered Commerce to further explain its decision to reject the grants as "minor corrections."  *Guizhou*, 523 F. Supp. 3d at 1340, 1352, 1392.  On remand, Commerce explained that it gathered additional information indicating that GTC had reported 45 new grants at verification, totaling approximately RMB 11,000,000, which was a "significant" amount.  *See* Remand Redetermination at page 46; GTC Remand Supplemental Response (Remand P.R. 2; Remand C.R. 1).

It is well recognized that verification is not a substitute for belatedly providing factual information as requested, and the purpose of verification is not to "continue the information-gathering stage of {Commerce's} investigation."  *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l Trade 2015).  Moreover, corrective information provided at verification should not serve to fill gaps caused by a respondent's failure

to provide a full questionnaire response. *See Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1357-1358 (Ct. Int'l Trade 2019) (citation omitted).

Commerce accepts information at verification *only* when the information makes minor corrections to information already on the record or when information is requested by the verifiers to corroborate, support, and clarify information already on the record. *See* Remand Redetermination at 10. Here, the submission of 45 new grants for the first time at verification represents information that GTC should have submitted in response to Commerce's questionnaires. Its attempt to submit them at verification serves no other purpose but to fill gaps in the questionnaire responses submitted by GTC earlier in the proceeding, far past the deadline for the submission of such information. *See id.* By failing to submit this information by the deadline, GTC withheld information from Commerce and failed to cooperate to the best of its ability, thus Commerce acted in accordance with 19 U.S.C. § 1677e when it applied AFA to GTC with respect to the 45 unalleged grants reported at verification.

Furthermore, GTC's arguments merely attempt to distract from the fact that it failed to report these grants in a timely manner. *See* GTC Cmts. at 4-17. Contrary to GTC's argument that the magnitude of the grants' changes was a "minor correction" because each grant would have failed the .5 percent test, Commerce explained it had clearly stated in the verification outline that "magnitude of change" "applies only with regard{} to updating information *already on the record* that needs to be corrected, not entirely new information which is absent from the record." Remand Redetermination at 46 (emphasis in original); *see also id.* at 47 ("{GTC} was aware of what constitutes a recognized minor correction at verification, as well as what Commerce sought when it referred to the magnitude of a change."). With no information on the record about the grants, Commerce found "no basis to calculate the magnitude of change as

instructed in the verification outline." *Id.* at 47.  Regarding the .5 percent test, Commerce

explained that even though GTC alleged that the grants would have failed the test, it had no

ability to "evaluate whether any of these disbursements were part of the same program (or

whether they were export contingent), which, if Commerce did determine they were part of the

same program, could result in the combined program passing the .5 percent test," especially

because many of the grants had very similar names.  *Id.* at 48-49.

Although GTC argues that it had already conceded the self-reported 180 grants as

countervailable and a full analysis of the newly-reported grants was unnecessary, Commerce

explained that "this does not alter the fact that this information was presented *at verification*,

well after the deadline to present this information had passed."  *Id.* at 50 (emphasis in original).

Even if GTC conceded the countervailability of these grant programs, that concession does not

preclude Commerce from asking questions regarding these programs during the course of the

investigation, as it did for several of the other grants submitted in a timely manner.  *Id.*  Because

GTC failed to report these 45 additional grants to Commerce until verification, Commerce was

unable to request additional information regarding these grant programs or otherwise analyze and

determine which grants Commerce should verify at verification.  *Id.* at 50-51.

GTC also argues that Commerce would "merely" need to confirm that the amounts

reported in the minor corrections chart match the amounts in the financial system and then spot

check to confirm that no other grants remain unreported, which it was also doing to confirm the

accounts in the non-use portion of its verification.  GTC Cmts. at 12.  However, this ignores

Commerce's concern that the grant information was new record information and Commerce had

no prior information available on the record regarding the nature of these programs.  *See* Remand

Redetermination at 51-53.  GTC's related argument that Commerce could have sought further

information about the grants through "homework" is equally unavailing.  *See* GTC Cmts. at 14-15.  While Commerce does seek additional information through "homework during verification" in some instances, such action was not appropriate under the facts in this case, where the information being submitted was untimely filed factual information.  *See* Remand Redetermination at 52.

Guizhou's arguments that verification of the unreported grants would have been a simple endeavor ignores Guizhou's own failure to respond to Commerce's questionnaires in a complete and timely manner and presupposes that Guizhou, and not Commerce, is in the best position to determine what can and cannot be addressed at verification.  *See Acaci Speciali Terni S.p.A. v. United States*, 120 F. Supp. 2d 1101, 1104 (Ct. Int'l Trade 2000) (holding that Commerce was not required to accept untimely filed sales information on the record, and further that Commerce's regulations limit the definition of the record by excluding material returned to the respondent as untimely).  Whether Commerce *could* have sought to accommodate GTC's failure to cooperate to the best of its ability instead of applying adverse facts available is likewise irrelevant.  *See American Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("the statute gives Commerce wide latitude in its verification procedures").  In this instance, GTC was not seeking to "rectify reporting mistakes contained in its previous submission to the record," but to "supply additional underlying data to fill gaps caused by an omission or withholding of requested information from Commerce," *Goodluck*, 393 F. Supp. 3d at 1368, as GTC "asked (and is continuing to ask) Commerce to accept information regarding 45 new grant programs for the first time at verification, well beyond the deadline for the submission of information of this nature."  Remand Redetermination at 53.  Accepting such new information at verification would

not only deprive Commerce of the opportunity to investigate and verify the information, but also deny parties the opportunity to review and comment on that information.  *See id.*

Furthermore, while GTC claims that its failure to submit the grants was "an honest mistake," this does not change the fact that allowing a company to submit new factual information far past the deadline for the submission of such information would be providing a path for companies to not report "other" subsidies in its questionnaire responses.  *Id.*; *see also Nippon Steel*, 337 F.3d at 1382-83 (explaining Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent.").  The purpose of Commerce's request for "other subsidies" is to ensure that Commerce receives information regarding *all* potential subsidies that the respondent may have benefited from during the period of investigation.  Remand Redetermination at 53.  If Commerce allowed companies to submit information past the deadline under the premise that they are small, irrelevant grants as GTC argues, companies could delay reporting these subsidies until verification under "the pretext that the company has determined such subsidies to be small or insignificant." *Id.*  Creating such an incentive would limit Commerce's ability to thoroughly investigate potentially countervailable subsidies and enable companies to potentially avoid the incorporation of these subsidies in their individual rates. *Id.*  Moreover, there is no way for Commerce to confirm or refute GTC's claim of an "honest mistake," and allowing such an excuse to free respondents from their burden to cooperate with Commerce to the best of their abilities would create a loophole through which respondents could manipulate proceedings in an attempt to obtain lower antidumping and/or countervailing duty margins. *Id.* at 53-54.

For these reasons, the Court should sustain Commerce's application of AFA with respect to GTC's 45 unalleged grants.

III.   **Commerce's Application Of AFA To The EBCP Is In Accordance With Law And Supported By Substantial Evidence**

In the remand redetermination, Commerce set forth in great detail the numerous difficulties it faces in trying to investigate the countervailability of the EBCP, and as explained above, thoroughly responded to the Court's nine questions.  *See id.* at 12-34, 54-78; *Guizhou*, 523 F. Supp. 3d at 1392-93.  These difficulties include:  the uncertain status of the $2 million threshold for loan eligibility, the uncertainty regarding which banks may distribute loans under the program, and the refusal by the GOC to provide sample documentation regarding what the process for applying for a loan under the program would look like.  *See* Remand Redetermination at 12-34, 54-78.  Commerce explained that, if it knew the EBCP was limited to "larger contracts, {it} could limit the number of loans to review at verification," and likewise, if it knew the participating banks, then it could limit its "review to loans from these banks during verification," which "would open new avenues of verification of non-use, which would determine the method by which to verify use or non-use of the program."  *Id.* at 57-58.

In its response to the Court's questions, Commerce also outlined what a hypothetical verification on the U.S. customer-side would look like.  *See id.* at 17-22.  First, Commerce would request a list of all of the customers of the mandatory respondents during the investigation period to ensure all potential beneficiaries of the EBCP are taken into account.  *See id.* at 18.  Next, Commerce would issue a questionnaire to these U.S. customers requesting *all* forms of financing the company had outstanding during the period of investigation, regardless of whether the financing was provided under the EBCP, and tie this information to the company's audited financial statements and/or tax returns.  *Id.*; *id.* at 60 (explaining that in investigations of similar programs, Commerce "would request the company report all purchases of the input under consideration," to "provide Commerce the opportunity to evaluate which, if any, of these

purchases are countervailable purchases under the alleged LTAR program.").  This step ensures that Commerce is able to review all forms of financing to determine whether any of them were provided under the EBCP.  *Id.* at 18.  Commerce would then need to review each loan for each customer to determine whether the loan could potentially be a loan under the EBCP.  *Id.*

The process of attempting to verify non-use through the U.S. customer presents numerous difficulties, as Commerce explained in the remand redetermination.  For Commerce to determine with certainty that mandatory respondents did not benefit from the EBCP, Commerce would have to review all loan documents for every potential beneficiary.  *Id.* at 17-22.  Commerce rejected GTC's assertion that since the EBCP is such a "very" specific program, that "there would undoubtedly be a clear paper trail linking the loan to this program, even in the case of a correspondent bank," because Commerce explained that GTC "has made a number of unsubstantiated statements regarding the administration of the EBC{P} without providing supporting evidence to back up its claims."  *Id.* at 61.  Thus, when reviewing these documents, Commerce would have no way to identify which loans could have been provided under the EBCP because of the GOC's refusal to provide Commerce with sample loan documentation.  *Id.* at 17-22.  Without a way to narrow the loan documents to only those that could have been dispensed under the EBCP, Commerce would have to review every single loan and supporting documentation for each loan, a burden that grows exponentially as the number of potential beneficiaries increases.  *Id.* at 19-20.  Further, Commerce explained that "the uniqueness of this program (specifically, that it is reflected in the *customer's* books and records) makes evaluating and confirming usage/non-usage particularly challenging."  *Id.* at 62 (emphasis added).

This problem is exacerbated by the voluntary nature of the entire questionnaire process. While Commerce can solicit information from the third-party U.S. customers through these

questionnaires, Commerce cannot compel these parties to respond outside of relying on the use of adverse facts available when certain statutory requirements are met. *Id.* at 18-19. Furthermore, even if all U.S. customers were to respond, the information Commerce gathered from their responses would not provide any certainty of a respondent's non-use of the program without full cooperation from the GOC. *Id.* at 19. Commerce explained that it is "absolutely essential that Commerce request information from all the U.S. customers to confirm non-use of the EBC{P}" because the program would be on the customers' books and records, and by only selecting a handful of customers, Commerce "would have no confidence that the other customers – entirely different companies – were truthful in their reporting of non-use." *Id.* at 66.

Rather than address the remand redetermination in this case, GTC argues that a separate administrative determination issued *after* the remand redetermination in this case renders the redetermination "moot, inaccurate, unreasonable, and ultimately, unlawful." GTC Cmts. at 17. To wit, GTC primarily examines Commerce's answers to the Court's questions via the lens of *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) (final affirm. CVD determ.), and accompanying Issues and Decision Memorandum at Cmt. 5 (*MAE* IDM). GTC argues that "{n}ow that Commerce has actually verified this issue at respondents' U.S. customers" in *MAE*, "Commerce's theoretical objections are demonstrably false." GTC Cmts. at 20-26. To a lesser extent, GTC also refers to *Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China*, 86 Fed. Reg. 14,071 (Dep't of Commerce Mar. 12, 2021) (final affirm. CVD determ.), and accompanying IDM at Cmt. 2 (*VSE* IDM), in which Commerce found non-use of the EBCP without a verification, although the respondent submitted lending agreements. GTC Cmts. at 23 n.13.

When Commerce submitted the final remand redetermination to the Court, it was still developing a way to move forward regarding the EBCP in the face of the numerous decisions from this Court regarding Commerce's explanation of the difficulties it faces in investigating the countervailability of the EBCP. The result of this evolving process was the questionnaires issued in *MAE*. Through these questionnaires, which take the exact form described in Commerce's remand redetermination regarding how it might go about verifying through the U.S. customers, Commerce is attempting to find some way to determine, *based on facts available*, whether or not a company used the program. *See MAE* at Cmt. 5; *VSE* at Cmt. 2. For example, in the final determination for *MAE*, Commerce stated, "we continue to find that the GOC's non-cooperation significantly impedes and prevents a complete verification of the EBC program" and determined, based on facts available, that the respondents did not use the EBCP. *MAE* IDM at 55. The use of this questionnaire does not invalidate or otherwise eliminate the numerous difficulties that Commerce still faces in investigating the EBCP and explained in detail in its remand redetermination here. *See* Remand Redetermination at 12-34, 54-78.

Moreover, contrary to what GTC may claim, there are significant differences between *MAE* and *VSE* and this case. First, in both *MAE* and *VSE*, Commerce was investigating a limited number of respondents, who, in turn, had an extremely small number of customers. *See MAE* IDM at 47-49 (showing one respondent had two U.S. customers total, while the other had only one U.S. customer); *VSE* IDM at 22 (showing the mandatory respondent Commerce found non-use for had only one U.S. customer, its parent company). In contrast, Double Coin reported 84 U.S. customers during the period of investigation, while GTC submitted 67 non-use certifications from its U.S. customers. *See* Remand Redetermination at 21. As explained above and in great detail in the remand redetermination, Commerce would face a significant burden in

attempting to collect and analyze information on all of the loans received by over 140 customers during the period of investigation, which is the exact information Commerce relied on in finding non-use based on *facts available* in both *MAE* and *VSE*.  *See MAE* IDM at 55 ("We received complete responses from the respondents, and, consequently, as facts available, we find that neither Dingli nor LGMG – or their U.S. customers used the program"); *VSE* IDM at 13 ("For the reasons set forth below, we also find that Chongqing Kohler did not use the EBCP based on facts available"); *see also* Remand Redetermination at 21.

Because *MAE* and *VSE* both involved an extremely small number of potential beneficiaries of the EBCP, Commerce was able to review documentation for every form of financing available to all potential beneficiaries of the EBCP, and through this review determine non-use based on facts available.  *See MAE* IDM at Cmt. 5; *VSE* IDM at Cmt. 2.  What may be workable in administrative reviews with very small numbers of U.S. customers is not a one-size-fits-all approach.  Indeed, the facts of *MAE* and *VSE* are at the opposite end of the factual spectrum with respect to the number of U.S. customers when compared to this case.

Here, where there are numerous U.S. customers, Commerce would have an insurmountable task before it if it tried to follow the process it followed in *MAE* and *VSE*. Sending questionnaires to over 140 customers requesting documentation for every loan those customers received during the period of investigation, reviewing each and every loan for those 140 customers, and filtering out which loans may have been dispersed under the EBCP would be virtually impossible to complete within the statutory deadline.  Remand Redetermination at 21-22.  Furthermore, this burden would not "become significantly reduced as Commerce gets more familiar with verifying this issue," as GTC claims.  GTC Cmts. at 22.  Because Commerce would still have to send questionnaires to all 140 U.S. customers, hope that all of them responded,

review all of the loan documentation collected in response to these questionnaires, filter out the loans that could have dispensed under the EBCP, and determine whether any loans were dispensed under the program.  *See* Remand Redetermination at 57-79.

Second, GTC's argument that Commerce has verified in some instances, and therefore could verify in this case, assumes that every single customer cooperates and responds to Commerce's questionnaire.  *See* GTC Cmts. at 23-26.  Every U.S. customer of a mandatory respondent is a potential beneficiary of the EBCP.  *See* Remand Redetermination at 18 (explaining that all customers could be "potential beneficiaries").  In both *MAE* and *VSE*, all of the mandatory respondents who were found to not have used the EBCP had substantive filings from all of their customers providing the information that Commerce customarily seeks through its questionnaires.  *See MAE* IDM at Cmt. 5; *VSE* IDM at Cmt. 2.  Should even *one* of the U.S. customers refuse to respond or otherwise fail to provide the necessary loan documentation, however, Commerce would have no choice but to rely on adverse facts available, just as it has done in the underlying remand redetermination.  *See* Remand Redetermination at 22-23.  As Commerce explained, if Commerce found non-use when it only received responses from some, but not all, of the customers, Commerce would be incentivizing companies who did receive financing under the program to simply not respond to the request for information.  *Id.* at 23.

GTC attempts to reduce these substantive problems by arguing that Commerce could rely on sampling or "spot-checking" of a portion of a mandatory respondents' customers to confirm non-use of the program for that respondent.  *See* GTC Cmts. at 28-29.  As Commerce explained, however, the GOC has not provided any information that could be used to differentiate a loan under the EBCP from a normal loan.  Remand Redetermination at 12-17, 75-76.  If Commerce attempted to sample or "spot-check" as GTC proposes, Commerce would need to resort to

35

randomly selecting a few of the respondent's customers and review that customer's information with no meaningful guidance as to how the EBCP operates. *Id.* at 76. As Commerce explained, if it were to examine "one or two of 67 companies that may have used the program," "{a} verification of such a small sample is not an effective confirmation of non-use, and an inefficient use of Commerce's resources." *Id.* at 67.

Where Commerce is missing significant, fundamental information about the how program works, how funds are disbursed through the program, and what documentation is involved for loans disbursed under the program, there is no way for Commerce to effectively narrow which customers Commerce should even select to review to confirm non-use. *Id.* at 62-64. For example, Commerce does not possess "the information that would allow {it} to narrow down the number of customers to be reviewed in any meaningful manner" and "nothing that would allow {it} to effectively select companies that might have received loans under the program." *Id.* at 62. Without an understanding of what EBCP loan documentation looks like, Commerce does not have a "roadmap" to determine whether a particular "loan from a bank that participates in the EBC{P}" was, in fact, a loan under that program. *Id.* at 63. Additionally, "since the non-use certificates provided are no more than one-page documents that do not provide any details regarding the operation or structure of the company making the certification, there is no factual information on the record for Commerce to verify" and it would be "evaluating *all* relevant information about the company *for the first time* at verification." *Id.* at 68 (emphasis added); *see id.* at 70 (explaining that "to reliably confirm non-use of the EBC{P}, and to follow the standard process Commerce follows in confirming non-use of the programs by respondent companies, Commerce needs to collect information from the respondent's customers *prior* to verification.") (emphasis added).

Thus, GTC's comparison of this case to *MAE* and *VSE* grossly oversimplifies the difficulties Commerce faces in investigating the EBCP. "Instead, the GOC's lack of cooperation in providing information regarding the program will make consistent confirmation of non-usage of this program very difficult, if not impossible, in most proceedings involving the EBC{P}." Remand Redetermination at 59. The GOC's continued refusal to cooperate prevents Commerce from gathering the information it needs to verify use or non-use of the program, and problems associated with Commerce's lack of understanding of the program are amplified when there is a large number of potential beneficiaries. For these reasons, the Court should sustain Commerce's application of adverse facts available to find use of the EBCP for GTC and Double Coin.

IV.   **Commerce's Decision Not To Apply Double Coin's Proposed Supply Ratio Adjustment Is In Accordance With Law**

Commerce complied with the Court's remand order by further explaining the basis for its decision not to apply a supply ratio to the import duty and ocean freight adjustments. *See Guizhou*, 523 F. Supp. 3d at 1393. As Commerce explained, Double Coin's proposed supply ratio had no reliable domestic prices because the domestic suppliers were "authorities," and applying such a ratio would have the effect of "lowering these import duty and ocean freight expenses to account for a non-existent domestic supply." Remand Redetermination at 81-82. Rather than apply a supply ratio, "Commerce has used actual prices to calculate benchmarks, and not artificially lowered these prices by incorporating unreliable data, which reflects a clear effort by Commerce to calculate {countervailing duty} rates as accurately as possible." *Id.* at 83. The Court should reject Double Coin's arguments to the contrary.

Where goods are provided for less than adequate remuneration, a benefit is treated as "conferred upon the recipient" and it is up to Commerce to calculate the benefit received. *See TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1344 (Ct. Int'l Trade 2016). Once a good

or service is deemed a "benefit," the adequacy of remuneration shall be determined in relation to prevailing market conditions for that good or service.  *See Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315, 1325 (Ct. Int'l Trade 2019) (*Guizhou 2019*) (citing 19 U.S.C. § 1677(5)(E)(iv)).  A "prevailing market condition" may include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale," and the adequacy of the remuneration must be adjusted to reflect the price that a firm actually paid or would pay if it imported the product.  *Id.* at 1325-26 (citing 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(iv)).  Furthermore, in measuring the adequacy of remuneration, "Commerce's regulations provide that the agency shall measure the adequacy of remuneration by comparing the government price to a multi-tiered series of benchmark prices."  *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2018).  In making this comparison, Commerce has broad discretion to determine how to adjust the world market benchmark price to reflect delivery charges, so long as such adjustments are reasonable.  *See TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1320 (Ct. Int'l Trade 2017) (*TMK II*).

When discussing adequate remuneration, the statute provides no guidance beyond stating that the adequacy of remuneration must be determined in relation to prevailing market conditions for the good being provided or the goods being purchased in the country which is subject to the investigation.  Remand Redetermination at 80.  Beyond this, Commerce relies upon 19 C.F.R. § 351.511 to select and calculate benchmarks for measuring remuneration.  *Id.* at 81.  Under its benchmark methodology, Commerce generally begins by identifying a proper benchmark price, which is "the price that could have constituted adequate remuneration," and then compares that price with the government-determined price paid by respondents.  *See Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1299 (Ct. Int'l Trade 2017) (citing *Fine Furniture*

*(Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014)); 19 C.F.R. § 351.511.

The preferred method under tier one is to compare the government price to a market-determined price for the good or service resulting from actual transactions in the country in question.  *See Maverick Tube*, 273 F. Supp. 3d at 1299.  If no useable market-determined price can be traced to actual transactions within the country, Commerce will resort to tier two and compare the price paid by the respondent to a world market price where it is reasonable to conclude that such price *would be available* to purchasers in the country in question.[2]  *See id.*  As this Court has held, the statute gives only a "non-exhaustive" list of prevailing market conditions, and that aside from this list of conditions, "gives no guidance as to how {Commerce} should interpret the adequacy of remuneration language."  *Id.* at 1306.

In instances where Commerce has found the market to be distorted, and thus that all domestic suppliers constitute "authorities," Commerce cannot rely on domestic prices, because these prices are not representative of transactions between private domestic parties and do not accurately reflect market-based transactions.  Remand Redetermination at 81-82.  Here, Commerce found that it could not rely on domestic prices in China because the domestic market for certain inputs was distorted such that there were no tier-one benchmarks available.  *See id.* at 3, 81-82.  Commerce thus followed its regulatory hierarchy and relied on world market prices, *i.e.*, tier two, in the form of Maersk prices adjusted for ocean freight and import duties.  *Id.* at 37.  By using actual market prices as the benchmark to compare to the prices Double Coin paid to its suppliers, Commerce ensured that prevailing market conditions are being taken into account, because the prices used are representative of *actual prices* available to Double Coin for the

---

[2] Not relevant here, if there are no tier-two benchmarks available, Commerce resorts to tier three, market principles.  *See* 19 C.F.R. § 351.511(a)(2)(iii).

importation of certain inputs to its production facilities in China.  *Id.* at 83.  Making an adjustment to these actual market prices based on the ratio of domestic supply to imported supply would serve no purpose other than to distort the benchmark prices, and the application of such a ratio is not appropriate under the factual circumstances of this case.  *Id.* at 81-83.

However, Double Coin warps the meaning of prevailing market conditions to argue that Commerce must alter actual market prices such that they would no longer accurately reflect prevailing market conditions.  *See* Double Coin Cmts. at 4-8.  Double Coin further argues that Commerce's application of its regulations is somehow contrary to the statute, relying heavily on dictionary definitions and unsupported interpretations of the meaning of the statutory language.  *Id.*  Notably, Double Coin cites no authority supporting its interpretation of the statute.  *See id.* at 4-13.

The reason that Double Coin cannot provide any authority supporting its statutory interpretation of prevailing market conditions is because its interpretation runs contrary to the purpose of determining whether an input has been provided for LTAR.  As stated above, when selecting benchmarks to use as a comparison point for the prices paid by a respondent company for inputs, Commerce seeks to use benchmark prices that are reflective of prevailing market conditions for the good being purchased in the country of investigation, in accordance with the statute.  Remand Redetermination at 81-83.  When the domestic market for an input is distorted by substantial involvement from the government in the market, domestic prices for that input do not serve as an appropriate basis for use as benchmark prices.  *Id.* at 3, 81-83; *see* 19 C.F.R. § 351.511(a)(2)(i).  In such circumstances, Commerce relies on world market prices, adjusted for ocean freight and inland freight charges that would be incurred to deliver these inputs to the respondents' production facilities.  Remand Redetermination at 4; 19 C.F.R. 351.511(a)(2)(ii).

In the final determination and remand redetermination, Commerce found the domestic market for carbon black was distorted, and thus relied on actual world market prices sourced from Maersk, adjusted to reflect applicable VAT, ocean freight, and import duties, as benchmark prices because those prices reflect what a party would actually pay if it were to import the goods at issue into China. *See* Remand Redetermination at 81-83; *see also* Double Coin Amended Final Determination Calculations at Tab "Carbon Black LTAR Benchmark" (C.R. 429, P.R. 481). Using market prices adjusted for appropriate freight charges and import duties allows Commerce to determine more accurately what a company would pay under prevailing market conditions to import the input to their production facilities in China. *See* Remand Redetermination at 81-83. Because the purpose of an adequacy of remuneration analysis is to determine, using a price-to-price comparison, whether a respondent's suppliers received adequate remuneration for inputs provided to the respondent, actual observed market prices are preferable to other benchmark sources. *See id.* at 83. Further, under a similar fact pattern, this Court has previously held that Commerce does not need to make adjustments to ocean freight and import duties to reflect the level of domestic supply in China, and held that allowing a supply ratio adjustment to these expenses would include domestic purchases that were found to be an inappropriate comparative for benchmarking. *Guizhou 2019*, 389 F. Supp. 3d at 1325.

Double Coin argues that to comply with the statute's requirement to take into account prevailing market conditions, Commerce must somehow modify benchmark prices or otherwise modify the relevant adjustments made to benchmark prices to reflect the ratio of domestic supply to imported supply, *see* Double Coin Cmts. at 4-8, but such a ratio would not reflect "prevailing market conditions" as Double Coin claims. If Commerce were to apply Double Coin's suggested supply ratio to either the relevant market prices or adjustments made to those prices,

they would no longer reflect the price Double Coin would actually pay if it imported carbon

black to its production facilities in China.  *See* Remand Redetermination at 81-83.  Companies

do not pay a reduced price, reduced ocean freight, or reduced import duties for inputs based on

the ratio of domestic supply to imported supply when they import a good to their production

facilities.  Double Coin's argument that Commerce should somehow alter actual market prices

"accounting for the degree to which domestic production supplies the market" would only result

in benchmark prices that no longer reflect actual market prices for importing the goods under

prevailing market conditions.  *Id.* at 82.  In other words, if Commerce were to apply Double

Coin's supply ratio, it would no longer be comparing the prices paid by Double Coin for carbon

black to actual, world market-based prices, which would in turn result in a less accurate price-to-

price comparison for the purposes of measuring adequacy of remuneration.  *Id.*

Furthermore, while Double Coin argues that the proposed supply ratio is an adjustment

based on the domestic supply, and is thus unrelated to Commerce's finding that the domestic

market is distorted, Double Coin Cmts. at 11-13, it is unclear how an adjustment based on the

ratio of domestic supply to imported supply would result in a more accurate determination of

adequacy of remuneration.  When determining whether an input has been provided for less-than-

adequate remuneration, Commerce performs a *price-to-price* comparison where Commerce

selects market-based prices for use as a benchmark and then compares these prices to the prices

paid by the respondent company.  *See* Remand Redetermination at 3, 36-37, 81-83.  This

comparison uses a hierarchy or a multi-tiered series of benchmark prices to determine whether or

not the price paid by Double Coin to its suppliers is reflective of adequate remuneration for the

good being provided.  *See Nucor Corp.*, 286 F. Supp. 3d at 1371.  Double Coin's suggested

supply ratio would take this market-based price and alter that price so that it is no longer

reflective of the price a company would pay if it imported the good into China, and Double Coin fails to provide any reasonable explanation for how this adjustment would result in a more accurate *price-to-price* comparison for the purposes of measuring adequacy of remuneration. *See* Double Coin Cmts. at 4-13; Remand Redetermination at 80-83.

Commerce's interpretation of the statute in reference to the prevailing market condition of "availability," which this Court has frequently sustained, is that the statute is not referring to the general availability of the input domestically, but the availability of the benchmark price to the respondent in the country of investigation. *See TMK II*, 222 F. Supp. 3d at 1320 ("if there is no useable market-determined price with which to make the comparison, Commerce will measure the adequacy of remuneration by comparing the government price to a world market price 'where it is reasonable to conclude that such price would be available to purchasers in the country in question.'") (quoting 19 C.F.R. § 351.511(a)(2)(ii)); *Maverick Tube*, 273 F. Supp. 3d at 1299. For example, if a world market price is found to not be available in the country of investigation, Commerce does not rely on that price for use as a benchmark because such a price would not accurately reflect prevailing market conditions. *See e.g., Maverick Tube*, 273 F. Supp. 3d at 1299. Nowhere does the statute require that Commerce make adjustments to the benchmark based on the *availability* of domestic supply or imported supply, and it remains unclear how the application of the ratio of these figures would result in a more accurate determination of whether Double Coin's suppliers received adequate remuneration for inputs supplied to Double Coin during the period of investigation. *See* Remand Redetermination at 80-83.

For these reasons, the Court should sustain Commerce's decision not to apply Double Coin's proposed supply ratio to the benchmark for measuring adequacy of remuneration for the ocean freight and import duties for certain inputs.

## V.  Commerce Complied With The Court's Remand Order With Respect To The Remaining Two Issues

Finally, Commerce complied with the Court's remand order with respect to Commerce's decision as to the quantity of black carbon benchmarks and to not assign a combination cash deposit rate to Jinhaoyang. *See Guizhou*, 523 F. Supp. 3d at 1593. No party has commented on these issues and the Court should sustain Commerce's remand redetermination.

Commerce confirmed that it "*did* evaluate all elements, including quantity, in determining which was the best {t}ier 1 benchmark." Remand Redetermination at 39 (emphasis in original). It then determined that the synthetic rubber import quantities that both respondents reported were of a significant volume, and that because both companies "routinely imported synthetic rubber at significant volumes and values," there is nothing to indicate that these purchases would result in aberrational benchmark prices." *Id.* at 39-40. Thus, Commerce continued to find that it was appropriate to use Double Coin's import prices as a tier 1 benchmark for synthetic rubber. *Id.* at 41.

Turning to Jinhaoyang's cash deposit rate, Commerce explained that Jinhaoyang, "as an unaffiliated exporter, is not entitled to receive Double Coin's cash deposit rate in this order" because Jinhaoyang "was not a mandatory respondent in this case, and thus is not entitled to its own rate." *Id.* at 42. Commerce explained that it would be "inappropriate to assign Jinhaoyang Double Coin's rate as nothing on the record indicates that Jinhaoyang exports only Double Coin's products," and, in any event, "Commerce's customs instructions specifically stipulate that any merchandise produced or exported by Double Coin is subject to Double Coin's rate." *Id.* at

42-43.  Further, it is not Commerce current practice to assign a combination rate to an unaffiliated exporter in these instances, even when the exporter provides questionnaire responses.  *See id.* at 44.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/L. Misha Preheim
by Tara K. Hogan
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

W. MITCH PURDY
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

December 22, 2021

s/Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Civil Division/National Courts
U.S. Department of Justice
P.O. Box 480
Washington, DC 20044
Phone: (202) 305-7571
Email: kara.m.westercamp@usdoj.gov

Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief contains 13,581 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).


<u>/s/ Kara M. Westercamp</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE**: **THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| GUIZHOU TYRE CO., LTD., AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| CHINA MANUFACTURERS ALLIANCE, LLC, SHANGHAI HUAYI GROUP CORPORATION LIMITED, and QINGDAO JINHAOYANG INTERNATIONAL CO., LTD., | ) ) ) ) ) | Consol. Court No. 19-00032 |
| Consolidated Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

## <u>ORDER</u>

Upon consideration of the comments in opposition to Commerce's remand redetermination, defendant's comments in support of the remand redetermination, and all other pertinent papers, it is hereby

ORDERED that Commerce's remand redetermination is sustained.

Dated: _____        _____

New York, New York                              Judge